UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

14 CV    6852

-------------------------------------------------------------------X

WINTER INVESTORS, LLC and JACOB FRYDMAN
derivatively on behalf of ETRE FINANCIAL, LLC and on
their own behalf with respect ty direct claims

Plaintiffs,

-against-

SCOTT PANZER, PAUL FRISCHER, JESSE STEIN,
SOL MAYER, ELI VERSCHLEISER, ETRE
FINANCIAL, LLC f/k/a ETRE FINANCIAL HOLDINGS,
LLC, JS3 ALTERNATIVE INVESTMENTS, LLC,
FRISCHER KRANZ INC., SMP REALTY NM, LLC,
EVE, LLC, LH FINANCIAL and ETR INVESTORS
HOLDINGS LLC

Defendants,

-and-

ETRE FINANCIAL, LLC

Nominal Defendant.

-------------------------------------------------------------------X

**VERIFIED COMPLAINT**

**DERIVATIVE ACTION
and DIRECT ACTION**

**JURY TRIAL
DEMANDED**

**JUDGE FAILLA**

RECEIVED
AUG 22 2014
U.S.D.C. S.D.N.Y.

## COMPLAINT

1.     Plaintiffs Winter Investors, LLC and Jacob Frydman, bring this action pursuant to

Federal Rule of Civil Procedure 23.1 derivatively on behalf of nominal Defendant ETRE Financial, LLC

against certain of its officers, Managers and Members seeking remedies for flagrant breaches of

fiduciary duties, breaches of the Operating Agreement of the Company and other contractual breaches,

the taking of unauthorized and ultra vires acts, stripping the Company of its assets, conversion,

permitting Defendants Panzer and Frischer to be unjustly enriched, fraud, abuse of control, gross

mismanagement, waste of corporate assets and unjust enrichment, and violations of the Securities and

Exchange Act of 1934 (the "Exchange Act") with respect to their derivative claims, and on their own

1

behalf with respect to direct claims, and for their Complaint against defendants Scott Panzer, Paul

Frischer, Jesse Stein, Sol Mayer, Eli Verschleiser, ETRE Financial, LLC f/k/a ETRE Financial

Holdings, LLC, ETR Investors Holdings LLC, JS3 Alternative Investments, LLC, Frischer Kranz Inc.,

SMP Realty NM, LLC, EVE, LLC, LH Financial, and ETR Investors Holdings LLC, hereby allege as

follows:

## TABLE OF CONTENTS

NATURE OF THIS ACTION ................................................................ 6

THE PARTIES ................................................................................ 9

    The Plaintiffs ........................................................................... 9

    The Defendants ........................................................................ 9

    The Nominal Defendant ............................................................. 11

OBLIGATIONS AND DUTIES OF THE DEFENDANTS ......................... 11

JURISDICTION AND VENUE ........................................................... 13

FACTUAL BACKGROUND .............................................................. 13

    The Exchange Traded Real Estate Concept ..................................... 13

    The Formation of ETRE Financial, LLC ......................................... 15

    The Filing of a Patent Application for a System for Trading Electronic Traded Properties ........... 17

    Relevant Provisions of the 2012 Operating Agreement ........................ 18

        With respect to the Management of the Company ........................... 18

        With respect to the Transfer of Units ........................................ 20

        With respect to Withdrawal of a Member or Termination of a Member's Employment .......... 20

        With respect to a Terminated Member's Non-Compete and Non-Solicitation obligations ....... 24

        With respect to Preemptive Rights .......................................... 25

        With respect to Tax Matters .................................................. 26

        With respect to the Amendment, Restatement and/or Waiver of the 2012 Operating Agreement and ETRE's Certificate of Formation ............ 26

        With respect to Loans by Members of the Company ........................ 26

        With respect to the "Frischer Patents" ...................................... 27

        With respect to Indemnification by the Company .......................... 28

        With respect to Members' Information Rights .............................. 29

        With respect to Use of the "ETRE" Name .................................. 30

With respect to Remedies, Rights and Choice of Law ............................................... 30

With respect to Fiduciary Duties ............................................................................... 31

With respect to Arbitration and pre-arbitration injunction for provisional relief and to maintain the status quo or prevent irreparable harm and withy respect to With respect to Termination of the 2012 Operating Agreement ................................................. 33

The Creation of the ETRE REIT ................................................................................... 33

Violation of the Exchange Act ..................................................................................... 34

The Plan to Circumvent Plaintiffs' Rights .................................................................. 38

Frischer and Stein's Failed Attempt to Take the First Building Public .......................... 44

Frischer, Panzer, Stein and Verschleiser hatch a plan to deprive Plaintiffs' of more than $3 million by Recapitalizing ETRE and selling 34.95% of the Company to one of their Cronies at 20% of the valuation they made just six months earlier in an arms-length third party investment banking agreement ........................................................................................................................ 47

The Verschleiser – Mayer Association ......................................................................... 48

CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION ........................... 52

Notwithstanding the Ultra Vires Actions of Defendants ETRE continued to exist .......................... 59

Frydman Removes Panzer, Stein and Frischer for Cause ............................................... 60

Plaintiffs notice an Event of Default under the Stein Note and Stein Pledge Agreement ................ 60

IRREPARABLE HARM ....................................................................................................... 62

DERIVATIVE ACTION AND DEMAND FUTILITY ALLEGATIONS ....................................... 66

**DERIVATIVE CLAIMS** ....................................................................................................... 67

COUNT I ............................................................................................................................ 67

Against Defendants Panzer, Frischer and Stein for Violations of Section 10 (b) of ..................... 67

the Exchange Act ............................................................................................................. 67

COUNT II ........................................................................................................................... 69

Against Defendants Panzer, Frischer and Stein for Breach of Fiduciary Duty ........................... 69

COUNT III .......................................................................................................................... 70

Against Defendants Panzer, Frischer and Stein for Gross Mismanagement ............................. 70

COUNT IV .......................................................................................................................... 70

Against Defendants Panzer, Frischer and Stein for Waste of Company Assets ........................... 70

COUNT V ........................................................................................................................... 72

Against Defendants Panzer, Frischer and Stein for Contribution and Indemnification .................. 72

COUNT VI .......................................................................................................................... 72

Against Defendants Panzer, Frischer and Stein for Abuse of Control ..................................... 72

COUNT VII ......................................................................................................................... 73

Against Defendants Panzer, Frischer and Stein for Breach of Contract .................................... 73

COUNT VIII..................................................................................................... 73

    Against Defendant Frischer for Breach of his Employment Agreement.......................... 73

COUNT IX........................................................................................................ 73

    Declaratory Judgment.................................................................................. 73

COUNT X......................................................................................................... 75

    Injunctive Relief......................................................................................... 75

COUNT XI......................................................................................................... 76

    Against Defendants Panzer, Frischer, Stein, Verschleiser, Mayer,  ETRE Financial Holdings, LLC, LH Financial and ETR Investors Holdings LLC for Fraud.......................................... 76

COUNT XII........................................................................................................ 77

    Against Defendants Panzer, Frischer, Stein, Verschleiser, Mayer,  ETRE Financial Holdings, LLC, LH Financial and ETR Investors Holdings LLC for Conversion................................. 77

COUNT XIII....................................................................................................... 78

    Against Defendants Panzer, Frischer, Stein, Verschleiser, Mayer,  ETRE Financial Holdings, LLC, LH Financial and ETR Investors Holdings LLC for Intentional Interference with Contractual Rights .................................................................................................... 78

COUNT XIV....................................................................................................... 78

    Against Defendants Panzer, Frischer, Stein, Verschleiser, the Panzer Entity, Frischer Entity, Stein Entity, the Verschleiser Enity for Specific Performance............................................. 78

**DIRECT CLAIMS**............................................................................................ 79

COUNT XV....................................................................................................... 79

    Against Defendants Panzer, Frischer, Stein, Verschleiser, Mayer,  ETRE Financial Holdings, LLC, LH Financial and ETR Investors Holdings LLC for Civil Conspiracy............................. 79

COUNT XVI....................................................................................................... 80

    Against Defendants Panzer, Frischer, Stein, Verschleiser, Mayer,  ETRE Financial Holdings, LLC, LH Financial and ETR Investors Holdings LLC for Fraud.......................................... 80

COUNT XVII...................................................................................................... 80

    Against Defendants Panzer, Frischer, Stein, Verschleiser, Mayer,  ETRE Financial Holdings, LLC, LH Financial and ETR Investors Holdings LLC for Intentional Interference with Contractual Rights .................................................................................................... 80

COUNT XVIII..................................................................................................... 81

    Against Defendants Panzer, Frischer, Stein, Verschleiser, Mayer,  ETRE Financial Holdings, LLC, LH Financial and ETR Investors Holdings LLC for Tortious Interference With Prospective Business Relations .................................................................................... 81

COUNT XIX....................................................................................................... 81

    Against Defendants Panzer, Frischer, Stein and Verschleiser for Breach of Duties of Care, Loyalty, Good Faith and Fair Dealing............................................................................. 81

COUNT XX ..................................................................................................................... 82

    Against Defendants Panzer, Frischer, Stein, Verschleiser, the Panzer Entity, the Frischer Entity, the Stein Entity and the Verschleiser Entity for Breach of Contract ................................................ 82

COUNT XXI ..................................................................................................................... 83

    Against Defendant the Stein Entity on the Stein Note and Stein Pledge Agreement ................... 83

COUNT XXII .................................................................................................................... 85

    Declaratory Judgment ................................................................................................... 85

COUNT XXIII ................................................................................................................... 85

    Injunctive Relief ........................................................................................................... 85

COUNT XXIII ................................................................................................................... 86

    Against Defendants Panzer, Frischer, Stein, Verschleiser, the Panzer Entity, Frischer Entity, Stein Entity, the Verschleiser Entity  for Specific Performance ............................................................ 86

**PRAYER FOR RELIEF** ................................................................................................... 87

**JURY DEMAND** ............................................................................................................. 87

**VERIFICATION** ............................................................................................................. 89

## NATURE OF THIS ACTION

2.      Plaintiffs bring this action against Defendants Scott Panzer, Paul Frischer and Jesse Stein (the "Manager Directors"), who, together with Plaintiff Frydman comprised the four member Board of Managers of ETRE Financial, LLC ("ETRE" or the "Company"). The Company was subject to an Operating Agreement entered into in August 2012 by and among the four Managers, Eli Verschleiser, and the Members of the Company, Defendants JS3 Alternative Investments, LLC, Frischer Kranz Inc., SMP Realty NM, LLC, EVE, LLC, (the "Member Defendants) and Plaintiff Winter Investors, LLC, which required the unanimous prior approval of the board of Managers for most non-day to day decisions of the Company.

3.      In June of 2014 Defendant Sol Mayer and his affiliate, Defendant LH Financial negotiated a recapitalization plan for the Company with Defendant Paul Frischer, which envisioned the issuance of new ownership Units in the Company and the dilution of the existing members, the increase of the size of the board of Managers to permit Defendant Sol Mayer to be appointed to the board, the approval of certain self-dealing transactions between Defendants Frischer and Panzer and the Company, the amendment of the Operating Agreement of the Company to delete the unanimous prior approval requirements, and numerous other matters, all of which were of the nature which, pursuant to the express terms of the Company's Operating Agreement required the prior unanimous approval of the four Managers of the Company. Plaintiff Frydman, as one of the four Managers of the Company voted against these proposals.

4.      Not satisfied with Frydman's "No" vote, the Manager Defendants conspired with the other Defendants to keep Frydman at bay, by reaching out to Frydman, ostensibly to seek to restructure the proposed recapitalization plan on a basis that would be acceptable to Frydman, while secretly hatching a plan to effect all of their desired actions by merging the Company with and into ETRE

Financial Holdings, LLC, an affiliate of Defendant Mayer solely as a way to circumvent Frydman's "No" vote.

5.     While ostensibly working on a resolution with Frydman to gain his approval to a modified recapitalization proposal, Defendants secretly negotiated a series of merger agreements and related documents, which effectively adopted each and every of the proposals, amendments to the Operating agreement of the Company, and related transactions which Frydman had just voted against, and persuaded themselves that they somehow could effect this "merger" without noticing Frydman of their intentions or seeking his prior consent.

6.     On July 24, 2014, Defendant Stein sent an email to Frydman alleging that, despite Plaintiffs' voting against the proposed recapitalization and related transactions, the LH Investment had been completed and ETRE's Operating Agreement had been amended **as a _fait accompli_** on the basis that Frydman voted against, but structured as a "merger". Frydman objected in writing and asserted that proposed merger was unacceptable to Frydman, and if these transactions were to "close" they would constitute unauthorized and ultra vires acts and have no legal effect.

7.     Moreover, as officers and directors of a public Real Estate Investment Trust sponsored by the Company and of which the Company was the managing member, the Manager Defendants also violated their duty to file accurate and truthful information with the US Securities and Exchange Commission and instead filed materially false information in connection with the registration statement and related documents by which they were seeking to raise capital from the public in connection with the ETRE REIT. Among the wrongs committed by the Manager Defendants was the unauthorized increase of the board of directors of the  ETRE REIT to permit the Manager Defendants to appoint themselves and four of their associates to the board of the public REIT sponsored by, and of which, the Company was the Managing Member, all in violation of the Operating agreement of Company.

8.      By reason of their positions as officers and/or Managers and Members of the Company, and because of their ability to control the business and affairs of the Company, the Manager and Member Defendants owed the Plaintiffs and the Company the obligations of good faith, trust, loyalty, and due care, and were required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner so as to benefit all Members and Managers equally and not in furtherance of their personal interests or benefit. Instead, the Manager and Member Defendants breached their duties to the Company and the Plaintiffs by, inter alia, conspiring with the other Defendants, including the Member Defendants, Mayer, LH Financial, and ETR Investors Holdings LLC to violate the express governance requirements of the Companies Operating Agreement, to strip Plaintiffs of their governance rights as a Member and Manager of the Company, dilute their interests and otherwise cause them economic loss and damage, by, *inter alia*, flagrant violations of the Operating Agreement of the Company, all in an effort to benefit themselves and their associates at Plaintiffs' costs.  Plaintiffs therefore bring this action derivatively on behalf of the Company as well as on their own behalf for their direct claims against Defendants to right those wrongs, put the Company and Plaintiffs back in their proper positions and enforce their respective rights under the Company's Operating Agreement and the law.

9.      As a result of the foregoing, as well as a litany of other wrongs committed by Defendants as hereinafter set forth, the Plaintiffs, derivatively on behalf of the Company, seek, *inter alia*,  to void the purported merger;  remove the seven members of the board of directors of the Company's sponsored public REIT; enforce the Company's rights to repurchase the Units of the withdrawing Members; confirm the removal by Frydman of the Manager Defendants as Managers of the Company for "Cause"; confirm the Company's repurchase of the Defendant Members Units pursuant to section 7.4 of the Operating Agreement of the Company, and seek redress for Defendants' fraud, breaches of their

fiduciary duties, breaches of contract, gross mismanagement, abuse of control, waste of Company assets, self-dealing, unjust enrichment and other injuries suffered by the Company.

## THE PARTIES

### The Plaintiffs

10.     Winter Investors, LLC (the "Frydman Entity") is a Delaware limited liability company with its principal place of business in New York, and is controlled by Jacob Frydman and is owned by affiliates of Jacob Frydman and is, and at all relevant times, was, a Member of ETRE Financial, LLC ("ETRE" or the "Company").

11.     Jacob Frydman ("Frydman") is an individual residing in New York and is the manager of the Frydman Entity, and is, and at all relevant times, was, a Manager and member of the Board of ETRE.

### The Defendants

12.     Defendant Scott Panzer ("Panzer") is an individual residing at 200 Candlewood Lake Road North, New Milford, CT 06776 with an office in New York and was until July 24, 2014 a Manager and member of the Board of ETRE.

13.     Defendant SMP Realty NM, LLC (the "Panzer Entity") is on information and belief a limited liability company with its principal place of business at 200 Candlewood Lake Road North, New Milford, CT 06776, and is controlled and owned by Panzer, and was until July 24, 2014 a Member of ETRE.

14.     Defendant Paul Frischer ("Frischer") is an individual residing at 80 Birch Lane, Greenwich, CT 06830 with an office in New York and was until July 24, 2014 the Chief Executive Officer of ETRE, and a Manager and member of the Board of ETRE.

15.     Defendant Frischer Kranz Inc. (the "Frischer Entity") is on information and belief a limited liability company with its principal place of business at 80 Birch Lane, Greenwich, CT 06830, and is controlled and owned by Frischer, and was until July 24, 2014 a Member of ETRE.

16.     Defendant Jesse Stein ("Stein") is an individual residing at 100 Jay Street, Apt 14H, Brooklyn, NY 11201 with an office in New York and was until July 24, 2014 the Executive Managing Director and a Manager and member of the Board of ETRE.

17.     Defendant JS3 Alternative Investments, LLC (the "Stein Entity") is on information and belief a limited liability company with its principal place of business at 100 Jay Street, Apt 14H, Brooklyn, NY 11201, and is controlled and owned by Stein, and was until July 24, 2014 a Member of ETRE.

18.     Defendant Eli Verschleiser ("Verschleiser") is an individual residing at 3501 Avenue T, Brooklyn, NY 11234, with an office in New York and is a Manager of EVE, LLC.

19.     Defendant EVE, LLC (the "Verschleiser Entity") is on information and belief a limited liability company with its principal place of business at 3501 Avenue T, Brooklyn, NY 11234, and is controlled and owned by Verschleiser, and was until July 24, 2014 a Member of ETRE.

20.     Defendant Sol Mayer ("Mayer") is an individual, with an office at 510 Madison Avenue, Suite 1400, New York, NY 10022 and is a Manager of ETR Investors Holdings, LLC.

21.     Defendant ETR Investors Holdings, LLC (the "Mayer Entity") is on information and belief a limited liability company with its principal place 510 Madison Avenue, Suite 1400, New York, NY 10022, and is controlled and/or owned by Mayer.

22.     Defendant LH Financial is on information and belief a trade name and/or entity used by Mayer and his various affiliates to transact business, and maintains a place of business at place 510 Madison Avenue, Suite 1400, New York, NY 10022 and is controlled and/or owned by Mayer.

23.     Defendant ETRE Financial, LLC ("Ersatz ETRE") was formerly known as ETRE Financial Holdings, LLC, is purported by the Defendants to be a Delaware LLC with a principal place of business at 44 Wall Street, Second Floor, New York.

## The Nominal Defendant

24.     Nominal Defendant ETRE Financial, LLC ("ETRE" or the "Company") is a Delaware limited liability company which, until July 24, 2014 maintained its executive office at 44 Wall Street, second floor, New York New York, 10005.

25.     The Company is the sponsor and managing member of a public Real Estate Investment Trust ("REIT") known as the ETRE REIT.

26.     During the relevant period complained of herein the Manager Defendants caused the Company, as the ETRE REIT's managing member to file a registration statement with the US Securities and Exchange Commission to take the ETRE REIT public and offer to sell its Series Shares to investors.

## OBLIGATIONS AND DUTIES OF THE DEFENDANTS

27.     By reason of their positions as Members, members of the Board of Managers of ETRE, and/or Managers, officers and/or fiduciaries of the Members of and the Company, its Subsidiaries and Affiliates, and because of their ability to control the business and financial affairs of the Company and its Subsidiaries and Affiliates, each of Defendants Panzer, Stein, Frischer, Verschleiser, the Panzer Entity, the Stein Entity, the Frischer Entity and the Verschleiser Entity, owed the Company and its Members and Managers the duty to exercise due care and diligence in the management and administration of the affairs of the Company and in the use and preservation of its property and assets; the duty of loyalty; the obligation to put the interests of the Company above their own financial interests; and the duty of candor, including full and candid disclosure of all material facts related to any offerings of securities and the filing of all documents with the Securities and Exchange Commission and

with the State of Delaware. Further, defendants owed a duty to the Company and its Members and Managers to ensure that the Company operated in compliance with its Operating Agreement and all applicable federal and state laws, rules and regulations, and that the Company not engage in any illegal business practices.

28.     The conduct of Defendants Panzer, Stein, Frischer (collectively the "Manager Defendants") complained of herein involves knowing violations of their duties as members of the board of Managers of the Company and its Subsidiaries and Affiliates and the absence of good faith on their part, which the Defendants were aware, or should have been aware, posed a risk of loss to the Company, its Subsidiaries and Affiliates.

29.     To discharge these duties, defendants were required to exercise reasonable and prudent supervision of the management, policies, practices, controls and financial and corporate affairs of the Company. By virtue of the obligation of ordinary care and diligence, the Manager Defendants were required, among other things, to:

   a. manage, conduct, supervise and direct the business and affairs of the Company in accordance with the Operating Agreement of the Company, and in compliance with all laws, rules and regulations;

   b. neither violate nor knowingly or recklessly permit any officer or member of the board of Managers or any of the Managers or any of the Members of the company to violate provisions of the 2012 Operating Agreement or to violate applicable laws, rules and regulations, and to exercise reasonable control and supervision over such officers, Managers and Members, and to ensure the prudence and soundness of the policies and practices undertaken or proposed to be undertaken by the Company and its Subsidiaries and Affiliates;

   c. supervise the preparation, filing and/or dissemination of all SEC filings, press releases, audits, reports or other information disseminated by the Company and to examine and accurately disclose all material facts, concerning the Company, its Subsidiaries and Affiliates;

   d. preserve and enhance the Company's reputation as the sponsor of a public company and to maintain public trust and confidence in the Company as a prudently managed company fully capable of meeting its duties and obligations;

e.  establish and maintain accurate records and reports of the business and affairs of the Company in accordance with their obligations pursuant to the 2012 Operating Agreement; and

f.  neither engage in self-dealing, nor knowingly permit any officer, Manager or Member of the Company to engage in self-dealing.

30.    The Manger Defendants, because of their positions of control and authority over the Company were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

31.    Defendants also breached their duties of loyalty, full disclosure, due care and of good faith and fair dealing by misrepresenting facts in various filings with the US Securities and Exchange Commission and as otherwise detailed herein and from failing to prevent the other defendants from taking the illegal and wrongful actions as hereinafter set forth.

## JURISDICTION AND VENUE

32.    This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1331 in that Plaintiffs claims arise in part under the constitution and laws of the United States, including the Securities Exchange Act of 1934 (the "Exchange Act"). This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a). This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

33.    Venue is proper in this jurisdiction pursuant to 28 U.S.C. §1391(b) insofar as a substantial part of the events or omissions giving rise to the claims set forth herein occurred within this judicial district.

## FACTUAL BACKGROUND

**The Exchange Traded Real Estate Concept**

34.     During the summer of 2011 Frydman and Stein , who was then employed by United

Realty Advisors, LP, an affiliate of Frydman, collaborated on the creation of a "Real Estate Liquidity

Exchange" which resulted in an August 4, 2011 white paper written by Frydman as a concept and

strategic plan for the establishment of such an exchange. A copy of Frydman's white paper is attached

hereto as Exhibit "A".

35.     Frydman envisioned the creation of "an efficient liquid marketplace where large

institutional investors as well as small retail investors can purchase partial ownership interests in a

particular property (the "shares"), which shares will trade on the exchange based on a bid-ask spread."

36.     Frydman and Stein commenced working on the establishment of the exchange, and by

April of 2011 Frydman determined that a full-time employee should be hired to focus on executing on

the business plan.

37.     As a result of a search undertaken in the spring of 2012, Frydman and Stein selected

Frischer as the person they wished to hire to help execute the plan.

38.     On June 1, 2012 United Realty Partners, LLC, an affiliate of Frydman, entered into a

consulting/employment agreement with Frischer (the "Frischer Employment Agreement").  A copy of

said agreement is attached hereto as Exhibit "B".

39.     Frischer was initially engaged as a consultant for a period of 30 days during which his

performance was to be evaluated, and thereafter, if United Realty Partners, LLC elected to continue the

relationship, Frischer would become employed as CEO of the entity that would eventually be formed for

the establishment of the exchange at an initial salary of $300,000 per year. In addition to his salary

Frischer would be able to "earn" up to 20% of the venture over a five (5) year vesting period with 20%

on the Official Hire Date (August 1, 2012), and 20% on each of the first, second, third and fourth

anniversaries of the Official Hire Date, and upon the termination of his employment any shares which had not then vested would be forfeited.

40.      In consideration of his employment, the receipt of his salary and the other rights and benefits, Frischer expressly covenanted and agreed that he would not "claim to have any right, title or interest of any kind or nature whatsoever in or to any products, methods, practices, processes, discoveries, ideas, design, Confidential Information (including, without limitation, and for the avoidance of doubt, the Company's track record and investment performance records), improvements, devices, creations or inventions in each case directly or indirectly relating to or useful in any aspect of the business of the Group, whether created, developed or invented by any of them or [Frischer] during the term of [Frischer's] employment with the Company[1]".

41.      In the event of a breach or a threatened breach of the covenants made by Frischer in his Employment Agreement, in addition to the Company's other rights, the Company had the right to have such Covenants specifically enforced by any court having equity jurisdiction, as the parties acknowledged and agreed that any breach of any of such Covenants will cause irreparable injury and that money damages will not provide an adequate remedy.

## The Formation of ETRE Financial, LLC

42.      In August 2012, Plaintiff Frydman, together with Defendants Panzer, Frischer, Verschleiser and Stein (collectively the "Founders") joined to form ETRE Financial, LLC, a Delaware limited liability company, for the purpose of launching a new public real estate investment platform envisioned by Frydman in his white paper. The platform would be the first to allow investors to invest in

---

[1] Frischer's rights to U.S. Patent Nos.7,974,904 and 8,180,697 and related intellectual property, as well as trademarks, copyrights, and other intellectual property previously owned by Frischer or his affiliate associated with the development and distribution of alternative energy were acknowledged as belonging to Frischer.

individual commercial real estate assets (e.g., a particular office building) by purchasing shares of those assets on a national stock exchange.

43.     On August 15, 2012, the Founders executed a Limited Liability Company Agreement (the "2012 Operating Agreement"), which set forth the rights and responsibilities of ETRE's Members, Managers, and Officers. A copy of the 2012 Operating Agreement is attached hereto as Exhibit "C".

44.     Pursuant to the 2012 Operating Agreement, each of the Founders contributed capital through their respective LLCs or corporations (i.e., the Frydman Entity, the Panzer Entity, the Frischer Entity, the Stein Entity, and the Verschleiser Entity) in return for membership Units of ETRE, and these five entities became the sole Members of ETRE.

45.     Pursuant to Section 3.3 of the 2012 Operating agreement the Members committed to contribute up to a maximum aggregate of $1,000,000 to the Capital of the company, and were required to make at least minimum Initial Capital Contribution aggregating $500,000, with the balance of the committed capital available to be called by the vote of at least 3 of the 4 Managers of ETRE. Any capital calls in excess of $1,000,000 in the aggregate would require the **_unanimous_** prior approval of all the Managers.

46.     The Managers called all of the committed capital, and a total of $1,000,000 in capital contributions were made by the Members to the Capital of the Company.

47.     Pursuant to the 2012 Operating Agreement, the Stein Entity was issued 30,000 Units representing 30% of the Membership Interests in ETRE; the Frischer Entity and the Panzer Entity were each issued 20,000 Units representing 20% of the Membership Interests in ETRE; and the Frydman Entity and the Verschleiser Entity were each issued 15,000 Units representing 15% of the Membership Interests in ETRE.

48.     The Frydman Entity and the Verschleiser Entity loaned the Stein Entity the funds necessary to make the Stein Entity's Initial Capital Contribution to ETRE and the loan was memorialized by a promissory note (the "Stein Note") executed by the Stein Entity on August 20, 2014, in return for its stake of 30,000 Units in ETRE. A Copy of the Stein Note is attached hereto as Exhibit "D".

49.     The Stein Note was secured by the Stein Entity's pledge of its 30,000 Units in ETRE pursuant to a certain Pledge Agreement executed by the Stein Entity on August 20, 2012 (the "Stein Pledge Agreement"). A Copy of the Stein Pledge Agreement is attached hereto as Exhibit "E".

## The Filing of a Patent Application for a System for Trading Electronic Traded Properties

50.     On October 19, 2012, Frydman, Stein, Panzer, Verschleiser and Frischer, as joint inventors, filed a patent application with the US Patent and Trademark Office entitled "System For Trading Electronic Traded Properties", seeking a patent for a "programmed computer for facilitating trades of electronic traded properties". (the "ETRE Patent Application").

51.     On September 12, 2013 the Founders assigned the ETRE Patent Application to the Company together with "the entire right, title and interest, for the whole world, in and to said invention and said applications, as well as any subsequent application that claims priority based upon the filing date of any of said applications identified and the patents, both domestic and foreign, that may or shall result therefrom including the right to claim in respect of any subsequent United States and foreign patent applications and patents". See copy of Patent Assignment attached hereto as Exhibit "AP".

52.     In connection with the assignment to the Company of the ETRE Patent Application each of the Founders covenanted and agreed with the Company "that we will not execute any writing or do any act whatsoever conflicting with these presents, and that will at any time upon request, without further or additional consideration, but at the expense of the said Assignee, execute such additional assignments and other writings and so such additional acts as said Assignee may deem necessary or desirable to perfect the

Assignee's enjoyment of this grant, and render all necessary assistance in making application for and obtaining provisional, original, continuation, continuation-in-part, divisional, reissued, reexamined or extended patent of the United States or of any and all foreign countries on said invention, and in enforcing any rights or chooses in action accruing as a result of such applications or patents."

## Relevant Provisions of the 2012 Operating Agreement
### a. With respect to the Management of the Company

53.    All Capitalized terms not otherwise defined in this complaint shall have the meaning ascribed to such terms under the 2012 Operating Agreement.

54.    Pursuant to Sections 6.1 and 6.3 of the 2012 Operating Agreement ETRE was to be managed under the direction of a Board of four (4) Managers (the "Board"), with each member of the Board being referred to as a "Manager".

55.    Frydman, Stein, Frischer and Panzer were appointed the four Managers of the board of ETRE, and each Manager was entitled to one (1) vote on matters coming before the Board of ETRE (see Section 6.3 of the 2012 Operating Agreement).

56.    Pursuant to Section 6.12 of the 2012 Operating Agreement, *notwithstanding anything to the contrary contained in the 2012 Operating Agreement*, the *unanimous* prior approval of all of the Managers then serving on the Board is, and at all relevant times, was, a prerequisite for:

> (i) the issuance of any Units or other equity securities of the Company or any Subsidiary or Affiliate;
>
> (ii) the admission of an additional Members;
>
> (iii) the Company's consent to any Transfer of Units other than a Permitted Transfer;
>
> (iv) any action that results in a liquidation or dissolution of the Company or any Subsidiary;
>
> (v) a merger, consolidation, conversion or other similar transaction involving the Company or any of the Subsidiaries as a result of which the Principals and their Permitted Transferees (or in the case of a Subsidiary, the Company, directly or

indirectly) hold in the aggregate less than a majority of the outstanding voting equity securities of the surviving entity immediately after such transaction;

(vi) the making of any capital call, except as provided for in Section 3.3(b);

(vii) the incurring of any debt obligations by the Company;

(viii) any increase or decrease in the authorized size of the Board;

(ix) any modification or amendment of the 2012 Operating Agreement;

(x) the Company or any Subsidiary to enter into, amend, modify or terminate any agreement or transaction with a Member or with an Affiliate of a Member;

(xi) the issuance of any equity securities by any Subsidiary or Affiliate;

(xii) increase or decrease the number of managers, general partners, or the size of the board of any Subsidiary;

(xiii) any amendment or modification of the Company's or any Subsidiary's Certificate of Formation;

(x) any change in the designation of the Company's Tax Matters Partner,

(xi) any change in the name of the Company or any Subsidiary;

(xii) any change or designation of the Tax Matters Partner of the Company or any Subsidiary;

(xiii) approve any recapitalization of the Company or any Subsidiary; and

(xiv) any change in the purpose of the Company or any Subsidiary;

(xv) the hiring or firing of any accounting firm or law firm for the Company or any Subsidiary;

(xvi) the issuance of any Units or other equity securities pursuant to Section 3.2, other than those issued and outstanding as of the Effective Date; and

(xvii) the Company or any Subsidiary to enter into, amend, modify or terminate any agreement or transaction with a Member or with an Affiliate of a Member;

57.     Section 7.2 of the 2012 Operating Agreement provides that no Member is an agent of or has authority to act for or bind the Company solely by reason of such Member's status as a Member. Any Member who takes any action or purports or attempts to bind the Company in violation of Section 7.2 shall be solely responsible for any loss and/or expense incurred by the Company, any Manager or any Member as a result of such unauthorized action, and such Member shall indemnify and hold harmless the Company, each Manager and each other Member with respect to such loss and/or expense.

**Relevant Provisions of the 2012 Operating Agreement**
**b.  With respect to the Transfer of Units**

58.     Pursuant to Section 7.3 of the 2012 Operating Agreement, without the ***unanimous*** approval of the Board, no Member had any right to Transfer any Units, except pursuant to a Permitted Transfer.

59.     A "Transfer" is defined in the 2012 Operating Agreement to mean, "with respect to any Unit, . . . when used as a verb, to sell, assign, transfer, exchange, distribute, devise, gift, grant a lien on, encumber or otherwise dispose of such Unit, property, asset or other right or interest, in whole or in part, or, when used as a noun, the sale, assignment, transfer, exchange, distribution, devise, gift, granting of a lien, encumbrance or other disposition of such Unit, property, asset or other right or interest, in whole or in part, in either case, whether pursuant to a sale, ***merger***, combination, consolidation, reclassification or otherwise, and whether voluntarily or by operation of law" (emphasis added).

**Relevant Provisions of the 2012 Operating Agreement**
**c.   With respect to Withdrawal of a Member or Termination of a Member's Employment**

60.     Pursuant to Section 7.4(f) of the 2012 Operating Agreement a Member may withdraw from the Company at any time.

61.    As a material inducement to the Principals to enter in to the 2012 Operating Agreement, each of the Members of ETRE specifically agreed pursuant to Section 7.4(f) of the 2012 Operating Agreement that a withdrawing Member may *only sell its Units to another Member* and that sales to a third party non-member are prohibited, and that "*[o]nly the Board in its sole discretion and with a unanimous vote may approve the sale of a withdrawing Member's Units to a third party non-member*." (Emphasis added).

62.    Pursuant to section 7.4 (d) of the 2012 Operating Agreement Units that have been Transferred (or which are purported to be Transferred) are subject to the repurchase provisions of Section 7.4 (d) irrespective of such Units' purported Transfer.

63.    "Employment" or "employment" of a Member is defined in the 2012 Operating Agreement to mean the Member's relationship as a provider of services to the Company and its Subsidiaries in any legal capacity, not merely as an employee, in each case, whether in the capacity of Manager, employee, consultant, contractor or otherwise. References to a Member's employment shall mean, in the case of any Member that is not a natural person, the Company's employment of the Principal or any other person.

64.    "Cause" is defined in the 2012 Operating Agreement, *inter alia*, to mean with respect to a Member, the finding by a court or arbitrator that the Member has committed an act of dishonesty, misappropriation, embezzlement or fraud involving personal profit or a breach of fiduciary duty in connection with the performance of such Member's company duties, or which affects the Company, or any member of the Group, or property of any member of the Group, or the finding by a court or arbitrator that the Member has breached in any material respect the 2012 Operating Agreement or any other agreement with the Company or any member of the Group which breach is not cured (to the extent reasonably susceptible to cure) after written notice to the Member of such breach and a thirty (30) Day

opportunity to cure such breach, or the finding by a court or arbitrator that the Member has breached any of the representations, warranties or covenants contained in the 2012 Operating Agreement.

65.     "Group" is defined in the 2012 Operating Agreement to include the Company, its parents, subsidiaries, Affiliates and each of their respective owners, members, partners, shareholders, officers, managers and/or directors.

66.     Pursuant to section 7.4 (a) of the 2012 Operating Agreement, in the event a Member's employment with the Company is terminated for Cause, then in any such event the Company may, within ninety (90) days of such event, with the prior vote or written consent of all of the Managers (not including the Member serving as a Manager who is terminated), but shall not be obligated to, elect to repurchase from such Member, and/or his or her Personal Representative or Successor, and if the Company so elects, such Member and/or such Personal Representative or Successor shall be obligated to sell to the Company, all or any portion of such Member's Units at a price equal to the lower of (A) the Original Cost of such Units or (B) fifty percent (50%) of the Fair Value of such Units.

67.     Pursuant to section 7.4 (b) of the 2012 Operating Agreement in the event a Member's employment with the Company is terminated without Cause or a Member withdraws as a Member, then the Company may, within ninety (90) days of such event, with the prior vote or written consent of all of the Managers (not including a withdrawing Member serving as a Manager), but shall not be obligated to, elect to repurchase from such Member, and/or his or her Personal Representative or Successor, and if the Company so elects, such Member and/or such Personal Representative or Successor shall be obligated to sell to the Company, all or any portion of such Member's Units at a price equal to the lower of (A) the positive Capital Account balance of such Member's Units or (B) the book value of such Units as determined in accordance with GAAP by the Company's certified public accountants.

68.    Pursuant to section 7.4 (d) of the 2012 Operating Agreement upon a Member's termination of employment (a "Former Member"), and in the event the Board (not including a withdrawing terminated Member serving as a Manager) by unanimous vote or written consent elects to repurchase such Former Member's Units, the Company shall notify the Former Member or other applicable holder in writing of such election and, within thirty (30) days after determination of the repurchase price therefor, pay the repurchase price to the Former Member.

69.    Pursuant to section 7.4 (d) of the 2012 Operating Agreement the purchase price paid to a Former Member who withdrew from the Company or who's employment was terminated for the repurchase of such Members' Units, at the Company's option, may be paid by the issuance of a promissory note. Such promissory note is to be unsecured, subordinated to all indebtedness of the Company then outstanding or thereafter issued on terms and conditions set forth by the Board, and payable in up to ten equal annual installments of principal, with interest accruing (without compounding) at the prime rate in effect as of the date of issuance of such note (as reported by Citibank, N.A. in New York, New York), provided that payments under such note shall be suspended if and for so long as the Company's capacity to make such payments is prohibited by any credit agreement of the Company or any of its Subsidiaries. In addition, as consideration for and as a condition to the Company's payment of the repurchase price, the Former Member and/or his or her Personal Representative or Successor is obligated to execute and deliver to the Company a release of any and all claims against the Company and its Members, officers and Managers and their respective Affiliates. Upon payment of the repurchase price pursuant to the terms of this Section 7.4(d) which includes upon the execution of a promissory note, the Units subject to repurchase shall be deemed repurchased by the Company without any further action being taken by the Former Member, his or her Personal Representative or Successor or the Company.

**Relevant Provisions of the 2012 Operating Agreement**

**d.   With respect to a Terminated Member's Non-Compete and Non-Solicitation obligations.**

70.     Pursuant to Section 12.2 of the 2012 Operating Agreement, in light of each Member's access to Confidential Information and position of trust and confidence with the Company, each Member agreed that, during the period of his or her continued employment or other engagement with the Company, and for a period of twelve (12) months, running consecutively, beginning on the date of any termination of the Member's employment for any reason (the "Restricted Period"), such Member shall not (x) render services or give advice to, or affiliate with (as employee, partner, consultant or otherwise), or (y) directly or indirectly through one or more of any of their respective Affiliates, own, manage, operate, control or participate in the ownership, management, operation or control of, any Competitor or any division or business segment of any Competitor.

71.     "Competitor" is defined in the 2012 Operating Agreement to mean any Person engaged, directly or indirectly, in whole or in part, in any business that operates in the same or similar fashion to an "Exchange Traded Real Estate Platform" or any competitive business. "Exchange Traded Real Estate Platform" is defined in the 2012 Operating Agreement to mean an electronic investment platform where investors will be able to buy and sell shares in publicly traded securities in entities that own individual real estate assets, and the ancillary businesses related thereto.

72.     Pursuant to Section 12.2 (b) of the 2012 Operating Agreement each Member further agreed that, for a period of one (1) year beginning on the date of any termination of the Member's employment for any reason he or she shall not, directly or indirectly through one or more of any of such Member's Affiliates:

(i)     hire or solicit, or encourage any other Person to hire or solicit, any individual who has been an employee, consultant or advisor of the Company or any Subsidiary or Affiliate of the Company within one (1) year prior to the date of such hiring or solicitation;

(ii)     solicit or entice, or attempt to solicit or entice, any investors, contractors, suppliers of the Company or any Subsidiary or Affiliate of the Company for purposes of diverting their business or services from the Company or such Subsidiary or Affiliate or for any other purpose; or

(iii)    make any statement or publication that is intended to or could reasonably be understood to disparage or impugn the reputation of the Company or any Subsidiary or Affiliate of the Company, or any of their respective products, services, executives, partners, directors, officers or employees, regardless of any perceived truth of such statement or publication.

## Relevant Provisions of the 2012 Operating Agreement
### e.   With respect to Preemptive Rights

73.    Pursuant to Section 3.2 of the 2012 Operating agreement, *subject to the unanimous approval requirements of Sections 6.12 and the Preemptive rights set forth at Section 7.6*, the Company may issue additional Units or other Membership Rights, including any new class or series of Units, on terms, including relative rights and preferences, established by the Board, and amend the 2012 Operating Agreement and Schedule A as the Board shall deem necessary or appropriate in connection with the authorization and issuance of such additional Units. (emphasis added).

74.    Pursuant to Section 6.12 (i) of the 2012 Operating Agreement the issuance of any Units or other equity securities other than those issued and outstanding as of the Effective Date to any Person not already a Member requires the prior unanimous approval of the Managers.

75.    Pursuant to Section 7.6 of the 2012 Operating Agreement, if the Company determines to issue new Units or any other Membership Rights, which can only be done with the prior *unanimous* approval of the Board pursuant to Section 6.12, it shall "deliver to each Member that demonstrates to the Company's reasonable satisfaction that it is an 'accredited investor' . . . a written notice" of the terms and price of the proposed issuance along with the identity of the proposed buyer. For the next ten days, each such Member shall have the option to purchase a proportionate share of the new units, subject to the stated terms and price ("Preemptive Rights").

76.     Pursuant to Section 7.6 of the 2012 Operating Agreement, each Member who is an accredited investor has the right to purchase its Proportionate Share of Offered New Units and if so purchased, such Member has oversubscription rights.

77.     Plaintiffs are Accredited Investors, and are therefore entitled to Preemptive rights pursuant to Section 7.6 of the 2012 Operating Agreement.

**Relevant Provisions of the 2012 Operating Agreement**
   **f.   With respect to Tax Matters**

78.     Section 3.10 of the 2012 Agreement appoints Frydman as ETRE's Tax Matters Partner.

**Relevant Provisions of the 2012 Operating Agreement**
   **g.   With respect to the Amendment, Restatement and/or Waiver of the 2012 Operating Agreement and ETRE's Certificate of Formation**

79.     Article 10 of the 2012 Operating Agreement provides that the 2012 Operating Agreement may only be amended, restated, or waived, only if approved by the Members holding ***all of the outstanding Units entitled to vote***; and that if any amendment, amendment and restatement, or waiver would materially and adversely change the specifically enumerated rights granted by the 2012 Operating Agreement to one or more Members ("Affected Members") in a way that is materially different from the change such amendment, amendment and restatement, or waiver would have on such specifically enumerated rights of other Members, such amendment, amendment and restatement, or waiver shall not be effective as to any Affected Member unless consented to by all of the Affected Members (emphasis added).

80.     Moreover, pursuant to article 10 of the 2012 Operating Agreement provides that any amendment to Sections 3.3, 6.12 or 7.1 shall not be binding on a Member without such Member's written consent.

**Relevant Provisions of the 2012 Operating Agreement**
   **h.   With respect to Loans by Members of the Company**

81.     Section 3.8 of the 2012 Operating Agreement provides that loans by Members to the Company must be approved by the Board in advance of any such loan being made.

82.     Section 6.12 (x) of the 2012 Operating Agreement requires the unanimous approval of the Managers in connection with the incurring of any debt obligations by the Company.

83.     Section 7.2 of the 2012 Operating Agreement provides that any Member who takes any action or purports or attempts to bind the Company in violation of the 2012 Operating Agreement shall be solely responsible for any loss and/or expense incurred by the Company, any Manager or any Member as a result of such unauthorized action, and such Member shall indemnify and hold harmless the Company, each Manager and each other Member with respect to such loss and/or expense.

## Relevant Provisions of the 2012 Operating Agreement
### i.  With respect to the "Frischer Patents"

84.     Frischer is the holder of U.S. Patent No. #8,180,697 for a method of trading in real estate derivatives, and U.S. No. Patent #7,974,904, for a method of trading in real estate derivatives (the "Frischer Patents").

85.     Pursuant to Section 5.4 of the 2012 Operating Agreement Frischer assigned to the Company 50% of all of his and his Affiliates' right and interest in and to the Frischer Patents Income generated from any and all sources.

86.     "Frischer Patents Income" is defined in the 2012 Operating Agreement to mean, for so long as Frischer and/or his Affiliates own the Frischer Patents, the sum of all income from any source whatsoever except only with respect to the proceeds of a Transfer of the Frischer Patents, if any, relating to the use, enjoyment, licensing, royalties, lease, sublease, license, concession or other grant of right to use all or any portion of the Frischer Patent and other benefits derived from the Frischer Patents received

by Frischer and/or his Affiliates with respect to the Frischer Patents net of all actual cash expenses paid or incurred to third parties in order to generate such income, if any.

87.   In addition, pursuant to Section 5.4.2 of the 2012 Operating Agreement, the Company was granted a right of First Refusal with respect to the Frischer Patents at eighty percent (80%) of the price offered for same, and otherwise upon the terms and conditions of the Offer.

88.   Moreover, during his tenure with ETRE Frischer was prohibited from directly or indirectly, selling, transferring, assigning, or otherwise conveying, or mortgaging, pledging, hypothecating or otherwise disposing of all or any interest in the Frischer Patents to any Person.

**Relevant Provisions of the 2012 Operating Agreement**
    **j.  With respect to Indemnification by the Company**

89.   Pursuant to Section 6.8 of the 2012 Operating Agreement, The Company indemnified Plaintiffs as "Covered Persons", holding Plaintiffs harmless to the fullest extent permitted by applicable law from and against any and all losses, claims, demands, costs, damages, liabilities (joint or several), obligations, expenses of any nature (including reasonable legal and accounting fees and expenses, costs of investigation and sums paid in settlement), judgments, fines, settlements, and other amounts "Indemnified Costs") arising from any and all claims, demands, actions, suits, or proceedings, whether civil, criminal, administrative or investigative, in which the Covered Person may be involved, or threatened to be involved as a party or otherwise, incurred by reason of any act or omission performed or omitted by such Covered Person from and after the Effective Date in good faith on behalf of the Company and its Subsidiaries and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by the 2012 Operating Agreement.

90.   By contrast, Section 6.8 of the 2012 Operating Agreement specifically negates indemnification for any Member or Manager, including, Defendants Panzer, Stein, Frischer,

Verschleiser, the Panzer Entity, the Frischer Entity, the Stein Entity and the Verschleiser Entity, as a result of their fraud, intentional misconduct or bad faith violation of the implied contractual covenant of good faith and fair dealing or such Covered Person's breach of a the 2012 Operating Agreement as is more fully set forth hereafter.

**Relevant Provisions of the 2012 Operating Agreement**
    **k.  With respect to Members' Information Rights**

91.    Pursuant to Section 6.11 of the 2012 Operating agreement, the Company was required to provide all Members (i) within one-hundred twenty (120) days after the close of each Fiscal Year with audited consolidated balance sheets and statements of income and retained earnings and cash flows of the Company and its Subsidiaries certified by the Company's accounting firm auditing the same to have been prepared in accordance with GAAP; (ii) within thirty (30) days after the end of each month, consolidated unaudited balance sheets and statements of income and retained earnings and of cash flows for the Company and its Subsidiaries as of the end of such month, comparing such financial position and results of operations against the same periods for the prior year and against the budget, and a letter from the Company's management discussing the revenues and operations of the Company and its Subsidiaries with respect to such month.

92.    Pursuant to Section 6.11 of the 2012 Operating Agreement, prior to the start of each Fiscal Year, the Company was to deliver to the Members the Company's budget for such Fiscal Year, including monthly consolidated unaudited balance sheets and monthly statements of income and retained earnings and cash flows for the Company and its Subidiaries.

93.    Pursuant to Section 6.14 of the 2012 Operating Agreement, Frischer and Stein, as the officers of the Company were required to cause the Company's financial and accounting professionals or employees to prepare, and submit to the Board for its approval on or before November 1st of each

calendar year, a proposed budget for the operation of the Company and for each Subsidiary for the succeeding calendar year (a "Budget").

94.     Frischer and Stein, as officers of the Company failed to meet their obligations and that they failed to deliver the requisite financial statements time frames required; failed to live deliver budgets as required; and otherwise failed to provide the information required to be provided to the Members pursuant to the 2012 Operating Agreement.

**Relevant Provisions of the 2012 Operating Agreement**
### l.   With respect to Use of the "ETRE" Name

95.     Pursuant to Section 13.1 of the 2012 Operating Agreement the name "ETRE Financial" and all goodwill associated therewith are property of the Company, and no Member or Affiliate of the Company shall have the right to use the name "ETRE Financial" or "ETRE" as a component of the name of any business venture or otherwise.

**Relevant Provisions of the 2012 Operating Agreement**
### m. With respect to Remedies, Rights and Choice of Law

96.     Pursuant to Section 14.3 of the 2012 Operating Agreement the Members and Managers of ETRE  agreed that irreparable harm would occur in the event that any of the agreements or provisions of the 2012 Operating Agreement were not performed fully by the parties thereto in accordance with their specific terms or conditions or were otherwise breached, and that money damages would be an inadequate remedy for breach of the 2012 Operating Agreement because of the difficulty of ascertaining and quantifying the amount of damage that will be suffered by the Plaintiffs in the event that the 2012 Operating Agreement is not performed in accordance with its terms or conditions or is otherwise breached. It was therefore agreed that Plaintiffs shall be entitled to an injunction or injunctions, without the necessity of proving actual damages, to restrain, enjoin and prevent breaches of the 2012 Operating Agreement by the Defendants and to enforce specifically the terms and provisions of the 2012 Operating

Agreement, such remedies being in addition to and not in lieu of, any other rights and remedies to which the Plaintiffs may be entitled to at law or in equity.

97.     Pursuant to Section 14.4 of the 2012 Operating Agreement each of Panzer, Frisher, Stein, Verschleiser, the Panzer Entity, the Frischer Entity, the Stein Entity and the Verschleiser Entity (each a "Breaching Party") covenanted and agreed to indemnify and hold the Plaintiffs harmless from and against all costs and expenses, including legal or other professional fees and expenses incurred by Plaintiffs, in connection with or arising out of any proceeding instituted by Plaintiffs against the Breaching Parties in the event that Plaintiffs substantially prevail in such proceeding.

98.     Pursuant to Section 14.2 of the 2012 Operating Agreement, the 2012 Operating Agreement is to be construed in accordance with and governed by the internal laws of the State of New York, without regard to the principles of conflicts or choice of laws thereof that would give rise to the application of the domestic substantive law of any other jurisdiction, except to the extent the laws of the State of Delaware are required to govern a limited liability company formed under the laws of such state.

**Relevant Provisions of the Delaware Limited Liability Company Act and the 2012 Operating Agreement**
### n.   With respect to Fiduciary Duties

99.     Except with respect to the definition of "Cause", the 2012 Operating Agreement is silent with respect to a Manager or Members fiduciary duty to the Company.

100.    Effective August 1, 2013, the Delaware General Assembly amended Section 18-1104 of the Delaware Limited Liability Company Act to provide that, unless the limited liability company agreement says otherwise, the managers and controlling members of a limited liability company owe fiduciary duties of care and loyalty to the limited liability company and its members.  The amendment to the one sentence of Section 18-1104 was to add the following underlined words: "In any case not

provided for in this chapter, the rules of law and equity, including the rules of law and equity relating to fiduciary duties and the law merchant, shall govern."

101.    The General Assembly's synopsis of the amendment explains as follows: "Section 8 amends Section 18-1104 to confirm that in some circumstances fiduciary duties not explicitly provided for in the limited liability company agreement apply. For example, a manager of a manager-managed limited liability company would ordinarily have fiduciary duties even in the absence of a provision in the limited liability company agreement establishing such duties. Section 18-1101(c) continues to provide that such duties may be expanded, restricted or eliminated by the limited liability company agreement."

102.    One of the five criteria comprising the definition of "Cause" in the 2012 Operating Agreement is a "finding by a court or arbitrator that the Member has committed an act of dishonesty, misappropriation, embezzlement or fraud involving personal profit or a breach of fiduciary duty in connection with the performance of such Member's company duties, or which affects the Company, or any member of the Group, or property of any member of the Group".

103.    As such, and in light of the 2013 amendment to the Delaware limited liability Act, each Manager and each Member has a fiduciary duty to the Company.

104.    Section 14.11 of the 2012 Operating Agreement provides a limited waiver with respect to claims made by Members or Managers (but not with respect to claims made by the Company) against other Members or Managers for breach of fiduciary duties, *provided* that the foregoing waiver does not limit a Member's rights and claims, including a claim for breach of fiduciary duty, with respect to a breach by a Manager or Member of the 2012 Operating Agreement. (See Section 14.11 of the 2012 Operating Agreement).

**Relevant Provisions of the 2012 Operating Agreement**

o.  **With respect to Arbitration and pre-arbitration injunction for provisional relief and to maintain the status quo or prevent irreparable harm and withy respect to With respect to Termination of the 2012 Operating Agreement**

105.    Although the 2012 Operating Agreement provides an arbitration agreement, the Defendants have asserted through counsel that the 2012 Operating Agreement "no longer exists".  See letter from Thomas B. Fiddler, Esq. of White and Williams, LLP attached hereto as Exhibit "D".

106.    Moreover Defendants' counsel asserted that ETRE Financial, LLC has "adopted a new Operating Agreement, and old ETRE ceased to exist".

107.    While Defendants are wrong in that their unauthorized and illegal actions did not, and in fact could not as a matter of law, without Frydman's express prior unanimous consent, negate the 2012 Operating Agreement, nor cause the adoption of a new operating agreement, nor result in the "old ETRE" ceasing to exist, by their actions, Defendants did cause (i) a purported Transfer of their Units on July 24, 2014; (ii) their withdrawal as Members of ETRE as of July 24, 2014; (iii) the termination of their employment with ETRE (as defined in the 2012 Operating Agreement) as of July 24, 2014, and (iv) numerous non-curable breaches of the 2012 Operating Agreement. As such, ETRE continues to exist, and the 2012 Operating Agreement continues to govern the rights, responsibilities and obligations of the non—withdrawing Members and their respective Managers, but Defendants waived their rights to now enforce any of the agreements of other Members or Managers to the ETRE 2012 Operating Agreement, including, waiving their right to seek enforcement of the arbitration agreement (or any other agreement) made in the 2012 Operating Agreement.

108.    Moreover, the 2012 Operating agreement did not "intend to deprive any court of its jurisdiction to issue a pre-arbitral injunction, pre-arbitral attachment, or other order in aid of arbitration proceedings or to maintain the status quo or prevent irreparable harm…".

**The Creation of the ETRE REIT**

109.    On April 22, 2013, without requisite authority of the Board of Managers of ETRE, Frischer and Stein caused the Company to form an Affiliate, ETRE REIT, LLC as a Delaware limited liability

company, with the Company acting as the managing member of ETRE REIT, LLC, and intending that "[a]ll of the common equity ownership of ETRE REIT, LLC shall be registered for sale to the public pursuant to applicable state and federal registration requirements".

110.     The formation of ETRE REIT, LLC, pursuant to Section 6.12 of the 2012 Operating Agreement required the prior unanimous approval of all four managers, including Frydman, because (i) it constituted an agreement between the Company and an Affiliate both with respect to its formation as well as the Company's acting as the managing member; and (ii) as the formation of said entity was undertaken for the sole purpose of issuing equity securities by said Affiliate to the public.

111.     Frischer and Stein failed to obtain the requisite prior unanimous approval of the board of Managers of ETRE for the formation of ETRE REIT, LLC, and as a result thereof, ETRE REIT, LLC was not properly formed, lacks any legal authority and is ultra vires.

112.     Similarly, Frischer, Panzer and  Stein failed to obtain the requisite prior unanimous approval of the board of ETRE for the formation of four subsidiary companies, ETRE Capital Markets, LLC, ETRE Tenant Profiles, LLC; ETRE Asset Management, LLC and ETRE Trading, LLC, which Frydman only learned of by reviewing the June 13, 2014 recapitalization proposal made by Frischer to Defendants Sol Mayer and the Mayer Entity, and as a result thereof, ETRE Capital Markets, LLC, ETRE Tenant Profiles, LLC; ETRE Asset Management, LLC and ETRE Trading, LLC were not properly formed, lack any legal authority and are ultra vires.  A copy of the June 13, 2014 recapitalization proposal made by Frischer is attached hereto as Exhibit "AJ".

**Violation of the Exchange Act**

113.     In connection with the filing of the registration statement for the ETRE REIT Defendants Panzer, Frischer and Stein caused ETRE as the managing member of ETRE REIT to enter into an Administrative Agency Agreement with ETRE Asset Management, LLC, a Subsidiary of the Company in violation of Section 6.12 of the 2012 Operating Agreement, and thereafter falsely represented and

warranted in filings made with the US Securities and Exchange Commission that the Administrative

Agency Agreement was properly authorized and in effect, when in fact the Administrative Agency

Agreement was not authorized in advance by the unanimous approval of the Managers in accordance

with Section 6.12 of the 2012 Operating Agreement.

114.    In connection with the formation of the ETRE REIT Defendants Frischer and Stein filed

a registration statement with the US Securities and Exchange Commission pursuant to which they

represented:

> "ETRE Financial, LLC, an affiliate of our Administrative Agent, as the managing member of our
> company, will have the sole power to (i) nominate and elect all directors to our board of
> directors, (ii) set the number of directors of our board of directors, (iii) remove any director, with
> or without cause, at any time and (iv) fill any vacancies on our board of directors.  ETRE
> Financial, LLC has nominated and elected our initial board of directors. ETRE Financial, LLC is
> owned and controlled by its founding members,  Paul Frischer and Jesse Stein, who also serve as
> President and Chief Executive Officer and Chief Operating Officer, Secretary and Interim Chief
> Accounting Officer of our company, and Scott Panzer, who serves as a director of our
> company.  Each of our directors holds office for an annual term, or until his or her resignation or
> removal by ETRE Financial, LLC. Our Board is currently comprised of three members.  Upon
> completion of this offering, ETRE Financial, LLC will appoint four additional directors who are
> independent within the criteria established by the NASDAQ for independent board
> members.  Following these appointments, we expect that our board of directors will consist of
> seven directors."

115.    The statements made by Defendants Frischer and Stein in the registration statement filed

with the US Securities and Exchange Commission and as quoted in the preceding paragraph were false

and fraudulent in that, ETRE Financial, LLC did not nominate nor elect the initial board of directors in

accordance with the terms of the 2012 Operating Agreement; ETRE Financial, LLC is not owned and

controlled by Paul Frischer, Jesse Stein, and Scott Panzer; Frischer and Stein do not serve as President,

Chief Operating Officer, Secretary and Interim Chief Accounting Officer of ETRE REIT, as they were

not properly elected or appointed to those offices in conformance with the requirements of Section 6.12

of the 2012 Operating Agreement; Scott Panzer does not properly serve as a director of ETRE REIT as

he was never properly designated to the board pursuant to the terms of Section 6.12 of the 2012

Operating Agreement; "[u]pon completion of [the] offering, ETRE Financial, LLC" did not, and could

not appoint four additional directors without the prior unanimous approval of the Managers of ETRE in

accordance with Section 6.12 of the 2012 Operating Agreement's requirement that any modification or

increase in the size of the board of any Subsidiary or Affiliate requires the prior unanimous approval of

the Managers, including Frydman, and Frydman neither agreed to nor consented to same.

116.   Notwithstanding the blatant  misrepresentations made by Frischer and Stein in the

registration statement filed with the US Securities and Exchange Commission, and notwithstanding the

express requirements of section 6.12 of the 2012 Operating Agreement, Defendants Panzer, Frischer and

Stein wrongfully, and without authority, appointed themselves directors of ETRE REIT and entered into

an agreement with ETRE REIT to act as directors of ETRE REIT, increased the size of the board of

ETRE REIT from 3 to 7 in violation of Section 6.12 of the 2012 Operating Agreement, wrongfully and

without authority nominated and appointed Jay Anderson, Mark Filanowski,  Joseph Capezza and John

Gregorits as directors of ETRE REIT, and then filed documents with US Securities and Exchange

Commission misrepresenting that the increase in the size of the board and the nominations and

appointments of the seven member board was properly authorized, when in fact it was not.

117.   In connection with the filing of the registration statement for the ETRE REIT Defendants

Panzer, Frischer and Stein made numerous additional misrepresentations, including, without limitation:

(i) that the ETRE REIT was "duly formed and is validly existing as a series limited liability company in

good standing under the laws of the State of Delaware, and has full power and authority to own, lease

and operate its properties and to conduct its business as described in the General Disclosure Package and

the Prospectus and to enter into and perform its obligations under" the underwriting agreement with

Sandler O'Neill & Partners, L.P.; (ii) that "[e]ach "subsidiary" (as such term is defined in Rule 1-02 of

Regulation S-X) of the Company, including the Property A-1 Subsidiary  (each, a "Subsidiary" and,

collectively, the "Subsidiaries"), has been duly incorporated or formed, as applicable, and is validly

existing as a corporation, limited partnership or limited liability company, as applicable, in good

standing under the laws of the jurisdiction of its organization and has full power and authority to own,

lease and operate its properties and to conduct its business as described in the General Disclosure

Package and the Prospectus; (iii) that "the limited liability company interests of the Company have been

duly authorized and validly issued and, to the extent applicable, are fully paid and nonassessable; and

none of the outstanding limited liability company interests of the Company was issued in violation of the

preemptive or other similar rights of any security holder of the Company; and (iv) that the underwriting

agreement with Sandler O'Neill & Partners, L.P "has been duly authorized, executed and delivered by

each of the Company, with respect to itself and the A-1 Series".

118.    In fact, each of the representations made by Defendants Panzer, Frischer and Stein as

above set forth were false and fraudulent, and made by Panzer Frischer and Stein intentionally or

recklessly, and in wanton disregard to the requirements of the 2012 Operating Agreement.

119.    Defendants Panzer, Frischer and Stein had determined that they would proceed in any

way the felt appropriate to the exclusion of Frydman, because they did not want Frydman to have any

opportunity to stop them from executing any plan or artifice they elected to pursue, and were concerned

that Frydman might not have agreed to all of their plans.

120.    In total disregard to the rights of the Company, the rights of the Frydman Entity and the

rights of Frydman, Defendants Panzer, Stein and Frischer simply ignored their legal and contractual

obligations, trampled over the rights of Frydman and the Frydman Entity, acted as "cowboys" in

pursuing their own selfish goals and interests, all in express violation of their duties and obligations, and

in the process violated the Securities Exchange Act and exposed the Company to significant potential

risk and damage.

121.    Additionally Defendants Panzer, Frisher and Stein caused a Trademark License Agreement to be entered into by and between ETRE and ETRE REIT in violation of the provisions of Sections 13.1 and 6.12 of the 2012 Operating Agreement, pursuant to which Panzer, Frischer and Stein caused ETRE to grant a royalty-free license to use and display the ETRE Name and the Licensed Mark to the "Licensed Users" all in express violation of sections 13.1 and 6.12 of the 2012 Operating, and then filed said agreement with the US Securities and Exchange Commission, and in connection therewith represented that said agreement was properly authorized.

122.    Defendants Panzer, Frisher and Stein also caused ETRE REIT, to adopt a Non-Management Director Compensation Plan to provide incentives to non-management directors of the ETRE REIT in violation of Section 6.12 of the 2012 Operating Agreement, and then filed said agreement with the US Securities and Exchange Commission, and in connection therewith misrepresented that said agreement was properly authorized by ETRE.

123.    In connection with ETRE REIT's attempt to acquire a property in Washington, DC, Defendants Panzer, Frischer and Stein caused ETRE Property A-1, LLC to enter into an agreement with M-C Capitol Associates L.L.C., in violation of Section 6.12 of the 2012 Operating Agreement, and in connection therewith misrepresented and warranted that ETRE Property A-1, LLC had the power to enter into the transactions contemplated by this Agreement and to execute, deliver and perform that Agreement, including without limitation, the purchase of the Property, and then filed said agreement with the US Securities and Exchange Commission.

**The Plan to Circumvent Plaintiffs' Rights**

124.    Beginning at some point prior to January, 2014, Defendants Stein, Frischer, and Panzer embarked upon their plan to conceal from Frydman a series of actions which they knew or should have known required unanimous prior approval of all the Managers, including Frydman, but which they

feared Frydman might not approve, and which they believed were in their personal best interest, and therefore wished to cause the Company to take in complete disregard of, and in violation of the unanimous prior approval requirements of the 2012 Operating Agreement.

125.    In an effort to hide their mischievous misdeeds, and in a veiled attempt to seek to legitimize their wrongful actions circumventing the unanimous prior approval requirement of all the Managers, Defendants Stein, Frischer, and Panzer came up with a scheme which they hoped would either go un-noticed, or which would give them "cover" for their wrongful and illegal actions.

126.    Rather than properly seek the unanimous approval of all the Managers, they somehow convinced themselves that they could try to "mask" their unauthorized acts by purporting to have each of those actions approved "by written consent of the board of managers in lieu of a special meeting," pursuant to Section 6.5 (e) of the 2012 Operating Agreement[2] and by the purported waiver of all notices in connection with those actions, and by failing to inform Frydman of these actions, nor seek his consent, nor notice him of these alleged written action until long after they were taken.

127.    Section 6.5(e) of the 2012 Operating Agreement provides:

> Any action required or permitted to be taken at any meeting of the Board or a committee thereof may be taken without a meeting if a consent in writing is sought from *all Managers*, and the consent sets forth the action proposed to be taken. The consent takes effect once it is signed by Managers holding the requisite number of the votes held by the Managers then serving on the Board or such committee as such action requires. *Prompt notice of the taking of an action without a meeting by less than unanimous written consent shall be given to those Managers who have not consented in writing."*

128.    Defendants Stein, Frischer and Panzer's plan was ill conceived, as Section 6.5 (e) of the 2012 Operating Agreement expressly requires that board actions by written consent *must be sought from all Board members before action is taken without a meeting,* and that *all Managers must* be given prompt notice of the taking of an action without a meeting.

---

[2]  In their haste to get these purported actions prepared Defendants Stein, Frischer and Panzer referenced Section 6.5 (c) relating to quorum requirements for the transaction of business by the Board, rather than the intended 6.5 (e).

129.    Moreover, the provision of Section 6.5 (e) of the 2012 Operating Agreement authorizing the written consent of the board of managers in lieu of a special meeting did not, and by the express terms of the 2012 Operating Agreement, could not, vitiate the unanimous prior approval requirements of Section 6.12 of the Operating Agreement.

130.    Section 6.12 of the 2012 Operating Agreement expressly provides that:

> "*Notwithstanding anything to the contrary contained in this Agreement*, the Company shall not, and shall not permit any of the Subsidiaries to, engage in or cause any of the following transactions or take any of the following actions, and the Board shall not permit or cause the Company or any of the Subsidiaries to engage in, take or cause any such action, except *with the unanimous prior approval of all of the Managers then serving on the Board*.

131.    Since January of 2014 none of the actions purported to be taken by Defendants Stein, Frischer and Panzer "by written consent of the board of managers in lieu of a special meeting," met the prerequisites of section 6.5 (e) in that no consent was *sought* from Frydman *before such action was purported to be taken* without a meeting, nor was *prompt notice of the taking of such action* without a meeting by less than unanimous written consent given to Frydman. As such none of the actions so taken had any legal effect.

132.    Moreover, even if the prerequisites of Section 6.5 (e) of the 2012 Operating Agreement were met with respect to each of the actions which Defendants purported to take by written consent without a meet (which they were not), none of those actions could be taken on less than the unanimous consent of the four Managers including Frydman, because each of those actions were of the nature that they required prior unanimous approval pursuant to Section 6.12 of the 2012 Operating Agreement "notwithstanding anything to the contrary contained" in said 2012 Operating Agreement.

133.    By the first such action, on January 6, 2014, Defendants Stein, Frischer, and Panzer, purported to cause ETRE to ratify all prior actions taken by ETRE in connection with the formation of ETRE REIT, LLC, authorizing ETRE to serve as the Managing Member of ETRE REIT, and

authorizing ETRE to undertake all actions necessary to do so.  Plaintiff was given no notice of this

action until July 14, 2014, and did not consent to it. A copy of the January 6, 2014 purported action is

attached as Exhibit "F".

134.    Even if Frydman were given prior notice of that action, which he was not, that action

could not be effective without the prior unanimous consent of all the Mangers, as it constituted an

agreement between the Company and an Affiliate both with respect to its formation as well as the

Company's acting as the managing member; and the formation of said entity was undertaken for the sole

purpose of issuing equity securities by said Affiliate to the public, and Section 6.12 (xiii) specifically

requires unanimous consent of all the Managers for the Company or any Subsidiary to enter into, amend,

modify or terminate any agreement or transaction with a Member or with an Affiliate of a Member, and

section 6.12 (xvii) requires the unanimous consent of the Managers for the issuance of any equity

securities by any Subsidiary or Affiliate.

135.    On January 10, 2014, Defendants Stein and Frischer purported to amend the 2012

Operating Agreement to increase the number of Units authorized for issuance from 100,000 to 200,000.

By that same action, Defendants Stein and Frischer also purported to authorize ETRE to issue to the

Dalmore Group, LLC, 0.75% of ETRE's outstanding membership interests as compensation for services

rendered to another entity purported to be formed by Frischer and Stein, ETRE Financial Investors,

LLC, and also to authorize ETRE to issue Units to ETRE Financial Investors, LLC, in exchange for cash

invested by ETRE Financial Investors, LLC, in ETRE. Plaintiff was given no notice of these actions

until July 14, 2014, and did not consent to them. A copy of the January 10, 2014 purported action is

attached as Exhibit "G".

136.    Even if Frydman were given prior notice of that action, which he was not, that action

could not be effective without the prior unanimous consent of all the Mangers, as it (a) required prior

unanimous consent under Section 6.12 (iii) with respect to the admission of an additional Member; (b)

required prior unanimous consent under Section 6.12 (iv) with respect to the Company's consent to any transfer of Units; (c) required prior unanimous consent under Section 6.12 (xvi) as it constituted a modification or amendment of the 2012 Operating Agreement; (d) required prior unanimous consent under Section 6.12 (i) as it constituted a the issuance of any Units or other equity securities pursuant to Section 3.2, other than those issued and outstanding as of the Effective Date.

137. On January 23, 2014 Defendant Frischer entered into an Advisory Services Agreement with Source Capital Group, Inc. ("Source"), purportedly on behalf of ETRE, pursuant to which ETRE would engage Source as its registered broker dealer in exchange for cash fees and Units of ETRE Financial Investors, LLC, equivalent to 0.5% of the outstanding equity in ETRE at the time of issuance. The Source Agreement also provided for indemnification by the Company. Plaintiff was given no notice of this agreement until July 14, 2014, and did not consent to it. A copy of the January 23, 2014 Source agreement is attached hereto as Exhibit "H".

138. The Source agreement required unanimous prior approval of all the managers pursuant to section 6.12 of the 2012 Operating Agreement. No such approval was obtained the Source Agreement is ultra vires and of no force and effect, and any liability thereunder, pursuant to Section 7.2 of the 2012 Operating Agreement rests solely with Frischer, as Frischer has, by virtue of Section 7.2 of the 2012 Operating Agreement, indemnified the Company and each of the Managers and Members with respect to these wrongful acts.

139. However, the Source agreement is elucidating in that it provided an arms length-third-party investment banker's determination of the value of Company at that time. The Source agreement envisioned the raising of $2 million of equity interest in the Company in exchange for the percent of the ownership interest in the Company. By virtue thereof, the third-party arm's-length valuation of the Company as of January 2014 was $25 million.

140.    Between February 17, 2014 and June 21, 2014, in direct violation of sections 3.8 and 6.12 (x) and 6.12 (xiii) of the 2012 Operating Agreement Defendants Frischer, Stein and Panzer entered into a series of six loan agreements with Panzer, through which ETRE purportedly incurred a $315,000 debt to Panzer. A copy of the purported Panzer loan agreements are attached hereto as Exhibit "I".

141.    On February 19, 2014, in direct violation of sections 3.8 and 6.12 (x) and 6.12 (xiii) of the 2012 Operating Agreement Defendants Frischer, Stein and Panzer entered into a loan agreement with Frischer, through which ETRE purportedly incurred a $50,000 debt to Frischer. A copy of the purported Frischer loan agreements are attached hereto as Exhibit "J".

142.    As neither the Panzer loan agreements nor the Frischer loan agreement received prior unanimous approval of the Managers of the Company the debts purported to have been created are a nullity, and pursuant to Section 7.2 of the 2012 Operating Agreement, which provides that any Member who takes any action or purports or attempts to bind the Company in violation of the 2012 Operating Agreement shall be solely responsible for any loss and/or expense incurred by the Company, the Panzer Loan and the Frischer loan are the personal obligations of Defendants Panzer, Frischer and Stein, or their respective Member affiliates, and not the obligation of the Company.  Moreover, pursuant to Section 7.2 of the 2012 Operating Agreement, Defendants Panzer, Frischer and Stein have indemnified the Company and Frydman and Winter with respect to such loans.

143.    On May 21, 2014, Defendants Stein, Frischer, and Panzer by written consent of the board without a meeting purported to amend the 2012 Operating Agreement to increase the number of Units authorized for issuance from 100,000 to 200,000. Plaintiff was given no notice of this action until July 14, 2014, and did not consent to it. A copy of the purported May 21, 2014 action by written consent of the board without a meeting is attached hereto as Exhibit "K".

144.    The actions purported to have been taken by Defendants Panzer, Frischer and Stein by written consent of the board without a meeting in increasing the number of Units authorized for issuance from 100,000 to 200,000 required the prior unanimous consent of the Managers under Section 6.12 (xvi) as it constituted a modification or amendment of the 2012 Operating Agreement; (d) required prior unanimous consent under Section 6.12 (i) as it constituted the issuance of Units or other equity securities pursuant to Section 3.2, other than those issued and outstanding as of the Effective Date.

**Frischer and Stein's Failed Attempt to Take the First Building Public**

145.    The purpose of forming ETRE was to establish a liquid marketplace where large institutional investors as well as small retail investors can purchase partial ownership interests in a particular property (the "shares"), which shares trade on the exchange based on a bid-ask spread.

146.    Frischer and Stein, as the two officers of the Company were charged with executing on the plan to create the Exchange Traded Real Estate Platform and bring a building public within one year of the August 1, 2012 "Effective Date".

147.    In fact, as set forth in a presentation prepared by Frisher and Stein, ETRE expected to have 10 buildings listed in 2014, with $1,700,000,000.00 of assets under management in 2014, with net revenues of more than $7.6 million ( not including projected revenues generated from ETRE Trading, Nasdaq ETRE Indexes, or ETRE Tenant Profile Reports) and EBIDTA of more than $6.4 million, after payment of more than $1.2 million in expenses in 2014. See page 33 of presentation attached hereto as Exhibit "AK".

148.    Notwithstanding numerous assurances by defendants Frisher and Stein that they were "on target" to timely execute on this plan, as a result of Frisher and Stein's negligence and/or ineptitude they were unable to meet their time commitments to the Members. As a result, the Company, which was capitalized with $1,000,000 pursuant to a budget created by Frisher and Stein which relied on launching the exchange traded platform by August 2013, began running out of money.

149.    In fact, it was not until March 2014, more than 6 months behind schedule, that ETRE was ready to list its first building.