197.    The various documents attached to Stein's email purported to take these actions in the form a merger agreement, which Defendants wrongfully believed to be a way to circumvent the need to get the unanimous consent of the Board of Managers, pursuant to the 2012 Operating Agreement. At no point before July 24, 2012 had Plaintiff been apprised of any proposal to merge ETRE with another entity.

198.    Included with Stein's July 24, 2014 email were several documents signed on July 24, 2014, purporting to authorize a merger between ETRE and a separate entity called ETRE Financial Holdings, LLC ("Holdings"), whose sole member was Sol Mayer. Included with that email was a Certificate of Merger issued by the Delaware Secretary of State on July 24, 2014, stating that ETRE and ETRE Holdings had merged under the name "ETRE Financial, LLC" ("Ersatz ETRE"). A copy of the Certificate of Merger is attached hereto as Exhibit "U".

199.    The effect of the Certificate of Merger, were it not ultra vires and unauthorized, would have been to dissolve ETRE.

200.    In another document attached to Stein's July 24, 2014 email, Defendants Stein, Frischer, and Panzer purported to cause ETRE, pursuant to Section 6.5(e) of the 2012 Agreement, to approve the "merger" by written consent in lieu of a special meeting. One provision of the action explicitly referenced Plaintiff's dissent: "WHEREAS one member of the Board has rejected LH's offer because one of the conditions thereof is a modification to the Company's LLC Agreement to provide for supermajority approval for actions taken by the Board that currently require unanimous approval." Nonetheless,

201.    The email also included a "Unit Purchase Agreement" detailing the transaction whereby ETR Investors Holdings LLC would invest $1,725,000 in Ersatz ETRE  in exchange for 94,810 Units of ETRE II, a copy of which is attached hereto as Exhibit "Z".

202.    The email also included a "Founder Debt for Equity Exchange Agreement", pursuant to which the board of Ersatz ETRE purported to allow Scott Panzer to convert the $275,000 owed to him by ETRE into 11,000 Units of Ersatz ETRE.   A copy of the "Founder Debt for Equity Exchange Agreement" is attached hereto as Exhibit "AA".

203.    The purported merger, the filing of a certificate of merger, the amendment of the Operating Agreement, the transfer of all the Company's assets ostensibly through the purported merger, including, without limitation, the transfer of the Stein Patent Income and the Stein Patent Right of First Refusal, the transfer of the assigned patent application, the transfer of the intellectual property, source code, software, agreements with Sungaurd, Standard & Poors, Rapid Ratings, and others, and the transfer of the other assets of the Company by implication through the purported merger, the Agreement Of Merger, the Unit Purchase Agreement and the Founders Debt for Equity Exchange Agreement, and all related agreements and undertakings are each an express violation of Sections 6.12, 3.8 and/or 7.4 of the 2012 Operating Agreement, required, in each instance, the prior unanimous approval of Frydman, and because Frydman did not approve any of the foregoing, they are each unauthorized, and ultra vires, and without legal effect.

204.    The attempt to circumvent the Company's governance requirements in seeking to effect the series of transactions above referenced constituted an incurable breach of the 2012 Operating Agreement, breaches of their fiduciary duties, breaches of contract, gross mismanagement, abuse of control, waste of Company assets, self-dealing, unjust enrichment, obligations of good faith, trust, loyalty, and due care, which Defendants were required to use to control and manage the Company in a fair, just, honest, and equitable manner so as to benefit all Members and Managers equally and not in furtherance of their personal interests or benefit.

205.    In committing the wrongful acts alleged herein, Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Defendants further aided and abetted and/or assisted each other in breach of their respective duties and the 2012 Operating Agreement, as well as interfered with the contractual rights of Plaintiffs.

206.    The purpose and effect of Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things to disguise the Manager and Member Defendants' breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, breach of contract and unjust enrichment.

207.    Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs alleged herein. In taking such actions to substantially assist the commission of the wrongdoing alleged herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or its overall contribution to, and furtherance of, the wrongdoing.

208.    On August 2, 2014, Frydman sent an email to Defendants Stein, Frischer, Panzer, Verschleiser and Mayer, expressing his dissent and asserting his claim that all of the July 24, 2014 merger documents were ultra vires and without legal effect and violate the 2012 Operating Agreement. Plaintiffs reserved the right to pursue all rights and remedies available to them in law and equity, should the transactions contemplated by the attached documents be closed. A copy of Frydman's August 2, 2014 letter is attached hereto as Exhibit "AB".

209.    Plaintiff also called a meeting of the Board of ETRE, pursuant to Section 6.5(b) of the 2012 Agreement, to discuss the various actions detailed in Stein's July 24, 2014 email, including the

proposed merger and proposed investment by LH Financial in ETRE. See copy of Notice of Meeting of Managers dated August 2, 2014 attached hereto as Exhibit "AC".

210.    On August 4, 2014, Defendant Frischer responded to Frydman's email stating that "ETRE Financial, LLC was merged with and into ETRE Financial Holdings, LLC on July 24, 2014, with ETRE Financial Holdings, LLC being the surviving entity in the merger and changing its name to ETRE Financial, LLC as part of the merger. . . . Please also note that under the terms of the Agreement of Merger . . . , your rights as a manager or member of the surviving entity (including noticing a board meeting) are subject to your executing and returning a counterpart to the limited liability company agreement of the surviving entity dated as of July 24, 2014 . . . . Accordingly, no one will be attending the meeting on Thursday." A copy of the August 4, 2014 email from Frischer is attached hereto as Exhibit "AD"

**The Manager ad Member Defendants Wrongfully caused the termination of ETRE, which termination was Ultra Vires and therefore should be ruled to be ineffective**

211.    Section 14.15 of the 2012 Operating Agreement entitled "Termination of Agreement" Provides in pertinent part: "Upon the consummation of ...  (b) a merger or consolidation in which the Members of the Company immediately prior to such merger or consolidation do not own at least a majority of the Capital Securities of the surviving entity . . .  (each a **"Termination Event")**, . . . all rights and Obligation of the parties under this Agreement shall terminate immediately and be of no further effect".

212.    The surviving company of the purported merger effected by the Member and Manager Defendants was  ETRE Financial Holdings, LLC.

213.     Immediately prior to the purported merger ETRE Financial Holdings, LLC was owned 100% by affiliates of Defendant Sol Mayer, and zero percent by the Members of ETRE.

214.    As a result of the purported merger, and pursuant to Section 14.5 of the 2012 Operating Agreement, all rights and Obligation of the parties to the 2012 Operating Agreement terminated immediately upon the filing of the certificate of merger with the Delaware Secretary of State.

215.    Pursuant to Delaware Code - Section 18-209 (d) entitled "MERGER AND CONSOLIDATION" states: "a merger or consolidation shall be effective upon the filing in the office of the Secretary of State of a certificate of merger or consolidation".

216.    On July 24, 2014 the Manager Defendants wrongfully caused a certificate of merger to be filed with the Delaware Secretary of State. (see Exhibit U).

217.    Pursuant to Delaware Code - Section 18-209 (e) entitled MERGER AND CONSOLIDATION states: "A certificate of merger or consolidation shall act as a certificate of cancellation for a domestic limited liability company which is not the surviving or resulting entity in the merger or consolidation".

218.    As a result of the wrongful filing of the Certificate of Merger by the Manager Defendants, the Manager Defendants wrongfully caused the termination of the 2012 Operating Agreement.

219.    The filing by the Manager Defendants of the Certificate of Merger was in express violation of the Delaware Code[3], in that the Code requires that a certificate of merger may only be authorized and approved by "each domestic limited liability company which is to merge or consolidate". And with respect to ETRE, the 2012 Operating Agreement required that ETRE, one of the domestic limited liability companies which was purported by Defendants to have merged, required that it be authorized and approved by the unanimous approval of the managers of ETRE, which it was not.

---

[3] Even though the Manager Defendants have violated the Delaware Code by wrongfully filing the Certificate of Merger, the Delaware Code does not provide a way to "undo" the Certificate of Merger" except through the filing of a certificate of correction.

220.    The certificate of merger was signed by each of the Manager Defendants by Nina Finn as their agent.

221.    Because the merger lacked proper authority, it was illegal and ultra vires.

222.    Moreover, pursuant to the Delaware Code the filing of certificate of merger without proper authorization constituted perjury.

223.    DEL CODE § 18-204 (c) provides: "The execution of a certificate by a person who is authorized by this chapter to execute such certificate constitutes an oath or affirmation, under the penalties of perjury in the third degree, that, to the best of such person's knowledge and belief, the facts stated therein are true".

224.    Each of the members of ETRE *except for Plaintiff Winter Investors*, Transferred their interests in ETRE by exchanging same for membership interests in ETRE Financial Holdings, LLC.  As such, each of the members of ETRE, except only Winter Investors, withdrew as members of ETRE.

225.    Each of the Managers of ETRE, except only Plaintiff Frydman, voluntarily terminated their employment with ETRE, and, in violation of the express terms of the 2012 Operating Agreement, now work for ETRE Financial Holdings, LLC, a "competitor" of ETRE as defined in the 2012 Operating Agreement.

226.    Although the effect of the wrongful termination of ETRE by the Manager and Member Defendants as above set forth was the cancellation of ETRE and the corresponding termination of the 2012 Operating Agreement, because such acts were unauthorized and ultra vires, this court should rescind said merger *ab initio*, rescind the filing of the certificate of merger *ab initio*, and reinstate the status quo *ab initio*, and  that this court should recognize the voluntary withdrawal of the member defendants as members of ETRE and should recognize the voluntary termination of the employment of the manager defendants as employees of ETRE.

**Frydman Removes Panzer, Stein and Frischer for Cause**

227.   Based on the illegal actions of Panzer, Stein and Frischer as hereinabove set forth, on August 6, 2014, Plaintiffs, acting in light of the unauthorized acts of the defendants, and in accordance with the appropriate equitable expectations as set forth in the preceding paragraph, removed Panzer, Stein and Frischer as Managers of ETRE for Cause pursuant to Section 6.3 (e) of 2012 Operating Agreement.  A copy of Plaintiffs' notice of removal is attached hereto as Exhibit "AE".

**Plaintiffs notice an Event of Default under the Stein Note and Stein Pledge Agreement.**

228.   Defendants' actions as above set forth resulted in the Transfer of Defendants' Units as defined by and pursuant to the 2012 Operating Agreement on July 24, 2014.

229.   As a result of Defendants' Transfer of their Units, the Stein Note automatically became due and payable on July 24, 2014, but was not timely paid.

230.   Pursuant to Section 2(b) of Stein Pledge Agreement, upon the occurrence of an Event of Default, all of the Borrower's voting and consensual powers or rights pertaining to the Pledged Securities "shall terminate and the Pledgee or its nominee or nominees shall have the sole and exclusive right to exercise all powers of voting and consent pursuant to the Pledged Securities, or any part thereof, and shall exercise such powers in such manner as the Pledgee may elect in its sole discretion."

231.   In accordance therewith Plaintiffs terminated the Stein Entity's rights to exercise all powers of voting and consent pursuant to the Pledged Securities and the Frydman Entity elected to exercise its rights and powers pertaining to the Pledged Securities. See August 7, 2014 Notice of Default to Stein attached hereto as Exhibit "AF", and Lender's election to Exercise Rights attached hereto as Exhibit "AG".

232.   On August 11, 2014 Thomas Fiddler, an attorney with White and Williams LLP, a Philadelphia law firm, wrote a letter to Frydman as counsel to Ersatz ETRE with respect to the notice of

removal sent by Plaintiffs to Defendants on August 6, 2014, and therein wrongly asserted: "[a]s part of the merger, ETRE Financial Holdings, LLC changed its name to ETRE Financial, LLC ("ETRE"), adopted a new Operating Agreement, and old ETRE ceased to exist. A copy of Mr. Fiddler's letter is attached hereto as Exhibit "AN".

233.    On August 11, 2014 Frydman replied to Fiddler by letter stating: "I respectfully disagree with your analysis. The purported merger which you refer to is wholly ultra vires, unauthorized and of no legal effect." Moreover, with respect to Plaintiffs' exercise of their rights pursuant to the Stein pledge Agreement, Frydman advised Fiddler that "to the extent that, and for so long as, the purported "merger" remains unchallenged (which I suggest will be a very short period of time), I wish to advise you and your clients, that by virtue of my exercise of rights pursuant to that certain Pledge Agreement between Winter Investors, LLC and JS3 Alternative Investments, LLC, I now control all voting rights (to the extent such rights exist) with respect to units held by Winter investors, LLC and JS3 Alternative Investments, LLC. As the purported Operating Agreement of the purported merged entity requires a 75% vote of the managers in order for any actions to be effective, and as there are five managers, and all actions require a vote of 4 managers, and as I now control 2 votes, no actions can be taken without the express approval of myself and Daniel Edelman, who I substituted as the manager in place and stead of Jesse Stein, with respect to the Rights Accruing to JS3 Alternative Investments, LLC. A copy of Frydman's August 11, 2014 letter to Fiddler is attached hereto as Exhibit "AO".

234.    On August 15, 2014, Frydman, as the sole remaining Manager of ETRE caused ETRE to exercise its rights pursuant to Section 7.4 of the 2012 Operating Agreement to repurchase the Units of each of the Former Members, to wit, the Stein Entity, the Panzer Entity, the Frischer Entity and the Verschleiser Entity.  A copy of the Action by Written Consent effecting the foregoing is attached hereto as Exhibit "AH".

235.     To effect the repurchase of Units of the four Former Members, on August 18, 2014 the Company issued to each such Former Member the repurchase price for their Units by delivering the Company's promissory note in accordance with Section 7.4 of the 2012 Operating Agreement.  A copy of the respective promissory notes (together with the cover letter and release sent therewith) are attached hereto as Exhibit "AI".

**Verschleiser and Warren Diamond and Scott Diamond Conspire To Cause Harm to Frydman with respect to Frydman's interests in 500 Lincoln, LLC.**

236.     In April 2002 Frydman, through his affiliate Tunnel Associates, LLC, entered into a ground lease and an option to purchase the fee interest in 500 Tenth Avenue, New York, NY ("500 Tenth Avenue" or the "Property") from its then owner through its wholly owned subsidiary, 500 Lincoln LLC ("500 Lincoln").

237.     At the time the 4th and 5th floors of the Property were vacant and Tunnel was seeking a tenant to rent those floors.

238.     Shortly after acquiring control of the Property Frydman was introduced to Warren Diamond as a potential tenant through his self-storage business operated under the "American Self Storage" trade name.  However, Warren was not interested in renting in the building unless he also became one of its owners.

239.     In October 2002, Tunnel made a deal with Warren through which his storage business ("Tunnel Self Storage, LLC" or "TSS") agreed to lease the two vacant floors.  500 Lincoln also sold a 49% interest in 500 Lincoln to Corem, thus making Warren a minority owner in the Property as well as a tenant.

240.     As part of the deal, Tunnel wanted $1.5 million more than Warren was willing to pay for Corem's purchase of the minority interest in 500 Lincoln.  To make the deal work, the parties agreed

that Tunnel, or its affiliates, would acquire a minority interest in TSS, and that TSS would loan $1.5 million on a "non-recourse basis" to Tunnel's affiliated members in TSS.

241.     Tunnel and Warren agreed that all landlord and tenant bank accounts would require joint signatures, one from either of Rutter or Frydman, and one from Warren.

242.     Warren volunteered to open several of the accounts at a bank where he had long-standing relationships that was close to his office in New Jersey, offered to have his bookkeeper maintain the accounts, and send Plaintiff monthly statements and Plaintiff had no reason to object.

243.     Warren opened two accounts for the business -- an operating account in November 2002 and a so-called Money Market Account in December 2003 and circulated signature cards for Frydman and Rutter to sign, which they did, and returned them to Warren so that he could deliver them to that bank.

244.     During Tunnel's negotiations with Warren, Frydman asked Warren directly if he had ever been convicted of a crime or if he had any past dealings that would or could be of concern to Plaintiff as potential partners. Warren said he had none and Plaintiff did not find any evidence to the contrary.

245.     In 2002, Frydman could never have suspected that going into business with Warren would lead to more than a decade of frustration, headache and constant battles to protect their business interests.

**Birds of a Feather….**

246.     Warren concealed from Frydman that he was, in fact, a convicted felon who had served time in federal prison having been convicted on federal RICO charges relating to a wide variety of criminal activities in association with the Bonanno organized crime family, which was connected to the nationwide criminal organization known as "La Cosa Nostra."

247.     Warren and his cohorts were charged in a sixty-four count federal indictment with participating in a racketeering enterprise which had as its object the control and use of a union to obtain money from New York moving and storage companies through various schemes and acts of extortion, rigging bids for government contracts, requiring unlawful employer payoffs, and receiving and making illegal payments to union representatives. In exchange for the payoffs, the companies received, according to the indictment, labor peace, lucrative government contracts, relaxed enforcement of union rules and contracts, and other benefits.

248.     Warren was convicted of the charges and served time in federal prison.

249.     Verschleiser too has been convicted of crimes.

250.     Verschleiser was indicted in 1993 by a federal grand jury for bank fraud under Section 1344 of Title 18, United States Code, in connection with a "scheme to cause financial institutions to make payments upon forged, counterfeit and worthless checks, to obtain the proceeds of those checks and to conceal the proceeds of those checks", in violation of Section 1344 of Title 18, United States Code.

251.     Rather than face these charges he fled to a foreign country. He returned approximately two years later and was convicted in a plea bargain of one count of failure to appear in violation of Title 18, United States code, section 3146(a) (1) and (b)(l)(B).

252.     In 2012 Verschleiser was arrested and convicted of committing the offense of criminal impersonation of a police officer in the second degree.

**Warren Changes His Name**

253.     As he was leaving prison, Warren had changed his name, which Plaintiff believes was so that he could conceal his criminal past.

254.     Frydman asked Warren directly if he had ever been convicted of a crime (or if he had any past dealings that would be of concern), he lied and said he had none.

255.     Plaintiff did not uncover Warren's criminal past until after Plaintiff had gotten into a dispute with Warren in March 2004, after TSS defaulted by failing to pay the rent for the fourth and fifth floors and 500 Lincoln was forced to serve a Notice of Default.

256.     In response, Warren proceeded to threaten Frydman with serious physical harm.

257.     He stated to Plaintiff that if he were to pursue the claims for unpaid rent he might find himself "dead in a garbage can".

258.     He even threatened to "burn down" the two building which at that time they had jointly acquired.

259.     To prove that he was serious Warren took a baseball bat to a classic collector Mercedes Benz owned by Frydman which Frydman was storing in a jointly owned building, and smashed its windows, severely dented the car's body, and destroyed all the lights.

260.     Frydman became concerned that he may in fact be in danger of physical harm, and so for most of the remainder of 2004 Plaintiff retained armed body guards to protect him against Warren.

261.     In early 2004, at a time that Warren had been approximately $500,000 in arrears on the rent payments Plaintiff instituted a summary eviction action against the tenant.

262.     To his great amazement, Warren's defense to that action was that the rent was indeed paid.

263.     Not only had he claimed to have paid the past due rent, but he claimed in documents filed with the court that he "pre-paid" the next six month's rent.

264.    To prove his claim of rent payment he produced a copy of a check for more than $1.2 million drawn on the tenant's account, which showed, based on the endorsement, that it was deposited in the landlord's account.

265.    Frydman was shocked and perplexed.

266.    Frydman contacted the bank and learned that the bank balance in the landlord account after the rent payment was alleged to have been made, was exactly the same as the bank balance in the landlord account prior to the rent payment having been made.

267.    Frydman learned that on March 24, 2004, Warren stole $1.28 million from the landlord's Money Market Account.  He deposited those stolen landlord's funds into the tenant's account, and drew a check on the tenant's account which he used as evidence in the court proceeding, claiming to have paid  the past-due rent on behalf of TSS, and to pre-pay the rent for the next six months, and deposited that check into the landlord's account.

268.    In effect, Warren used the landlord's own funds to claim to pay the rent on behalf of the tenant.

269.     In reviewing the bank statements Frydman also learned that  on February 26, 2004, Warren improperly withdrew, without Plaintiff' knowledge or consent, $833,000 from the Money Market Account, and attempted to use the funds to bid at an auction sale of a $7 million mansion in Middletown New Jersey .

270.    In reviewing the bank statements Frydman also learned that Warren improperly, and without Plaintiff's consent or knowledge, linked the landlord's Money Market Account to Warren's other accounts at that bank, to facilitate his theft of additional funds.

271.    Warren knew that if he simply wrote bad checks on the tenant operating account that bounced, that the bank would shift funds from the Money Market Account to cover the shortfall.

272.    Warren was able to conceal his criminal activity because the bank statements were sent only to Warren's office.

273.    What Frydman eventually learned was that after Frydman delivered signed signature cards to Warren, he then added himself and others to those signature cards, giving himself check-signing privileges while withholding knowledge of that from Frydman.

274.    As a result of these and numerous other disagreements led Frydman and Warren into very serious disputes concerning the management and ownership of 500 Lincoln resulting in very significant multiple litigations.

275.    On November 3, 2005, Frydman entered into a settlement agreement (the "2005 Settlement Agreement") based on Warren's promises to divest himself of all ownership and management rights in any and all of the jointly owned entities, by transferring those direct and indirect ownership interests to a trust over which he would have no control, to cause Frydman to be repaid the sums stolen from Frydman as a priority distribution from future proceeds, and his commitment that for so long as Frydman or any entity in which he or his family members had a direct or indirect interest, Warren would never be in a control or management position, nor would he ever thereafter have any ownership, or equitable interest, whether direct or indirect, in any of the entities which control or own any of the joint enterprises, and that he would not serve as trustee of the trust to which his prior interests were transferred.

276.    In reliance on these promises, Plaintiff entered into the 2005 Settlement Agreement to (he thought) forever rid himself of Warren, settle existing litigations and put Plaintiff in a position where there would be no future litigation.

277.    Plaintiff was wrong.    With the ink barely dry on the 2005 Settlement Agreement Warren initiated a lengthy and protracted arbitration before the Honorable Michael J. Dontzin

challenging provisions of the 2005 Settlement Agreement, and wrongfully attempting to extract money from Plaintiff.

278.    Shortly before September 11, 2006, a date on which hearings in the arbitration were scheduled, Warren, through his lawyer, made a written request to Judge Dontzin that the September 11th hearing be continued because Warren was "participating in a September 11th Memorial Service".

279.    Judge Dontzin granted Warren's request for the continuance.

280.    Plaintiff had reason to believe that Warren in fact was not intending to participate in any memorial services on September 11th, and so Plaintiff hired a private investigator to follow him on that day.

281.    In fact, Warren did not participate in any September 11th memorial service. He did not even attend any such service.

282.    Nonetheless, on the next scheduled hearing date, Plaintiff's counsel at that time, Cyrus Vance, the current Manhattan District Attorney, asked Warren about this while he was under oath.

283.    Warren perjured himself by saying that he did indeed participate in such a memorial service.

284.    But when confronted with the true facts, he admitted that he did not participate or attend a memorial service, instead he went to a Japanese restaurant and a shopping mall with his wife, but attempted to justify his perjury by stating that he "drove-by" the National Cathedral where a memorial service was taking place.

285.    In his December 22, 2006 arbitration decision, Judge Dontzin commented on Warren's perjury. The decision observed as follows: "I now turn to the disturbing credibility issue. I find it difficult to understand why Diamond created this problem for himself ...I find this to be a serious reflection on his credibility".

286.     The 2005 Settlement Agreement specifically provided that John Del Monaco, one of the beneficial owners of Corem, would succeed Warren as the co-manager of 500 Lincoln and Corem and as manager of several other entities for six years.

287.     During those six years, Mr. Del Monaco maintained a cooperative co-managerial relationship with Plaintiff, and with Warren and his agents out of the picture, they were able to greatly enhance the economic results for the beneficial owners of 500 Lincoln and significantly enhance the value of the Property.

288.     In October 2011, the co-managers of 500 Lincoln issued joint bank instructions providing for automatic monthly electronic distribution of certain funds of 500 Lincoln to the beneficial owners of Tunnel and Corem.  The instructions were consistent with the agreement between Tunnel and Corem to distribute the proceeds at issue 50-50.

## Scott Diamond Asserts Managerial Rights

289.     Unfortunately, the peace and harmony, not to mention the economic benefits, generated during the six years that the Diamonds were not involved in the management of the enterprise came to a halting stop when Del Monaco resigned as a co-manager of 500 Lincoln in November 2011.

290.     Based on Scott's January 2012 representation to Plaintiff and Citibank N.A. that he succeeded to the manager role, Frydman agreed to permit Scott to become a signatory on the 500 Lincoln bank account at Citibank in February 2012 as the successor to John Del Monaco.

291.     In fact, Scott's representations to Plaintiff and Citibank were untrue.

292.     On or about May 15, 2012 Frydman learned that in fact Scott did not succeed to the role of manager, and based on his misrepresentation of that fact to Frydman and Citibank, Frydman rescinded his consent to have Scott act as a signatory on the bank account of 500 Lincoln.

293.    Scott then wrongfully issued unilateral instructions to Citibank effectively freezing 500 Lincoln's bank account in violation of the operating agreements of 500 Lincoln and to the detriment of Tunnel's and Corem's beneficial owners, thus causing disruption in the distribution of funds belonging to the beneficial owners of 500 Lincoln.

294.    Scott had also refused to execute, or had sought to extract benefits for himself and/or Warren by demanding unacceptable amendments to, a lease amendment required by DHL, the tenant of the Property owned by 500 Lincoln, to undertake a significant construction project at the Property.

**Like Father, Like Son**

295.    As a result of a continuum of ongoing disputes between Scott and the principals of 500 Lincoln, Frydman soon found himself embroiled in acrimonious litigation with Scott and Warren ye again.

296.    In an effort to forever resolve these disputes, on December 12, 2012, Plaintiff and Defendants (together with Rutter, Tunnel and SLD 500 LLC, an entity believed by Plaintiff to be owned and controlled by Scott) entered into yet another settlement agreement (the "2012 Settlement Agreement").

**The Phantom Income Problem**

297.    The rents collected by 500 Lincoln from its tenant DHL increase annually, and are used primarily to pay the debt service and amortize the $97 million mortgage placed on the Property in 2010 in favor of Loan (the "Loan Loan")

298.    The Loan Loan was structured to substantially amortize over the balance of the term of the DHL lease so that only $4 million of unpaid principal would remain due at the end of the current DHL lease term.

299.    Because most of the cash flow being generated from the Property was being used to

service the debt and amortize the principal balance of the Loan Loan, the beneficial owners of 500 Lincoln were about to face an ever growing phantom income problem, in that the taxable income would be significantly higher than the amount of cash available to be distributed, resulting in a tax liability without corresponding cash distributions to make the tax payments.

300.    As of June 2014 the original $97 million loan that was placed on the Property, just 4 years earlier, had been reduced to approximately $84 Million.

301.    During June 2014 Frydman and Rutter ran a series of projections which revealed that over the balance of the term of the DHL lease the beneficial owners of 500 Lincoln could face as much as $85 million in phantom income.

302.    During June 2014 Frydman and his co-manager in Tunnel reached out to Loan Insurance to discuss their concerns about the looming phantom Income issue, and to explore the possibility of additional financing structured in a way that would potentially alleviate the phantom income

303.    As a result of a series of discussions between Tunnel and Loan, in early August 2014 Loan proposed making an additional $92 million loan structured as a $53 million zero coupon loan which would grow to $92 million over 12 years and would provide the beneficial owners of 500 Lincoln with significant proceeds of refinancing, and at the same time alleviate the phantom income issue.

304.    All of the principals in 500 Lincoln, representing 87.5% of the ownership interests in 500 Lincoln were in favor of taking the additional Loan Loan.

305.    In fact, pursuant to the 2005 Settlement Agreement the co-managers of 500 Lincoln were contractually bound to maximize the leverage potential of that Property.

306.    Section 9 of the 2005 Settlement Agreement provides with respect to the financing of the 500 Lincoln Property, as follows:

> *Corem and Tunnel Associates agree that 500 Lincoln and/or 500 Tenth (as appropriate) should maximize the full leverage potential of the 500 Property; neither party shall*

> *withhold their consent to any financing or financings of the 500 Property based on any*
> *assertion or belief that it is no longer in the best interest of 500 Lincoln and/or 500 Tenth*
> *(as appropriate) or any stakeholder therein to leverage the 500 Property for less than*
> *100% of the maximum amount capable of being financed from the 500 Property through*
> *any one or more institutional financings..*

**Verschleiser Finds The Diamonds And Conspires With Them To Breach**
**Their Contractual Undertakings And Refuse To Accept The Additional**
**Loan Loan Unless They Extort Plaintiff**

307.    On information and belief Verschleiser has sought out all of Frydman's partners in various transactions to identify opportunities to harm and injure Frydman and his business interests.

308.    As a result of the foregoing there is no love lost between Frydman and the Diamonds.

309.    At some time after December 3, 2013 Verschleiser contacted the Diamonds, or was contacted by the Diamonds.

310.    Motivated by their joint desire to cause harm to Frydman, Verschleiser and the Diamonds conspired to identify ways to injure Frydman and his business interests.

311.    On information and belief Verschleiser induced the Diamonds to take illegal actions to frustrate Frydman's purpose, and to cause harm to Frydman.

312.    On information and belief Verschleiser participated in meetings with the Diamonds to explore opportunities to extort Frydman and the other 500 Lincoln beneficial owners.

313.    On information and belief Verschleiser offered to have his lawyer, Steve Cooper of Reed Smith act on behalf of the Diamonds at Verschleiser's costs to initiate false and fraudulent litigation against Frydman.

314.    On information and belief, Verschleiser encouraged the Diamonds to reject the additional financing unless they could extort Frydman and the other 500 Lincoln beneficial owners of substantial funds.

315.   On information and belief defendants Scott and Warren also desired to accept the additional Loan, but edged on by Verschleiser, and in clear violation of the governance documents of 500 Lincoln, including the 2005 and 2012 Settlement agreements, Warren and Scott conspired with Verschleiser to seek to extort Frydman and institute false and fraudulent lawsuit against Frydman.

316.   On September 14, 2014, Scott and Warren made their initial extortion attempt by demanding that Frydman pay $200,000 to Scott and Warren, as a prerequisite to Scott's acceptance of the Loan commitment, which would be "donated by you to one of our charities."

317.   On information and belief the extortion attempt by the Diamonds was at the insistence of Verschleiser.

318.   On information and belief, Warren was seeking to extort these funds because Warren and Scott had made a $2.5 million commitment (to be paid over a multi-year period in monthly installments) to the Monmouth Medical Center Foundation to create the Cheryl L. Diamond Cancer Care Pavilion at the Leon Hess Cancer Center at Monmouth Medical Center, which, on information and belief, after making the first four monthly payments against this long-term commitment, they defaulted on their pledge.  Frydman further believes that Warren and Scott were seeking to extort Frydman so as to give them other people's funds to try to cure the default in their pledge.

319.   Warren, Scott and Verschleiser's acts constitute extortion in violation of the Hobbs Act, 18 U.S.C. 1951, which states: "Whoever in anyway or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both".

320.    "Extortion" means "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."   "Fear" includes threatened fear of economic loss.

321.    Plaintiff refused to be extorted or respond to Defendants' extortion attempt.

322.    During October 2014 the Diamonds caused a proposed Modification Agreement to be prepared and sent to Plaintiff.

323.    The draft modification Agreement was nothing short of the next extortion attempt by Warren and Scott at the influence of Verschleiser. Except unlike the prior extortion attempt which sought $200,000, the October extortion attempt sought to extort $920,000.

324.    On information and belief the second extortion attempt by the Diamonds was at also the insistence of Verschleiser.

325.    Verschleiser's acts conspiring with the Diamonds as above set forth and in requiring the payment of $920,000 as a condition to the execution of the Loan commitment constitute extortion in violation of the Hobbs Act, 18 U.S.C. 1951.

326.    Neither Plaintiff, nor any of the other beneficial owners of 500 Lincoln were willing to be extorted.

327.    The loan commitment was not signed by the close of business on October 24, 2014.

328.    After Business hours on October 24, 2014, the lender confirmed in an email to Frydman, that the commitment expired and was withdrawn.

329.    As a result, Plaintiff lost the benefit of his prorate share of $53 million of loan proceeds. As a result Plaintiff will incur his proportionate share of $86 million in phantom income over the next 11 years.

330.   On October 20, 2014, after having the commitment out for almost 6 weeks the lender notified the principals of 500 Lincoln that unless the commitment were accepted by the close of business on October 24, 2014, the commitment would be withdrawn.

**Verschleiser Persuades Warren And Scott To Abuse**
**The Legal Process Through A Malicious Prosecution**

331.   On information and belief Verschleiser was aware that 500 Lincoln LLC's governance documents required the principals to maximize the full leverage potential of the Property and prohibited any principal from withholding their consent to any financing or financings for less than 100% of the maximum amount capable of being financed from the Property through any one or more institutional financings.

332.   On information and belief Verschleiser was also aware that Frydman had made clear to the Diamonds that if they improperly held up the loan and/or sought to gain an economic advantage as a condition to agreeing to the loan Frydman intended to file a suit against the Diamonds.

333.   In furtherance of his intentional interference with the governance documents and his goal of interfering with Frydman's obtaining the loan, Verschleiser volunteered, at his cost and expense, to have his team of lawyers, headed up by Steven Cooper, abuse the legal process by initiating a prosecution against Frydman, intending to use that action to improperly stop Frydman from initiating the action, which is a purpose that could not be accomplished through the suit.

334.   Verschleiser conspired with the Diamonds to provide the Diamonds with Verschleiser's counsel, to file a complaint against Frydman which Verschleiser, Warren and Scott knew could not be sustained, and which was not based on any facts which would set forth a proper cause of action for which relief could be granted.

335.   On October 30, 2014 Verschleiser, Warren and Scott caused Verschleiser's counsel Steve Cooper of Reed Smith to wrongfully file a complaint on behalf of Warren and Scott against

Frydman in the Supreme Court of the State of New York, New York County, alleging two causes of action. The first cause of action was for declaratory relief, based on the wrongful assertion that "This action seeks relief from Defendant Jacob Frydman's attempt to extort money from Plaintiffs Warren and Scott Diamond and trample on their bargained-for right to arbitrate all disputes arising under the Operating Agreement of 500 Lincoln LLC ("500 Lincoln"), an entity that they jointly own".

336.    The first cause of action seeks a declaratory judgment "setting forth the rights and obligations of the parties herein, including but not limited to, that: (a) Frydman's putative complaint arises out of the Operating Agreement; (b) the arbitration clause in the Operating Agreement is in full force and effect; and (c) all disputes under the Operating Agreement must be settled by arbitration pursuant to the terms of the Operating Agreement".

337.    The second cause of action, which is introduced as a claim against Frydman for "extortion" is actually a claim for Anticipatory Breach of Contract, premised on the statement that "Frydman informed the Diamonds that he would file a complaint against the Diamonds in the United States District Court for the Southern District of New York -thereby breaching the arbitration clause contained in the Operating Agreement-unless Scott Diamond authorized a multi-million dollar loan on the Property".

338.    Verschleiser, Warren and Scott knew that their allegations were baseless, but brought the lawsuit for the purpose of misusing the legal process.

339.    That suit claimed that Frydman threatened to file a "civil RICO and RICO conspiracy" action against the Diamonds (the "Diamond Complaint"), and sought a declaratory judgment that Frydman did not have the right to bring the Diamond complaint in federal court because of an arbitration agreement signed by Frydman and the Diamonds in

the Operating Agreement of 500 Lincoln LLC .

340.    However the 500 Lincoln Operating Agreement, which includes an arbitration agreement, was *not* signed by any of the parties to this action.

341.    Moreover, at paragraph 28 of complaint filed by Cooper, Cooper quotes from the draft Diamond Complaint that "[t]he Complaint further alleges that "in clear violation of the governance documents of 500 Lincoln, including, the 2005 and 2012 Settlement Agreements, Warren and Scott embarked upon a plan and conspired to use this opportunity to again  seek to extort for themselves benefits which they were not entitled to from the other  beneficial  owners of 500 Lincoln."

342.    The referenced 2012 Settlement Agreement, which *was* signed by each of the parties to this lawsuit, and which, by its terms at section 20 expressly states: "This Agreement shall modify and amend in accordance with its terms, the terms of each of the Operating Agreements and the Settlement Agreements, and in the event of any inconsistencies between this Agreement and any of the Operating Agreements or Settlement Agreements, the terms of this Agreement shall control.

343.    Cooper was clearly aware of the 2012 Settlement Agreement.

344.    Section 20 of the 2012 Settlement Agreement provides: "This Agreement shall modify and amend in accordance with its terms, the terms of each of the Operating Agreements and the Settlement Agreements, and in the event of any inconsistencies between this Agreement and any of the Operating Agreements or Settlement Agreements, the terms of this Agreement shall control."

345.    Section 19 of the 2012 Settlement Agreement entitled "Dispute Forum" provides as follows:

> "*Should any dispute arise between the Parties which gives rise to injunctive or equitable relief pursuant to the terms of this Agreement, the Operating Agreements or the Settlement Agreements, then notwithstanding anything else contained in such agreements, the party initiating an action seeking injunctive or equitable relief may at his/her/its election bring such action in a court of*

*competent jurisdiction, and each of the other Parties hereby consent to same and shall not seek to dismiss or otherwise move such action to arbitration or other adjudication."*

## IRREPARABLE HARM WITH RESPECT T ETRE

346.    Without a declaratory judgment that the purported merger and related unauthorized acts as hereinabove set forth are ultra vires and therefore invalid for violating the rights granted to the Managers under, or are otherwise violative of, the 2012 Operating Agreement, the rights of the Members and Managers of the Company will be materially frustrated and impaired.

347.    The purported merger and other unauthorized acts set forth above irreparably harms all of the Company's Members and Managers by effectively stripping them of rights expressly granted in the 2012 Operating Agreement.

348.    This dispute carries the risk of specific, irreparable harm for Plaintiffs as a Member and Manager of the board of ETRE with respect to their rights to vote on Company actions which require the unanimous prior approval of all the Managers, or which requires the affirmative vote of all the Members, or where the effect of the ultra vires acts has deprived the Members of their preemptive rights.

349.    Plaintiffs, as a Member and Manager of the board of ETRE cannot be adequately compensated by monetary damages for loss of their rights under the 2012 Operating Agreement.

350.    Therefore Plaintiffs and the Company are entitled to a declaratory judgment declaring void the purported merger, the Merger Agreement, the Certificate of Merger, the Unit Purchase Agreement, the ETRE License Agreement, the Panzer and Frischer Loan Agreements, and the Founder Debt for Equity Exchange Agreement.

351.    Similarly, Plaintiffs and the Company are entitled to a declaratory judgment that the actions of the Defendants Panzer, Frischer and Stein as herein set forth amounts to a "Cause" event in that   the Member Defendants and the Manager Defendants have committed an act of dishonesty,

misappropriation, embezzlement or fraud involving personal profit or a breach of fiduciary duty in connection with the performance of such Member's or Manager's company duties, or which affects the Company, or any member of the Group, or property of any member of the Group, and/or that the Member Defendants and Manager Defendants have breached in  material respect the 2012 Operating Agreement and/or other agreement with the Company or any member of the Group which breach is not cured (to the extent reasonably susceptible to cure) after written notice, and/or that Member Defendants and Manager Defendants have breached of the representations, warranties or covenants contained in the 2012 Operating Agreement and/or in the Agreements entered with or on behalf of the Company, its Subsidiaries and/or Affiliates, and that Defendants Panzer, Frischer and Stein were properly removed as Managers of the Company.

352.     Similarly, the Plaintiffs and the Company are entitled to a declaratory judgment that the actions of the Defendants the Panzer Entity, the Frischer Entity, the Stein Entity and the Verschleiser Entity as above set forth constitutes an unlawful "Transfer" of their Units in the Company in violation of Section 6.12 of the 2012 Operating Agreement, and that the actions of Defendants the Panzer Entity, the Frischer Entity, the Stein Entity and the Verschleiser Entity as above set forth constitutes A Withdrawal from the Company on July 24, 2014, and that pursuant to section 7.4 of the 2012 Operating Agreement, the Company re-purchased such Former Members' Units in the Company by tendering the Company's promissory note for the capital account balance of such Former Members' Units, and that said Units have been repurchased by the Company.

353.     Similarly, the Plaintiffs and the Company are entitled to a declaratory judgment that Jacob Frydman is the tax matters partner of the Company.

354.     Similarly, the Plaintiffs and the Company are entitled to a declaratory judgment that Frischer has assigned 50% of the Frischer Patents Income to the Company, and that the company has a

right of first refusal with respect to the Frischer Patents at 80% of the bona fide offer from a third party, in accordance with the provisions of the 2012 Operating Agreement.

355.    Similarly, the Plaintiffs and the Company are entitled to a declaratory judgment that the name "ETRE Financial" and all goodwill associated therewith are the property of the Company and no Member or Affiliate of the Company shall have the right to use the name "ETRE Financial" or "ETRE" as a component of the name of any business venture or otherwise.

356.    Similarly, the Plaintiffs and the Company are entitled to a declaratory judgment that Ersatz ETRE is a "Competitor" of ETRE.

357.    Similarly, Plaintiffs and the Company are entitled to a preliminary and permanent injunction enjoining Defendants Frischer, Stein, Panzer and Verschleiser, from directly or indirectly claiming to have any right, title or interest of any kind or nature whatsoever in order to any products, methods, practices, processes, discoveries, ideas, designs, improvements, devices, creations or inventions in each case directly or indirectly relating to or useful in any aspect of the business of the Company or the Group, whether created, developed or invented by any of them during the term of their employment and or association with the Company, and, without limitation, the Exchange Traded Real Estate Platform, and any inventions or patent applications assigned to the Company.

358.    Similarly, the Plaintiffs and the Company are entitled to a preliminary and permanent injunction enjoining Defendants Frischer, Stein, Panzer and Verschleiser, the Frischer Entity, the Stein Entity, the Panzer Entity and the Verschleiser Entity through July 3, 2015 pursuant to section 12.2 of the 2012 Operating Agreement from (i) rendering services or giving advice to, or being affiliate with (as employee, partner, consultant or otherwise), or (ii) directly or indirectly through one or more of any of their respective Affiliates, owning, managing, operating, controlling or participating in the ownership, management, operation or control of, any Competitor or any division or business segment of any

Competitor; or (iii) hiring, soliciting or encouraging Person to hire, or solicit any individual who is been an employee, consultant or adviser of the Company or any Subsidiary or Affiliate of the Company; or (iv) soliciting or enticing, or attempting to solicit or entice, any investors, contractors, suppliers of the Company or any Subsidiary or Affiliate of the Company for purposes of diverting their business or services from the Company or such Subsidiary or Affiliate or for any other purpose; or (v) making a statement or publication that is intended to or could reasonably be understood to disparage or impugn the reputation of the Company or any such Subsidiary or Affiliate of the Company or any of their respective products, services, executives, partners, directors, officers or employees, regardless of any perceived truth of such statement or publication.

359.    Similarly, the Plaintiffs and the Company are entitled to a preliminary and permanent injunction enjoining Defendant Frischer from Transferring any of the Frischer Patents to any Person without first offering them to the Company, at 80% of the bona fide offer price in accordance with the terms of the 2012 Operating Agreement.

## DERIVATIVE ACTION AND DEMAND FUTILITY ALLEGATIONS

360.    Plaintiffs bring this action derivative the right and for the benefit of Company to redress the injuries suffered, and to be suffered, by the company as a direct result of the breach of fiduciary duty, waste of Company assets, and unjust enrichment, alleged herein.

361.    Plaintiffs will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights.

362.    Plaintiff the Frydman Entity is, and has continuously been an owner of the Company's Units during the wrongful conduct alleged herein.

363.    Plaintiff Frydman is, and has continuously been a member of the board of Managers of the Company during the wrongful conduct alleged herein.

364.    Plaintiffs did not make demand on the Managers of the Company to bring this action on behalf of the Company because such a demand would have been a futile, wasteful and useless act for the following reasons:

a.  all of the Manager Defendants authorized, approved, ratified or have failed to rectify each of the matters complained of herein and are named as Defendants herein;

b.  all of the Defendants participated in, or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company and Plaintiffs, and/or were acting intentionally, recklessly and or negligently or with gross negligence regarding the wrongs complained of herein, and therefore are not disinterested parties;

c.  each time Plaintiffs made a demand upon Defendants to rectify any of the wrongs complained of herein Defendants failed to acknowledge same, and retorted directly and/or through counsel that the actions taken by Defendants as herein set forth were appropriate, authorized and in accordance with law, and that the as part of the purported merger, Ersatz ETRE adopted a new operating agreement and the old ETRE ceased to exist, or that the matters complained of herein rely on 2012 Operating Agreement for a company that, according to defendants and their counsel "no longer exists".

## DERIVATIVE CLAIMS

### COUNT I

### Against Defendants Panzer, Frischer and Stein for Violations of Section 10 (b) of the Exchange Act

365.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if fully rewritten herein.

366.    Defendants Panzer, Frischer and Stein issued, caused to be issued, and participated in the issuance of materially false and misleading statements contained in the filings made by ETRE REIT with the US Securities and Exchange Commission which misrepresented or failed to disclose, inter alia, the facts set forth above, and specifically that the increased seven member board of ETRE REIT was properly authorized and that the seven board members were properly nominated and appointed; and that

ETRE REIT and each of the other Subsidiaries and Affiliates of the Company using the ETRE name were properly authorized to use the ETRE name and/or the ETRE trademark.

367.   In fact, Defendants Panzer, Frischer and Stein were not properly authorized to establish or increase the size of the board of directors of the ETRE REIT, nor to nominate or appoint any directors to said board as Section 6.12 of the 2012 Operating Agreement required the prior unanimous consent of all the Managers of ETRE as to increase or decrease the number of managers, general partners, or the size of the board of any Subsidiary, or the Company or any Subsidiary entering into any agreement or transaction with a Member or with an Affiliate of a Member, and no such unanimous approval was sought or obtained.

368.   In fact, the ETRE REIT and each of the other Subsidiaries and Affiliates of the Company using the ETRE name and/or trademark were not properly authorized to use the ETRE name or trademark as  Section 13.1 of the 2012 Operating Agreement specifically prohibited any Subsidiary or Affiliate of the Company from using "ETRE Financial" or "ETRE" as a component of its name, and the purported license granted by the Company to ETRE REIT to use the ETRE name or trademark was not was properly authorized in that it required the amendment of the 2012 Operating Agreement which required the prior unanimous approval of the Managers of the Company, which prior unanimous approval was neither sought nor obtained.

369.   By reason of the conduct alleged herein, each of defendants Panzer, Frischer and Stein violated section 10 (b) of the Exchange Act.

370.   Plaintiffs, on behalf of the Company, seek to void the appointment of Defendants Panzer, Frischer and Stein and non-parties Jay Anderson, Mark Filanowski,  Joseph Capezza and John Gregorits as directors of ETRE REIT or any other Affiliate or Subsidiary of ETRE, and seek to void the license agreement purportedly granted by the Company through Panzer, Frischer and Stein to ETRE REIT

based on the misleading and fraudulent registration statement and related documents filed with the US Securities and Exchange Commission in connection with the filing of the ETRE REIT registration statement, and to recover damages caused by Defendants Panzer, Frischer and Stein's failure to disclose the unauthorized and improper establishment of and increase in the size of the board of ETRE REIT and any compensation paid to any of the seven purported directors of the ETRE REIT, and in connection with the unauthorized and improper license agreement entered into with ETRE REIT.

## COUNT II

### Against Defendants Panzer, Frischer and Stein for Breach of Fiduciary Duty

371.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if fully rewritten herein.

372.    Defendants Panzer, Frischer and Stein owe the Company fiduciary obligations. By reason of their fiduciary relationships, Defendants Panzer, Frischer and Stein of the Company the highest obligation of good faith, fair dealing, loyalty and due care.

373.    Defendants Panzer, Frischer and Stein, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

374.    Defendants Panzer, Frischer and Stein, and each of them authorized, or by abdication of duty, permitted the registration statements and related documents filed on behalf of and in connection with formation of ETRE REIT to contain material misrepresentations in violation of section 10 (b) of the Exchange act. These actions were not a good faith exercise of his judgment to protect and promote the Company's it's Subsidiaries' and Affiliates' interests.

375.    As a direct and proximate result of Defendants Panzer, Frischer and Stein, and each of their breaches of their fiduciary duties, Defendants Panzer, Frischer and Stein have caused, and will continue to cause, the Company to suffer substantial monetary damages, as well as further and even

greater damage in the future, including damage to the Company's, its Subsidiaries' and Affiliates' business and goodwill.

376.    The Company has been directly and substantially injured by reason of Defendants Panzer, Frischer and Stein, and each of their, fraud, intentional breaches and or reckless disregard of their fiduciary duties to the Company it's subsidiaries and Affiliates. Plaintiffs the Frydman Entity, as a Member and Frydman as a representative of the Company, seek damages and other relief for the Company in an amount to be proven at trial.

<u>**COUNT III**</u>

<u>**Against Defendants Panzer, Frischer and Stein for Gross Mismanagement**</u>

377.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if fully rewritten herein.

378.    By their actions as herein alleged, Defendants Panzer, Frischer and Stein abandoned and abdicated their responsibilities and duties with regard to prudently managing the assets and business of the Company, its subsidiaries and Affiliates in a manner consistent with the operations of a publicly held company.

379.    As a direct result of Defendants Panzer, Frischer and Stein Gross mismanagement and breaches of duty alleged herein, the Company has sustained and will continue sustained significant damages.

380.    As a result of the misconduct and breaches of duty alleged herein, Defendants Panzer, Frischer and Stein are liable to the Company in an amount to be proven at trial.

<u>**COUNT IV**</u>

<u>**Against Defendants Panzer, Frischer and Stein for Waste of Company Assets**</u>

381.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if fully rewritten herein.

382.    Between February 17, 2014 and June 21, 2014, in direct violation of sections 3.8 and 6.12 (x) and 6.12 (xiii) of the 2012 Operating Agreement Defendants Frischer, Stein and Panzer entered into a series of six loan agreements with Panzer, through which ETRE purportedly incurred a $315,000 debt to Panzer and a $50,000 debt to Frischer.

383.    As neither the Panzer loan agreements nor the Frischer loan agreement received prior unanimous approval of the Managers of the Company the debts purported to have been created are a nullity, and pursuant to Section 7.2 of the 2012 Operating Agreement, which provides that any Member who takes any action or purports or attempts to bind the Company in violation of the 2012 Operating Agreement shall be solely responsible for any loss and/or expense incurred by the Company, the Panzer Loan and the Frischer loan are the obligations of Defendants Panzer, Frischer and Stein, and not the obligation of the Company.   Moreover, pursuant to Section 7.2 of the 2012 Operating Agreement, Defendants Panzer, Frischer and Stein have indemnified the Company and Frydman and Winter with respect to such loans.

384.    As stated above, Defendants Panzer, Frischer and Stein, also, without requisite authority, and in express violation of sections 13.1 and 6.12 of the 2012 Operating Agreement licensed the ETRE name and the ERTE trademarks to Subsidiaries and Affiliates of the Company.

385.    The acts of Defendants Panzer, Frischer and Stein, as above set forth constitute waste.

386.    As a result of Defendants Panzer, Frischer and Stein's waste, Defendants Panzer, Frischer and Stein are liable to the Company in an amount to be proven at trial.

## COUNT V

### Against Defendants Panzer, Frischer and Stein for Contribution and Indemnification

387.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if fully rewritten herein.

388.     On account of the wrongful acts, practices, and related misconduct alleged against Panzer, Frischer and Stein, which arise, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of said Defendants, the Company is entitled to contribution and indemnification from Defendant Panzer, Frischer and Stein in connection with all such claims that have been, are, or may in the future be asserted against the Company by virtue of the said Defendants' misconduct.

## COUNT VI

### Against Defendants Panzer, Frischer and Stein for Abuse of Control

389.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if fully rewritten herein.

390.     The conduct of Defendants Panzer, Frischer and Stein, as alleged herein, constituted an abuse of their control over the Company, its Subsidiaries and Affiliates.

391.     As a direct and proximate result of the Defendants Panzer's, Frischer's and Stein's abuse of control, the Company has suffered, and will continue to suffer, damages for which Defendants Panzer, Frischer and Stein are liable in an amount to be proven at trial. Plaintiffs, moreover, has no adequate remedy at law.

392.     As a result of Defendants Panzer, Frischer and Stein's abuse of control, Defendants Panzer, Frischer and Stein are liable to the Company in an amount to be proven at trial.

## COUNT VII

### Against Defendants Panzer, Frischer and Stein for Breach of Contract

393.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if fully rewritten herein.

394.    Defendants Panzer, Frischer and Stein actions as hereinabove set forth constitute numerous express breaches of the 20012 Operating Agreement.

395.    The Company and Plaintiffs have been damaged by Defendants Panzer, Frischer and Stein's numerous breaches of contract as hereinabove set forth. Plaintiff, as a shareholder and representative of the Company, seeks damages and other relief for the Company as a result thereof, in an amount to be proven at trial.

## COUNT VIII

### Against Defendant Frischer for Breach of his Employment Agreement

396.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if fully rewritten herein.

397.    Defendant Frischer's actions as hereinabove set forth constitute breaches of Frischer's Employment Agreement with the Company.

398.    The Company and Plaintiffs have been damaged as a result of Defendant Frischer's breaches of his employment agreement as hereinabove set forth. Plaintiff, as a shareholder and representative of the Company, seeks damages and other relief for the Company as a result thereof, in an amount to be proven at trial.

## COUNT IX

### Declaratory Judgment

399.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if fully rewritten herein.

400.    This Court has the power to declare the rights, status or other legal relations of the parties before it.

401.    There is an actual, narrow, ripe and purely legal controversy regarding the applicability of the 2012 Operating Agreement to the facts set forth herein.

402.    Plaintiff requests that this Court declare that:

b.  that the purported merger and related unauthorized acts as hereinabove set forth are ultra vires and therefore invalid for violating the rights granted to the Managers under, or is otherwise violative of the 2012 Operating Agreement;

c.  that the purported Unit Purchase Agreement and related unauthorized acts as hereinabove set forth are ultra vires and therefore invalid for violating the rights granted to the Managers under, or is otherwise violative of the 2012 Operating Agreement;

d.  that the Panzer and Frischer Loan Agreements and related unauthorized acts as hereinabove set forth are ultra vires and therefore invalid for violating the rights granted to the Managers under, or is otherwise violative of the 2012 Operating Agreement;

e.  that the Founder Debt for Equity Exchange Agreement and related unauthorized acts as hereinabove set forth are ultra vires and therefore invalid for violating the rights granted to the Managers under, or is otherwise violative of the 2012 Operating Agreement;

f.  that the ETRE License Agreement and related unauthorized acts as hereinabove set forth are ultra vires and therefore invalid for violating the rights granted to the Managers under, or is otherwise violative of the 2012 Operating Agreement;

g.  that the actions of Defendants Panzer, Frischer and Stein as herein set forth amounts to a "Cause" event in that the Member Defendants and the Manager Defendants have committed an act of dishonesty, misappropriation, embezzlement or fraud involving personal profit or a breach of fiduciary duty in connection with the performance of such Member's or Manager's company duties, or which affects the Company, or any member of the Group, or property of any member of the Group, and/or that the Member Defendants and Manager Defendants have breached in  material respect the 2012 Operating Agreement and/or other agreement with the Company or any member of the Group which breach is not cured (to the extent reasonably susceptible to cure) after written notice, and/or that Member Defendants and Manager Defendants have breached of the representations, warranties or covenants contained in the 2012 Operating Agreement and/or in the Agreements entered with or on behalf of the Company, its Subsidiaries and/or Affiliates, and that Defendants Panzer, Frischer and Stein were properly removed as Managers of the Company.

h.  that the actions of Defendants the Panzer Entity, the Frischer Entity, the Stein Entity and the Verschleiser Entity as above set forth constitutes an unlawful "Transfer" of their Units in the

Company in violation of Section 6.12 of the 2012 Operating Agreement, and that the actions of Defendants the Panzer Entity, the Frischer Entity, the Stein Entity and the Verschleiser Entity as above set forth constitutes A Withdrawal from the Company on July 24, 2014, and that pursuant to section 7.4 of the 2012 Operating Agreement, the Company re-purchased such Former Members' Units in the Company by tendering the Company's promissory note for the capital account balance of such Former Members' Units, and that said Units have been repurchased by the Company;

i.   that Frischer has assigned 50% of the Frischer Patents Income to the Company, and that the Company has a right of first refusal with respect to the Frischer Patents at 80% of the bona fide offer from a third party, in accordance with the provisions of the 2012 Operating Agreement; and

j.   That the seven members of the board of ETRE REIT, including, without limitation, Panzer, Stein, Frischer, Jay Anderson, Mark Filanowski,  Joseph Capezza and John Gregorits were not properly nominated not appointed as board members and are removed as directors; and

k.   that the name "ETRE Financial" and all goodwill associated therewith are the property of the Company and no Member or Affiliate of the Company shall have the right to use the name "ETRE Financial" or "ETRE" as a component of the name of any business venture or otherwise.

## COUNT X

### Injunctive Relief

403.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if fully rewritten herein.

404.   The Company has protectable rights under the Frischer Employment Agreement and the 2012 Operating Agreement.

405.   Plaintiffs, on behalf of the Company, request that this Court issue a preliminary and permanent injunction:

a.   enjoining Defendants Frischer, Stein, Panzer and Verschleiser, from directly or indirectly claiming to have any right, title or interest of any kind or nature whatsoever in order to any products, methods, practices, processes, discoveries, ideas, designs, improvements, devices, creations or inventions in each case directly or indirectly relating to or useful in any aspect of the business of the Company or the Group, whether created, developed or invented by any of them during the term of their employment and or association with the Company, and, without limitation, the Exchange Traded Real Estate Platform, and any inventions or patent

applications assigned to the Company;

b. enjoining Defendants Frischer, Stein, Panzer and Verschleiser, the Frischer Entity, the Stein Entity, the Panzer Entity and the Verschleiser Entity through July 3, 2015 pursuant to section 12.2 of the 2012 Operating Agreement from (i) rendering services or giving advice to, or being affiliate with (as employee, partner, consultant or otherwise), or (ii) directly or indirectly through one or more of any of their respective Affiliates, owning, managing, operating, controlling or participating in the ownership, management, operation or control of, any Competitor or any division or business segment of any Competitor; or (iii) hiring, soliciting or encouraging Person to hire, or solicit any individual who is been an employee, consultant or adviser of the Company or any Subsidiary or Affiliate of the Company; or (iv) soliciting or enticing, or attempting to solicit or entice, any investors, contractors, suppliers of the Company or any Subsidiary or Affiliate of the Company for purposes of diverting their business or services from the Company or such Subsidiary or Affiliate or for any other purpose; or (v) making a statement or publication that is intended to or could reasonably be understood to disparage or impugn the reputation of the Company or any such Subsidiary or Affiliate of the Company or any of their respective products, services, executives, partners, directors, officers or employees, regardless of any perceived truth of such statement or publication;

c. enjoining Defendant Frischer from Transferring any of the Frischer Patents to any Person without first offering them to the Company, at 80% of the bona fide offer price in accordance with the terms of the 2012 Operating Agreement; and

d. enjoining Frischer, Panzer, Stein or Verschleiser or any of their affiliates from serving as Managers of the Company;

e. enjoining Frischer, Panzer, Stein, Verschleiser, Jay Anderson, Mark Filanowski,  Joseph Capezza and John Gregorits from serving as directors of the ETRE REIT or any of the Company's Subsidiaries or Affiliates.

406.    Plaintiffs and the Company have no adequate remedy at law.

## COUNT XI

### Against Defendants Panzer, Frischer, Stein, Verschleiser, Mayer,  ETRE Financial Holdings, LLC, LH Financial and ETR Investors Holdings LLC for Fraud

407.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if fully rewritten herein.

408.   The actions of Defendants Panzer, Frischer, Stein, Verschleiser, Mayer, ETRE Financial Holdings, LLC, LH Financial and ETR Investors Holdings LLC, as hereinabove set forth constitutes fraud.

409.   As a result of the fraud committed by Defendants Panzer, Frischer, Stein, Verschleiser, Mayer, ETRE Financial Holdings, LLC, LH Financial and ETR Investors Holdings LLC, the Company has been damaged as above set forth and seek damages and other relief as a result thereof, in an amount to be proven at trial.

410.   Defendants' Panzer, Frischer, Stein, Verschleiser, Mayer, ETRE Financial Holdings, LLC, LH Financial and ETR Investors Holdings LLC actions were willful and malicious and performed with an evil motive and with reckless indifference to the rights of the Company, its Members and Managers, entitling the Company to punitive damages.

## COUNT XII

### Against Defendants Panzer, Frischer, Stein, Verschleiser, Mayer,  ETRE Financial Holdings, LLC, LH Financial and ETR Investors Holdings LLC for Conversion

411.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if fully rewritten herein.

412.   The actions of Defendants Panzer, Frischer, Stein, Verschleiser, Mayer, ETRE Financial Holdings, LLC, LH Financial and ETR Investors Holdings LLC, as hereinabove set forth constitutes conversion with respect to: (i) the ETRE name and Trademark; (ii) the intellectual property, proprietary products, and trade secrets of ETRE; (iii) the Frischer Paternt Income; (iv) the Frischer Patents and the Company's right of first refusal with respect to the Frischer Patents; (v) the Company's Exchange Traded Real Estate Platform; and (v) the other property of the Company which Defendants Panzer, Frischer, Stein, Verschleiser, Mayer, ETRE Financial Holdings, LLC, LH Financial and ETR Investors Holdings LLC, by their actions have stolen, and have exercised exclusive dominion over.

413.    The assumption by Defendants Panzer, Frischer, Stein, Verschleiser, Mayer, ETRE Financial Holdings, LLC, LH Financial and ETR Investors Holdings LLC of right of ownership over the property of the Company as listed above was without authorization and Defendants have continued to exercise ownership and dominion to the exclusion of the Company and Plaintiffs over said property even though Plaintiffs have made a demand for return of said property and Defendants' have been under an obligation to return said property.

414.    As a result of Defendants Panzer, Frischer, Stein, Verschleiser, Mayer, ETRE Financial Holdings, LLC, LH Financial and ETR Investors Holdings LLC's conversion the Company has been damaged as above set forth and seek damages and other relief as a result thereof, in an amount to be proven at trial.

## COUNT XIII

### Against Defendants Panzer, Frischer, Stein, Verschleiser, Mayer,  ETRE Financial Holdings, LLC, LH Financial and ETR Investors Holdings LLC for Intentional Interference with Contractual Rights

415.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if fully rewritten herein.

416.    The actions of Defendants Panzer, Frischer, Stein, Verschleiser, Mayer, ETRE Financial Holdings, LLC, LH Financial and ETR Investors Holdings LLC, as hereinabove set forth constitutes intentional interference with the Company's contractual rights.

417.    As a result of the intentional interference with Plaintiffs' contractual rights committed by Defendants Panzer, Frischer, Stein, Verschleiser, Mayer, ETRE Financial Holdings, LLC, LH Financial and ETR Investors Holdings LLC, the Company has been damaged as above set forth and seek damages and other relief as a result thereof, in an amount to be proven at trial.

## DIRECT CLAIMS

## COUNT XIV

### Against Defendants Panzer, Frischer, Stein, Verschleiser, Mayer,  ETRE Financial Holdings, LLC, LH Financial and ETR Investors Holdings LLC for Civil Conspiracy

418.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if fully rewritten herein.

419.    Defendants Panzer, Frischer, Stein, Verschleiser, Mayer,  ETRE Financial Holdings, LLC, LH Financial and ETR Investors Holdings LLC conspired with one another to illegally cause the unauthorized and ultra vires merger of the Company solely as a way to circumvent the "No" vote by Frydman, one of the four Managers of the Company who's affirmative vote was a prerequisite to a series of proposals to recapitalize the Company, sell Units of the Company and amend the Operating Agreement of the Company all as more fully set forth herein.

420.    Defendants committed numerous overt acts in furtherance of the conspiracy including, but not limited to the actions detailed above as well as other overt acts.

421.    As a direct result of the foregoing conduct, undertaken by Defendants Panzer, Frischer, Stein, Verschleiser, Mayer, ETRE Financial Holdings, LLC, LH Financial and ETR Investors Holdings LLC, these Defendants have caused and continue to cause damages to Plaintiffs, including but not limited to depriving plaintiffs of significant economic rights with respect to their Membership interest in ETRE and governance rights with respect to Frydman's interest as a Manager in ETRE.

422.    Defendants' conspiracy was willful and malicious and performed with an evil motive and with reckless indifference to the rights of others, entitling Plaintiffs to punitive damages.

## COUNT XV

### Against Defendants Panzer, Frischer, Stein, Verschleiser, Mayer,  ETRE Financial Holdings, LLC, LH Financial and ETR Investors Holdings LLC for Fraud

423.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if fully rewritten herein.

424.    The actions of Defendants Panzer, Frischer, Stein, Verschleiser, Mayer, ETRE Financial Holdings, LLC, LH Financial and ETR Investors Holdings LLC, as hereinabove set forth constitutes fraud.

As a result of the fraud committed by Defendants Panzer, Frischer, Stein, Verschleiser, Mayer, ETRE Financial Holdings, LLC, LH Financial and ETR Investors Holdings LLC, Plaintiffs have been damaged as above set forth and seek damages and other relief as a result thereof, in an amount to be prove

## COUNT XVI

### Against Defendants Panzer, Frischer, Stein, Verschleiser, Mayer,  ETRE Financial Holdings, LLC, LH Financial and ETR Investors Holdings LLC for Intentional Interference with Contractual Rights

425.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if fully rewritten herein.

426.    The actions of Defendants Panzer, Frischer, Stein, Verschleiser, Mayer, ETRE Financial Holdings, LLC, LH Financial and ETR Investors Holdings LLC, as hereinabove set forth constitutes intentional interference with Plaintiffs' contractual rights.

427.    As a result of the intentional interference with Plaintiffs' contractual rights committed by Defendants Panzer, Frischer, Stein, Verschleiser, Mayer, ETRE Financial Holdings, LLC, LH Financial and ETR Investors Holdings LLC, Plaintiffs have been damaged as above set forth and seek damages and other relief as a result thereof, in an amount to be proven at trial.

## COUNT XVII

### Against Defendants Panzer, Frischer, Stein, Verschleiser, Mayer,  ETRE Financial Holdings, LLC, LH Financial and ETR Investors Holdings LLC for Tortious Interference With Prospective Business Relations

428.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if fully rewritten herein.

429.     The actions of Defendants Panzer, Frischer, Stein, Verschleiser, Mayer, ETRE Financial Holdings, LLC, LH Financial and ETR Investors Holdings LLC, as hereinabove set forth constitutes tortious interference with prospective business relations.

430.     As a result of the tortious interference with prospective business relations committed by Defendants Panzer, Frischer, Stein, Verschleiser, Mayer, ETRE Financial Holdings, LLC, LH Financial and ETR Investors Holdings LLC, Plaintiffs have been damaged as above set forth and seek damages and other relief as a result thereof, in an amount to be proven at trial.

## COUNT XVIII

### Against Defendants Panzer, Frischer, Stein and Verschleiser for Breach of Duties of Care, Loyalty, Good Faith and Fair Dealing

431.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if fully rewritten herein.

432.     Defendants Panzer, Frischer, Stein and Verschleiser, By reason of their relationships, owe the Plaintiffs the highest obligation of good faith, fair dealing, loyalty and due care.

433.     Defendants Panzer, Frischer, Stein and Verschleiser, and each of them, violated and breached their duties of good faith, fair dealing, loyalty and due care.

434.     As a direct and proximate result of Defendants Panzer, Frischer, Stein and Verschleiser's, and each of their breaches of their duties of good faith, fair dealing, loyalty and due care, Defendants Panzer, Frischer and Stein have caused, and will continue to cause, Plaintiffs to suffer substantial monetary damages.

435.     As a result of Defendants Panzer, Frischer, Stein and Verschleiser's, and each of their breaches of their duties of good faith, fair dealing, loyalty and due care Plaintiffs have been directly and

substantially injured, and Plaintiffs seek damages and other relief for the Company in an amount to be proven at trial.

## COUNT XIX

### Against Defendants Panzer, Frischer, Stein, Verschleiser, the Panzer Entity, the Frischer Entity, the Stein Entity and the Verschleiser Entity for Breach of Contract

436.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if fully rewritten herein.

437.   By their actions as herein alleged, Defendants Panzer, Frischer, Stein, Verschleiser, the Panzer Entity, the Frischer Entity, the Stein Entity and the Verschleiser Entity, breached the 2012 Operating Agreement.

438.   As a direct result of Defendants Panzer, Frischer, Stein, Verschleiser, the Panzer Entity, the Frischer Entity, the Stein Entity and the Verschleiser Entity's breaches of the 2012 Operating Agreement Plaintiffs have has sustained and will continue to sustain significant damages.

439.   As a result of the breaches of the 2012 Operating Agreement  by Defendants Panzer, Frischer, Stein, Verschleiser, the Panzer Entity, the Frischer Entity, the Stein Entity and the Verschleiser Entity  as above set forth Plaintiffs are entitled to recover damages in an amount to be proven at trial.

## COUNT XX

### Against Defendant the Stein Entity on the Stein Note and Stein Pledge Agreement

440.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if fully rewritten herein.

441.   The Stein Entity's actions as above set forth resulted in the Transfer of the Stein ' Units as defined by and pursuant to the 2012 Operating Agreement on July 24, 2014.

442.   As a result of Defendants' Transfer of their Units, the Stein Note automatically became due and payable on July 24, 2014, but was not timely paid.

443.    Plaintiff the Frydman Entity has made demand for payment, and Defendant the Stein Entity has failed to pay.

444.    Therefore, Plaintiff the Frydman Entity is entitled to judgment against the Stein Entity on the Stein Note in an amount to be proved at trial.

445.    In addition, pursuant to Section 2(b) of Stein Pledge Agreement, upon the occurrence of an Event of Default, all of the Borrower's voting and consensual powers or rights pertaining to the Pledged Securities "shall terminate and the Pledgee or its nominee or nominees shall have the sole and exclusive right to exercise all powers of voting and consent pursuant to the Pledged Securities, or any part thereof, and shall exercise such powers in such manner as the Pledgee may elect in its sole discretion."

446.    In accordance therewith Plaintiffs terminated the Stein Entity's rights to exercise all powers of voting and consent pursuant to the Pledged Securities and the Frydman Entity elected to exercise its rights and powers pertaining to the Pledged Securities.

447.    Pursuant to Section 2(b) of the Stein Pledge Agreement, upon the occurrence of an Event of Default, all of the Borrower's voting and consensual powers or rights pertaining to the Pledged Securities "shall terminate and the Pledgee or its nominee or nominees shall have the sole and exclusive right to exercise all powers of voting and consent pursuant to the Pledged Securities, or any part thereof, and shall exercise such powers in such manner as the Pledgee may elect in its sole discretion."

448.    On August 7, 2014 Borrower's rights to exercise all powers of voting and consent pursuant to the Pledged Securities were terminated by Plaintiff JF Entity, who  elected to exercise its rights and powers pertaining to the Pledged Securities.

449.    Pursuant to Section 2 (d) (1) of the Stein Pledge Agreement "any Unit dividend, Unit split, reclassification, readjustment, or other change is declared or made in the capital structure of any

entity whose securities are included in the Pledged Securities, all new, substituted, and additional shares, or other securities, issued by reason of any such change and received by the Pledgor or to which the Pledgor shall be entitled shall be held by the Pledgor in trust for the benefit of, and immediately delivered by the Pledgor to, the Pledgee, duly endorsed in blank or with a stock power duly endorsed in blank, and shall thereupon constitute Pledged Securities to be held by the Pledgee under the terms of this Agreement."

450.    As a result of the foregoing, Plaintiff the Frydman Entity removed Jesse Stein as a Manager / member of the board of Second ETRE and substituted Daniel Edelman in his place and stead.

451.    As a result of the foregoing, any action requiring the vote, consent and/or approval of Jesse Stein in Second ETRE is deemed from and After August 7, 2014, to require the vote, consent and/or approval of Daniel Edelman.

## COUNT XXI

### Declaratory Judgment

452.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if fully rewritten herein.

453.    This Court has the power to declare the rights, status or other legal relations of the parties before it.

454.    There is an actual, narrow, ripe and purely legal controversy regarding the applicability of the 2012 Operating Agreement and the Stein Pledge Agreement to the facts set forth herein.

455.    Plaintiff requests that this Court declare that:

a.  that the purported merger and related unauthorized acts as hereinabove set forth are ultra vires and therefore invalid for violating the rights granted to the Managers under, or is otherwise violative of the 2012 Operating Agreement;

b.  that the purported Unit Purchase Agreement and related unauthorized acts as hereinabove set forth are ultra vires and therefore invalid for violating the rights granted to Plaintiffs under, or is otherwise violative of the 2012 Operating Agreement;

c.  that Plaintiffs' removal of Panzer, Stein and Frischer as Managers of the Company is effective, and that Daniel Edelman is successor Manager to Jesse Stein, and that Alex Libin is successor Manager to Scott Panzer, and that Ryan Morfin is successor Manager to Paul Frischer; and

d.  that pursuant to the Stein Pledge Agreement Jesse Stein was properly removed as a Manager / member of the board of Ersatz ETRE and Daniel Edelman was substituted in his place and stead. As a result of the foregoing, any action requiring the vote, consent and/or approval of Jesse Stein in Ersatz ETRE is deemed from and After August 7, 2014, to require the vote, consent and/or approval of Daniel Edelman.

## COUNT XXII

### Injunctive Relief

456.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if fully rewritten herein.

457.    Plaintiffs have protectable rights under the 2012 Operating Agreement.

458.    Plaintiffs, request that this Court issue a preliminary and permanent injunction enjoining Defendants Frischer, Stein, Panzer, Verschleiser, the Panzer Entity, the Frischer Entity, the Stein Enity and the Verschleiser Entity from directly or indirectly taking any action in violation of the 2012 Operating Agreement.

459.    Plaintiffs and the Company have no adequate remedy at law.

## COUNT XXIII

### Against Defendant Verschleiser
### for Intentional Interference with Contractual Rights

460.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if fully rewritten herein.

461.    The actions of Defendant Verschleiser with respect to Warren and Scott Diamond as hereinabove set forth constitutes intentional interference with Plaintiffs' contractual rights.

462.    As a result of the intentional interference with Plaintiff Frydman's contractual rights committed by Defendant Verschleiser Plaintiff Frydman has been damaged as above set forth and seek damages and other relief as a result thereof, in an amount to be proven at trial, believed to be not less than $30 million.

## COUNT XXIV

### Against Defendant Verschleiser for Tortious Interference With Prospective Business Relations

463.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if fully rewritten herein.

464.    The actions of Defendant Verschleiser with respect to Warren Diamond and Scott Diamond as hereinabove set forth constitutes tortious interference with prospective business relations.

465.    As a result of the tortious interference by Verschleiser with Plaintiff Frydman's prospective business relations as above set forth Plaintiff Frydman seeks damages and other relief as a result thereof, in an amount to be proven at trial believed to be not less than $30 million.

## COUNT XXV

### Against Defendant Verschleiser for Abuse of Process

466.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if fully rewritten herein.

467.    The actions of Defendant Verschleiser in facilitating Warren Diamond and Scott Diamond as hereinabove set forth constitutes abuse of process.

468.    As a result of the abuse of process by Defendant Verschleiser Plaintiff Frydman seeks damages and other relief as a result thereof, in an amount to be proven at trial.

## COUNT XXVI

### Against Defendant Verschleiser
### for Malicious Prosecution

469.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if fully rewritten herein.

470.    The actions of Defendant Verschleiser in facilitating the filing of lawsuit referenced above constitutes tortious malicious prosecution.

471.    As a result of the malicious prosecution by Defendant Verschleiser Plaintiff Frydman seeks damages and other relief as a result thereof, in an amount to be proven at trial .

## PRAYER FOR RELIEF

Plaintiff, on behalf of themselves and on behalf of ETRE, pray for judgment as follows:

472.    Awarding compensatory damages against each respective Defendant in amounts to be proven at trial;

473.    Awarding appropriate equitable relief, including injunctive and declaratory relief requested herein;

474.    Awarding punitive damages at the maximum amount permitted by law;

475.    Awarding pre-judgment interest, as well as reasonable attorneys' fees and other costs.

476.    Awarding such other relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable.


Dated: November 3, 2014

Jacob Frydman, *pro se*
60 Broad Street
34th Floor
New York, NY 10004
(212) 388-6880
Jacob.f@urpa.com


WROBEL, SCHATZ & FOX LLP

By: _____
David C. Wrobel (DW-5242)
M. Katherine Sherman (KW-7490)
1040 Avenue of the Americas,
11th Floor
New York, NY 10018
(212) 421-8100
wroble@wsfny.com
Sherman@wsfny.com

103

## VERIFICATION

STATE OF NEW YORK    )
                           ) ss:
COUNTY OF NEW YORK  )

JACOB FRYDMAN, being duly sworn, deposes and says:

I am a Plaintiff in this action and am the Manager of Plaintiff Winter Investors, LLC. I have read the

forgoing Verified Amended Complaint and know the contents thereof. The same is true to my own

knowledge, except those matters therein which are stated to be alleged on information and belief, and as

to those matters I believe them to be true.

       Dated: November 3, 2014
       New York, New York

_____
Jacob Frydman

ALEXANDER MARTIN LIBIN
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 02LI6261807
Qualified in Dutchess County
Commission Expires May 14, 2016

104

## CERTIFICATE OF SERVICE

I hereby certify that I have on November 3, 2014  served a true and correct copy of the foregoing by

emailing a copy hereof and depositing a copy hereof in regular US mail to the following addresses:

Mitchell G.  Mandell, Esq.
Thomas B. Fiddler, Esq.
Siobhan K. Cole, Esq.
White & Williams
One Penn Plaza
1250 W.34th Street
Suite 41101
New York, NY 10119
mandellm@whiteandwilliams.com


Steven Cooper, Esq.
scooper@reedsmith.com
Reed Smith LLP
599 Lexington Avenue
New York, NY 10022-7650
scooper@reedsmith.com


Jacob Frydman, *pro se*
60 Broad Street
34th Floor
New York, NY 10004
(212) 388-6880
Jacob.f@urpa.com

105



# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK
### Pro Se Office

**SCANNED**

**To:**        The Honorable .Judge Katherine Polk Failla

**From:**        ____R.Diaz_____, Pro Se Intake Clerk, Docket Services, Ext. __1177__

**Date:**            _____11/3/2014_____

**Re:**        **Winter Investors, LLC et al v. Panzer et al, 14-cv-06852-KPF**
        The attached document, which was received by this Office on_____11/3/2014_____, has been submitted to the Court for filing.  The document is deficient as indicated below. Instead of docketing the document for public access, it has been docketed as a court-view only docket entry. I am forwarding it to you for your consideration. See Fed. R. Civ. P. 5(d)(2)(B), (4).

(  )        No original signature.

(  )        No Affirmation of Service/ proof of service.

(X)        Other:__Mr. Frydman files amended complaint, but is represented by Mr. Wrobel on the docket sheet._____
        _____

        If you memo-endorse the filing, you do not need to return this memorandum to the Pro Se Office. Once your memo-endorsement is docketed and filed, all ECF users on the case will be notified.

        In the alternative, please return this memorandum with the attached papers to this Office, indicating at the bottom what action should be taken.

(X)        **ACCEPT FOR FILING**        (  )        **RETURN TO** *PRO SE* **LITIGANT**

                                                    *Katherine Polk Failla*
| Comments: | |
|---|---|
| NOV − 6 2014 | |

                            United States District Judge
                    Dated: 11/5/2014

                            _____
                            United States Magistrate Judge
                            Dated: