# EXHIBIT A

# R.E.L.E

## REAL ESTATE LIQUIDITY EXCHAGE

Initial concept thoughts document
Jacob Frydman
August 4, 2011

### Introduction

The Real Estate Liquidity Exchange ("RELE") is a multiple, combined, business opportunity. It envisions the creation of four basic business enterprises, each a separate entity, but initially owned and operated by the same group: (i) the exchange; (ii) the underwriter; (iii) the property manager; and the (iv) market maker. All four are each an integral part of the process and will be discussed separately below.

In summary, it is envisioned that the exchange will provide an efficient liquid marketplace where large institutional investors as well as small retail investors can purchase partial ownership interests in a particular property (the "shares"), which shares will trade on the exchange based on a bid-ask spread. A property owner can seek to list his property on the exchange by having the underwriter underwrite the asset and determine whether or not to list it on the exchange. If the underwriter determines to list the asset on the exchange it will also provide either a best efforts or a firm underwriting for a mutually agreeable amount of the initial shares. In order to provide transparency and accountability into the marketplace all properties listed on the exchange will be managed by the property manager.

The property manager will take on all of the roles of the owner of the property, except that it will only "own" a small minority interest of not less than 2% nor more than 5% of the shares of any property (which shares the property owner may sell only after a 24 month hold period). An owner of the property which is underwritten for listing on the exchange will transfer all of his interest in the property to a special purpose, bankruptcy remote pass-through entity (the "owner entity") in exchange for 95% to 98% of the shares (with the property manager retaining 2% to 5% of the shares (based on the value of the transaction) in exchange for providing property management services and organizing the owner entity. All the other shares will be immediately tradable and the owner of the property will determine with the underwriter at the time of acceptance of the underwriting what percentage of the shares will be sold in the initial public offering as part of the underwriting. The 2% to 5% which the property owner is giving up in this transaction should be less than the Delta of additional value created by the liquidity of the exchange.

The property manager will then operate the property and provide financial information to the shareholders and the exchange. The exchange will have a separate data room from every asset, each shareholder will be granted a "password key" to the data room. Each property's data room will include current and historical financial information, rent rolls, lease abstract, and all other data relevant to that asset which would typically be obtained in a normal due diligence process (the data room standards are yet to be developed). In addition each property will have a quarterly and annual disclosure document which will be accessible by any person within the public domain

and can be reviewed during the due diligence on whether to acquire a share in any property. Quarterly and annual disclosure documents will follow the requirements of the securities rules of the SEC and the respective states.

Distributions to shareholders will be made by the property manager on a periodic basis, not less often than quarterly. Shareholders will also receive an annual K-1 which will pass through all of the benefits of real estate ownership, including the shelter benefits and depreciation to the shareholders in accordance with IRS rules and regulations. The property manager will provide standard property management services (which it may subcontract to others), will oversee the accounting functions of each property, will oversee legal issues relating to each property, will undertake to lease each property (which it may subcontract others), will oversee any construction that prevents at each property (which may subcontract others), will determine the need for, and oversee financings and refinancing, manager for reporting functions for each property, and otherwise provided all of other activities of ownership for each property.

The market maker will act as a market maker for the shares. It will compile the bid-ask process and match up buyers and sellers for shares the RELE.

Marketing functions will be undertaken both by the underwriter with respect to originations of properties to be listed, and by the exchange with respect to bringing eyeballs to the exchange and generating interest in share purchasers acquire shares on the exchange.

## The Exchange

The exchange itself will be an electronic exchange and will operate as a stand-alone e-business. It will act in two capacities. It will be a share exchange, not unlike the NYSE or any other publicly traded exchange, and will also act as a electronic brokerage operation such as E*Trade, but restricted to the brokerage of only shares traded on the exchange.

The exchange will be operated in the clouds through proprietary software functioning owned hardware in a high-speed data center. The brokerage component of the exchange will operate both electronically in the cloud, and in person-to-person telephonic trades. It is envisioned that the primary expenditure of initial capital for the exchange will be in creating software and purchasing hardware for the creation of the exchange. Once operational the exchange will require significant staffing to operate.

For budgeting purposes:

     initial capital costs:
          software development-outsourced
          hardware design – outsourced
          hardware purchase
          datacenter placement - long-term lease
          establishment of exchange/patent protection - legal-outsourced
          exchange offices -long-term lease
          exchange FF&E – purchase
          exchange technology - including computers, hardware, phone systems, etc-purchase
          creation of data room standards - outsourced to auditing firms and legal firms
          initial marketing costs

Ongoing operational costs:
        I T personnel --software
        I T personnel-hardware
        systems maintenance personnel
        broker-dealer principals, compliance, and financial personnel
        in-house legal --securities/compliance and data disclosure related
                        (could be shared with underwriter)
        phone order takers/brokers
        accounting/bookkeepers
        management personnel
        clerical personnel
        data transmission costs
        telephone and cable costs
        system platform upgrade costs
        software maintenance costs
        reserves for obsolete equipment replacement
        marketing costs

Exchange Revenue Sources:
    Exchange Related:
            Initial Listing Fee – TBD
            Annual Listing Fees – TBD
            Per transaction fee – added to brokerage fees – TBD
            Data Room Upload Fees – TBD

    Brokerage Related:
            Per share/transaction fee - TBD

## The Underwriter

The underwriter is effectively a captive investment bank. Its sole function is to originate and underwrite properties for listing on the RELE. It generates its revenue by reviewing properties brought to it by property owners for underwriting. Initially a modest fee to review the asset is agree to, and if the asset is not accepted for listing on the exchange, the property owner pays that fee to the underwriter. If the asset is accepted for listing on the exchange and the property owner executes the underwriting agreement and transfers the asset to the single-purpose entity the initial fee is waived, and the underwriter is paid an underwriting fee. In addition, the underwriter and the property owner negotiate a minimum amount of shares to be sold as an "initial Public offering". The underwriter either issues a best efforts underwriting or a firm underwriting. Typically there will be a spread between the price paid for the shares by the underwriter to the property owner (below the IPO price), with the spread greater on a firm underwriting compared to a best efforts underwriting, and that spread generates the additional revenues for the underwriter. The underwriter then places the shares which it agreed to purchase on a best efforts or a firm underwriting basis with institutional or other purchasers, in a manner similar to an initial public offering of other shares on other exchanges.

For budgeting purposes:

initial capital costs:

    offices -long-term lease

    FF&E – purchase

    technology - including computers, hardware, phone systems, etc-purchase

    creation of underwriting standards - outsourced to auditing firms and legal firms

    initial marketing costs

Ongoing operational costs:

    Property underwriting Originators – Sales guys

    Underwriters/analysts

    Research personal – to maintain current data on market conditions effecting all property types in

all regions

    Firm commitment/ Best efforts selling placement agents

    broker-dealer principals, compliance, and financial personnel

    in-house legal –   real estate- leasing/ debt/ acquisition

                 securities/compliance and data disclosure related

                 (could be shared with Exchange)

    Investment committee

    accounting/bookkeepers (shared among the 4 businesses)

    management personnel

    clerical personnel

    disclosure costs

    telephone and cable costs

    IP upgrade and maintenance costs

    reserves for obsolete equipment replacement

    marketing costs

Underwriter Revenue Sources:

    Initial Underwriting Fee – TBD

    IPO related Fees – TBD

    Spread on Best Efforts / Firm Underwriting of IPO shares – TBD

### The Property Manager

The property manager takes on the role of property owner in a non-single owner owned property. This is necessary for several reasons. It creates consistency across the board in the operation of the assets, provides accountability and transparency. The property manager makes its revenues through traditional, and some nontraditional, fee generating services for the operation, management, maintenance, leasing, improvement, financing and otherwise operating the real estate assets, as well as providing compliance data for the securities which have been created, arranging and processing distributions of dividends to shareholders; overseeing tax matters and preparation of quarterly and annual disclosures as well as annual tax returns.

Once a property is agreed to be listed on the exchange by the underwriter, the exchange and the property owner, the cost of entry for the property owner to be relieved of its ownership obligations is 2% to 5% of the shares

granted to the property manager. The actual amount of shares will be tied to the equity value of the shares and a sliding scale. While a great property owner might be subcontracted by the property manager to provide some or all of the services, it should be assumed that in general, the services will be provided either directly by the property manager or through subcontracts by the property manager to professional firms in the localities of each of these assets.

The property manager, by overseeing the accounting functions and preparing disclosure documents, and otherwise acting as an owner, will provide requisite transparency and consistency across the board in developing how information is presented in the data rooms of the various properties.

For budgeting purposes:

> initial capital costs:
>> offices -long-term lease
>> FF&E – purchase
>> technology - including computers, hardware, phone systems, etc-purchase
>> creation of underwriting standards - outsourced to auditing firms and legal firms
>> initial marketing costs

> Ongoing operational costs (during the initial periods, and until a critical mass exists to support same some of these specialty professionals should be outsourced):
>> Property managers
>> Asset Managers
>> Leasing personnel
>> Underwriters/analysts (can be shared with underwriter)
>> Research personal – to maintain current data on market conditions effecting all property types in all regions (can be shared with underwriter)
>> Debt placement agents
>> Compliance, and financial personnel
>> In-house legal –  real estate- leasing/ debt/ acquisition
>>>> securities/compliance and data disclosure related
>>>> (could be shared with Exchange)
>> In house Architects, Engineers, Construction Managers
>> accounting/bookkeepers (shared among the 4 businesses)
>> management personnel
>> clerical personnel
>> disclosure costs
>> telephone and cable costs
>> IP upgrade and maintenance costs
>> reserves for obsolete equipment replacement

Property manager Revenue Sources:
> 2% to 5% of restricted (for 24 mos) shares in each asset
> Property Management Fees – (2% - 5% of annual gross revenues based on property type and size)
> Loan Placement Fees – 1% to 2% of each financing based on size

Distribution Fees – a per shareholder annual fee for making distributions and preparing tax returns and quarterly/annual disclosures

Data preparation/compliance fees - TBD

Leasing Fees – TBD

T.I. Fees and other construction fees– a % of such costs

Space planning/ architectural and engineering fees – TBD

Legal Fees – as needed

Disposition fees – 2% of the sale price of the entire asset (Query: will this ever occur?)

## The Market Maker

The market maker acts exactly in the same capacity as market makers in other securities and matches up buyers and sellers based on the bid ask. The spread at which the market maker buys and sells represents his revenue. The expenses associated with the market maker need to be considered, but likely will include:

initial capital costs (many of which can initially be shared with the other businesses):

offices -long-term lease

FF&E – purchase

technology - including computers, hardware, phone systems, etc-purchase

creation of a platform to match buyers and sellers based on a bid/ask structure

Related software

Related Hardware

Ongoing operational costs:

accounting/bookkeepers (shared among the 4 businesses)

management personnel

clerical personnel

telephone and cable costs

IP upgrade and maintenance costs

reserves for obsolete equipment replacement

## Marketing at the exchange and the underwriter

At some point the exchange will become sufficiently popular that it will be sought out by property owners and buyers of shares. However until that critical mass evolves we will need to bring recognition to the exchange from both the perspective of property owners who wish to list their assets as well as share purchases who wish to purchase shares in those assets. This will require multiple marketing tracks. The property owners track will probably be focused on publications and e-media which attracts and is read by property owners. Institutional buyers of shares likely will form a second track; and retail buyers of shares should be viewed more in the fashion of e-commerce eyeballs. In order to successfully launch and operate the exchange and its related businesses will need to incur substantial upfront marketing costs, most if not all of which should be outsourced. For purposes of budgeting, we need to assume three separate marketing tracks as well as a public relations track.

EXHIBIT  B



### UNITED REALTY PARTNERS, LLC
44 Wall Street, Second Floor
New York, NY 10005

June 1, 2012

Mr. Paul Frischer
Frischer Kranz Inc.
80 Birch Lane
Greenwich, CT 06830

Via e-mail:
pf@rexxindex.com

Dear Paul:

We are very pleased to confirm the terms on which Frischer Kranz Inc. ("Consultant") will be retained to provide the personal services of Paul Frischer as a consultant, initially to United Realty Partners, LLC ("URA"), and upon formation of an electronic marketplace for facilitating and bringing together purchasers and sellers of equity securities that consist of shares of entities that own a single commercial real estate asset (the "Real Estate Exchange Platform " or "Venture") to the Real Estate Exchange Platform (the "Company").

Initially, you will be engaged as a consultant for a period of 30 days during which your duties will be consistent with those of a Chief Executive Officer for the Venture. You will be paid a consultation fee of $25,000/month. Prior to the expiration of the Initial Consultation Period, URA will determine, in its sole discretion, whether it would like to (i) offer you the position as Chief Executive Officer of the Venture; (ii) offer to extend the consultation period; (iii) or terminate your services.

This retention will commence on June 4, 2012 (the "Effective Date").

In the event that the Company has elected to offer you the Position as Chief Executive Officer of the Venture, and you have accepted the Position (such date being the "Official Hire Date") you shall serve at the reasonable direction of the Jesse Stein, Eli Verschleiser and Jacob Frydman (collectively the "Managers") of the Company and for so long as you are an employee of the Company you shall be an employee at will and in consideration for your services to the Company you shall be entitled to the following:

> (i)  a base salary (a "Base Salary") at a rate of $300,000.00 per annum;

(ii)     Subject to the vesting provisions below, an award of membership interests of the Company equal to 20% of the total equity interests in the Company (the "Awarded Shares"), which award shall vest over five years as follows: 20% on the Official Hire Date, and 20% on each of the first, second, third and fourth anniversaries of the Official Hire Date, and upon the termination of your employment with the Company you shall automatically forfeit all Awarded Shares which have not then vested.

For the purposes of this Agreement, the Base Salary shall be payable in accordance with the Company's normal payroll procedures (but no less frequently than monthly). All payments to you are subject to withholding for all required taxes, whether Federal, state or local in nature, including but not limited to income taxes, Social Security taxes and Federal Unemployment Compensation taxes that are required to be paid by you pursuant to any applicable law.

From and after the Official Hire Date you shall be eligible to participate, in accordance with their terms, in all group medical and health plans, discretionary bonus and such other employment benefits, if any, as are maintained from time to time by the Company for employees performing comparable services for it; provided that the Company shall at all times be free to terminate, modify or amend such plans in accordance with the provisions thereof. You shall be entitled to annual vacations in accordance with the vacation policy of the Company.

You agree that while you continue to be an employee of the Company, you will not engage in any other employment, occupation, consulting or other business activity, or engage in any other activities, that conflict with your Company Duties, provided, however, that to the extent that these business activities shall not be competitive with the business of the Company: (X) you shall be permitted to invest or otherwise participate in the business activities of Rexx Index, LLC ("Rexx"), Frischer-Kranz, Inc. ("FKI"), FrischEnergy, LLC ("FE"), and Newmark Energy Solutions, LLC ("NES") as a limited or general member or partner, availing yourself of any business and investment opportunities with respect to those business entities; and (Y) you shall be able to devote occasional business time to industry associations and charitable and community activities, so long as such activities do not interfere with the discharge of your Company duties. In furtherance of the foregoing, except for the business activities identified in (X) above, you agree that, during the term of your employment with the Company, in no event will you own an active interest in, or manage, operate or act in a managerial capacity for or on behalf of any company or entity engaged in any business or investment activity other than the Company. For purposes of the previous sentence an "active interest" means an equity or debt interest in an entity that, whether due to relative size or special rights of the holder of such interest, causes the holder to participate in the management and operations of such entity or have the right or power to participate in the direction of the management and operations of such entity. Nothing in the prior two sentences shall be deemed to prohibit you from owning one percent (1%) or less of the outstanding stock of any class of any corporation. In addition, you agree to follow such internal conflict policies and procedures (including, without limitation, policies designed to prohibit insider trading) as adopted and amended from time to time by the Company, and to certify from time to time that you are following such policies and procedures if so requested by the Company. In that regard, should your business activities in connection with Rexx, FKI, FE or NES create an actual conflict under the Company's internal conflict policies and procedures, the parties agree to inform each other promptly and reasonably cooperate with the Company to agree upon an appropriate resolution of the conflict, if any.

You hereby represent, warrant and covenant and agree that your execution of this letter and the performance of your duties hereunder does not and will not violate or be a breach of any agreement with a former employer, client or any other person or entity, including, but not limited to, the Confidentiality and Non-Solicitation Agreement between you and Newmark Knight Frank, executed by you on or about October 28, 2008, a copy of which you have provided to the Company. You also represent and warrant that you have not ever been the subject of a suspension, revocation, consent decree, or other disciplinary action by any regulatory agencies or bodies; that you have never been indicted for or convicted of a misdemeanor or felony other than with respect to a traffic violation. Further, you agree to indemnify the Company for, and hold the Company harmless from, and against, all claims, including, but not limited to, attorneys' fees and expenses of investigation, by any third party which may now have or may hereafter come to have any claim against us based upon or arising out of any non competition or non solicitation agreement or confidentiality agreement between you and such third party which was in existence as of the date of this letter and not disclosed to us in writing.

In addition, in consideration of your Base Salary, and any other rights and benefits provided to you in this Agreement, you agree as follows:

(b)     From the Effective Date until the date that is twelve (12) months after the date of the termination of your employment by the Company, you will not, without the prior written consent of the Company, directly or indirectly, except with regards to your business activities in connection with Rexx, FKI, FE and NES:

(i)     solicit, induce or influence any person which has a business relationship with the Company, URA, each of their respective Affiliates and all members, officers, owners, partners, shareholders of the each of the foregoing (collectively the "Group") to discontinue or reduce the extent of such relationship in a manner in any way detrimental to the Group,

(ii)     (A) recruit, solicit or otherwise induce or influence any employee, consultant or advisor of the Group, to discontinue such person's relationship with the Group or with any asset owned or operated by the Group or (B) hire any such employee, consultant or advisor,

(iii)     be Affiliated in any way with any company or person, which does any of the things which you are prohibited from doing under Sections (i) or (ii) above,

(iv)     disparage the Group in any communications, whether in writing or orally, in a manner that could reasonably be expected to in any way intended to or which does injure the Group's business or reputation,

(v)     divulge to anyone (except as required by law), use, retain copies of or seek to benefit personally from any confidential information, Trade Secret (as defined below) or intellectual property of the Group, including but not limited to:

(A)     all business or financial information, track records, investment performance records or terms, plans, processes, procedures and strategies, market research and analyses, projections, financing arrangements, consulting and sales

methods and techniques, expansion plans, forecasts and forecast assumptions, business practices, operations and procedures, marketing and merchandising information and strategy, distribution techniques, customer information and other business information, including records, designs, business plans, financial statements, manuals, memoranda, lists and other documentation respecting the Group or any asset owned or operated by the Group, or

(B) any information and materials which are proprietary and confidential to a third party and which have been provided to the Group by such third party for the Group's use, or

(C) any information derived from the information contained in Sections 1(b)(v)(A) or (B) above, or

(D) any ideas, designs, creations, inventions, discoveries, improvements, devices, practices, processes, methods or products, whether or not patented or patentable,

in each case directly or indirectly relating to or useful in or potentially useful in any aspect of the business of the Group, and as to which you are, or at any time during the term of your employment with the Company shall become, informed and which shall not be generally known to the public or recognized as standard practice (collectively, "Confidential Information"). For purposes hereof, the term "Trade Secret" shall have the meaning given in the Delaware enactment of the Uniform Trade Secrets Act, and shall include, without limitation, the whole or any portion or phase of any scientific or technical information, design, process, formula, concept, data organization, manual, other system documentation, or any improvement of any thereof, in any case that is valuable and secret (in the sense that it is not generally known to the Group's competitors); or

(vi) claim to have any right, title or interest of any kind or nature whatsoever in or to any products, methods, practices, processes, discoveries, ideas, design, Confidential Information (including, without limitation, and for the avoidance of doubt, the Company's track record and investment performance records), improvements, devices, creations or inventions in each case directly or indirectly relating to or useful in any aspect of the business of the Group, whether created, developed or invented by any of them or you during the term of your employment with the Company, provided, however, that you claim, and the Company acknowledges your claim, (a) to all right, title, and interest of any kind or nature whatsoever in or to U.S. Patent Nos. 7,974,904 and 8,180,697, along with their improvements and any further creations or inventions directly or indirectly relating to them; (b) as the owner of FKI, to all right, title, and interest of any kind or nature whatsoever in or to certain trademarks, copyrights, and other intellectual property associated with the provision of analytic services for real estate forecast modeling and calculation, along with their improvements and any further creations or inventions (including any derivative works) directly or indirectly relating to them; (c) as owner of FE, to all right, title, and interest of any kind or nature whatsoever in or to certain trademarks, copyrights, and other intellectual property associated with the development and distribution of alternative energy and distributed generation, along with their improvements and any further creations or inventions (including any derivative works) directly or indirectly relating to them. In the event of a breach or

a threatened breach of any of the covenants contained herein (the "Covenants"), the Group shall, in addition to any remedies it may have at law, have the right and remedy to have such Covenants specifically enforced by any court having equity jurisdiction, it being acknowledged and agreed that any breach of any of such Covenants will cause irreparable injury to the Group and that money damages will not provide an adequate remedy to the Group. You acknowledge and agree that the Covenants are reasonable and valid in geographical and temporal scope and in all other respects. If any court determines that any of such Covenants, or any parts thereof, are invalid or unenforceable, the other provisions and the remainder of any of the Covenants so impaired shall not thereby be affected and shall be given full effect, without regard to the invalid portions. If any court determines that any of the Covenants, or any parts thereof, are unenforceable because of the duration or geographic scope thereof, such court shall have the power to reduce the duration or geographic scope, as the case may be, of such Covenants and, in such reduced form, such Covenants shall then be enforceable. If any court holds any of the Covenants unenforceable by reason of its breadth of geographical scope or otherwise, it is the intention of the parties that such determination not bar or in any way affect the Group's right to the relief provided above or in the courts of any other jurisdiction as to breaches of any of such Covenants in such other jurisdictions, each of the Covenants as the relate to each jurisdiction being severable into diverse and independent Covenants.

This Agreement shall be binding upon, inure to the benefit of and be enforceable by the parties hereto and their respective heirs, legal representatives, successors and assigns. You understand that you have been selected by us on the basis of your personal qualifications, experience and skills. You agree, therefore, that you cannot assign all or any portion of your performance under this Agreement. Nothing contained in this Agreement shall be to the benefit of or enforceable by any person that is not a party hereto, provided that in the event of your death or incapacity references in this Agreement to you shall be deemed, where applicable, to refer to your beneficiary, estate or other legal representative.

This Agreement shall be governed by and construed and interpreted in accordance with the internal laws of the State of New York. In the event of any dispute or claim relating to or arising out of this Agreement or any other agreement between the parties, or your employment or termination of employment with the Company, all parties to this Agreement agree that all such disputes shall be fully and finally resolved by binding arbitration conducted by the American Arbitration Association in New York, New York under its Commercial Arbitration Rules. Judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. All fees, costs and expenses, including reasonable attorneys' fees, court costs and costs of appeal, incurred by the prevailing party in any such litigation, action, arbitration or proceeding shall be reimbursed by the non-prevailing party; provided, that if a party to any such litigation, action, arbitration or proceeding prevails in part, and loses in part, the court, arbitrator or other adjudicator presiding over such litigation, action, arbitration or proceeding shall award a reimbursement of the fees, costs and expenses incurred by such party on an equitable basis.

This Agreement supersedes any prior representations or agreements, whether written or oral between you and us in relation to the terms addressed herein. This Agreement does not contain all terms to be addressed in the Definitive Documents, but the Definitive Documents shall not contain any terms, conditions or restrictions that are less favorable to you than the

terms, conditions and restrictions that are set forth in this Agreement. This Agreement may not be modified or amended except by a written agreement, signed by all parties hereto, that expressly refers to the provision being amended.

To indicate your acceptance of the terms contained in this Agreement, please sign and date this Agreement in the space provided below and return it to us at your earliest opportunity.

Sincerely,

UNITED REALTY PARTNERS, LLC

By: _____
Jacob Frydman, Manager

And: _____
Eli Verschleiser, Manager


Accepted and agreed:

Date: ___6/4___, 2012

_____
Paul Frischer

# EXHIBIT C

**ETRE FINANCIAL LLC**

**LIMITED LIABILITY COMPANY AGREEMENT**

**August _15_, 2012**

# ETRE FINANCIAL, LLC

## LIMITED LIABILITY COMPANY AGREEMENT

THIS LIMITED LIABILITY COMPANY AGREEMENT (this "**Agreement**"), dated August __, 2012 2012, is made by and among ETRE Financial, LLC, a Delaware limited liability company (the "**Company**"); Jacob Frydman, Eli Verschleiser, Jesse Stein, Scott Panzer and Paul Frischer (the "**Principals**"); and Winter Investors, LLC ("JF Entity"), JS3 Alternative Investments LLC ("JS Entity"), SMP Realty NM LLC ("SP Entity"), Frischer Kranz Inc ("PF Entity"), and EVE, LLC ("EV Entity") (the initial "**Members**") executing this Agreement as of the date hereof, and each other Person who after the date hereof becomes a Member of the Company and becomes a party to this Agreement.

## RECITALS

The Company was formed as a limited liability company under the Act (as defined below) by the filing of a Certificate of Formation with the Secretary of State of the State of Delaware on June 20, 2012.

The parties to this Agreement wish to set forth their respective rights and obligations as members of the Company and provide for the management of the Company and its affairs and the conduct of its business.

NOW, THEREFORE, in consideration of the foregoing and the covenants and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, each intending to be legally bound, hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

**Section 1.1**      **Definitions**. The following capitalized terms used in this Agreement have the following meanings:

"**Act**" means the Delaware Limited Liability Company Act, as it may be amended from time to time, and any successor to the Act.

"**Adjusted Capital Account Balance**" of a Member as of any date means the balance in such Member's Capital Account as of such date (a) increased by any amount such Member is deemed obligated to contribute to the Company pursuant to Treasury Regulation Section 1.704-1(b)(2)(ii)(c) or is deemed obligated to restore with respect to any deficit balance pursuant to the penultimate sentences of Treasury Regulation Section 1.704-2(g)(1) and Section 1.704-2(i)(5) and (b) reduced by any allocations or distributions to such Member described in Treasury Regulation Sections 1.704-l(b)(2)(ii)(d)(4), (5) or (6).

"**Affected Members**" has the meaning set forth in Article 10.

"**Affiliate**" means with respect to any Person, any other Person which is controlling, controlled by, or under common control with (directly or indirectly through any Person) the Person referred to, and, if the Person referred to is a natural person, a Family Member of such Person. The term "control" (including, with correlative meaning, the terms "controlled by" and "under common control with") as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" means this Agreement, as amended, supplemented or restated from time to time.

"**Applicable Law**" means all existing and future applicable laws, rules, regulations, statutes, treaties, codes, ordinances, permits, certificates and applicable judgments, decrees, injunctions, writs, orders or like action of any court, arbitrator or other administrative, judicial or quasi-judicial tribunal or agency of competent jurisdiction, as any of the foregoing are amended, modified, codified, replaced or reenacted, in whole or in part, and in effect from time to time.

"**Board**" has the meaning set forth in Section 6.1.

"**Breaching Party**" has the meaning set forth in Section 14.4.

"**Business Day**" means any day other than (a) Saturday or Sunday or (b) any other day on which banks in Delaware are permitted or required to be closed.

"**Capital Account**" of a Member means the account maintained by the Company for each Member pursuant to Section 3.5 of which the initial balance for each Member is set forth on **Schedule A**.

"**Capital Contributions**" of a Member means the amount of cash and/or the fair market value (as determined by the Board) of property (net of liabilities secured by such property that the Company is considered to assume or take subject to under Section 752 of the Code) contributed by such Member to the Company, as set forth on **Schedule A**, as such Schedule may be amended from time to time.

"**Capital Securities**" means as to any Person that is a corporation, the authorized shares of such Person's capital stock, including all classes of common, preferred, voting and nonvoting capital stock, and, as to any Person that is not a corporation or an individual, the ownership or membership interests in such Person, including, without limitation, the right to share in profits and losses, the right to receive distributions of cash and property, and the right to receive allocations of items of income, gain, loss, deduction and credit and similar items from such Person, whether or not such interests include voting or similar rights entitling the holder thereof to exercise control over such Person.

"**Cause**" means (a) the Member being indicted of, or the subject of, a governmental or regulatory securities or criminal complaint (exclusive of misdemeanor traffic violations); (b) the Member being convicted of or entering a plea of nolo contendere to a felony or misdemeanor involving a crime of moral turpitude or dishonesty; (c) the finding by a court or arbitrator that the Member has committed an act of dishonesty, misappropriation, embezzlement or fraud involving

personal profit or a breach of fiduciary duty in connection with the performance of such Member's company duties, or which affects the Company, or any member of the Group, or property of any member of the Group, (c) the finding by a court or arbitrator that the Member has breached in any material respect this Agreement or any other agreement with the Company or any member of the Group which breach is not cured (to the extent reasonably susceptible to cure) after written notice to the Member of such breach and a thirty (30) Day opportunity to cure such breach, or (d) the finding by a court or arbitrator that the Member has breached any of the representations, warranties or covenants contained in this Agreement.

"**Certificate**" means the Company's Certificate of Formation filed with the Secretary of State of the State of Delaware on June 20, 2012.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Commenced Business**" means the time when the Company has executed agreements with respect to the launch of an Exchange Traded Real Estate Platform with the following third parties: (i) a property management/leasing company; (ii) a trading exchange; (iii) a provider of electronic information; and (iv) an institutional investor.

"**Company**" has the meaning set forth in the preamble to this Agreement.

"**Competing Businesses**" has the meaning set forth in Section 12.1.

"**Confidential Information**" has the meaning set forth in Section 12.1.

"**Conversion**" has the meaning set forth in Section 9.4.

"**Covered Person**" means (a) each Member, (b) each officer, director, manager, stockholder, employee, member, partner, representative or agent of each Member in the foregoing capacity listed, (c) each Manager, (d) any Liquidator, and (e) any other Person designated by the Board as a Covered Person.

"**Depreciation**" means, for each Fiscal Year, an amount equal to the depreciation, amortization or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such Fiscal Year; provided, however, that if the Gross Asset Value of an asset differs from its adjusted tax basis at the beginning of such Fiscal Year, Depreciation shall be an amount that bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction with respect to such asset for such Fiscal Year bears to such beginning adjusted tax basis; and provided further, that if the federal income tax depreciation, amortization or other cost recovery deduction for such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Board.

"**Effective Date**" means the date of this Agreement.

"**Exchange Traded Real Estate Platform**" means an electronic investment platform where investors will be able to buy and sell shares in publicly traded securities in entities that own individual real estate assets, and the ancillary businesses related thereto.

"**Fair Value**" of Units means the fair market value of the applicable Units, as determined by the Board in good faith (excluding, for purposes of this determination, any Board member controlling or otherwise affiliated with the a Member whose Units are being valued).

"**Family Member**" means, as applied to any Person who is an individual, such individual's spouse, parent, sibling, child, stepchild, grandchild or other descendent thereof (whether natural or adopted) and each trust, limited partnership, limited liability company or other estate or tax planning vehicle or entity created for the exclusive benefit of the individual or one or more of such Persons.

"**Fiscal Year**" has the meaning set forth in Section 8.3.

"**Former Member**" has the meaning set forth in Section 7.4(d).

"**Frischer Group**" means the PF Entity and the SP Entity.

"**Frischer Patents**" means (i) Method of trading in real estate derivatives, U.S. Patent No. #8,180,697; and (ii) Method of trading in real estate derivatives, U.S. No. Patent #7,974,904, which patents are expressly excluded from the meaning of the Stein-URP Patents (as hereinafter defined), or in any way a result of, or developed in reliance on, the Stein-URP Patents.

"**Frischer Patents Income**" means, for so long as Frischer and/or his Affiliates own the Frischer Patents, the sum of all income from any source whatsoever except only with respect to the proceeds of a Transfer of the Frischer Patents, if any, relating to the use, enjoyment, licensing, royalties, lease, sublease, license, concession or other grant of right to use all or any portion of the Frischer Patent and other benefits derived from the Frischer Patents received by Frischer and/or his Affiliates with respect to the Frischer Patents net of all actual cash expenses paid or incurred to third parties in order to generate such income, if any.

"**GAAP**" means United States generally accepted accounting principles consistently applied from period to period and throughout any period.

"**Gross Asset Value**" means, with respect to any asset, such asset's adjusted basis for federal income tax purposes, except as follows:

(i)       the initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined in good faith and agreed to by the contributing Member and the Board;

(ii)      for purposes of "booking up" the Capital Accounts of Members to reflect increases in the value of the Company upon certain occasions, the Gross Asset Value of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Board, as of the following times: (a) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution or as consideration for services performed on behalf of the Company; (b) the distribution by the Company to a Member of more than a de minimis amount of Company assets as consideration for an interest in the Company; and (c) the liquidation of the Company within the meaning of Treasury Regulation

Section 1.704-l(b)(2)(ii)(g); provided, however, that adjustments pursuant to clause (a) and clause (b) of this sentence shall be made only if the Board reasonably determines such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company.

(iii)　the Gross Asset Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution, as determined in good faith and agreed to by the Board.

If the Gross Asset Value of an asset has been determined or adjusted pursuant to paragraph (i) or paragraph (ii) above, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Net Income and Net Loss.

"Group" means the Company, its parents, subsidiaries, Affiliates and each of their respective owners, members, partners, shareholders, officers, managers and/or directors.

"**Indemnified Costs**" has the meaning set forth in Section 6.8(a).

"**IRS Notice**" has the meaning set forth in Section 3.10A.1(a).

"**Lien**" means (a) any encumbrance, mortgage, pledge, lien, charge or other security interest of any kind upon any property or assets of any character, or upon the income or profits therefrom; (b) any acquisition of or agreement to have an option to acquire any property or assets upon conditional sale or other title retention agreement, device or arrangement (including a capitalized lease); or (c) any sale, assignment, pledge or other transfer for security of any accounts, general intangibles or chattel paper, with or without recourse.

"**Liquidator**" has the meaning set forth in Section 9.2(a).

"**Manager**" has the meaning set forth in Section 6.1.

"**Member**" means each Person that executes a counterpart of this Agreement as a Member, and becomes a Member as provided herein or therein, as applicable, so long as such Person continues as a Member and is reflected as such in the records of the Company, in each case in such Person's capacity as a member of the Company, and "Members" means all such Persons. If a Member ceases to be a Member of the Company in accordance with the terms and conditions of this Agreement, all references in this Agreement to the actual name of that Member shall, if applicable, be deemed to refer to that Member's successors and permitted assigns pursuant to Section 7.3, as if the necessary changes have been made. References to a Member that is not a natural person shall also be deemed to include a Principal or any other person owning, controlling or otherwise affiliated with such Member who is also an employee of the Company.

"**Membership Rights**" means all legal and beneficial ownership interests in, and rights and duties as a Member of, the Company, including, without limitation, the right to share in Net Income and Net Loss, the right to receive distributions of cash and other property from the Company, and the right to receive allocations of items of income, gain, loss, deduction and credit and similar items from the Company.

"**Net Income**" and "**Net Loss**" for each Fiscal Year or part thereof means the income and loss of the Company for that period, as determined for federal income tax purposes, including all distributive items under Section 702 of the Code, adjusted to take into account any tax-exempt income of the Company and any expenses of the Company that are described in Section 705 or 709 of the Code as not deductible or amortizable for federal income tax purposes, and further adjusted as follows:

(a)     Upon adjustment of the Gross Asset Value of Company property pursuant to clauses (ii) and (iii) in the definition of Gross Asset Value, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such property;

(b)     Amount of depreciation, amortization and other cost recovery with respect to Company property having a Gross Asset Value that differs from its adjusted basis for tax purposes shall equal the Depreciation computed with respect to such property;

(c)     Items of income, gain, loss or deduction attributable to the disposition of Company property having a Gross Asset Value that differs from its adjusted basis for tax purposes shall be computed by reference to such property's book value in accordance with Treasury Regulation Section 1.704-l(b)(2)(iv)(g);

(d)     Any items that are specially allocated pursuant to Section 4.1(c) shall not be taken into account.

"**New Units**" shall mean any Units issued after the Effective Date other than (i) securities offered to the public pursuant to a registration statement filed under the Securities Act in connection with a Public Offering; (ii) securities issued to any sellers in consideration of the acquisition of another Person or business by the Company or any of its Subsidiaries by merger, consolidation, amalgamation, exchange of shares, the purchase of substantially all of the assets or otherwise; (iii) Units or options to purchase Units issued to any employees of, or providers of services to, the Company or its Subsidiaries pursuant to any form of incentive compensation plan or agreement approved by the Board; (iv) Units issued upon any Unit split, dividend, combination or other similar event with respect to the Units; (v) Units or warrants to purchase Units issued to one or more lenders as partial consideration for the Company's or any Subsidiary's debt financing; and (vi) Units subsequently issued on conversion, exercise or exchange of those Units, options, warrants or other rights which have been issued in compliance with, or on issuance were exempt from, the preemptive rights provided for in Section 7.6.

"**Notice of Proposed Issuance**" has the meaning set forth in Section 7.6(b).

"**Offer Period**" has the meaning set forth in Section 7.6(c).

"**Offered New Units**" has the meaning set forth in Section 7.6(b).

"**Original Cost**" means, with respect to a specified number of Units, an amount equal to the aggregate Capital Contributions, if any, attributable to such Units that have not been repaid by the Company as of the date of the exercise of the repurchase rights under this Agreement.

"**Partial Waiver**" has the meaning set forth in Section 7.6(a).

"**Permitted Transfer**" means: (i) any Transfer of Units by a Member to a a natural person who is a Family Member or Personal Representative of such Member solely for estate planning purposes so long as the Transferor retains sole and exclusive power to direct and exercise all Member rights pertaining to such Units, including but not limited to voting power over all of the Transferred Units, (ii) any Transfer of Units to a Family Member on such Member's death, (iii) a Transfer of Units pursuant to a Public Offering, (iv) any Transfer to the Company or another Member, (v) any Transfer to an Affiliate of a Principal, but only if the Company or another Member, (v) any Transfer to an Affiliate of a Principal, but only if the Principal retains sole and exclusive power to direct and exercise all Member voting, consent or approval rights pertaining to such Units. Any Transfer of Units pursuant to the preceding clauses (i), (ii), (iv) or (v) shall only be a Permitted Transfer if such Transferee agrees to execute a joinder to this Agreement providing that such Transferee is bound by all of the terms and conditions of this Agreement to the same extent that the Transferor was bound with respect to the Transferred Units.

"**Permitted Transferee**" means a Person to whom a Permitted Transfer of Units is made.

"**Person**" means any individual, sole proprietorship, partnership, joint venture, limited liability company, limited liability partnership, trust, estate, unincorporated organization, association, corporation, institution or other entity.

"**Personal Representative**" means the successor or legal representative (including without limitation, a guardian, executor, administrator or conservator) of a deceased or legally declared incompetent Member.

"**Platform Launch Date**" means the last day of the eighteenth (18th) month after the Effective Date.

"**Preemptive Rights Holder**" has the meaning set forth in Section 7.6(b).

"**Principal**" shall mean any of Jacob Frydman, Eli Verschleiser , Jesse Stein, Paul Frischer and Scott Panzer.

"**Proportionate Share**" has the meaning set forth in Section 7.6(d).

"**Proposed Buyer**" has the meaning set forth in Section 7.6(b).

"**Public Offering**" means the sale or distribution of the common stock of a Public Vehicle pursuant to an underwritten public offering registered under the Securities Act following a Conversion of the Company.

"**Public Vehicle**" has the meaning set forth in Section 9.4.

"**Real Estate Exchange Platform**" means an Exchange Traded Real Estate Platform or any similar or competitive business.

"**Regulatory Authorizations**" has the meaning set forth in Section 4.1(c)(vi).

"**Restricted Period**" has the meaning set forth in Section 12.2.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Stein-URP Patents**" mean the provisional application for patent for Real Estate Exchange Platform filed on or about October 26, 2011 and which was assigned 25% each to Jacob Frydman and Eli Verschleiser on January 23, 2012, and all other Patents issued as a result thereof or reliance thereon and which are hereafter obtained by the Company or the Principals, except the Frischer Patents.

"**Subsidiary**" or **Subsidiaries**" means as of any time any Person of which the Company at such time owns directly or indirectly through another Person at least a majority of the outstanding Capital Securities entitled to vote generally.

"**Substituted Member**" means a Transferee of a Member that is admitted as a Member to the Company pursuant to Section 7.3.

"**Successor**" means any Person to whom a Member shall have Transferred Units in a Transfer.

"**Termination Event**" has the meaning set forth in Section 14.15.

"**Tax Matters Partner**" has the meaning set forth in Section 14.9.

"**Transfer**" means, with respect to any Unit, property, asset or other right or interest, when used as a verb, to sell, assign, transfer, exchange, distribute, devise, gift, grant a lien on, encumber or otherwise dispose of such Unit, property, asset or other right or interest, in whole or in part, or, when used as a noun, the sale, assignment, transfer, exchange, distribution, devise, gift, granting of a lien, encumbrance or other disposition of such Unit, property, asset or other right or interest, in whole or in part, in either case, whether pursuant to a sale, merger, combination, consolidation, reclassification or otherwise, and whether voluntarily or by operation of law.

"**Transferor**" and "**Transferee**" have meanings corresponding to the definition of "Transfer."

"**Treasury Regulations**" means the final and temporary income tax regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"**Units**" means collectively, the interests issued by the Company representing Membership Rights in the Company.

"**URPA Group**" means the JS Entity, the JF Entity and the EV Entity.

"**Withholding Payment**" has the meaning set forth in Section 5.5(b).

**Section 1.2   Other Definitions.**  Certain additional defined terms used in this Agreement have the meanings specified throughout the Agreement.

**Section 1.3   Rules of Interpretation.**

(a)     The singular includes the plural and the plural includes the singular.

(b)     A reference to the masculine gender shall be deemed to be a reference to the feminine gender and vice versa.

(c)     The word "or" is not exclusive.

(d)     A reference to a Person includes its permitted successors and permitted assigns.

(e)     The words "include," "includes" and "including" are not limiting.

(f)     A reference in a document to an Article, Section, Exhibit, Schedule, Annex or Appendix is to the Article, Section, Exhibit, Schedule, Annex or Appendix of such document unless otherwise indicated.  Exhibits, Schedules, Annexes or Appendices to any document shall be deemed incorporated by reference in such document.

(g)     References to any document, instrument or agreement (i) shall include all exhibits, schedules and other attachments thereto, (ii) shall include all documents, instruments or agreements issued or executed in replacement thereof, and (iii) shall mean such document, instrument or agreement, or replacement or predecessor thereto, as amended, modified and supplemented from time to time and in effect at any given time.

(h)     The words "hereof," "herein" and "hereunder" and words of similar import when used in any document shall refer to such document as a whole and not to any particular provision of such document.

(i)     This Agreement is the result of negotiations among, and has been reviewed by, the Members with the advice of counsel to the extent deemed necessary by any Member. Accordingly, this Agreement shall be deemed to be the product of the Members, and no ambiguity shall be construed in favor of or against any Member on the basis of who drafted the Agreement.

(j)     All accounting terms not specifically defined in this Agreement shall be construed in accordance with GAAP.

(k)     The term "day" shall mean calendar day.  Whenever an event or action is to be performed by a particular date or a period ends on a particular date, and the date in questions falls on a day which is not a Business Day, the event or action shall be performed, or the period shall end, on the next succeeding Business Day.

(l)     All references in this Agreement to any law shall be to such law as amended, supplemented, modified and replaced from time to time.

## ARTICLE 2
## GENERAL PROVISIONS

**Section 2.1 Formation.** The parties agree to continue the Company under and pursuant to the Act. The Company was organized as a limited liability company by the filing of the Certificate pursuant to the Act with the Secretary of State of the State of Delaware on June 20, 2012. The parties acknowledge that this Agreement may require amendment upon a Conversion. The Members hereby confirm that Katina Hamm is an "authorized person" for purposes of the Act to execute and file the Certificate with the Secretary of State of Delaware, and hereby approve and ratify all actions taken by **Katina Hamm** in connection therewith.

**Section 2.2 Name.** The name of the Company is "ETRE Financial, LLC" and shall operate under such name, or such other name as may from time to time be selected by the Board.

**Section 2.3 Purpose.** The purpose of the Company is to establish an Exchange Traded Real Estate Platform and engage in any business activity permitted by the Act and approved by the Board.

**Section 2.4 Office.** The principal place of business of the Company shall be located at 44 Wall Street, New York, NY, or such other location as the Board may determine from time to time; provided, however, that the Board shall provide notice of such change of the principal place of business to the Members as promptly as practicable after such change. The Board may establish other places of business of the Company when and where required by or advisable for the Company's business.

**Section 2.5 Term.** The term of the Company commenced with the filing of the Certificate with the office of the Secretary of State of the State of Delaware and shall continue until the Company is dissolved in accordance with this Agreement and the Act.

**Section 2.6 Ownership of Company Property.** All property acquired by the Company, real or personal, tangible or intangible, shall be owned by the Company as an entity, and no Member, individually, shall have any ownership interest therein solely due to its capacity as a Member.

**Section 2.7 Registered Office; Registered Agent; Principal Office in the United States; Other Offices.** The registered agent and registered office of the Company required by the Act to be maintained in the State of Delaware shall be as provided in the Certificate or such other registered agent or office (which need not be a place of business of the Company) as the Board may designate from time to time in the manner provided by law.

**Section 2.8 No State Law Partnership.** The Company (i) shall be taxed as a partnership for all applicable federal, state and local income tax purposes and (ii) shall not be a partnership or joint venture for any other purpose, and no Member or any Manager shall, by virtue of this Agreement, be a partner or joint venture of any other Member or Manager.

## ARTICLE 3
## UNITS, CAPITAL CONTRIBUTIONS, NATURE OF INTERESTS AND ESTABLISHMENT OF CAPITAL ACCOUNTS

**Section 3.1    Units**.

(a)    _Authorization_. There are hereby established and authorized for issuance 100,000 Units. As of the Effective Date, 100,000 Units are issued and held as set forth on **Schedule A**. No Units or other interests purporting to confer Membership Rights shall be issued unless they have been authorized for issuance by the Company under the terms of this Agreement.

(i)    _Voting Rights_. Except as otherwise provided by this Agreement or as otherwise required by the Act or applicable law each Member shall be entitled to one vote per Unit on all matters upon which the Members have the right to vote under this Agreement; and

**Section 3.2    Issuance of Additional Units; Admission of Additional Members**. The Company may, subject to _Section 6.12_ and _Section 7.6_, issue additional Units or other Membership Rights, including any new class or series of Units, on terms, including relative rights and preferences, established by the Board, and amend this Agreement and **Schedule A** as the Board shall deem necessary or appropriate in connection with the authorization and issuance of such additional Units. No Person acquiring any such additional Units that is not currently a Member shall be admitted as a Member unless such Person shall execute and deliver a counterpart of or joinder to this Agreement.

**Section 3.3    Members' Capital Contributions**.

(a)    On the Effective Date, each Member is (i) committing to make the Capital Contributions to the Company in an aggregate amount equal to such Member's Commitment as and when called pursuant to and in accordance with the requirements of this Section 3.3; and (ii) is making, or has heretofore made a Capital Contribution to the Company in immediately available funds and/or an in-kind Capital Contribution in the amount set forth opposite such Member's name below under the heading "Initial Capital Contribution Amount" and, in consideration therefor, the Company is issuing to each such Member the number of Units set forth opposite such Member's name.

(b) All Initial Capital Contributions shall be made in cash except that the JS Entity and the PF Entity, in return for their Units, shall each execute a note (each a "Note"). Each Note shall have a term of 120 months, be non-recourse except as provide for herein, bear interest and be adjusted to the 10 year Treasury plus 200 basis points as of January 1st of each year and secured only by their Units. The JS Entity Note shall be in favor of the JF Entity and the EV Entity and shall be in the principal sum equal to (i) the JS Entity Initial Capital Contribution; and (ii) _increased_ by 33% of all Capital Calls (as defined in section 3.3(c) herein) contributed by the JF Entity and the EV Entity. A copy of the JS Entity Note is attached hereto as Exhibit "C". The PF Entity Note shall be in favor of the SP Entity and shall be in the principal sum equal to (i) the PF Entity Initial Capital Contributions; and (ii) increased by 33% of all Capital Calls contributed by the SP Entity. A copy of the PF Entity Note is attached hereto as Exhibit "D". The JS Entity

hereby directs the Company, and the Board hereby agrees, to pay all Distributions which would otherwise be paid to the JS Entity to be paid 50% to the JF Entity and 50% to the EV Entity until such time as the JS Note is paid in full. The PF Entity hereby directs the Company, and the Board hereby agrees, to pay all Distributions which would otherwise be paid to the PF Entity to be paid to the SP Entity until such time as the PF Note is paid in full.

### Initial Commitment and Capital Contribution Amount

| Member | Total Commitment | Initial Capital Contribution | Units |
|--------|------------------|------------------------------|-------|
| [JF Entity] | $ 250,000 | $ 62,500 | 15,000 |
| [EV Entity] | $ 250,000 | $ 62,500 | 15,000 |
| [JS Entity] | $ -0- | $ 125,000 | 30,000 |
| [SP Entity] | $ 500,000 | $ 125,000 | 20,000 |
| [PF Entity] | $ -0- | $ 125,000 | 20,000 |
| Total | $1,000,000 | $ 500,000 | 100,000 |

(c) In the event that the 75% of the Board determines that additional Capital Contributions beyond the initial contributions are necessary to fund actual or anticipated costs or expenses of the Company, the Board shall determine the aggregate amount of additional capital to request up to but not exceeding the total Commitment, and shall call for Capital Contributions in proportion to the Commitments made from each of the Members (each a "Capital Call").

(d) With respect to each such Capital Call, the Members who made Commitments shall have the obligation to make Capital Contributions to the Partnership equal to the aggregate amount of such Capital Call. Each such Member shall make a pro rata Capital Contribution to the Partnership in an amount proportional to its respective Commitment. These Members shall make their Capital Contributions not later than the twentieth (20th) Business Day following their receipt of written notice thereof specified in such notice.

(e) If any Member who has made a Commitment fails to fund all or any part of such Member's pro rata share of any such required Capital Contributions, each other Member who made a Commitment shall have the right and option, pro rata based on such other Members' ownership of Units who made Commitments, to fund the unpaid amount (including any other Member's pro rata share of the unpaid amount not funded by such other Member). Should any of the Capital Call remain unfunded after this right is offered then any of the Other Members who funded their portion of the Capital Call may fund a portion of the defaulting Member's required Capital Contribution, pro rata, and they shall be issued a number of additional Units equal to (i) the amount funded, divided by (ii) the total Commitment amount of the defaulting member, multiplied by (iii) Units held by the defaulting Member, and the number of Units held by such defaulting Member shall be deemed reduced by a like number. The issuance of additional Units pursuant to this Section 3.3(e) is authorized without further approval of the Company or Board and in accordance with the terms of Section 3.2.

(f) Should any of the Capital Call remain unfunded after this right is offered to the Other Members who funded their portion of the Capital Call, each of the Members other than the defaulting Member shall be issued a number of additional Units equal to (i) the unpaid amount divided by (ii) the total Commitment amount of the defaulting member, multiplied by (iii) the percentage of Units each of the Members owns of the total units excluding the Units being issued. The number of Units held by such defaulting Member shall be deemed reduced by (i) the unpaid amount, divided by (ii) the total Commitment of the defaulting member. In addition, the Frischer Patents and Frischer Patent Income shall no longer remain subject to the restrictions imposed by Section 5.4.1 and 5.4.2.

(g) Except as set forth in this <u>Section 3.3,</u> no Member shall have any obligation to make any additional Capital Contribution to the Company at any time, and any future Capital Contributions made by any existing Member or new Member shall only be made in connection with a duly-authorized issuance of Units made in compliance with <u>Section 3.2.</u>

(h) <u>In the event any Member fails to make its Initial Capital Contribution as required by Section 3.3(a) within 10 days of the Effective Date, the Company shall be dissolved pursuant to Section 9 (a "Failure to Fund"). The parties agree that in the event of a Failure to Fund they shall each bear their own costs associated with their involvement in the transactions contemplated by this Agreement and waive and otherwise release each other of any and all claims that currently exist or that may arise in the future associated with their involvement in the transactions contemplated by this Agreement. The parties agree that the JF Entity shall assume the responsibility without compensation to effect a dissolution caused by a Failure to Fund including but not limited to the filing and signing of any required federal or state tax returns and documents with the the the Secretary of State of Delaware.</u>

**Section 3.4** <u>Nature Of Interests</u>. The Units and all other Membership Rights shall for all purposes be personal property. No Member has any interest in specific Company property. Each Member hereby waives any and all rights such Person may have to initiate or maintain any suit or action for partition of the Company's assets.

**Section 3.5** <u>Capital Accounts</u>. An individual Capital Account shall be established and maintained for each Member in accordance with the rules of Treasury Regulations Section 1.704-1(b)(2)(iv). Each Member's Capital Account shall be increased by (i) the amount of money contributed by such Member to the Company, (ii) the Gross Asset Value of property contributed by such Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to under Section 752 of the Code), and (iii) allocations to such Member of Net Income (or items thereof). Each Member's Capital Account shall be decreased by (i) the amount of money distributed to such Member by the Company, (ii) the Gross Asset Value of property distributed to such Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to under Section 752 of the Code), and (iii) allocations to such Member of Net Loss (or items thereof). The Capital Accounts also shall be maintained and adjusted as permitted by the provisions of Treasury Regulation Section 1.704-1(b)(2)(iv)(f) and as required by the other provisions of Treasury Regulation Section 1.704-1(b)(2)(iv) and Section 1.704-1(b)(4). Upon the Transfer of all or a portion of a Member's Units, the Capital Account of the

Transferor that is attributable to the Transferred Units shall carry over to the Transferee Member in accordance with the provisions of Treasury Regulation Section 1.704-1(b)(2)(iv)(l).

**Section 3.6** **Negative Capital Accounts**. No Member shall be required to pay to any other Member or the Company any deficit or negative balance that may exist from time to time in such Member's Capital Account (including, without limitation, any such deficit or negative balance as may exist upon and after dissolution of the Company).

**Section 3.7** **No Withdrawal**. No Member shall be entitled to withdraw all or any portion of such Member's Capital Contributions or the balance of such Member's Capital Account, to borrow or withdraw any portion of such Member's Capital Contribution or Capital Account from the Company, or to receive any distribution from the Company, except as expressly provided herein.

**Section 3.8** **Loans From Members**. Loans by Members to the Company shall not be considered Capital Contributions. If any Member shall advance funds to the Company in excess of the amounts required hereunder to be contributed by such Member to the capital of the Company, the making of such advances shall not result in any increase in the amount of the Capital Account of such Member unless otherwise agreed by the Company (with the approval of the Board) and such Member. The amount of any such advances that are not agreed to be additional Capital Contributions shall be a debt of the Company to such Member and shall be payable or collectible in accordance with the terms and conditions upon which such advances are made. The making of any loan must be approved by the Board in advance of it being made.

**Section 3.9** **Units Governed by Article 8**. The Company hereby irrevocably elects that all Units in the Company shall be securities governed by Article 8 of the Uniform Commercial Code as in effect in the State of Delaware and each other applicable jurisdiction. Should the Company issue certificates to a Member evidencing the Units held by such Member in the Company, each such certificate shall bear the following legend:

> "This certificate evidences an interest in ETRE Financial, LLC and shall be a security governed by Article 8 of the Uniform Commercial Code as in effect in the State of Delaware and, to the extent permitted by applicable law, each other applicable jurisdiction."

**Section 3.10** **Code Section 83(b) Election**.

(a) Each Member that acquires Units subject to vesting hereunder agrees that within thirty (30) days after such Person becomes a Member, the Person who is performing the services to which the vesting requirement relates shall file an election with the Internal Revenue Service under Section 83(b) of the Code and the Treasury Regulations promulgated thereunder with respect to such Units.

(b) By executing this Agreement or a joinder agreement, each Member authorizes and directs the Company to elect to have the "Safe Harbor" described in the proposed Revenue Procedure set forth in Internal Revenue Service Notice 2005-43 (the "**IRS Notice**") apply to any interest in the Company transferred to a service provider by the Company on or after the effective date of such Revenue Procedure in connection with services provided to the Company.

For purposes of making such Safe Harbor election, Jacob Frydman is hereby designated as the "partner who has responsibility for U.S. federal income tax reporting" by the Company and, accordingly, execution of such Safe Harbor election by Jacob Frydman constitutes execution of a "Safe Harbor Election" in accordance with Section 3.03(1) of the IRS Notice. The Company and each Member hereby agree to comply with all requirements of the Safe Harbor described in the IRS Notice, including the requirement that each Member shall prepare and file all U.S. federal income tax returns reporting the income tax of each "Safe Harbor Partnership Interest" issued by the Company in a manner consistent with the requirements of the IRS Notice. A Member's obligations to comply with the requirements of this Section 3.10 shall survive such Member's ceasing to be a Member of the Company or the termination, dissolution, liquidation and winding up of the Company, and, for purposes of this Section 3.10, the Company shall be treated as continuing in existence.

(c)     Each Member authorizes the Board to amend this Section 3.10 to the extent necessary to achieve substantially the same tax treatment with respect to any Unit transferred to a service provider by the Company in connection with services provided to the Company as set forth in Section 4 of the IRS Notice (e.g. to reflect changes from the rules set forth in the IRS Notice in subsequent Internal Revenue Service guidance); provided, that such amendment is not adverse to such Member (as compared with the after tax consequences that would result if the provisions of the IRS Notice applied to all Units transferred to a service provider by the Company in connection with services provided to the Company).

## ARTICLE 4
## ALLOCATIONS

### Section 4.1     Allocations of Net Income and Net Loss.

(a)     Subject to Section 4.1(c), for each Fiscal Year (or portion thereof), except as otherwise provided in this Agreement, Net Income and Net Loss (and, to the extent necessary, individual items of income, gain, loss or deduction) of the Company shall be allocated among the Members in a manner such that that would result in positive Capital Account balances equal to all amounts required to be distributed pursuant to the method described in Section 9.2(c)iii assuming a hypothetical liquidation of the Company. In determining the amounts distributable to the Members using such method the distribution to each Member shall be equal to the amount that would be received by such Member if all Company assets were sold on the last day of the allocation period for cash equal to their basis for Capital Account purposes (provided, however, that the Company may increase or decrease Capital Accounts in accordance with applicable Treasury Regulations to reflect any revaluations of the Company's property, including any write-downs in the amount thereof), all Company liabilities were satisfied to the extent required by their terms (limited, with respect to each "partner nonrecourse liability" and "partner nonrecourse debt," as defined in Treasury Regulations Section 1.704-2(b)(4), to the fair market value of the assets securing such liability), and the net assets of the Company were distributed in full to the Members all as of the last day of such allocation period in accordance with Section 5.2 hereof.

(b)     The parties intend that the allocation provisions of this Section 4.1 shall produce Capital Account balances of the Members that will be consistent with the distribution provisions

of Section 5.2 and the liquidation provisions of Section 9.2(c). Notwithstanding anything to the contrary in this Agreement, to the extent the Board determines that the allocation provisions of this Section 4.1 may fail to produce such Capital Account balances, (i) such provisions shall be amended by the Board to the extent necessary to produce such result and (ii) Net Income and Net Loss and other items of income, gain, loss, credit and deduction of the Company for the most recent open year (or items of income, gain, loss, deduction, and Code Section 705(a)(2)(B) expenditures of the Company for such years) shall be reallocated among the Members to the extent it is not possible to achieve such results with allocations of Net Income and Net Loss (or items of income, gain, loss, deduction, and Code Section 705(a)(2)(B) expenditures) for the current year and future years, as determined by the Board. This Section 4.1(a) shall control notwithstanding any reallocation or adjustment of taxable income, taxable loss, or items thereof by the Internal Revenue Service or any other taxing authority.

(c)     Special Allocations.

(i)     Minimum Gain Chargeback. Except as otherwise provided in Treasury Regulation Section 1.704-2(f), notwithstanding any other provision of this Agreement, if there is a net decrease in partnership minimum gain (as defined in the Code) during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in partnership minimum gain, determined in accordance with Treasury Regulation Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Treasury Regulation Sections 1.704-2(f)(6) and 1.704-2(j)(2). This Section 4.1(c)(i) is intended to comply with the minimum gain chargeback requirement in Treasury Regulation Section 1.704-2(f) and shall be interpreted consistently therewith.

(ii)    Partner Minimum Gain Chargeback. Except as otherwise provided in Treasury Regulation Section 1.704-2(i)(4), notwithstanding any other provision of this Section 4.1, if there is a net decrease in partner nonrecourse debt minimum gain (as defined in the Code) attributable to a partner nonrecourse debt during any Fiscal Year, each Member who has a share of the partner nonrecourse debt minimum gain attributable to such partner nonrecourse debt, determined in accordance with Treasury Regulation Section 1.704-2(i)(5), shall be specially allocated items of income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in partner nonrecourse debt minimum gain attributable to such partner nonrecourse debt, determined in accordance with Treasury Regulation Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Treasury Regulation Section 1.704-2(i)(4) and 1.704-2(j)(2). This Section 4.1(c)(ii) is intended to comply with the minimum gain chargeback requirement in Treasury Regulation Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(iii)   <u>Qualified Income Offset</u>.  In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulation Sections 1.704-1(b)(2)(ii)(d)(4), (d)(5) or (d)(6), items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the deficit Adjusted Capital Account Balance of such Member as quickly as possible, provided that an allocation pursuant to this <u>Section 4.1(c)(iii)</u> shall be made if and only to the extent that such Member would have a deficit Adjusted Capital Account Balance after all other allocations provided for in this <u>Article 4</u> have been tentatively made as if this <u>Section 4.1(c)(iii)</u> were not a term of this Agreement.  This <u>Section 4.1(c)(iii)</u> is intended to constitute a "qualified income offset" provision as described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(iv)   <u>Gross Income Allocation</u>.  In the event any Member has a deficit Capital Account at the end of any Fiscal Year which is in excess of the amount such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulation Sections 1.704-2(g)(1) and 1.704-2(i)(5), each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this <u>Section 4.1(c)(iv)</u> shall be made if and only to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this <u>Section 4.1(c)</u> have been tentatively made as if this <u>Section 4.1(c)(iv)</u> and <u>Section 4.1(c)(iii)</u> hereof were not in the Agreement.

(v)   <u>Partner Nonrecourse Deductions</u>.  Any partner nonrecourse deductions for any Fiscal Year shall be specially allocated to the Member who bears the economic risk of loss with respect to the partner nonrecourse debt to which such partner nonrecourse deductions are attributable in accordance with Treasury Regulation Section 1.704-2(i)(1).

(vi)   <u>Curative Allocations</u>.  The allocations set forth in <u>Section 4.1(c)(i)</u>, <u>(ii)</u>, <u>(iii)</u>, <u>(iv)</u> and <u>(v)</u> hereof (collectively, the "<u>Regulatory Allocations</u>") are intended to comply with requirements of the Treasury Regulations.  It is the intent of the parties hereto that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this <u>Section 4.1(c)(vi)</u>.  Therefore, notwithstanding any other provision of <u>Article 4</u> (other than the Regulatory Allocations), the Board shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Adjusted Capital Account Balance is, to the extent possible, equal to the Capital Account such Member would have had if the Regulatory Allocations were not terms of this Agreement and all Company items were allocated pursuant to <u>Section 4.1</u>.  In exercising its discretion under this <u>Section 4.1(c)(vi)</u>, the Board shall take into account future Regulatory Allocations under <u>Section 4.1(c)(iii)</u> and <u>(v)</u> that, although not yet made, are likely to offset other Regulatory Allocations previously made under <u>Section 4.1(c)(ii)</u> and <u>(iv)</u>.

(vii)   _Allocations of Withholding_.  To the extent the Company receives (or is deemed to receive) an amount of income that is net of any withholding tax, (i) such income shall be allocated among the Members as if the Company received the gross amount of such income before giving effect to the payment of the withholding tax and (ii) any resulting tax credit shall be allocated among the Members such that each Member receives a portion thereof reflecting the amount of withholding tax to which such Member would be subject if such Member received the gross income allocated to such Member in accordance with clause (i) above directly.

(viii)   _Member Loans_.  Any interest deductions with respect to loans to the Company by any Member shall be specially allocated to the Member making such loan.

(ix)   _Distributions of Nonrecourse Liability Proceeds_.  If, during a Fiscal Year, the Company makes a distribution to any Member of the proceeds of any nonrecourse liability of the Company that would otherwise be allocable to an increase in partnership minimum gain pursuant to Treasury Regulation Section 1.704-2(h), then the Company may elect, to the extent permitted by Treasury Regulation Section 1.704-2(h)(3), to treat such distribution as a distribution that is not allocable to an increase in partnership minimum gain.

(d)   With respect to any Fiscal Year during which any Member's interest in the Company changes, allocations under Article 4 shall be adjusted appropriately to take into account the varying interests of the Members during such period.

## Section 4.2   Tax Allocations.

(a)   _Generally_.  Except as otherwise provided in this Section 4.2, taxable income and loss and all items thereof shall be allocated to the Members to the greatest extent practicable in a manner consistent with the manner set forth in Section 4.1 and Sections 704(b) and (c) of the Code.  Allocations pursuant to this Section 4.2 are solely for federal income tax purposes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Income, Net Loss, other items or distributions pursuant to any provision of this Agreement.

(b)   _Section 704(c) of the Code_.  In accordance with Section 704(c) of the Code, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Gross Asset Value.

(c)   _Adjustments Under Section 704(c) of the Code_.  In the event the Gross Asset Value of any Company asset is adjusted pursuant to paragraph (ii) of the definition of "Gross Asset Value," subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted tax basis of such asset and its Gross Asset Value in the same manner as under Section 704(c) of the Code.

(d)    Decisions Relating to Section 704(c) of the Code.    Any elections or other decisions relating to allocations under this Section 4.2, including the selection of any allocation method permitted under Treasury Regulation Section 1.704-3, shall be made by the Board.

**Section 4.3    Limitations on Allocations to Holders of Units**.   Notwithstanding any other provision of this Article 4, to the extent that any Member has been granted any Units that, by the terms of such grant or by agreement, entitle the holder, once such Units vest, to receive less than the full amount of allocations of Net Income otherwise allocable with respect to such class or series of Units generally, then the provisions of such grant or agreement shall supersede such holder's rights under this Article 4 and the amount of reduction in allocations to such holder shall be made to all other Members in accordance with this Article 4.

## ARTICLE 5
## DISTRIBUTIONS

**Section 5.1    General**.   Subject to the provisions of Section 5.3, distributions pursuant to this Article 5 may be made from time to time in the sole discretion of the Board acting unanimously.

**Section 5.2    Distributions**.

(a) Subject to the provisions of Section 5.3 and Section 5.6, all distributions made by the Company from any source and with respect to all income or capital items received by the Company, as determined from time to time by the Board, shall be made to the holders of Units pro rata in accordance with the number of Units held by them.

(b) The Board may in its discretion provide for annual draws by Members, pro rata according to the Units held by them, which shall be treated as advances against future distributions.

**Section 5.3    Tax Distributions**.

(a) Subject to the limitations set forth below, on or before March 31 of each Fiscal Year, the Company shall distribute to each Person who was a Member during the immediately preceding Fiscal Year of the Company an amount of cash equal to the product of (x) the highest federal and New York State and New York City individual or corporate marginal tax rate pertaining to the type of income being taxed to any Member (i.e., the same rate shall be applied to each Member) multiplied by (y) the excess of (a) the cumulative amount of taxable income and gain allocated to such Person for federal income tax purposes in the Company's income tax return filed or to be filed with respect to such immediately preceding Fiscal Year and all prior Fiscal Years, over (b) the cumulative amount of losses, deductions and credits allocated to such Person for federal income tax purposes in the Company's income tax returns filed or to be filed with respect to such immediately preceding Fiscal Year and all prior Fiscal Years; with such product being reduced by any prior distributions to such Person pursuant to this Section 5.3. The amount of any distributions to a Member pursuant to this Section 5.3 shall be credited against and reduce any amounts otherwise distributable to such Member pursuant to Section 5.2 or Section 9.2(c).

(b) In the discretion of the Board, distributions under this Section 5.3 may be made on an estimated basis each quarter and if such estimated distributions exceed the actual amount required on March 31, such Member receiving excess distributions shall be given a credit balance and such excess shall be deducted from such Member's next distribution(s) under this Section 5.3 (until fully repaid).

(c) No distribution under this Section 5.3 shall be made if the making of such distribution would constitute a violation of the Act or any other applicable law or regulation or order of any court of competent jurisdiction or any contract or agreement by which the Company or any of its Subsidiaries is bound, including without limitation any credit agreement of the Company or any of its Subsidiaries.

(d) The Company shall provide, on a quarterly basis, information necessary to determine the estimated amount of federal and state income tax liability based on this Section 5.3. When otherwise required by this Section 5.3, distributions under this Section 5.3 shall be made no later than April 10th, June 10th, September 10th and December 10th of the applicable year.

**Section 5.4**     **Frischer Patents and Derivatives Business**.

The parties acknowledge that as of the Effective Date: (i) Frischer is the sole owner of the Frischer Patents, and Frischer represents and warrants that he is the owner of the Frischer Patents, has good title thereto, and has not transferred, sold or hypothecated any interest in the Frischer Patents to any other person; and (ii) that as of the Effective Date there exists no Frischer Patents Income. Notwithstanding the foregoing, Frischer has advised the Company and each of the Members that certain Persons may in the future assert claims against Frischer with respect to the Frischer Patents ("Third Party Claims"), in which case, Frischer, shall, directly or through one or more of his Affiliates, and at his or their costs, defend any such Third Party Claim.

**5.4.1**     **Assignment of Frischer Patents Income**.

Subject to (i) the Company having Commenced Business by launching an Exchange Traded Real Estate Platform on or before the Platform Launch Date; (ii) PF Entity is a Member of the Company; and (iii) the Frischer Patents have not been Transferred, Frischer hereby assigns to the Company 50% of all of his and his Affiliates' right and interest in and to the Frischer Patents Income generated from and after the Platform Launch Date from any and all sources. If, at any time, all of the foregoing conditions (i), (ii), and (iii) are not met, Frischer shall no longer have the obligation to assign to the Company any of the Frischer Patents Income.. Of the 50% assigned to the Company, 25% shall be assigned by the Company to the SP Entity, 7.5% to the JF Entity, 7.5% to the EV Entity and 10% to the JS Entity The Remaining fifty percent (50%) of the Frischer Patents Income, and all proceeds of a Transfer of the Frischer Patents, shall remain the exclusive property of Frischer and/or his respective Affiliates, but subject to the Company's rights pursuant to section 5.4.2 below.

**5.4.2**     **Company's right of First Refusal with respect to the Frischer Patents**.

(a) From the Effective Date and so long as Frischer is an employee of the Company and/or a member of the Board and/or is an Affiliate of the PF Entity and/or has not Transferred the PF Entity's membership interest in the Company (in accordance with the terms of this

Agreement) (the "ROFER Period"), except as provided in this Section 5.4, Frischer shall not directly or indirectly, sell, transfer, assign, or otherwise convey, or mortgage, pledge, hypothecate or otherwise dispose of (collectively, "Sale"), all or any interest in the Frischer Patents to any Person. A Sale shall not include a court ordered conveyance as a result of a Third Party Claim, or the determination by a court of competent jurisdiction in connection with a Third Party Claim, that Persons other than Frischer have an interest in all or part of the Frischer Patents.

(b) Subject to this subsection 5.4.2, during the ROFER Period in the event Frischer shall have received and conditionally accepted a bona fide offer from an independent third party for the purchase and sale of the Frischer Patents ("Offer"), Frischer shall give notice of such acceptance of Offer, stating in detail all the terms and conditions thereof ("Sale Notice"), to the Company. The Company shall have the right (but not the obligation) within thirty (30) Business Days after receipt of the Sale Notice ("Refusal Exercise Period") to elect to purchase the Frischer Patents by paying Frischer a sum equal to eighty percent (80%) of the price stated in the Offer, and otherwise upon the terms and conditions of the Offer.

(c) Subject to this subsection 5.4.2, if the Company elects to purchase the Frischer Patents pursuant to Section 5.4(c), it shall consummate such purchase, within ten (20) Business Days after the date such election is made. In the event the Company does not elect to purchase the Frischer Patents pursuant to Section 5.4(c), Frischer shall have the right during the ninety (90) day period immediately following the Refusal Exercise Period to sell the Frischer Patents, only upon the terms and conditions specified in the Offer to the Person named therein, and in the event such sale is not so consummated, the Frischer Patents shall remain subject to the restrictions imposed by Section 5.4.2.

(d) Notwithstanding anything contained in this subsection 5.4.2 to the contrary, in the event that a Third Party Claim is filed with respect to the Frischer Patents, then Frischer shall, within ten (10) days of being served with notice of same, deliver to the Company all documents and other information regarding such Third Party Claim and ask the Company and the Principals to indemnify Fischer with respect to said Third Party Claim and any and all costs, obligations, liabilities, legal fees and damages for which Fischer may be liable or obligated with respect to such Third Party Claim. The Company through unanimous approval of the Board and each Principal may elect to indemnify Frischer (but shall not be obligated to make said election) within thirty (30) business Days after the date Frischer delivers to the Company, and the Company acknowledges receipt of, all documents and other information regarding said Third Party Claim. In the event that the Company and the Principals do not provide written notice of their election to indemnify Fischer as herein set forth on or before the close of business on the 30th Business Day after the Document Delivery Date, then the Company and the Principals shall be deemed to have elected **_not_** to provide said indemnification to Frischer, in which case the Right of First Refusal granted to the Company in this section 5.4.2 shall be extinguished, and the Frischer Patents and Frischer Patent Income shall no longer remain subject to the restrictions imposed by Section 5.4.1 and 5.4.2.

**Section 5.5    Receipt of Fair Value; Withholding.**

(a)     Notwithstanding any provision of the Act, but subject to Section 7.4, no Person that ceases to be a Member of the Company shall be entitled to receive the fair value of such Person's interest in the Company prior to the dissolution and winding up of the Company.

(b)     The Company shall at all times be entitled to make payments with respect to any Member in amounts required to discharge any obligation of the Company to withhold from a distribution or make payments to any governmental authority with respect to any foreign, federal, state or local tax liability of such Member arising as a result of such Member's interest in the Company (a "**Withholding Payment**").  Any Withholding Payment made from funds withheld upon a distribution will be treated as distributed to such Member for all purposes of this Agreement.  Any other Withholding Payment will be deemed to be a recourse loan by the Company to the relevant Member.  The amount of any Withholding Payment treated as a loan plus interest thereon, from the date of each such Withholding Payment until such amount is repaid to the Company, at a rate per annum equal to the greater of (i) seven percent (7%), or (ii) the prime rate (as published in the Wall Street Journal) in effect on the date of the Withholding Payment plus three percent (3%), shall be repaid to the Company upon demand by the Company; provided, however, that in the Board's sole discretion, any such amount may be repaid by deduction from any distributions payable to such Member pursuant to this Agreement (with such deduction treated as an amount distributed to the Member) as determined by the Board in its sole discretion.

## ARTICLE 6
## MANAGEMENT OF THE COMPANY; INFORMATION

**Section 6.1     Management by Board of Managers**.  Except for situations in which the vote, consent or approval of one or more Members is expressly required by this Agreement or by non-waivable provisions of applicable law, (i) the powers of the Company, including, without limitation, (A) converting the Company into a corporation in accordance with Section 216 of the Act and Section 9.4 and (B) any merger or consolidation of the Company with any other Person pursuant to Section 18-209 of the Act, shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of, a Board of Managers (the "**Board**"); and each member thereof being referred to as a ("**Manager**") and (ii) the Board may make all decisions and take all actions for the Company not otherwise provided in this Agreement.

**Section 6.2     Expenses**.  The Company shall pay, or cause a Subsidiary to pay, all the reasonable out-of-pocket fees, costs and expenses incurred by the Managers in connection with travel to and attendance at Board meetings and other business functions on behalf of, or in connection with, the Company or any Subsidiaries or their respective businesses.

**Section 6.3     Constitution of the Board; Rights and Powers of the Board and Officers; Removal and Termination**.

(a)     The size of the Board shall be fixed at Four (4), two appointed by the URPA Group, and two appointed by the Frischer Group,  provided that  such number may be increased or decreased by the Managers as provided in Section 6.12. The initial members of the Board

shall be as follows, and the following designees are hereby duly elected as Managers of the Company:

> Jacob Frydman (the URPA Group Manager)
> Jesse Stein (the URPA Group Manager)
> Paul Frischer (the Frischer Group Manager)
> Scott Panzer (the Frischer Group Manager)

(b)     In the event any vacancy in the Board shall occur as a result of death, disability or resignation of a Manager appointed by the URPA Group, a replacement Manager may be designated by the URPA Group. In the event any vacancy in the Board shall occur as a result of death, disability or resignation of a Manager appointed by the Frischer Group, a replacement Manager may be designated by the Frischer Group. In the event any vacancy in the Board shall occur as a result of removal for Cause of a Manager appointed by the URPA Group, a replacement Manager may be designated by the Frischer Group. In the event any vacancy in the Board shall occur as a result of removal for Cause of a Manager appointed by the Frischer Group, a replacement Manager may be designated by the URPA Group. In the event that any other vacancy in the Board shall occur as a result of death, disability or resignation of a Manager, or removal of a Manager for Cause, a replacement Manager may be designated by action of the remaining members of the Board, or the vacancy may remain open.

(c)     Except as specifically provided otherwise in this Agreement or by non-waivable provisions of the Act, any action taken by the Board may only be taken with the approval, either in writing or at a duly called meeting, of Managers holding (in accordance with this Section 6.3(b)) a majority of the votes held by the Managers then serving on the Board. Each Manager shall be entitled to one (1) vote on matters coming before the Board.

(d)     The Board may establish one or more committees, which shall be comprised solely of Managers.

(e)     Any Manager may be removed from the Board for Cause by unanimous action of the other Managers. Any Manager's or Member's employment with the Company or a Subsidiary may be terminated by the Board for Cause by unanimous action of the Managers other than the Manager or Member whose employment is being terminated.

**Section 6.4     Officers**.    The Board may, from time to time appoint one or more individuals as officers and delegate to such officers such authority and duties as the Board deems advisable. In addition, the Board may assign titles (including, without limitation, chairman, chief executive officer, president, chief operating officer, chief financial officer, vice president, secretary, assistant secretary, treasurer or assistant treasurer) to such officers and, unless the Board decides otherwise, the assignment of such title shall constitute the delegation to such officer of the authority and duties that are normally associated with that office. Any number of titles may be held by the same individual. The salaries or other compensation, if any, of such officers shall be fixed from time to time by the Board. Any delegation pursuant to this Section 6.4 may be revoked at any time by the Board, in its sole and absolute discretion. The following are hereby appointed as officers of the Company:

| Name | Titles |
|------|--------|
| Paul Frischer | Chief Executive Officer |
| Jesse Stein | Executive Managing Director |
| Scott Panzer | Board Member |
| Jacob Frydman | Board Member |
| Eli Verschleiser | |

### Section 6.5    Meetings of Board.

(a)    The Board may hold its meetings in such place or places in the State of Delaware or outside the State of Delaware as it shall determine from time to time.

(b)    Meetings of the Board or a Board committee shall be held whenever called by at least one (1) Manager. Notice of the day, hour and place of holding of each meeting of the Board or any meeting of a Board committee shall be given to each Manager or committee member by email or any other method under Article 11, at least seventy-two (72) hours before the meeting. Unless otherwise indicated in the notice thereof, any and all business may be transacted at any such meeting. At any meeting at which every Manager or committee member shall be present, even though without any notice, any business may be transacted.

(c)    A quorum for the transaction of business by the Board shall consist of Managers holding a majority of the votes held by the Managers then serving on the Board, and a quorum for the transaction of business by a Board committee shall consist of committee members holding a majority of the votes held by the committee members then serving on such committee. If at any meeting of the Board or committee thereof, there is less than a quorum present, holders of a majority of the votes held by those present may adjourn the meeting from time to time until a quorum is present.

(d) Any Manager may participate in any meeting of the Board or a Board committee by means of telephone conference or similar communications equipment by means of which all persons participating in the meeting can hear each other, and such participation shall constitute presence in person at such meeting. Any Manager may participate in any meeting either in person or by proxy. A proxy may only be exercised by another Member and only for a single meeting after which it shall terminate. The Company must receive all proxies prior to the commencement of any meeting by any means.

(e)    Any action required or permitted to be taken at any meeting of the Board or a committee thereof may be taken without a meeting if a consent in writing is sought from all Managers, and the consent sets forth the action proposed to be taken. The consent takes effect once it is signed by Managers holding the requisite number of the votes held by the Managers then serving on the Board or such committee as such action requires. Prompt notice of the taking

of an action without a meeting by less than unanimous written consent shall be given to those Managers who have not consented in writing. A Manager who does not sign the consent may approve any matter by consent by email without actually signing the consent. If approval is requested in writing (including by e-mail) by a majority of the Managers with respect to any matter requiring approval of the Managers, and if a Manager has failed to respond to such request within 72 hours, such failure to respond shall be deemed an approval. All approvals and other written actions shall be filed with the minutes of proceedings of the Board or committee, as the case may be.

**Section 6.6    Liability.** Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company and its Subsidiaries, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company or a Subsidiary, and no Covered Person shall be obligated personally for any such debt, obligation or liability of the Company or a Subsidiary solely by reason of being a Covered Person.

**Section 6.7    Exculpation.**

(a)    To the fullest extent permitted by applicable law, no Covered Person shall be liable to the Company or any other Covered Person, Member or other Person that is a party to or otherwise bound by this Agreement for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person from and after the Effective Date in good faith on behalf of the Company and its Subsidiaries and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Agreement, except that a Covered Person shall not be released from liability to the Company or any other Covered Person, Member or other Person that is a party to or otherwise bound by this Agreement for any such loss, damage or claim incurred by reason of such Covered Person's fraud, intentional misconduct or bad faith violation of the implied contractual covenant of good faith and fair dealing, or such Covered Person's breach of this Agreement or other agreement with the Company or a Subsidiary to which such Covered Person is a party.

(b)    A Covered Person shall be fully protected in relying in good faith upon the records of the Company and its Subsidiaries and upon such information, opinions, reports or statements presented to the Company and its Subsidiaries by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company and its Subsidiaries, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits, losses or income or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid. Without limiting the foregoing, neither the Company nor any Covered Person shall have any liability with respect to any valuations performed pursuant to this Agreement, and shall be fully protected in relying in good faith upon the records of the Company and its Subsidiaries and upon information, opinions, reports or statements presented to the Company and its Subsidiaries by any person as to matters which the Company or such Covered Person reasonably believes are within such other Person's professional or expert competence.

## Section 6.8  Indemnification.

(a)    The Company shall cause its Subsidiaries to, indemnify and hold harmless each Covered Person to the fullest extent permitted by applicable law from and against any and all losses, claims, demands, costs, damages, liabilities (joint or several), obligations, expenses of any nature (including reasonable legal and accounting fees and expenses, costs of investigation and sums paid in settlement), judgments, fines, settlements, and other amounts ("**Indemnified Costs**") arising from any and all claims, demands, actions, suits, or proceedings, whether civil, criminal, administrative or investigative, in which the Covered Person may be involved, or threatened to be involved as a party or otherwise, incurred by reason of any act or omission performed or omitted by such Covered Person from and after the Effective Date in good faith on behalf of the Company and its Subsidiaries and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Agreement, regardless of whether the Covered Person is a Covered Person at the time any such Indemnified Cost is paid or incurred, except that no Covered Person shall be entitled to be indemnified in respect of (and this provision shall not reduce or limit the liability of a Covered Person with respect to) any Indemnified Cost incurred by such Covered Person by reason of such Covered Person's fraud, intentional misconduct or bad faith violation of the implied contractual covenant of good faith and fair dealing or such Covered Person's breach of a this Agreement or other agreement with the Company or a Subsidiary to which such Covered Person is a party; provided, however, that any indemnity under this Section 6.8 shall be provided out of and to the extent of the assets of the Company and its Subsidiaries (including insurance) only, and no Covered Person shall have any personal liability on account thereof.  Further, the Company shall not indemnify any Covered Person in connection with a proceeding (or part thereof) initiated by such Person against the Company or any Subsidiary or any other Covered Person, whether by direct claim, counterclaim or otherwise, unless the initiation thereof was approved or ratified by the Board.  The Company shall have the right to approve the selection of attorneys and to approve any settlement for any matter for which indemnification is claimed.  The Company may cause each of its Subsidiaries to execute a joinder agreeing to assume responsibility for its obligations pursuant to this Section 6.8 and to act in accordance herewith.

(b)    Notwithstanding any other provision of this Section 6.8, the Company shall, and shall cause its Subsidiaries to, reimburse Indemnified Costs incurred by a Covered Person in connection with such Person's appearance as a witness on behalf of the Company or its Subsidiaries or other participation at the request of the Company or a Subsidiary in a proceeding involving or affecting the Company or its Subsidiaries at a time when the Covered Person is not a named defendant or respondent in the proceeding.

(c)    The indemnification provided by this Section 6.8 shall be in addition to any other rights to which a Covered Person may be entitled under any agreement or vote of the Board, both as to an action in the Covered Person's capacity as a Covered Person, and as to an action in another capacity, and shall continue as to a Covered Person who has ceased to serve in such capacity and shall inure to the benefit of the heirs, successors, assigns, and administrators of each Covered Person.

## Section 6.9  Expenses; Advances. Subject to Section 6.8, to the fullest extent permitted by applicable law, the Company may, in the sole discretion of the Board, from time to

time, advance the expenses (including reasonable legal fees and expenses and costs of investigation) incurred by a Covered Person in defense or settlement of any claim, demand, action, suit or proceeding (whether civil, criminal, administrative, investigative or otherwise) that may be subject to a right of indemnification hereunder as such expenses are incurred by such Covered Person and prior to the final disposition thereof upon receipt by the Company of a written undertaking by or on behalf of such Covered Person to repay such amount to the extent that it shall be determined that such Covered Person is not entitled to be indemnified as authorized in Section 6.8 hereof.

Section 6.10    **Nature of Rights**. The rights set forth in Section 6.6 through Section 6.9 are contractual in nature and may not be revised as applied to prior actions of a Covered Person by a subsequent amendment of this Agreement without such Covered Person's and the Company's prior written approval. The Company will cause the organizational documents of its Subsidiaries to contain rights for Covered Persons substantially similar to those set forth herein in Section 6.6 through Section 6.9.

Section 6.11    **Information Rights**. The Company shall comply with, and will cause its Subsidiaries to comply with, the following provisions:

(a) Annual Statements. Within one-hundred twenty (120) days after the close of each Fiscal Year of the Company, commencing with the Fiscal Year ending on December 31, 2012, the Company will deliver to each Member audited consolidated balance sheets and statements of income and retained earnings and cash flows of the Company and its Subsidiaries, which annual financial statements shall show the financial condition of the Company and its Subsidiaries as of the close of such Fiscal Year and the results of the Company's operations during such Fiscal Year. Each of the financial statements delivered in accordance with the immediately preceding sentence shall be certified by the Company's accounting firm auditing the same to have been prepared in accordance with GAAP, except as specifically disclosed therein.

(b) Monthly Statements. Within thirty (30) days after the end of each month, the Company will deliver to each Member (i) consolidated unaudited balance sheets and statements of income and retained earnings and of cash flows for the Company and its Subsidiaries as of the end of such month, comparing such financial position and results of operations against the same periods for the prior year and against the budget, and (ii) a letter from the Company's management discussing the revenues and operations of the Company and its Subsidiaries with respect to such month.

(c) Budget; Other Information. Prior to the start of each Fiscal Year, the Company will deliver to the Members the Company's budget for such Fiscal Year, including monthly consolidated unaudited balance sheets and monthly statements of income and retained earnings and cash flows for the Company and its Subsidiaries. From time to time upon the request of a Member, the Company will furnish to the Members, within a reasonable time from the request, such information regarding the business, affairs, prospects and financial condition of the Company and the Subsidiaries as such Member may reasonably request.

(d) Termination of Information Rights. The information rights granted pursuant to this Section 6.11 will lapse and terminate immediately with respect to: (i) each Member whose

employment with the Company or any Subsidiary terminates for any reason; (ii) each Member who breaches (whether before or after termination of his or her employment with the Company or any of its Subsidiaries or Affiliates) this Agreement or any confidentiality, non-competition or non-solicitation obligations to the Company or any of its Subsidiaries or Affiliates; and (iii) each Member who becomes adverse to the Company in a legal action or proceeding initiated by the Member or any threat of a legal action or proceeding.

**Section 6.12  Managers' Unanimous Votes Required.**  Notwithstanding anything to the contrary contained in this Agreement, the Company shall not, and shall not permit any of the Subsidiaries to, engage in or cause any of the following transactions or take any of the following actions, and the Board shall not permit or cause the Company or any of the Subsidiaries to engage in, take or cause any such action, except with the unanimous prior approval of all of the Managers then serving on the Board:

(i)  the issuance of any Units or other equity securities pursuant to Section 3.2, other than those issued and outstanding as of the Effective Date, (A) to any Person not already a Member, (C) except as provided in Section 5.4, or (C) except as provided in Section 3.3, to existing Members in any proportions different than their Proportionate Shares;

(ii)  the repurchase of any Units by the Company, pursuant to Section 7.4 or otherwise.

(iii)  the admission of an additional Member pursuant to Section 3.2;

(iv)  the Company's consent to any transfer of Units pursuant to Section 7.3;

(v)  a merger, consolidation, conversion or other similar transaction involving the Company or any of the Subsidiaries as a result of which the Principals and their Permitted Transferees (or in the case of a Subsidiary, the Company, directly or indirectly) hold in the aggregate less than a majority of the outstanding voting equity securities of the surviving entity immediately after such transaction;

(vi)  any action that results in a liquidation or dissolution of the Company or any Subsidiary;

(vii)  the commencement by the Company or a Subsidiary of any bankruptcy, reorganization, debt arrangement, or other case or proceeding under any bankruptcy or insolvency law;

(viii)  the making of any capital call, except as provided for in Section 3.3(b);

(ix)  the making of any distributions provided for in Article 5, or any distributions by a Subsidiary to its equity holders;

(x)    the incurring of any debt obligations by the Company or by any Subsidiary of Company; any loan of funds by the Company or by any Subsidiary of Company; any finance or capital lease of the Company or any Subsidiary with a rental amount in excess of $50,000 per year which is not otherwise included in a Budget approved by the Board; any hedge or swap transaction; any prepayment, defeasance, refinancing or replacement of any of the foregoing; or any guarantee or other direct or indirect assumption of liability by the Company or any Subsidiary with respect to the obligations of any third party;

(xi)    any expenditure by the Company during a Fiscal Year that is not provided for in the budget for such Fiscal Year approved by the Board;

(xii)    an increase or decrease in the authorized size of the Board;

(xiii)    the Company or any Subsidiary to enter into, amend, modify or terminate any agreement or transaction with a Member or with an Affiliate of a Member;

(xiv)    the sale, lease, conveyance, pledge, mortgage, lease or other encumbrance of assets of the Company or any Subsidiary having a fair market value of more than $50,000 which is not otherwise included in a Budget approved by the Board;

(xv)    the transfer or encumbrance of Units other than in a Permitted Transfer;

(xvi)    any modification or amendment of this Agreement (subject to Article 10);

(xvii)    the issuance of any equity securities by any Subsidiary or Affiliate;

(xviii)    the prosecution, waiver, settlement or compromise of any claim or cause of action of or against the Company or a Subsidiary;

(xix)    any amendment or modification of the organizational documents of and United Realty Fund;

(xx)    any action to change the tax status of the Company; or

(xxi)    any determination of the amount of any reserves of the Company or a Subsidiary; or

(xxii)    As to the Company or any Subsidiary: to (i) amend or modify its Certificate of Formation, (ii) change or designate its Tax Matters Partner, (iii) change its name, (iv) change its purpose, (v) hire or fire its accounting firm or law firm, (vi) approve a recapitalization, (vii) determine whether or not to extend indemnification to any agent or other Person, (viii) increase or decrease the number of managers, general partners, or the size of the board of any Subsidiary, or (ix) hire or fire any relative or in-law of a member, partner or manager, or an affiliate of any of the foregoing.

**Section 6.13  Mediation of Board Deadlocks.**  Should the Board be unable to reach a unanimous decision within thirty days of the initial vote then a final decision shall be made pursuant to mediation. The Frischer Group shall select one mediator and the URPA Group shall select one mediator. The two mediators shall then select a third mediator. Should the two mediators not select a third mediator within ten days from the latest date a party selected their mediator any party to this Agreement may petition the Supreme Court of New York, NY to select the third mediator. The mediators need not be attorneys and may be persons with industry knowledge of the subject matter of this Agreement. There shall be no discovery during mediation. The parties shall submit briefs to the mediators stating their positions and the mediators shall hear oral argument during one mediation session with the parties having an equal amount of time to argue their positions. There shall be no testimony or witnesses at mediation. The mediators shall consider their briefs and oral argument and render a written decision in no more than twenty days of oral argument. The decision of the mediators shall be final non-appealable decision enforceable in any court of competent jurisdiction. The parties shall use their best efforts in good faith to complete mediation within sixty days of the selection of the third mediator.

**Section 6.14  Budgets.**  The Officers shall cause the Company's financial and accounting professionals or employees to prepare, and submit to the Board for its approval on or before November 1st of each calendar year, a proposed budget for the operation of the Company and for each Subsidiary for the succeeding calendar year (a "Budget"). The Budget for the Company and each Subsidiary shall consist of an operating budget (the "Operating Budget") and a capital improvements budget (the "Capital Budget"). The Operating Budget shall show, on a month-by-month basis, in reasonable detail, each line item of anticipated income and expense (on a cash basis). The Capital Budget shall show, on a month-by-month basis, in reasonable detail, each line item of anticipated capital expenditures, including anticipated investments of capital in ETRE Financial. Attached here as Schedule B is the initial Operating Budget for the Company through December 31, 2012 showing the budgeted amounts for each month through said date, which initial Operating Budget is hereby approved by the Board. If the Board shall fail to approve any Budget for any calendar year before the first day of such year, then the Board shall continue to manage, maintain, supervise, direct and operate the Company and its Subsidiaries in accordance with the Budget approved by the Board for the immediately preceding calendar year until the Board approves a new Budget.

## ARTICLE 7
## MEMBERS

**Section 7.1  Limited Liability.**  Except as otherwise provided by the Act, the Members will not be personally liable for any obligations of the Company and will have no obligation to make contributions to the Company in excess of their respective Capital Contributions.

**Section 7.2  No Agency or Authority.**  No Member is an agent of or has authority to act for or bind the Company solely by reason of such Member's status as a Member. Any Member who takes any action or purports or attempts to bind the Company in violation of this Section 7.2 shall be solely responsible for any loss and/or expense incurred by the Company, any

Manager or any Member as a result of such unauthorized action, and such Member shall indemnify and hold harmless the Company, each Manager and each other Member with respect to such loss and/or expense.

### Section 7.3    Transfers of Units.

(a)    Without the unanimous approval of the Board, (i) no Member may Transfer any Units, except pursuant to a Permitted Transfer, and (ii) a Transferee other than a Permitted Transferee will not become a Substituted Member. In addition, any Transferee (whether or not pursuant to a Permitted Transfer) will not become a Substituted Member unless and until the Transferee executes and delivers to the Company a counterpart of this Agreement. Except as otherwise provided in the instrument of Transfer and approved by the Board, any Substituted Member admitted to the Company in accordance with the terms of this Section 7.3 will succeed to all rights and be subject to all the obligations of the Transferor Member with respect to the Units to which the Transferee Member was substituted.

(b)    Except as expressly provided in this Agreement, the Transferor and Transferee will be jointly and severally obligated to reimburse the Company for all reasonable expenses (including legal fees) in connection with any Transfer or proposed Transfer of a Member's Units. As a condition to any Transfer of Units in the Company, the Transferor and the Transferee shall provide such legal opinions and documentation as the Board shall reasonably request.

### Section 7.4    Company's Rights to Repurchase Units on Termination of Employment for Cause or Withdrawal of a Member

(a) In the event a Member's employment with the Company or any Subsidiary is terminated for Cause, then in any such event such event the Company may, within ninety (90) days of such event, with the prior vote or written consent of all of the Managers (not including the Member serving as a Manager who is terminated), but shall not be obligated to, elect to repurchase from such Member, and/or his or her Personal Representative or Successor, and if the Company so elects, such Member and/or such Personal Representative or Successor shall be obligated to sell to the Company, all or any portion of such Member's Units at a price equal to the lower of (A) the Original Cost of such Units or (B) fifty percent (50%) of the Fair Value of such Units.

(b) In the event a Member's employment with the Company or any Subsidiary is terminated without Cause or a Member withdraws as a Member, then the Company may without the obligation, within ninety (90) days of such event, with the prior vote or written consent of all of the Managers (not including a withdrawing Member serving as a Manager), but shall not be obligated to, elect to repurchase from such Member, and/or his or her Personal Representative or Successor, and if the Company so elects, such Member and/or such Personal Representative or Successor shall be obligated to sell to the Company, all or any portion of such Member's Units at a price equal to the lower of (A) the positive Capital Account balance of such Member's Units or (B) the book value of such Units as determined in accordance with GAAP by the Company's certified public accountants.

(c) For purposes hereof "Employment" or "employment" of a Member shall mean the Member's relationship as a provider of services to the Company and its Subsidiaries in any legal capacity, not merely as an employee, in each case, whether in the capacity of Manager, employee, consultant, contractor or otherwise. References to a Member's employment shall mean, in the case of any Member that is not a natural person, the Company's employment of the Principal or any other person owning, controlling or otherwise affiliated with such Member.

(d) <u>Procedure</u>. Units that have been Transferred shall be subject to these purchase provisions notwithstanding such Transfer. Upon a Member's termination of employment (a "Former Member"), and in the event the Board (not including a withdrawing terminated Member serving as a Manager) by unanimous vote or written consent elects to repurchase such Former Member's Units pursuant to <u>Section 7.4(a)</u>, the Company shall notify the Former Member or other applicable holder in writing of such election and, within thirty (30) days after determination of the repurchase price therefor, pay the repurchase price in the manner set forth below to the Former Member and/or his or her Personal Representative or Successor. The purchase price shall be paid, at the Company's option by (i) check or wire transfer of funds to the account specified by such Persons, and/or (ii) issuance of a promissory note. Any promissory note issued hereunder will be unsecured, subordinated to all indebtedness of the Company then outstanding or thereafter issued on terms and conditions set forth by the Board, and payable in up to ten equal annual installments of principal, with interest accruing (without compounding) at the prime rate in effect as of the date of issuance of such note (as reported by Citibank, N.A. in New York, New York), <u>provided</u> that payments under such note shall be suspended if and for so long as the Company's capacity to make such payments is prohibited by any credit agreement of the Company or any of its Subsidiaries. As consideration for and as a condition to the Company's payment of the repurchase price, the Former Member and/or his or her Personal Representative or Successor shall execute and deliver to the Company a release of any and all claims against the Company and its Members, officers and Managers and their respective Affiliates. Upon payment of the repurchase price pursuant to the terms of this <u>Section 7.4(d) which includes upon the execution of a promissory note</u>, the Units subject to repurchase shall be deemed repurchased by the Company without any further action being taken by the Former Member, his or her Personal Representative or Successor or the Company.

(e) If any employment agreement with a Member contain terms that are contrary to or supplementary to the terms contained in this <u>Section 7.4</u>, then the provisions of such agreement shall supersede the terms contained in this <u>Section 7.4</u>.

(f) A Member may withdraw at any time, and the Member shall have the right to sell all of its Member interests to the remaining Members for an arm's length transaction only after the Company has waived its right to purchase the Member's Units pursuant to Section 7.4 above. . A withdrawing Member may only sell its units to another Member subject to the terms herein, sales to a third party non-member are prohibited and the agreement to this term of ownership by all the parties hereto is a material inducement to the Principals to enter in to this Agreement. Only the Board in its sole discretion and with a unanimous vote may approve the sale of a withdrawing Member's Units to a third party non-member.

**Section 7.5     Mandatory Pledge.** Each of the Members agrees to pledge and grant a Lien on and a security interest in and to their respective Units on a non-recourse basis to one or

more lenders to the Company or Subsidiaries, and take all steps necessary to enable such senior lenders to perfect such Liens and security interests, on such terms and conditions as may from time to time be requested by the Board; provided that, none of the Members shall be obligated to so pledge their respective Units or grant a Lien on or security interest therein except on terms and conditions that are identical in all material respects as those that are to be applied to the other Members with respect to the Units held by the other Members.

**Section 7.6** **Preemptive Rights**. The Company shall only issue New Units in accordance with the following terms:

(a)     Notwithstanding clauses (b) through (i) of this Section 7.6, the Board may waive, either prospectively or retrospectively, any and all rights arising under this Section 7.6 with respect to the issuance of any New Units to any Person, or may elect to waive the rights under this Section 7.6 with respect to the issuance of a portion of such New Units (a "**Partial Waiver**"), provided none of the Members or their Affiliates are purchasing those New Units subject to a waiver or Partial Waiver, and any such waiver or Partial Waiver shall be effective as to all holders with such rights under this Section 7.6.

(b)     In the event the Company desires to issue any New Units or other Membership Rights, with the prior approval of the Board pursuant to Section 6.12, it shall first deliver to each Member that demonstrates to the Company's reasonable satisfaction that it is an "accredited investor" (within the meaning of Regulation D promulgated under the Securities Act) (collectively, the "**Preemptive Rights Holders**" and each a "**Preemptive Rights Holder**") a written notice (a "**Notice of Proposed Issuance**") specifying the name and address of the proposed purchaser of the New Units or other Membership Rights (each such purchaser, a "**Proposed Buyer**"), the type and total number of such New Units or other Membership Rights which the Company then desires to issue to such Proposed Buyer (such New Units or other Membership Rights, the "**Offered New Units**"), all of the material terms, including the price, upon which the Company proposes to issue such Offered New Units to such Proposed Buyer, and stating that the Preemptive Rights Holders shall have the right to purchase such Offered New Units in the manner specified in this Section 7.6 at the price and in accordance with the terms and conditions specified in such Notice of Proposed Issuance.

(c)     During the ten (10) Business Day period commencing on the date on which the Preemptive Rights Holders receive the Notice of Proposed Issuance (the "**Offer Period**"), each Preemptive Rights Holder shall have the option to purchase the Offered New Units subject to such Notice of Proposed Issuance at the price and terms specified in such Notice of Proposed Issuance and in the amount specified in Section 7.6(d). A Preemptive Rights Holder shall give written notice of its election to purchase Offered New Units to the Company on or before the last day of the Offer Period and, if a Preemptive Rights Holder has not given such written notice within such period, such Preemptive Rights Holder shall be deemed to have rejected its right to purchase the Offered New Units. If the Offered New Units are being offered as a part of an investment unit together with debt or other instruments, any election by a Preemptive Rights Holder to purchase Offered New Units shall also constitute an election to purchase a like portion of such debt or other instruments. Each Preemptive Rights Holder shall have the right to condition his, her or its purchase of the Offered New Units upon the closing of the sale of the balance of such Offered New Units.

(d)     Each Preemptive Rights Holder shall have the right to purchase up to that number of the Offered New Units as shall be equal to the number of the Offered New Units multiplied by a fraction, the numerator of which is the number of Units then owned by such Preemptive Rights Holder and the denominator of which shall be the aggregate number of

(e)     Units then owned by all of the Preemptive Rights Holders thereof. The amount of such Offered New Units that each Person is entitled to purchase under this Section 7.6(d) shall be referred to as its "**Proportionate Share**."

(f)     Each Preemptive Rights Holder shall have a right of oversubscription (pursuant to one process pursuant to this subsection only) such that if any Preemptive Rights Holder fails to elect to purchase its full Proportionate Share of the Offered New Units, the remaining Preemptive Rights Holders shall, among them, have the right to purchase up to the balance of the Proportionate Shares of such Offered New Units not so purchased. Each Preemptive Rights Holder may exercise such right of oversubscription by electing to purchase more than its Proportionate Share of the Offered New Units by so indicating in its written notice given during the Offer Period. If, as a result thereof, such oversubscriptions exceed the total number of the Offered New Units available in respect to such oversubscription privilege, the oversubscribing Preemptive Rights Holders shall be cut back with respect to oversubscriptions on a pro rata basis in accordance with their respective Proportionate Shares or as they may otherwise agree among themselves.

(g)     If some or all of the Offered New Units have not been purchased by the Preemptive Rights Holders pursuant to Section 7.6(b) through (f) hereof, then the Company shall have the right, until the expiration of one-hundred eighty (180) days commencing on the first day immediately following the expiration of the Offer Period, to issue such remaining Offered New Units to the Proposed Buyer or one or more third parties at not less than, and on terms no more favorable to the purchasers thereof than, the price and terms specified in the Notice of Proposed Issuance. If for any reason the Offered New Units are not issued within such period and at such price and on such terms, the right to issue in accordance with the Notice of Proposed Issuance shall expire and the provisions of this Agreement shall continue to be applicable to the Offered New Units.

(h)     The Preemptive Rights Holder purchasing the greatest percentage of any Offered New Units shall set the place, time and date for the closing of the purchase of the Offered New Units, which closing shall be no later than the date of the closing of the sale of any Offered New Units to the Proposed Buyer. The purchase price for the Offered New Units shall, unless otherwise agreed in writing by the parties to such transaction, be paid in immediately available funds on the date of the closing.

(i)     The Company may proceed with the issuance of New Units without first following procedures in Section 7.6(b) through (h) above, provided that (i) the purchaser of such New Units agrees in writing to take such New Units subject to the provisions of this Section 7.6(i), and (ii) within ten (10) days following the issuance of such New Units, the Company or the purchaser of the New Units undertakes steps substantially similar to those in Section 7.6(b) through (h) above to offer to all Preemptive Rights Holders the right to purchase from the Company or such purchaser a pro rata portion of such New Units or equivalent at the same price