Execution Copy

and terms applicable to the purchaser's purchase thereof so as to achieve substantially the same effect from a dilution protection standpoint as if the procedures set forth in Section 7.6(b) through (h) had been followed prior to the issuance of such New Units.

(j)     Notwithstanding the foregoing, no Preemptive Rights Holder shall have any rights under this Section 7.6 if (A) at any time such Preemptive Rights Holder has failed to purchase its Proportionate Share of New Units that (1) had not been the subject of a waiver or Partial Waiver pursuant to Section 7.6(a) and (2) such Preemptive Rights Holder had the right to purchase under this Section 7.6, or (B) in the case of a Preemptive Rights Holder that is a Member (w) such Member's employment with the Company or any Subsidiary is terminated for Cause (x) such Member voluntarily terminates his or her employment with the Company or any Subsidiary prior to the first (1st) anniversary of the Effective Date, or (y) such Member breaches this Agreement or any confidentiality, non-competition or non-solicitation obligations to the Company or any of its Subsidiaries or Affiliates.

## ARTICLE 8
## ACCOUNTS

**Section 8.1     Books**.  The Board shall maintain or cause to be maintained complete and accurate books of account of the Company's affairs at the Company's principal office, including a list of the names and addresses of all Members and the aggregate Capital Contributions of each Member.   Subject to the termination of information rights pursuant to Section 6.11(d), each Member whose rights have not been terminated shall have the right to inspect the Company's books and records at the Company's principal office at any reasonable time upon advance written request to the Company.

**Section 8.2     Tax Reports, Returns and Audits**.  The Tax Matters Partner will furnish or will cause to be furnished to each Member (a) an Internal Revenue Service Schedule K-1 with respect to such Member, and (b) within 15 days after receipt thereof, any notice of audit from the Internal Revenue Service.   The Company shall use its commercially reasonable efforts to cause the Tax Matters Partner to deliver such K-1 to each Member within ninety (90) days of the end of each Fiscal Year (and in no event later than March 31 of the following Fiscal Year).   Without limitation of the foregoing March 31 requirement, in the event that such K-1's cannot be provided within (90) days of the end of each Fiscal Year, the Tax Matters Partner will instead deliver to each Member, according to the same timeframe, an estimate of the annual tax information for the applicable Fiscal Year, including an estimated Internal Revenue Service Schedule K-1.   The Company will also timely furnish to each Member an estimate of the quarterly tax information for each quarter during the Fiscal Year.

**Section 8.3     Fiscal Year**.  The fiscal year of the Company for both financial reporting and tax purposes (the "**Fiscal Year**") shall be the twelve (12) months ended December 31 of each year or, if the context so requires, any portion thereof.

**Section 8.4     Method of Accounting**.  The books and accounts of the Company shall be maintained using the accrual method of accounting for financial reporting purposes and tax purposes.

Execution Copy

**Section 8.5    Tax Returns**. The Tax Matters Partner shall cause to be prepared and filed on a timely basis all federal, state and local tax returns required of the Company.

**Section 8.6    Bank Accounts**. All funds of the Company will be deposited in its name in an account or accounts maintained with such bank or banks selected by the Company. The funds of the Company will not be commingled with the funds of any other Person. Checks will be drawn upon the Company account or accounts only for the purposes of the Company and shall be signed by authorized officers of the Company.

**Section 8.7    Other Information**. The officers of the Company and the Managers may release such information concerning the operations of the Company to such sources as is customary in the industry or required by law or regulation or by order of any regulatory body. For the term of the Company and for a period of four years thereafter, the Managers shall cause to be maintained and preserved all books of account and other relevant documents.

## ARTICLE 9
## DISSOLUTION OF THE COMPANY

**Section 9.1    Dissolution**. The Company shall be dissolved and its affairs shall be wound up upon the earliest to occur of:

(a)    The approval of the Members holding all of the outstanding Units entitled to vote;

(b)    the sale or distribution by the Company of all or substantially all of its assets; or

(c)    a Failure to Fund.

Any other provision of this Agreement to the contrary notwithstanding, no withdrawal, assignment, removal, bankruptcy, insolvency, death, incompetency, termination, dissolution or distribution with respect to any Member or any Unit will effect a dissolution of the Company.

**Section 9.2    Liquidation of Company Interests**.

(a)    Liquidation. Upon dissolution, the Company will be liquidated in an orderly manner. The Board will serve as the liquidator to wind up the affairs of the Company pursuant to this Agreement. The Person or Persons who act as the liquidator under this Section 9.2 are referred to herein as the "**Liquidator**".

(b)    Liquidation Procedure. Promptly following dissolution, the Liquidator shall within a reasonable period of time cause the Company's assets and properties to be liquidated for cash in an orderly and businesslike manner.

(c)    Final Allocation and Distribution. Upon dissolution of the Company and liquidation of its assets and properties as set forth above, a final allocation of all items of income, gain, loss and deduction will be made in accordance with Article 4 (provided, however, that the Company shall make remedial allocations to the Members so that the Capital Accounts of the Members at the time of final distribution comport with the distribution provisions of this Section

Execution Copy

9.2(c)), and proceeds arising from such liquidation, shall be distributed or used as follows and in the following order of priority:

(i) for the payment of the Company's liabilities and obligations to its creditors (including without limitation creditors that are also Members), and the expenses of liquidation;

(ii) to the setting up of any reserves that the Liquidator may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company;

(iii) to the holders of Units, pro rata in accordance with their Capital Contributions, if any, until such holders have received distributions pursuant to this Section 9.2(c) equal to the total amounts of such holders' Capital Contributions, to the extent not previously repaid to such holders; and

(iv) to the Members in accordance with Section 5.2.

(d) Notwithstanding Section 9.2(b), the Liquidator may, upon dissolution of the Company, distribute the Company's assets to the Members in kind in lieu of liquidating the Company's assets as provided in Section 9.2(b), provided that if any assets of the Company are to be distributed in kind, the Capital Accounts of the Members shall be adjusted in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(e) and such assets shall be distributed on the basis of the fair market value thereof (without taking Code Section 7701(g) into account) and any Member entitled to any interest in such assets shall receive such interest therein as a tenant-in-common with all other Members so entitled. The fair market value of such assets shall be that which is determined by the Liquidator.

**Section 9.3** **Liability for Return of Capital Contributions**. Each Member, by its execution of this Agreement, agrees that liability for the return of its Capital Contribution is limited to the Company's assets and, in the event of an insufficiency of such assets to return the amount of its Capital Contribution, hereby waives any and all claims whatsoever, including any claim for additional contributions that it might otherwise have, against any of the Company's agents or representatives (in each case unless there has been fraud, gross negligence or intentional misconduct) by reason thereof. Each Member shall look solely to the Company and its assets for all distributions with respect to the Company and his, her or its Capital Contribution thereto, and shall have no recourse therefor (upon dissolution or otherwise) against any of the Company's agents or representatives (in each case unless there has been fraud, gross negligence or intentional misconduct).

**Section 9.4** **Conversion to Corporation or Other Entity**. At any time, in connection with an initial Public Offering, the Board shall have the power and authority to, and shall, effect (a) the conversion of the Company's business form from a limited liability company to a corporation, a real estate investment trust or other entity (a "**Public Vehicle**"), (b) the merger of the Company with or into a new or previously-established but dormant Public Vehicle, or (c) the contribution of the assets and liabilities of the Company to a Public Vehicle, followed by a liquidation of the Company and a distribution of the Public Vehicle's equity securities to the

Execution Copy

Members (such a conversion, merger or liquidation is referred to as a "**Conversion**"). Upon the consummation of a Conversion, the Units held by each Member shall be converted into or exchanged for a number of shares or other units of the Public Vehicle's common stock or other equity interests determined by (i) calculating the fair market value of the Company based upon the actual offering price of the Public Vehicle's common stock or other equity interests and the number of Units of common stock or other equity interests to be outstanding after such offering, and (ii) by determining the amount each Member would receive if (A) all of the Company's assets were sold for such fair market value and (B) the proceeds were distributed in accordance with Section 5.2. The Board's determination of the number of Units of the Public Vehicle's common stock or other equity interests that each Member receives upon a Conversion shall be final and binding on the Members absent manifest arithmetic error. The Board shall use commercially reasonable efforts to undertake any Conversion in such manner as would provide for no gain or loss to the Members solely as a result of the Conversion.

## ARTICLE 10
## WAIVERS; AMENDMENTS

The provisions of this Agreement and the rights and obligations of the Company and all other parties hereto under this Agreement may be waived (either generally or in a particular instance, either retroactively or prospectively, and either for a specified period of time or indefinitely), or amended, or amended and restated, and, the Certificate may be amended (whether by merger or otherwise), or amended and restated, if and only if such waiver, amendment, or amendment and restatement is approved by the Members holding all of the outstanding Units entitled to vote; provided, however, that if any amendment, amendment and restatement, or waiver would materially and adversely change the specifically enumerated rights hereunder of one or more Members ("**Affected Members**") in a way that is materially different from the change such amendment, amendment and restatement, or waiver would have on such specifically enumerated rights of other Members, such amendment, amendment and restatement, or waiver shall not be effective as to any Affected Member unless consented to by all of the Affected Members. Any amendment to Sections 3.3, 6.12 or 7.1 shall not be binding on a Member without such Member's written consent. Each Member shall be bound by any amendment, amendment and restatement or waiver effected in accordance with this Article 10, whether or not such Member has consented to such amendment, amendment and restatement or waiver. Upon effectuation of each such waiver, amendment, or amendment and restatement, the Company shall give prompt written notice thereof to the Members who have not previously consented thereto in writing.

## ARTICLE 11
## NOTICES

All demands, notices, requests, consents and other communications required or permitted under this Agreement shall be in writing and shall be personally delivered, or sent by facsimile machine or e-mail (with a confirmation copy sent by one of the other methods authorized in this Section), or by reputable commercial express delivery service (including Federal Express and

Execution Copy

U.S. Postal Service overnight delivery service), or deposited with the U.S. Postal Service mailed first class, registered or certified mail, postage prepaid, as set forth below:

    (a)    If to the Company, to

> ETRE FINANCIAL, LLC
> 44 Wall Street
> Second Floor
> New York, New York 10005
> Attn: Paul Frischer, Manager
> Facsimile:
> Email:
>
> With a Copy to:
>
> ETRE FINANCIAL, LLC
> 44 Wall Street
> Second Floor
> New York, New York 10005
> Attn: Jacob Frydman, Manager
> Facsimile:
> Email:Jacob.F@urpa.com

    (b)    If to a Member, to its address set forth on **Schedule A**.

Notices shall be deemed given and delivered upon the earlier to occur of (i) receipt by the party to whom such notice is directed; (ii) if sent by facsimile machine or e-mail, on the day (other than a Saturday, Sunday or legal holiday in the jurisdiction to which such notice is directed) after such notice is sent if sent (as evidenced by the facsimile confirmed receipt) prior to 5:00 p.m. Eastern Time and, if sent after 5:00 p.m. Eastern Time, on the second day (other than a Saturday, Sunday or legal holiday in the jurisdiction to which such notice is directed) after which such notice is sent; (iii) on the first day (other than a Saturday, Sunday or legal holiday in the jurisdiction to which such notice is directed) following the day the same is deposited with a commercial courier if sent by commercial overnight delivery service; or (iv) the fifth day (other than a Saturday, Sunday or legal holiday in the jurisdiction to which such notice is directed) following deposit thereof with the U.S. Postal Service as aforesaid. Each party, by notice duly given in accordance herewith, may specify a different address for the giving of any notice hereunder.

## ARTICLE 12
## COVENANTS

### Section 12.1   Confidentiality.

    (a)    Each Member acknowledges that during the term of this Agreement, such Member will have access to and become acquainted with trade secrets, proprietary information and confidential information belonging to the Company, the Subsidiaries and their Affiliates that

Execution Copy

are not generally known to the public, including, but not limited to, information concerning business plans, financial statements and other information provided pursuant to this Agreement, operating practices and methods, expansion plans, strategic plans, marketing plans, contracts, customer lists or other business documents which the Company treats as confidential, in any format whatsoever (including oral, written, electronic or any other form or medium) (collectively, "Confidential Information"). In addition, each Member acknowledges that: (i) the Company has invested, and continues to invest, substantial time, expense and specialized knowledge in developing its Confidential Information; (ii) the Confidential Information provides the Company with a competitive advantage over others in the marketplace; and (iii) the Company would be irreparably harmed if the Confidential Information were disclosed to competitors or made available to the public. Without limiting the applicability of any other agreement to which any Member is subject, no Member shall, directly or indirectly, disclose or use (other than solely for the purposes of such Member's monitoring and analyzing such Member's investment in the Company or performing such Member's duties as a Manager, officer, employee, consultant or other service provider of the Company) at any time, including, without limitation, use for personal, commercial or proprietary advantage or profit, either during such Member's association or employment with the Company or thereafter, any Confidential Information of which such Member is or becomes aware. Each Member in possession of Confidential Information shall take all appropriate steps to safeguard such information and to protect it against disclosure, misuse, espionage, loss and theft.

(b)     Nothing contained in Section 12.1(a) shall prevent any Member from disclosing Confidential Information: (i) upon the order of any court or administrative agency; (ii) upon the request or demand of any regulatory agency or authority having jurisdiction over such Member; (iii) to the extent compelled by legal process or required or requested pursuant to subpoena, interrogatories or other discovery requests; (iv) to the extent necessary in connection with the exercise of any remedy hereunder; (v) to other Members; (vi) to such Member's representatives who, in the reasonable judgment of such Member, need to know such Confidential Information and agree to be bound by the provisions of this Section 12.1 as if a Member; or (vii) to any potential Permitted Transferee in connection with a proposed Transfer of Units from such Member, as long as such Transferee agrees to be bound by the provisions of this Section 12.1 as if a Member; provided, that in the case of clause (i), (ii) or (iii), such Member shall notify the Company and other Members of the proposed disclosure as far in advance of such disclosure as practicable (but in no event make any such disclosure before notifying the Company and other Members) and use reasonable efforts to ensure that any Confidential Information so disclosed is accorded confidential treatment satisfactory to the Company, when and if available.

(c)     The restrictions of Section 12.1(a) shall not apply to Confidential Information that: (i) is or becomes generally available to the public other than as a result of a disclosure by a Member in violation of this Agreement; (ii) is or becomes available to a Member or any of its Representatives on a non-confidential basis prior to its disclosure to the receiving Member and any of its Representatives in compliance with this Agreement; or (iii) is or has been independently developed or conceived by such Member prior to the Effective Date without use of Confidential Information.

**Section 12.2     Non-Compete; Non-Solicit.**

Execution Copy

(a)     Non-Compete. In light of each Member's access to Confidential Information and position of trust and confidence with the Company, each Member hereby agrees that, during the period of his or her continued employment or other engagement with the Company, and for a period of twelve (12) months, running consecutively, beginning on the date of any termination of the Member's employment for any reason, unless prior thereto the Company has not Commenced Business by the Platform Launch Date, then until the Platform Launch Date (the "Restricted Period"), such Member shall not (x) render services or give advice to, or affiliate with (as employee, partner, consultant or otherwise), or (y) directly or indirectly through one or more of any of their respective Affiliates, own, manage, operate, control or participate in the ownership, management, operation or control of, any Competitor or any division or business segment of any Competitor; provided, that nothing in this Section 12.2(a) shall prohibit such Member or any of his Permitted Transferees or any of their respective Affiliates from acquiring or owning, directly or indirectly:

(i)     Up to 2% of the aggregate voting securities of any Competitor that is a publicly traded Person; or

(ii)     Up to 2% of the aggregate voting securities of any Competitor that is not a publicly traded Person, so long as neither such Member nor any of its Permitted Transferees, directly or indirectly through one or more of their respective Affiliates, designates a member of the board of directors (or similar body) of such Competitor or its Affiliates or is granted any other governance rights with respect to such Competitor or its Affiliates (other than customary governance rights granted in connection with the ownership of debt securities).

For purposes of this Section 12.2(a), "Competitor" means any Person engaged, directly or indirectly, in whole or in part, in any business that operates in the same or similar fashion to the Real Estate Exchange Platform and not to include any business which a Member is engaged, directly or indirectly, in whole or in part prior to the Effective Date.

(b)     Other Restrictions. Each Member further agrees that, for a period of one (1) year beginning on the date of any termination of the Member's employment for any reason he or she shall not, directly or indirectly through one or more of any of such Member's Affiliates:

(i)     hire or solicit, or encourage any other Person to hire or solicit, any individual who has been an employee, consultant or advisor of the Company or any Subsidiary or Affiliate of the Company within one (1) year prior to the date of such hiring or solicitation; provided that this Section 12.2(b) shall not prevent a Member from hiring or soliciting any employee or former employee of the Company or any Subsidiary or Affiliate of the Company who was previously employed by such Member prior to the date of execution of this Agreement;

(ii)     solicit or entice, or attempt to solicit or entice, any investors, contractors, suppliers of the Company or any Subsidiary or Affiliate of the Company for purposes of diverting their business or services from the Company or such Subsidiary or Affiliate or for any other purpose; or

Execution Copy

(iii)   make any statement or publication that is intended to or could reasonably be understood to disparage or impugn the reputation of the Company or any Subsidiary or Affiliate of the Company, or any of their respective products, services, executives, partners, directors, officers or employees, regardless of any perceived truth of such statement or publication.

(c)   Blue Pencil. If any court of competent jurisdiction determines that any of the covenants set forth in this Section 12.2, or any part thereof, is unenforceable because of the duration or geographic scope of such provision, such court shall have the power to modify any such unenforceable provision in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Section 12.2 or by making such other modifications as it deems warranted to carry out the intent and agreement of the parties as embodied herein to the maximum extent permitted by Applicable Law. The parties hereto expressly agree that this Agreement as so modified by the court shall be binding upon and enforceable against each of them.

(d)   The restrictions in Section 12.2 (b) (i) and (ii) shall not apply from and after the Platform Launch Date in the event that  the Company has not Commenced Business by the Platform Launch Date.

(e)   The Principals agree that from and after the date the Company Commenced Business each of them, so long as he is employed by the Company, shall be entitled to the same Economic Interest as each of the other Principals, in the Company, whether or not they devote all or any or none of their time to the Company as an employees of the Company. "Economic Interest" means the amount of salary and bonus compensation above $400,000, but not more than $1 million, then being paid to any Principal whether as an employee, officer or Manager of the Company and any subsidiaries, or as otherwise determined by the Board.

**ARTICLE 13**

**13.1   Use of Name "ETRE Financial".**

The name "ETRE Financial" and all goodwill associated therewith are property of the Company, and no Member or Affiliate of the Company shall have the right to use the name "ETRE Financial" or "ETRE" as a component of the name of any business venture or otherwise.

**ARTICLE 14**

**MISCELLANEOUS**

**Section 14.1   Entire Agreement.** This Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof, and supersedes any prior or contemporaneous oral or written agreement or understanding among the parties hereto with respect to the subject matter hereof (other than any agreements with one or more Members effective on or after the Effective Date that expressly reference one or more sections of this Agreement and expressly modify the terms thereof for one or more of such Members).

Execution Copy

**Section 14.2   Governing Law**. This Agreement shall be construed in accordance with and governed by the internal laws of the State of New York, without regard to the principles of conflicts or choice of laws thereof that would give rise to the application of the domestic substantive law of any other jurisdiction, except to the extent the laws of the State of Delaware are required to govern a limited liability company formed under the laws of such state.

**Section 14.3   Equitable Remedies**. The parties hereto agree that irreparable harm would occur in the event that any of the agreements or provisions of this Agreement were not performed fully by the parties hereto in accordance with their specific terms or conditions or were otherwise breached, and that money damages are an inadequate remedy for breach of the Agreement because of the difficulty of ascertaining and quantifying the amount of damage that will be suffered by the parties hereto in the event that this Agreement is not performed in accordance with its terms or conditions or is otherwise breached. It is accordingly hereby agreed that the parties hereto shall be entitled to an injunction or injunctions, without the necessity of proving actual damages, to restrain, enjoin and prevent breaches of this Agreement by the other parties and to enforce specifically the terms and provisions of this Agreement, such remedies being in addition to and not in lieu of, any other rights and remedies to which the other parties are entitled to at law or in equity.

**Section 14.4   Recovery of Expenses**. Each party hereto (the **"Breaching Party"**) further covenants and agrees to indemnify and hold the other parties hereto harmless from and against all costs and expenses, including legal or other professional fees and expenses incurred by such parties, in connection with or arising out of any proceeding instituted by such parties against the Breaching Party; provided that the party or parties seeking indemnification pursuant to this Section 14.4 must have substantially prevailed in such proceeding.

**Section 14.5   Binding Effect**. Except as otherwise provided herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective legal representatives, heirs, successors and permitted assigns.

**Section 14.6   Severability**. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

**Section 14.7   Headings**. The sections and other headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

**Section 14.8   No Third-Party Beneficiaries**. Except for Section 6.6 through Section 6.10, as they relate to Covered Persons (each of whom shall be an express third party beneficiary of those Sections), nothing in this Agreement is intended to, or will, create any rights to any party other than a party that is a signatory hereto or who becomes a Member in accordance with the terms of this Agreement.

**Section 14.9   Tax Matters Partner**. The Board shall designate the "tax matters partner" of the Company (the **"Tax Matters Partner"**) for purposes of, and in accordance with,

Execution Copy

Section 6231(a)(7) of the Code. The Tax Matters Partner may be removed, and a new Tax Matters Partner appointed, by the Board in accordance with the Code and the Treasury Regulations.

**Section 14.10 Counterpart Execution; Fax Signatures**. This Agreement may be executed in any number of counterparts, each of which, when so executed and delivered, shall be an original, but all of which together shall constitute one agreement binding on the parties hereto. Transmission of an executed counterpart by fax or PDF file of this Agreement shall be deemed to constitute due and sufficient delivery of such counterpart, and such signatures shall be deemed original signatures for purposes of the enforcement and construction of this Agreement.

**Section 14.11 Waiver of Claims Related to  Fiduciary Duties of Members or Managers**. Each Member, on behalf of itself and its Affiliates, hereby waives, to the maximum extent permitted by law, any and all rights and claims which it, he or she may otherwise have against any other Member or Manager and such other Member's or Manager's officers, directors, shareholders, partners, members, managers, agents, employees, and Affiliates as a result of any claims of breach of fiduciary duties; provided that the foregoing shall not limit a Member's rights and claims with respect to a breach of this Agreement. No Member or Manager shall be liable to the Company or any other Member or its Affiliates for any act or omission taken or suffered by such Member or Manager in connection with the business or operations of the Company or arising out of this Agreement, unless such act or omission has been adjudicated by a court or arbitral panel of competent jurisdiction, in a final, non-appealable judgment or decision, to have constituted a breach of this Agreement on the part of such Member or Manager. The Company and each Member agree that the provisions of this Agreement, to the extent such provisions eliminate, restrict or limit the duties (including, without limitation, fiduciary duties) or liabilities of Members or Managers that may otherwise exist at law or in equity, shall replace such duties and liabilities of the Members and Managers.

**Section 14.12 Renunciation of Opportunities; No Expansion of Duties**.

(a) Each party to this Agreement agrees and acknowledges that no joint venture is created hereby.

(b) To the maximum extent permissible under applicable law, but subject to the restrictions provided in Section 12.2 and Section 12.3, each of the Members, its respective Affiliates, the Company and each Subsidiary hereby renounce any interest or expectancy any of them has or may have in, or in being offered an opportunity to participate in, any and all business opportunities that are presented to the other Members and their respective Affiliates, including, without limitation, persons who serve on the Board who are affiliates of Members, and no Member shall be obligated to present any particular investment opportunity to the other Members, their respective Affiliates, the Company or any Subsidiary, even if such opportunity is of a character that, if presented to the Company or a Subsidiary, could be taken by the Company or such Subsidiary, and each Member shall continue to have the right to take for its own respective account or to recommend to others any such particular investment opportunity, except as otherwise provided in this Agreement.

Execution Copy

### Section 14.13 Disputes; Arbitration

(a) In the event of any controversy or claim arising out of or relating to this Agreement, or the breach thereof, the parties to such controversy or claim shall first use their reasonable best efforts in good faith to resolve such dispute among themselves. If they are unable to resolve the dispute within thirty (30) days after any party has first notified the others of the dispute, then the controversy or claim shall be settled by arbitration administered by JAMS and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

(b) The arbitration shall be decided by three (3) arbitrators assigned pursuant to JAMS procedures..

(c) The parties shall be afforded the discovery rights as established under the applicable JAMS rules or as provided for by the arbitrators.

(d) The award rendered in any arbitration commenced hereunder shall constitute an award under the Federal Arbitration Act, Title 9 US Code and the 1958 New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, shall be final and binding upon the parties and judgment thereon may be entered in any court of competent jurisdiction. The arbitral tribunal may order any remedy permitted by law and this Agreement, including damages and specific performance of this Agreement or any portion thereof.

(e) The language of the arbitration shall be English. The place of arbitration shall be New York, New York, United States.

(f) By agreeing to arbitration, the parties do not intend to deprive any court of its jurisdiction to issue a pre-arbitral injunction, pre-arbitral attachment, or other order in aid of arbitration proceedings and/or the enforcement of any award. Without prejudice to such provisional remedies as may be available under the jurisdiction of a national court, the arbitral tribunal shall have full authority to grant provisional remedies and to direct the parties to request that any court modify or vacate any temporary or preliminary relief issued by such court, and to award damages for the failure of any party to respect the arbitral tribunal's orders to that effect. Each of the parties irrevocably and unconditionally submits to the exclusive jurisdiction of the federal and New York State courts located in Manhattan, New York City for the purpose of an order to compel arbitration, for provisional relief in aid of arbitration or to maintain the status quo or prevent irreparable harm prior to the appointment of the arbitral tribunal, and to the non-exclusive jurisdiction of such courts for the enforcement of any award issued hereunder. With respect to any action, suit or other proceeding for which it has submitted to jurisdiction pursuant to this Section 14.13, each party irrevocably consents to service of process in the manner provided for the giving of notices pursuant to Article 11 of this Agreement. Nothing in this Section 14.13 shall affect the right of any party to serve process in any other manner permitted by applicable law.

### Section 14.14 Further Assurances. The Members shall from time to time execute or cause to be executed all other documents or cause to be done all filing, recording, publishing, or other acts as may be necessary or desirable to comply with the requirements for the operation of

a limited liability company under the laws of the State of Delaware and all other jurisdictions in which the Company may from time to time conduct business.

**Section 14.15 Termination of Agreement.** Upon the consummation of (a) the dissolution of the Company in accordance with Section 9.1, (b) a merger or consolidation in which the Members of the Company immediately prior to such merger or consolidation do not own at least a majority of the Capital Securities of the surviving entity, or (c) a Conversion in accordance with Section 9.4 and consummation of an initial Public Offering in connection therewith (each a "**Termination Event**"), except as provided in the next sentence, all rights and obligations of the parties under this Agreement shall terminate immediately and be of no further effect. Notwithstanding the preceding sentence, the rights and obligations of the applicable parties under Sections 6.6 through 6.10, 7.1, 7.2, 9.3, Article 11 and this Article 13 shall survive any Termination Event.

**Section 14.16 Scope.** If any one or more of the provisions of this Agreement shall for any reason be held to be excessively broad as to time, duration, geographical scope, activity, or subject, each such provision shall be construed, by limiting and reducing it, so as to be enforceable to the extent compatible with applicable law then in force.

**Section 14.17 No Waiver.** No waiver by any party to this Agreement at any time of a breach by a party of any provision of this Agreement to be performed by such other party shall be deemed a waiver of any similar or dissimilar provisions of this Agreement at the same or any prior or subsequent time.

**Section 14.18 Acknowledgments and Representations.**

(a) _Members' Acknowledgements, Representations and Waiver._ Each of the Members hereby severally, and not jointly, represents and warrants to the Company that (i) such Member has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of an investment in the Company and making an informed investment decision with respect thereto, (ii) such Member is able to bear the economic and financial risk of the investment in the Company contemplated hereby for an indefinite period of time, (iii) such Member is acquiring an interest in the Company for investment only and not with a view to, or for resale in connection with, any distribution to the public or any public offering thereof (other than such a distribution or offering which is registered and qualified under applicable federal or state securities laws), (iv) such Member is an "accredited investor" within the meaning of Regulation D promulgated under the Securities Act, (v) to the extent the Units have not been registered under the securities laws of any jurisdiction, the same cannot be disposed of unless they are subsequently registered and/or qualified under applicable securities laws or disposed of pursuant to an applicable exemption from such laws, (vi) such Member is a resident of the state or other jurisdiction listed as its address on **Schedule A**, and (vii) the execution, delivery and performance of this Agreement do not require such Member to obtain any consent or approval that has not been obtained and do not contravene or result in a default under any provision of any existing law or regulation applicable to it, any provision of its charter, by-laws or other governing documents or any agreement or instrument to which it is a party or by which it is bound. Each Member has had the opportunity to seek the advice of counsel and other personal advisors and acknowledges that neither the Company nor any of its Affiliates has

provided such Member with any advice regarding the tax, economic or other impacts to such Member of the arrangements contemplated hereby.

(b) <u>Company Representations</u>.  The Company hereby represents and warrants to the Members as of the date of this Agreement, the following:  (i) the Company is a limited liability entity duly formed, validly existing and in good standing under the laws of the State of Delaware; (ii) the Units, when issued in accordance with the terms of this Agreement will be validly issued and, not subject to any adverse claim; (iii) the capitalization of the Company as of the date of this Agreement is set forth on **Schedule A**; (iv) except as set forth in the this Agreement, there are no outstanding options, warrants, preemptive rights, subscription rights, convertible securities or other agreements or plans under which the Company is or may become obligated to issue, sell or Transfer any Units or other securities of the Company; and (v) neither the Company nor anyone acting on its behalf has offered the Units for sale to or otherwise approached or negotiated in respect of such offer in a manner constituting a general solicitation and neither the Company nor anyone on its behalf has taken or will take any action that would subject the issuance or sale of any of the Company's securities to the registration requirements of Section 5 of the Securities Act of 1933, as amended.

**[The remainder of this page is left blank intentionally]**

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized representatives to execute this Limited Liability Company Agreement as their act and deed, to be effective as of the day and year first above written.

**The Company:**

ETRE FINANCIAL, LLC

By: _____
Name:
Title:

**The Members:**

Winter Investors, LLC

By: _____
Name: Jacob Frydman
Title: Authorized Person

EVE, LLC

By: _____
Name:  Eli Verschleiser
Title: Authorized Person

JS3 Alternative Investments LLC

By: _____
Name: Jesse Stein
Title: Authorized Person

SMP Realty NM LLC

By: _____
Name:  Scott Panzer
Title: Authorized Person

Frischer Kranz Inc.

By: _____
Name:  Paul Frischer
Title: Authorized Person

Execution Copy

Solely for purposes of Sections 3.11, 12.2 and 12.3, the Principals:

_____
Jesse Stein

_____
Paul Frischer

_____
Scott Panzer

_____
Jacob Frydman

_____
Eli Verschleiser

## Schedule A
## to Limited Liability Company Agreement of ETRE FINANCIAL, LLC

### As of July [    ], 2012

| Name and Address of Member | Units | Initial Capital Contribution Amount | Initial Capital Account |
|---|---|---|---|
| Winter Investors LLC<br>46 Ledgerock Lane<br>Hyde Park, NY 12538 | | | |
| JS3 Alternative Investments LLC<br>100 Jay Street, Apt 14H<br>Brooklyn, NY 11201 | | | |
| SMP Realty NM LLC<br>200 Candlewood Lake Road North<br>New Milford, CT 06776 | | | |
| Frischer Kranz Inc.<br>80 Birch Lane<br>Greenwich, CT 06830 | | | |
| EVE, LLC<br>44 Wall Street 2nd Floor<br>New York, NY 10005 | | | |
| | | | |
| | | | |
| **TOTAL:** | | | |

# EXHIBIT  D

## SECURED PROMISSORY NOTE

New York, New York
August 20th, 2012

THIS PROMISSORY NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR ANY STATE SECURITIES LAWS. IT MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF A REGISTRATION STATEMENT IN EFFECT WITH RESPECT TO THIS PROMISSORY NOTE UNDER THE SECURITIES ACT OF 1933 AND QUALIFICATION UNDER APPLICABLE STATE SECURITIES LAWS OR AN OPINION OF COUNSEL SATISFACTORY TO THE BORROWER THAT SUCH REGISTRATION IS NOT REQUIRED.

This Note is being delivered in connection with that certain Limited Liability Company Agreement , of even date herewith made by and among ETRE Financial, LLC, a Delaware limited liability company (the "Company"), Jacob Frydman, Eli Verschleiser, Jesse Stein, Scott Panzer and Paul Frischer (the "Principals"), and Winter Investors, LLC, JS3 Alternative Investments LLC, SMP Realty NM LLC, Frischer Kranz Inc, and EVE, LLC (the "Agreement"). All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

JS3 Alternative Investments LLC ("Borrower" or "JS Entity"), whose address is 100 Jay Street, Brooklyn, NY, 11201, or any Permitted Transferee subject to Section 7.3 of the Agreement, for value received, hereby promises to pay one-half to the order of Winter Investors, LLC ("JF Entity") whose address is 44 Wall Street, 4th Floor, New York, NY 10005 and to pay one-half to the order of EVE, LLC ("EV Entity") whose address is 44 Wall Street, 4th Floor, New York, NY 10005, (JS Entity and EV Entity are collectively referred to as "Holder") the principal sum equal to (i) the JS Entity Initial Capital Contribution; and (ii) increased by 33% of all Capital Calls contributed by the JF Entity and the EV entity (in the aggregate, the "Principal") or before the earlier of: (i) the date which is ten (10) years after the date hereof, and (ii) the date Borrower sells or otherwise Transfers its Units in the Company (hereinafter referred to as the "Due Date") and to pay interest from the date hereof on the unpaid principal amount hereof at the rate and on the dates set forth below, all on the terms and conditions set forth herein. Payment for all amounts due hereunder shall be made in lawful money of the United States of America, by certified mail, return receipt requested, to the address of the Holder, or, at the option of Holder, by wire transfer to an account designated in writing by the Holder.

The following is a statement of the rights of the Holder of this Note and the conditions to which this Note is subject, and to which the Holder hereof, by the acceptance of this Note, agrees:

1. <u>Definitions</u>. As used in this Note, each capitalized term shall have the meaning specified herein and the following terms shall have the indicated meanings:

(b) "Base Rate" shall mean the extrapolated rate of interest on the 10 year Treasury Bonds as of January 1st of each year during the term hereof.

(c) "New York Business Day" shall mean any day other than Saturday, Sunday or other day on which commercial banking institutions in New York, New York are authorized or required by law or other governmental action to remain closed for business.

2. Interest.  Interest shall accrue from the date hereof until all outstanding principal and interest on this Note shall have been paid in full at the Base Rate plus two percent (2%) per annum on the unpaid Principal balance hereof.  Interest shall accrue each day on the outstanding principal amount calculated on the basis of a 360-day year for the actual number of days and the rate of interest shall be adjusted every time there is a change in the Base Rate.  In the event that the Principal amount of this Note is not paid in full on the Due Date, interest at the maximum legally permitted interest rate shall continue to accrue on the balance of any unpaid Principal until such balance is paid.  Solely to the extent necessary to prevent interest under this Note from exceeding the maximum legal rate, any amounts that would be treated as excessive under a final judicial interpretation of applicable law shall be deemed to have been a mistake and automatically canceled, and if received by Holder, shall be refunded to Borrower.

3. Events of Default.  If any of the events specified in this Section 3 shall occur (herein individually referred to as an "Event of Default"):

(i) Default in payment of Principal or interest when due under this Note;

then, the Holder of this Note may, by notice to the Borrower, declare the principal of this Note, all interest thereon and all other amounts payable hereunder to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower, whereupon the principal amount of this Note, all such interest and all such amounts shall become and be immediately due and payable, and exercise any and all of its other rights under applicable law hereunder.

4. Payment and Prepayment.

(a) Voluntary Prepayment.  The Borrower may at any time prepay in whole or in part the principal sum, plus accrued interest on the amount so prepaid to date of payment, of this Note, without penalty or premium.

(b) Mandatory Prepayments.  Upon the receipt of (i) any Distributions from the Company, or (ii) income earned from the sale of shares of the Company ("Sale Proceeds"), Borrower shall, or shall Cause the Company, to pay all such Distributions and Sale Proceeds to Holder as mandatory prepayments of this Note, which shall be applied first to accrued interest and then to the outstanding Principal.

(c) Non-recourse. Holder shall have recourse only to the Distributions, the Sale Proceeds, and the security pledged to Holder under the Pledge Agreement (as hereinafter defined), and otherwise this Note shall be without recourse to Borrower.

5. Representations. The Borrower represents and warrants to the Holder that: (i) this Note is a legal, valid and binding agreement of the Borrower, enforceable against the Borrower in accordance with its terms; and (ii) the execution and delivery by the Borrower of this Note and the performance by the Borrower of the transactions contemplated hereby do not and will not conflict with, or result in a breach of, or constitute a default under the certificate of organization of the Borrower or under any agreement to which the Borrower is a party or to which the Borrower or its assets may be bound or affected.

6. Waiver of Presentation, Demand, Etc. All parties now or hereafter liable with respect to this Note, whether the Borrower, guarantor, endorser or any other person hereby expressly waive presentment, demand of payment, protest, notice for demand of payment, protest and notice of non-payment, or any other notice of any kind with respect thereto. No delay or failure on the part of the Holder in the exercise of any right or remedy hereunder or at law or in equity, shall operate as a waiver thereof, and no single or partial exercise by the Holder or of any right or remedy hereunder shall preclude or estop another or further exercise or any other right or remedy.

7. Defenses, Set-Offs, Counterclaims. Borrower hereby agrees not to raise or interpose any defense, set-off or counterclaim of any kind or nature whatsoever which it may have against the Holder in any action brought upon this Note and Borrower acknowledges that it has no defense of any kind or nature to the enforcement of this Note or to the binding nature of the obligations represented hereby.

8. Security. Payment of this Note is secured by a pledge of 30,000 Units of the issued and outstanding membership interests of the Company pursuant to a Pledge Agreement of even date herewith between Borrower and Holder (the "Pledge Agreement").

9. Amendments. No amendment, modification, alteration or change of any of the provisions of this Note shall be effective unless in writing signed by the Borrower and the Holder and only to the extent therein set forth.

10. Governing Law; Jurisdiction. This Agreement shall be governed by and construed in accordance with the laws of the State of New York excluding the body of law relating to conflict laws. Borrower hereby consents to the exclusive jurisdiction of the state and federal courts located in City and County of New York, New York in connection with any lawsuit, claim or other proceeding relating to this Note or the transactions contemplated hereby.

11. Time of the Essence. Time is of the essence of this Note and in case this Note is collected by law or through an attorney at law or under advice there from, the Borrower agrees to pay all costs of collection including reasonable attorneys' fees. The Holder shall be under no duty to exercise any or all of the rights and remedies given by this Note or the Pledge Agreement and no party to this instrument shall be discharged from the obligations or undertakings hereunder (a) should

3

the Holder release or agree not to sue any person against whom the party has, to the knowledge of Holder, a right to recourse, or (b) should the Holder agree to suspend the right to enforce this Note or Holder's interest in any collateral pledged to secure this Note against such person or otherwise discharge such person.

12. <u>Consent to Service and Waiver of Jury Trial.</u>  The Borrower hereby consents to service of any notice, process, motion or other document in connection with any lawsuit or other proceeding arising out of or relating to this Note by registered mail, return receipt requested, to the address set forth above or such other address as the Borrower shall provide Holder in writing and the Borrower hereby waives any right to trial by jury in any such lawsuit or proceeding.

13. <u>Severability.</u>  In the event that any term or provision of this Note shall be finally determined to be superseded, invalid, illegal or otherwise unenforceable pursuant to applicable law by any authority having jurisdiction, such determination shall not impair or otherwise affect the validity, legality or enforceability of the remaining terms and provisions of this Note, which shall be enforced as if the unenforceable term or provision were deleted.

IN WITNESS WHEREOF, the undersigned has caused this Note to be issued this __ day of August, 2012.

**JS3 Alternative Investments LLC**

By: _____
Jesse Stein

EXHIBIT E

## PLEDGE AGREEMENT

**THIS PLEDGE AGREEMENT** is made as of August 20TH , 2012 by and between JS3 Alternative Investments LLC, whose address is 100 Jay Street, Brooklyn, NY 11201 or any Permitted Transferee of the JS Entity subject to Section 7.3 of the Agreement (as defined below), ("Pledgor"), and Winter Investors, LLC whose address is 44 Wall Street, New York, NY 10005 and EVE, LLC ("EV Entity") ( the JF Entity and the EV Entity are collectively referred to as "Pledgee").

## W I T N E S S E T H:

**WHEREAS**, Pledgee has delivered its Note, dated the date hereof, from Pledgor to Pledgee (the "Note"), in connection with that certain Limited Liability Company Agreement , of even date herewith made by and among ETRE Financial, LLC, a Delaware limited liability company (the "Company"), Jacob Frydman, Eli Verschleiser, Jesse Stein, Scott Panzer and Paul Frischer (the "Principals"), and Winter Investors, LLC, JS3 Alternative Investments LLC, SMP Realty NM LLC, Frischer Kranz Inc, and EVE, LLC (the "Agreement"). All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Agreement. and

**WHEREAS** Pledgor has agreed to pledge to Pledgee 30,000 Units of Pledgor's membership interests in the Company (the "Pledged Securities") to secure Pledgor's obligations under the Note, hereunder.

**NOW, THEREFORE**, in consideration of the foregoing and of the mutual covenants contained herein, the parties hereto hereby agree as follows:

1.    Pledge and Assignment. As security for the performance by Pledgor of its obligations under the Note, , and any and all extensions, modifications or renewals hereof and thereof (hereinafter collectively referred to as the "Secured Obligations"), the Pledgor hereby pledges to the Pledgee and grants to the Pledgee a first lien on, and continuing security interest in and to, the Pledged Securities and all proceeds thereof including, but not limited to, all Distributions made upon, or in respect of, and all Sale Proceeds (as defined in the Note) with respect to, the Pledged Securities or any part thereof.

2.    Transfer, Voting Power, Dividends, Etc.

(a)    Until an "Event of Default" (as such term is defined in the shall have occurred, the Pledgor shall be entitled to exercise all voting and consensual powers or rights pertaining to the Pledged Securities. or any part thereof, for all purposes.

(b)    Upon the occurrence of an Event of Default all of the Pledgor's rights pursuant to the preceding subsection (a) shall terminate and the Pledgee or its nominee or nominees shall have the sole and exclusive right to exercise all powers of voting and consent pertaining to the

Pledged Securities, or any part thereof, and shall exercise such powers in such manner as the Pledgee may elect in its sole discretion; and

(c)     All Distributions, and Sale Proceeds up to the amount of principal and interest due on the Note made upon, or in respect of, the Pledged Securities or any part thereof, shall be paid directly to the Pledgee or held by the Pledgor in trust for the benefit of, and immediately delivered by the Pledgor to, the Pledgee and shall be retained by the Pledgee.

(d)     In the event that, during the term of this Agreement:

(1)     any Unit dividend, Unit split, reclassification, readjustment, or other change is declared or made in the capital structure of any entity whose securities are included in the Pledged Securities, all new, substituted, and additional shares, or other securities, issued by reason of any such change and received by the Pledgor or to which the Pledgor shall be entitled shall be held by the Pledgor in trust for the benefit of, and immediately delivered by the Pledgor to, the Pledgee, duly endorsed in blank or with a stock power duly endorsed in blank, and shall thereupon constitute Pledged Securities to be held by the Pledgee under the terms of this Agreement; and

(2)     any subscriptions, warrants or any other rights or options shall be issued in connection with the Pledged Securities, all new stock or other securities acquired through such subscriptions, warrants, rights or options by the Pledgor shall be held by the Pledgor in trust for the benefit of, and immediately delivered by the Pledgor to, the Pledgee, duly endorsed in blank or with a stock power duly endorsed in blank, and shall thereupon constitute Pledged Securities to be held by the Pledgee under the terms of this Agreement.

3.     **Remedies**.

(a)     Upon the occurrence of a an Event of Default, the Pledgee shall have the rights and remedies provided by the Uniform Commercial Code (the "Code") as in force in the State of New York and any other applicable law and the Pledgee may, without any notice except as hereinafter provided, (i) apply the cash, if any, then held by it as security hereunder to the payment of the amounts due under the Secured Obligations and (ii) if there shall be no such cash or the cash so applied shall be insufficient to pay in full the amounts due under the Secured Obligations, sell, deliver, assign, and transfer the Pledged Securities or any part thereof, at public or private sale, or at any broker's board or on any securities exchange, with or without demand on the Pledgor or advertisement of the time or place of sale or adjournment thereof, or otherwise, for cash, upon credit or for price or prices and upon such terms as the Pledgee shall determine, and the Pledgee may bid for, and purchase, any and all of the Pledged Securities so sold and thereafter hold the same absolutely free from any right or claim of whatsoever kind. The Pledgee is hereby authorized, at any such sale, if it deems it advisable so to do, to restrict the prospective bidders or purchasers to persons to whom, in the Pledgee's sole judgment, such sale may lawfully be made, and who will represent and agree that they are purchasing for their own account, for investment and not with a view to, or in connection with, the distribution or sale of any of the Pledged Securities. Upon any sale the Pledgee shall have the right to deliver, assign and transfer to the purchaser thereof the Pledged Securities so sold. The Pledgor and the Pledgee acknowledge that none of the Pledged Securities are registered or

2

qualified under the various Federal or State securities laws of the United States and disposition thereof after an Event of Default may be restricted to one or more private (instead of public) sales in view of the lack of such registration. The Pledgor understands that upon such sale, the Pledgee may approach only a restricted number of potential purchasers and further understands that a sale under such circumstances may yield a lower price for the Pledged Securities than if the Pledged Securities were registered and qualified pursuant to Federal and state securities laws and sold on the open market.

(b)     The Pledgee shall give the Pledgor written notice, sufficient for all purposes of its intention to make any such public or private sale or sale at a broker's board or on a securities exchange, by mailing a copy of such notice to Pledgor not less than ten (10) days prior to such sale. Such notice, in case of public sale, shall state the time and place fixed for such sale, and in case of sale at a broker's board or on a securities exchange, shall state the board or exchange at which such sale is to be made on the day on which the Pledged Securities, or that portion thereof so being sold, will first be offered for sale at such board or exchange. Any such public sale shall be held at such time or times within the ordinary business hours and at such place or places as the Pledgee may fix in the notice of such sale. At any such sale the Pledged Securities may be sold in one lot as an entirety or in separate parcels, as the Pledgee may determine. The Pledgee shall not be obligated to make any sale pursuant to such notice. The Pledgee may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at any time and place fixed for the sale, and such sale may be made at any time or place to which the same may be so adjourned. In case of any sale of all or any part of the Pledged Securities on credit or for future delivery, the selling price will be paid by the purchaser thereof, but the Pledgee shall incur no liability in the case of the failure of such purchaser to pay for the Pledged Securities so sold and, in case of any such failure, such Pledged Securities may again be sold upon like notice. The Pledgee, however, instead of exercising the power of sale herein conferred upon it may proceed by a suit or suits at law or in equity to foreclose the security interest and sell the Pledged Securities, or any portion thereof, under a judgment or decree of a court or courts of competent jurisdiction.

(c)     The Pledgee and its nominee or nominees shall incur no liability as a result of a sale of the Pledged Securities or any part thereof at any private or public sale. The Pledgor hereby waives any claims against the Pledgee or its nominee or nominees arising by reason of the fact that the price at which the Pledged Securities, or any part thereof, may have been sold at any such sale was less than the amount due to Pledgee by Pledgor as a result of an Event of Default, even if the Pledgee or its nominee or nominees accept the first offer received and do not offer the Pledged Securities, or any part thereof, to more than one offeree.

(d)     The Pledgor agrees that any sale or disposition of Pledged Securities made pursuant to the foregoing terms shall be deemed to have been made in a commercially reasonable manner, but the foregoing provisions shall not be deemed to limit the right of the Pledgee to dispose of any item of Pledged Securities in any other manner provided in Article 9 of the Code.

4.     Representations Warranties and Covenants. The Pledgor represents, and warrants and covenants to the Pledgee that: (i) it is the legal record and beneficial owner of, and has taken good and marketable title to, the Pledged Securities, owned by it free and clear of all pledges, liens,

mortgages, hypothecations, security interests, charges, options or other encumbrances whatsoever; (ii) all the Pledged Securities have been duly and validly issued, are fully paid and non-assessable; (iii) this Agreement is a legal, valid and binding agreement of Pledgor, enforceable against Pledgor in accordance with its terms; and (iv) the execution and delivery by Pledgor of this Agreement and the performance by Pledgor of the transactions contemplated hereby do not and will not conflict with, or result in a breach of, or constitute a default under any agreement to which Pledgor is a party or to which Pledgor or any of its assets may be bound or affected.

5.   Amendment, Modification and Waiver.   Any waiver of any provision hereof must be in writing. Any amendment or modification to this Agreement must be in writing signed by the Pledgor and the Pledgee. No failure on the part of the Pledgor or the Pledgee to exercise, and no delay in exercising, any right, power or privilege under this Agreement shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

6.   Termination.   This Agreement shall terminate upon the repayment to Pledgee of all amounts due under the Note. After such termination, the Pledgee shall deliver to the Pledgor any remaining Pledged Securities and all cash, if any, then held by the Pledgee hereunder and the Pledgee agrees to notify the issuer of the Pledged Securities to release the stop transfer restrictions on the Pledged Securities.

7.   Notices.   Any notice required, desired or permitted to be given to the Pledgor or the Pledgee hereunder shall be in writing and shall be delivered personally, sent certified or registered mail, return receipt requested, or sent by overnight courier service addressed to the party at its address first above written, or such other address as such party may give by notice to the other party in accordance with this Section 7. Such notices shall be deemed given (i) if delivered personally, upon delivery, (ii) if mailed as aforesaid, three (3) business days after deposit in the United States mail and (iii) if sent by overnight courier service (2) business days after deposit with the courier service.

8.   Severability.   In the event that any term or provision of this Agreement shall be finally determined to be superseded, invalid, illegal or otherwise unenforceable pursuant to applicable law by any authority having jurisdiction, such determination shall not impair or otherwise affect the validity, legality or enforceability of the remaining terms and provisions of this Agreement, which shall be enforced as if the unenforceable term or provision were deleted.

9.   Expenses and Indemnity.   The Pledgor agrees to pay all the Pledgee's expenses (including reasonable attorneys' fees) of, or incident to, the enforcement of any of the provisions of this Agreement, or any actual or attempted sale, or any exchange, enforcement, compromise or settlement in respect of any of the Pledged Securities, and for the care of the Pledged Securities and for defending or asserting its rights and claims in respect thereof, by litigation or otherwise, including expenses of insurance. The Pledgor further agrees to indemnify the Pledgee and hold the Pledgee harmless from and against any and all liabilities, claims, penalties or judgments (other than judgments in favor of the Pledgor against the Pledgee) made, imposed or rendered against, or incurred by, the Pledgee under this Agreement or in connection herewith.

4

10.   Set-Offs, Counterclaims.  The Pledgor hereby agrees not to raise or interpose any set-off or counterclaim of any kind or nature whatsoever which they may have against the Pledgee in any action brought upon this Agreement and the Pledgor acknowledges that it has no defense of any kind or nature to the enforcement of this Agreement or to the binding nature of the obligations represented hereby.

11.   Miscellaneous.

(a)   This Agreement and all obligations of the Pledgor hereunder shall be binding upon the successors and assigns of the Pledgor, and shall, together with the rights and remedies of the Pledgee hereunder, inure to the benefit of the Pledgee and its successors and assigns.

(b)   This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York without giving effect to the principles of conflicts of laws.  The Pledgor and the Pledgee hereby consent to the exclusive in personam jurisdiction of the Federal and State courts located in the City, County and State of New York, and to service of any notice, process, motion or other document in connection with any lawsuit or other proceeding arising out of or relating to this Agreement or the Note by the giving of notice as set forth in Section 7 hereof and hereby waive any right to trial by jury in any such lawsuit or proceeding.

(c)   The rights and remedies herein provided are cumulative and may be exercised singly or concurrently, and are exclusive of any rights or remedies provided by law.

(d)   The Pledgee shall exercise reasonable care in the custody of the Pledged Securities in its possession or control hereunder at any time, but shall be deemed to have exercised reasonable care if such property is accorded treatment substantially equal to that which the Pledgee accords its own property.

(e)   At the request of Pledgee, and at the expense of the Pledgor, the Pledgor will join with Pledgee in executing one or more financing statements and other certificates, instruments or documents, if any, now or thereafter required to protect or give notice of the security interest granted hereby pursuant to the Uniform Commercial Code of the State of New York or other applicable law, in form and substance satisfactory to Pledgee. Without limiting the generality of the foregoing, Pledgor agrees that whenever any such law requires Pledgor to sign a document for filing, purposes, Pledgor hereby appoints the Pledgee or any of Pledgee's representatives as Pledgor's attorney-in-fact and agent, with full power of substitution to sign or endorse Pledgor's name on any such financing statement or other certificates, instruments, or documents and authorizes Pledgee to file such financing statement, certificate, instrument or other document in all places where necessary to perfect or give notice of Pledgee's interest in the Pledged Securities.

IN WITNESS THEREOF, the Pledgor and the Pledgee have duly executed and delivered this Agreement on the day and year first above written.

Winter Investors, LLC

By: _____ Manager

Jacob Frydman
Manager


EVE, LLC

By: _____

Eli Verschleiser


JS3  Alternative Investments LLC

By: _____

Jesse Stein

# PLEDGE AGREEMENT

**THIS PLEDGE AGREEMENT** is made as of August 20TH, 2012 by and between JS3 Alternative Investments LLC, whose address is 100 Jay Street, Brooklyn, NY 11201 or any Permitted Transferee of the JS Entity subject to Section 7.3 of the Agreement (as defined below), ("Pledgor"), and Winter Investors, LLC whose address is 44 Wall Street, New York, NY 10005 and EVE, LLC ("EV Entity") ( the JF Entity and the EV Entity are collectively referred to as"Pledgee").

## WITNESSETH:

**WHEREAS**, Pledgee has delivered its Note, dated the date hereof, from Pledgor to Pledgee (the "Note"), in connection with that certain Limited Liability Company Agreement , of even date herewith made by and among ETRE Financial, LLC, a Delaware limited liability company (the "Company"), Jacob Frydman, Eli Verschleiser, Jesse Stein, Scott Panzer and Paul Frischer (the "Principals"), and Winter Investors, LLC, JS3 Alternative Investments LLC, SMP Realty NM LLC, Frischer Kranz Inc, and EVE, LLC (the "Agreement"). All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Agreement. and

**WHEREAS** Pledgor has agreed to pledge to Pledgee 30,000 Units of Pledgor's membership interests in the Company (the "Pledged Securities") to secure Pledgor's obligations under the Note, hereunder.

**NOW, THEREFORE**, in consideration of the foregoing and of the mutual covenants contained herein, the parties hereto hereby agree as follows:

1.  <u>Pledge and Assignment</u>. As security for the performance by Pledgor of its obligations under the Note, , and any and all extensions, modifications or renewals hereof and thereof (hereinafter collectively referred to as the "Secured Obligations"), the Pledgor hereby pledges to the Pledgee and grants to the Pledgee a first lien on, and continuing security interest in and to, the Pledged Securities and all proceeds thereof including, but not limited to, all Distributions made upon, or in respect of, and all Sale Proceeds (as defined in the Note) with respect to, the Pledged Securities or any part thereof.

2.  <u>Transfer, Voting Power, Dividends, Etc.</u>

    (a)     Until an "Event of Default" (as such term is defined in the shall have occurred, the Pledgor shall be entitled to exercise all voting and consensual powers or rights pertaining to the Pledged Securities, or any part thereof, for all purposes.

    (b)     Upon the occurrence of an Event of Default all of the Pledgor's rights pursuant to the preceding subsection (a) shall terminate and the Pledgee or its nominee or nominees shall have the sole and exclusive right to exercise all powers of voting and consent pertaining to the

Pledged Securities, or any part thereof, and shall exercise such powers in such manner as the Pledgee may elect in its sole discretion; and

(c)   All Distributions, and Sale Proceeds up to the amount of principal and interest due on the Note made upon, or in respect of, the Pledged Securities or any part thereof, shall be paid directly to the Pledgee or held by the Pledgor in trust for the benefit of, and immediately delivered by the Pledgor to, the Pledgee and shall be retained by the Pledgee.

(d)   In the event that, during the term of this Agreement:

(1)   any Unit dividend, Unit split, reclassification, readjustment, or other change is declared or made in the capital structure of any entity whose securities are included in the Pledged Securities, all new, substituted, and additional shares, or other securities, issued by reason of any such change and received by the Pledgor or to which the Pledgor shall be entitled shall be held by the Pledgor in trust for the benefit of, and immediately delivered by the Pledgor to, the Pledgee, duly endorsed in blank or with a stock power duly endorsed in blank, and shall thereupon constitute Pledged Securities to be held by the Pledgee under the terms of this Agreement; and

(2)   any subscriptions, warrants or any other rights or options shall be issued in connection with the Pledged Securities, all new stock or other securities acquired through such subscriptions, warrants, rights or options by the Pledgor shall be held by the Pledgor in trust for the benefit of, and immediately delivered by the Pledgor to, the Pledgee, duly endorsed in blank or with a stock power duly endorsed in blank, and shall thereupon constitute Pledged Securities to be held by the Pledgee under the terms of this Agreement.

3.   <u>Remedies</u>.

(a)   Upon the occurrence of a an Event of Default, the Pledgee shall have the rights and remedies provided by the Uniform Commercial Code (the "Code") as in force in the State of New York and any other applicable law and the Pledgee may, without any notice except as hereinafter provided, (i) apply the cash, if any, then held by it as security hereunder to the payment of the amounts due under the Secured Obligations and (ii) if there shall be no such cash or the cash so applied shall be insufficient to pay in full the amounts due under the Secured Obligations, sell, deliver, assign, and transfer the Pledged Securities or any part thereof, at public or private sale, or at any broker's board or on any securities exchange, with or without demand on the Pledgor or advertisement of the time or place of sale or adjournment thereof, or otherwise, for cash, upon credit or for price or prices and upon such terms as the Pledgee shall determine, and the Pledgee may bid for, and purchase,  any and all of the Pledged Securities so sold and thereafter hold the same absolutely free from any right or claim of whatsoever kind. The Pledgee is hereby authorized, at any such sale, if it deems it advisable so to do, to restrict the prospective bidders or purchasers to persons to whom, in the Pledgee's sole judgment, such sale may lawfully be made, and who will represent and agree that they are purchasing for their own account, for investment and not with a view to, or in connection with, the distribution or sale of any of the Pledged Securities. Upon any sale the Pledgee shall have the right to deliver, assign and transfer to the purchaser thereof the Pledged Securities sold. The Pledgor and the Pledgee acknowledge that none of the Pledged Securities are registered or

qualified under the various Federal or State securities laws of the United States and disposition thereof after an Event of Default may be restricted to one or more private (instead of public) sales in view of the lack of such registration. The Pledgor understands that upon such sale, the Pledgee may approach only a restricted number of potential purchasers and further understands that a sale under such circumstances may yield a lower price for the Pledged Securities than if the Pledged Securities were registered and qualified pursuant to Federal and state securities laws and sold on the open market.

(b)     The Pledgee shall give the Pledgor written notice, sufficient for all purposes of its intention to make any such public or private sale or sale at a broker's board or on a securities exchange, by mailing a copy of such notice to Pledgor not less than ten (10) days prior to such sale. Such notice, in case of public sale, shall state the time and place fixed for such sale, and in case of sale at a broker's board or on a securities exchange, shall state the board or exchange at which such sale is to be made on the day on which the Pledged Securities, or that portion thereof so being sold, will first be offered for sale at such board or exchange. Any such public sale shall be held at such time or times within the ordinary business hours and at such place or places as the Pledgee may fix in the notice of such sale. At any such sale the Pledged Securities may be sold in one lot as an entirety or in separate parcels, as the Pledgee may determine. The Pledgee shall not be obligated to make any sale pursuant to such notice. The Pledgee may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at any time and place fixed for the sale, and such sale may be made at any time or place to which the same may be so adjourned. In case of any sale of all or any part of the Pledged Securities on credit or for future delivery, the selling price will be paid by the purchaser thereof, but the Pledgee shall incur no liability in the case of the failure of such purchaser to pay for the Pledged Securities so sold and, in case of any such failure, such Pledged Securities may again be sold upon like notice. The Pledgee, however, instead of exercising the power of sale herein conferred upon it may proceed by a suit or suits at law or in equity to foreclose the security interest and sell the Pledged Securities, or any portion thereof, under a judgment or decree of a court or courts of competent jurisdiction.

(c)     The Pledgee and its nominee or nominees shall incur no liability as a result of a sale of the Pledged Securities or any part thereof at any private or public sale. The Pledgor hereby waives any claims against the Pledgee or its nominee or nominees arising by reason of the fact that the price at which the Pledged Securities, or any part thereof, may have been sold at any such sale was less than the amount due to Pledgee by Pledgor as a result of an Event of Default, even if the Pledgee or its nominee or nominees accept the first offer received and do not offer the Pledged Securities, or any part thereof, to more than one offeree.

(d)     The Pledgor agrees that any sale or disposition of Pledged Securities made pursuant to the foregoing terms shall be deemed to have been made in a commercially reasonable manner, but the foregoing provisions shall not be deemed to limit the right of the Pledgee to dispose of any item of Pledged Securities in any other manner provided in Article 9 of the Code.

4.     Representations Warranties and Covenants. The Pledgor represents, and warrants and covenants to the Pledgee that: (i) it is the legal record and beneficial owner of, and has taken good and marketable title to, the Pledged Securities, owned by it free and clear of all pledges, liens,

3

mortgages, hypothecations, security interests, charges, options or other encumbrances whatsoever; (ii) all the Pledged Securities have been duly and validly issued, are fully paid and non-assessable; (iii) this Agreement is a legal, valid and binding agreement of Pledgor, enforceable against Pledgor in accordance with its terms; and (iv) the execution and delivery by Pledgor of this Agreement and the performance by Pledgor of the transactions contemplated hereby do not and will not conflict with, or result in a breach of, or constitute a default under any agreement to which Pledgor is a party or to which Pledgor or any of its assets may be bound or affected.

5.   **Amendment, Modification and Waiver.**  Any waiver of any provision hereof must be in writing.  Any amendment or modification to this Agreement must be in writing signed by the Pledgor and the Pledgee.  No failure on the part of the Pledgor or the Pledgee to exercise, and no delay in exercising, any right, power or privilege under this Agreement shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

6.   **Termination.**  This Agreement shall terminate upon the repayment to Pledgee of all amounts due under the Note.  After such termination, the Pledgee shall deliver to the Pledgor any remaining Pledged Securities and all cash, if any, then held by the Pledgee hereunder and the Pledgee agrees to notify the issuer of the Pledged Securities to release the stop transfer restrictions on the Pledged Securities.

7.   **Notices.**  Any notice required, desired or permitted to be given to the Pledgor or the Pledgee hereunder shall be in writing and shall be delivered personally, sent certified or registered mail, return receipt requested, or sent by overnight courier service addressed to the party at its address first above written, or such other address as such party may give by notice to the other party in accordance with this Section 7.  Such notices shall be deemed given (i) if delivered personally, upon delivery, (ii) if mailed as aforesaid, three (3) business days after deposit in the United States mail and (iii) if sent by overnight courier service (2) business days after deposit with the courier service.

8.   **Severability.**  In the event that any term or provision of this Agreement shall be finally determined to be superseded, invalid, illegal or otherwise unenforceable pursuant to applicable law by any authority having jurisdiction, such determination shall not impair or otherwise affect the validity, legality or enforceability of the remaining terms and provisions of this Agreement, which shall be enforced as if the unenforceable term or provision were deleted.

9.   **Expenses and Indemnity.**  The Pledgor agrees to pay all the Pledgee's expenses (including reasonable attorneys' fees) of, or incident to, the enforcement of any of the provisions of this Agreement, or any actual or attempted sale, or any exchange, enforcement, compromise or settlement in respect of any of the Pledged Securities, and for the care of the Pledged Securities and for defending or asserting its rights and claims in respect thereof, by litigation or otherwise, including expenses of insurance.  The Pledgor further agrees to indemnify the Pledgee and hold the Pledgee harmless from and against any and all liabilities, claims, penalties or judgments (other than judgments in favor of the Pledgor against the Pledgee) made, imposed or rendered against, or incurred by, the Pledgee under this Agreement or in connection herewith.

4

10.   Set-Offs, Counterclaims. The Pledgor hereby agrees not to raise or interpose any set-off or counterclaim of any kind or nature whatsoever which they may have against the Pledgee in any action brought upon this Agreement and the Pledgor acknowledges that it has no defense of any kind or nature to the enforcement of this Agreement or to the binding nature of the obligations represented hereby.

11.   Miscellaneous.

(a)   This Agreement and all obligations of the Pledgor hereunder shall be binding upon the successors and assigns of the Pledgor, and shall, together with the rights and remedies of the Pledgee hereunder, inure to the benefit of the Pledgee and its successors and assigns.

(b)   This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York without giving effect to the principles of conflicts of laws. The Pledgor and the Pledgee hereby consent to the exclusive in personam jurisdiction of the Federal and State courts located in the City, County and State of New York, and to service of any notice, process, motion or other document in connection with any lawsuit or other proceeding arising out of or relating to this Agreement or the Note by the giving of notice as set forth in Section 7 hereof and hereby waive any right to trial by jury in any such lawsuit or proceeding.

(c)   The rights and remedies herein provided are cumulative and may be exercised singly or concurrently, and are exclusive of any rights or remedies provided by law.

(d)   The Pledgee shall exercise reasonable care in the custody of the Pledged Securities in its possession or control hereunder at any time, but shall be deemed to have exercised reasonable care if such property is accorded treatment substantially equal to that which the Pledgee accords its own property.

(e)   At the request of Pledgee, and at the expense of the Pledgor, the Pledgor will join with Pledgee in executing one or more financing statements and other certificates, instruments or documents, if any, now or thereafter required to protect or give notice of the security interest granted hereby pursuant to the Uniform Commercial Code of the State of New York or other applicable law, in form and substance satisfactory to Pledgee. Without limiting the generality of the foregoing, Pledgor agrees that whenever any such law requires Pledgor to sign a document for filing, purposes, Pledgor hereby appoints the Pledgee or any of Pledgee's representatives as Pledgor's attorney-in-fact and agent, with full power of substitution to sign or endorse Pledgor's name on any such financing statement or other certificates, instruments, or documents and authorizes Pledgee to file such financing statement, certificate, instrument or other document in all places where necessary to perfect or give notice of Pledgee's interest in the Pledged Securities.

IN WITNESS THEREOF, the Pledgor and the Pledgee have duly executed and delivered this Agreement on the day and year first above written.

**Winter Investors, LLC**

By: _____
     Jacob Prydman
     Manager

**EVE, LLC**

By: _____
     Eli Verschleiser

**JS3  Alternative Investments LLC**

By: _____
     Jesse Stein

6

# EXHIBIT F

## ACTION BY WRITTEN CONSENT
## OF THE BOARD MEMBERS
## AND MANAGERS OF ETRE FINANCIAL, LLC

The undersigned, being all of the Board members and Managers of **ETRE FINANCIAL, LLC**, a Delaware limited liability company (the "Company"), and acting pursuant to the provisions of the Delaware Limited Liability Company Act, do hereby declare the following as the action of the Company pursuant to Section 6.5(c) of the Company's Operating Agreement dated August 15, 2012, do hereby consent to the taking of such action without a meeting, do hereby vote in favor of such action, and do hereby waive all notice in connection with such action, as of the 6th day of January, 2014 (the "Effective Date"):

WHEREAS, The Company caused to be formed a Delaware series limited liability company named **ETRE REIT, LLC** on April 22, 2013;

WHEREAS, All of the common equity ownership of **ETRE REIT, LLC** shall be registered for sale to the public pursuant to applicable state and federal registration requirements;

WHEREAS, the Company will not own any of the common equity of **ETRE REIT, LLC**; and

WHEREAS the Company desires to serve as the Managing Member of **ETRE REIT, LLC**.

BE IT RESOLVED, that all actions taken by the Company prior to the adoption of these resolutions in connection with the formation of **ETRE REIT, LLC** and the furtherance of the respective transactions contemplated by **ETRE REIT, LLC** are hereby ratified and approved in all respects;

BE IT FURTHER RESOLVED, that the Company is authorized to serve as the Managing Member of **ETRE REIT, LLC**;

BE IT FURTHER RESOLVED, that the Company is hereby authorized to do and perform, or cause to be done and performed, all such acts, deeds and things, and to make, execute and deliver, or cause to be made, executed and delivered, all such agreements, undertakings, documents, instruments, and certificates and such further amendments, supplements, modifications and restatements in the name and on behalf of the Company, as be necessary, desirable or appropriate to effectuate or carry out more fully the purpose and intent of the foregoing resolutions, and to incur all such fees and expenses as in the Company's judgment shall be necessary or advisable in order to carry out fully the intent and purposes of the foregoing resolutions and in each such case, such execution or such action when made or taken will be conclusive evidence of such approval and of the authority therefor hereunder;

BE IT FURTHER RESOLVED, this Action by Written Consent may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument; and

BE IT FURTHER RESOLVED, that the execution and delivery of this Action by Written Consent by delivery of a facsimile copy bearing the facsimile signature of a party hereto shall constitute a valid and binding execution and delivery of this Written Consent by such party, and those facsimile copies shall constitute enforceable original documents.

IN WITNESS WHEREOF, the undersigned has duly executed this Action by Written Consent as of the Effective Date.

BOARD MEMBERS AND MANAGERS:


_____
Jacob Frydman

_____
Jesse Stein


_____
Paul Frischer


_____
Scott Panzer

**BE IT FURTHER RESOLVED,** this Action by Written Consent may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument; and

**BE IT FURTHER RESOLVED,** that the execution and delivery of this Action by Written Consent by delivery of a facsimile copy bearing the facsimile signature of a party hereto shall constitute a valid and binding execution and delivery of this Written Consent by such party, and those facsimile copies shall constitute enforceable original documents.

**IN WITNESS WHEREOF,** the undersigned has duly executed this Action by Written Consent as of the Effective Date.

**BOARD MEMBERS AND MANAGERS:**


_____
Jacob Frydman


_____
Jesse Stein

_____
Paul Frischer


_____
Scott Panzer

# EXHIBIT  G

## ACTION BY WRITTEN CONSENT
## OF THE BOARD MEMBERS
## AND MANAGERS OF ETRE FINANCIAL, LLC

The undersigned, being all of the Board members and Managers of ETRE Financial, LLC, a Delaware limited liability company (the "Company"), and acting pursuant to the provisions of the Delaware Limited Liability Company Act, do hereby declare the following as the action of the Company pursuant to Section 6.5(c) of the Company's Operating Agreement dated August 15, 2012, do hereby consent to the taking of such action without a meeting, do hereby vote in favor of such action, and do hereby waive all notice in connection with such action, as of the 10th day of January, 2014 (the "Effective Date"):

WHEREAS, The Company caused to be formed a Delaware limited liability company named ETRE Financial Investors, LLC on January 10th 2014 ("ETRE Investors");

WHEREAS, The Company has agreed to serve as ETRE Investors' Manager;

WHEREAS, the Company desires to offer for sale an 8% interest in the Company's membership interests for $2 million to ETRE Investors;

WHEREAS, ETRE Investors has agreed to conduct an offering to raise $2 million from the sale of its membership interests in a private offering (the "Offering") and to use the proceeds of the Offering to purchase an 8% interest in the Company's membership interests;

WHEREAS, the Company desires to enter into an agreement with The Dalmore Group ("Dalmore") to serve as ETRE Investor's placement agent for the Offering and to compensate Dalmore with, in addition to cash, non-cash compensation of a 0.75% (75 basis points) interest in the Company's outstanding membership interests should Dalmore successfully place $2 million of membership interests, or such lesser or greater amount, the non-cash compensation will increase or decrease proportionately ("Dalmore Non-Cash Compensation");

WHEREAS the Company is currently authorized pursuant to Section 3.1(a) of its Operating Agreement to issue 100,000 membership units all of which have been issued and are outstanding;

BE IT RESOLVED, that all actions taken by the Company prior to the adoption of these resolutions in connection with the formation of ETRE Investors and the furtherance of the respective transactions contemplated by the Company are hereby ratified and approved in all respects;

BE IT FURTHER RESOLVED, that Section 3.1(a) of the Company's Operating Agreement is hereby amended to provide that there are 200,000 Units authorized for issuance under the terms of the Company's Operating Agreement ("Units");

BE IT FURTHER RESOLVED, the Company is authorized to issue to Dalmore sufficient Units or fractions thereof to pay the Dalmore Non-Cash Compensation;

BE IT FURTHER RESOLVED, the Company is authorized to issue to ETRE Investors sufficient Units or fractions thereof in exchange for cash priced at 8% of the Company's outstanding Units for $2 million after the issuance of the Dalmore Non-Cash Compensation with

the amount of Units to be issued to be adjusted proportionately at the same pricing should ETRE Investors invest less or more in the Company than $2 million;

BE IT FURTHER RESOLVED, that the Company is hereby authorized to do and perform, or cause to be done and performed, all such acts, deeds and things, and to make, execute and deliver, or cause to be made, executed and delivered, all such agreements, undertakings, documents, instruments, and certificates and such further amendments, supplements, modifications and restatements in the name and on behalf of the Company, as be necessary, desirable or appropriate to effectuate or carry out more fully the purpose and intent of the foregoing resolutions, and to incur all such fees and expenses as in the Company's judgment shall be necessary or advisable in order to carry out fully the intent and purposes of the foregoing resolutions and in each such case, such execution or such action when made or taken will be conclusive evidence of such approval and of the authority therefor hereunder;

BE IT FURTHER RESOLVED, this Action by Written Consent may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument; and

BE IT FURTHER RESOLVED, that the execution and delivery of this Action by Written Consent by delivery of a facsimile or email copy bearing the facsimile or email signature of a party hereto shall constitute a valid and binding execution and delivery of this Written Consent by such party, and those facsimile and email copies shall constitute enforceable original documents.

IN WITNESS WHEREOF, the undersigned has duly executed this Action by Written Consent as of the Effective Date.

BOARD MEMBERS AND MANAGERS:


_____
Jacob Frydman


_____
Jesse Stein


_____
Paul Frischer


_____
Scott Panzer

the amount of Units to be issued to be adjusted proportionately at the same pricing should ETRE Investors invest less or more in the Company than $2 million;

**BE IT FURTHER RESOLVED**, that the Company is hereby authorized to do and perform, or cause to be done and performed, all such acts, deeds and things, and to make, execute and deliver, or cause to be made, executed and delivered, all such agreements, undertakings, documents, instruments, and certificates and such further amendments, supplements, modifications and restatements in the name and on behalf of the Company, as be necessary, desirable or appropriate to effectuate or carry out more fully the purpose and intent of the foregoing resolutions, and to incur all such fees and expenses as in the Company's judgment shall be necessary or advisable in order to carry out fully the intent and purposes of the foregoing resolutions and in each such case, such execution or such action when made or taken will be conclusive evidence of such approval and of the authority therefor hereunder;

**BE IT FURTHER RESOLVED**, this Action by Written Consent may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument; and

**BE IT FURTHER RESOLVED**, that the execution and delivery of this Action by Written Consent by delivery of a facsimile or email copy bearing the facsimile or email signature of a party hereto shall constitute a valid and binding execution and delivery of this Written Consent by such party, and those facsimile and email copies shall constitute enforceable original documents.

**IN WITNESS WHEREOF**, the undersigned has duly executed this Action by Written Consent as of the Effective Date.

**BOARD MEMBERS AND MANAGERS:**


_____
Jacob Frydman


_____
Jesse Stein


_____
Paul Frischer


_____
Scott Panzer

2

EXHIBIT  H

# Source
## Capital Group, Inc.

tcoffin@sourcegrp.com

Members /FINRA, SIPC          Investment Bankers / Brokers

W. Todd Coffin -- Senior Managing Director

January 23, 2014

Mr. Paul Frischer
Chief Executive Officer
ETRE Financial, LLC
ETRE Financial Investors, LLC
44 Wall Street, 2nd Floor
New York, New York 10005-2421

USA

Re: Investment Banking/Advisory Agreement

Dear Paul and Jesse:

This letter will confirm the basis upon which ETRE Financial Investors, LLC and its Manager, ETRE Financial ,LLC  (collectively the "**Company**") has engaged Source Group, LLC ("**Source**"), a registered broker dealer and member of FINRA and SIPC, on an non-exclusive basis, to provide certain investment banking services.

    1.    The Offering.  The Company is offering Units of limited liability company Membership Interests (the "Units") in the Company to U.S. Persons who also qualify as "Accredited Investors" in accordance with Sections 4(2), 4(6) and Regulation D Rule 506 of the Securities Act of 1933, as amended and applicable state law (the "Offering"). The Company has prepared a private placement memorandum (the "PPM") describing the terms and conditions of the offering as well as other suitability standards Accredited Investors must meet to purchase Units. The total amount of the Offering is limited to $2 million.

    2.    **Services to be Rendered.**  (a) Source shall use its reasonable best efforts to introduce the Company and place $2 million of Units in the Offering to Accredited Investors (the "Services"). Accredited Investors may include corporations, partnerships, mutual funds, hedge funds, investment partnerships, securities firms, lending and other institutions and entities, as well as select high net worth individuals, (collectively "the Investors"). The Services shall include but not be limited to the delivery of PPMs and other offering related materials prepared by the Company to Investors, and collecting subscription agreements and subscription amounts from Investor for delivery to the Company. Source shall also maintain a log containing the names, addresses and date each PPM is sent to potential Investors. Source shall disclose the identity of all potential Investors to the Company and shall not distribute any of the Company's information, including a PPM, to potential Investors until distribution is approved (to each Investor)

276 Post Road West • Westport, CT  06880    • 203 341-3500 • 800 882-2889 • Fax 203 341-3515

Source Capital Group, Inc.

by the Company ("Distribution Approval"). Source may submit lists of Investors to the Company for such prior approvals. At the time of Distribution Approval the Company will also indicate for which Investors Source shall be entitled to Tail Compensation during the Tail Period pursuant to Section 5(b) below ("Tail Approved Investors"). The parties acknowledge that potential Investors introduced to Source by the Company or already known to the Company will be included on the PPM log by Source and are not approved for Tail Compensation. Source shall provide copies of the PPM to the Company upon request and a final log within 10 days of the termination or expiration of this Agreement.

2. **Best Efforts.** Source agrees to devote such time and effort to the affairs of the Company as is reasonable and adequate to render the services contemplated by this Agreement. The Company understands and agrees that Source shall not be responsible for the performance of any services which may be rendered hereunder without the Company providing the necessary PPM and other offering materials prior thereto, nor shall Source include any services that constitute the rendering of any legal opinions or performance of work that is in the ordinary purview of the Certified Public Accountant. Source does not guarantee results on behalf of the Company, but shall pursue all reasonable avenues available through its network of contacts. In addition, Source and the Company agree that only the terms of the Offering disclosed in the PPM will be offered to Investors which at the discretion of Investors may be subject to their due diligence. The Company expressly acknowledges that the execution of this Agreement does not constitute a commitment by Source to purchase Units or any other securities of the Company.

3. **Information.** The Company shall furnish Source such information as Source reasonably requests in connection with the performance of its Services hereunder (all such information so furnished is referred to herein as the "Information"). The Company understands and agrees that Source, in performing its Services hereunder, will use and rely upon the Information as well as publicly available information regarding the Company and that Source shall not assume responsibility for independent verification of any information, whether publicly available or otherwise furnished to it, concerning Company, including, without limitation, any financial information, forecasts or projections, considered by Source in connection with the rendering of its services. Accordingly, Source shall be entitled to assume and rely upon the accuracy and completeness of all such information and is not required to conduct a physical inspection of any of the properties or assets, or to prepare or obtain any independent evaluation or appraisal of any of the assets or liabilities, of the Company. With respect to any financial forecasts and projections made available to Source by the Company and used by Source in its analysis and provision of its Services hereunder, Source shall be entitled to assume that such forecasts and projections have been reasonably prepared on bases reflecting the best currently available estimates and judgments of the management of the Company as to the matters covered thereby. The Company represents that the Information (i) will be prepared by the management of the Company; and (ii) that to the best of its knowledge the Information will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

Source Capital Group, Inc.

4.     **Timely Appraisals**.     During the Term of this Agreement, the Company hereby agrees to use its commercially reasonable efforts to keep Source up to date and apprised of all business, market and legal developments related to the Company and its operations and management. Accordingly:

(i)     the Company will advise Source at such reasonable time of the occurrence of any event or any other change known to the Company which results in the Information containing an untrue statement of a material fact or omitting to state a material fact required to be stated therein or necessary to make the statements therein or previously made, in light of the circumstance under which they were made, not misleading.

(ii)     the Company shall make available to Source for its review copies of all material amendments, revisions and changes to its business and marketing plans, bylaws, articles of incorporation, private placement memoranda, key contracts, employment and consulting agreements and other operational agreements that the Company deems relevant to the Offering;

(iii)     the Company shall promptly notify Source of all new material contracts agreements, joint ventures or material filings with any state, federal or local administrative agency, including without limitation the SEC or TASE, applicable securities agencies, that the Company deems relevant to the Offering and shall make available to Source for its review all related documents, including, copies of the exact documents filed, including without limitation, all annual reports, quarterly reports and notices of change of events filed with any regulatory agency;

(iv)     the Company shall also provide to Source current financial statements, including balance sheets, income statements, cash flows reasonably requested by Source from time to time; and

(v)     the Company shall also agree to provide Source with due diligence materials as we request or copies of due diligence materials which are provided to Investors in the Offering.

Source shall keep all documents and information supplied to it hereunder confidential pursuant to the terms of a fully executed Non-Disclosure Agreement.

5.     **Fees**.     (a) During the Term, Source shall receive the fees as set forth in this section 5(a). In consideration of Source's services, the Company hereby agrees to pay Source a cash fee of $50,000 (the "Cash Placement Fee") for its placement of $2 million pursuant to the Offering. The Cash Placement Fee shall be payable upon the Company's receipt of $2 million of subscription proceeds pursuant to the Offering regardless of who introduces the Company or Source to an Investor. A Cash Placement Fee advance of $7,500 will be due and payable upon execution of this agreement (the "Cash Advance"). The Cash Advance will be credited against the Cash Placement Fee when it is paid, as provided for above and is non-refundable. In addition, when the Cash

Source Capital Group, Inc.

Placement Fee is paid, the Company will cause Units to be issued to Source in ETRE Financial Investors, LLC which would be equivalent to a 0.50% (50 basis points) of the outstanding equity in ETRE Financial LLC at the time of issuance (the "Non Cash Placement Fee") without having a dilutive effect on the issuance of an 8% equity position to ETRE Financial Investors, LLC for its investment of the Offering proceeds. If less than the total Offering amount is raised, the Cash Placement Fee and Non Cash Placement Fee will be adjusted in proportion to the amount of Units sold. If no Units are sold upon termination of the Agreement no fees will be due to Source beyond the non-refundable Cash Placement Fee advance of $7,500 paid upon execution of this agreement. At Source's option, the Cash Placement Fee can be paid as the Company receives cleared funds from each Investor. The Non Cash Placement Fee will only be paid when the Offering is completed.

(b)      Source shall be entitled to Cash Placement Fees and Non Cash Placement Fees pursuant to this Section 5(b) ("Tail Compensation") during the twelve (12) month period following termination or expiration of this Agreement ("Tail Period"). In the event Tail Approved Investors purchase additional Units during the Tail Period over and above Units they purchased prior to the Tail Period, Source shall be entitled to Tail Compensation equal to 100% of the proportionate Cash Placement Fee and Non Cash Placement Fee for that investment in Additional Units. In the event Tail Approved Investors purchase Units for the first time during the Tail Period, Source shall be entitled Tail Compensation equal to 20% of the proportionate Cash Placement Fee and Non Cash Placement Fee for that investment in Units. Tail Compensation shall be paid to Source as the Company receives cleared funds from each Investor.

6.      **Reimbursement of Expenses.** Upon the closing of the Offering, the Company agrees to (a) reimburse Source for its reasonable documented expenses incurred by Source in connection with the Offering (including airfare, lodging for requested field visits upon prior approval of the Company); and (c) pay and cover Source's legal fees incurred in connection with the Offering, if any. Any expense incurred by Source of greater than $250 must be approved in advance by ETRE before incurred.

7.      **Term.** This Agreement shall take effect on the date first written above and shall continue for an initial term ("Term") of ninety (90) days at which point the Agreement will terminate. Notwithstanding the foregoing, either party may terminate this Agreement at any time for any reason upon 15 calendar day's written notice to the other party. Upon termination, Source will be entitled to receive any Cash Placement Fees and Non Cash Placement Fees earned prior to such termination and post termination (i.e., the "tail" provisions as provided in Section 5(b) above) and reasonable documented expenses incurred through the date of termination. In addition, upon expiration or termination of this Agreement, the parties agree that Section 8 Indemnification and Section 12 Miscellaneous shall survive.

8.      **Indemnification.** The Company and Source agree to the indemnification provisions set forth in Annex A. Said indemnification shall apply regardless of whether the proposed Offering is consummated.

Source Capital Group, Inc.

9.   **Conflicting Engagements**.  (a) Nothing in this Agreement shall be construed to limit the ability of Source or its affiliates to pursue, investigate, analyze, invest in, or engage in investment banking, financial advisory or any other business relationship with entities other than the Company, notwithstanding that such entities may be engaged in a business which is similar to or competitive with the business of the Company, and notwithstanding that such entities may have actual or potential operations, products, services, plans, ideas, customers or supplies similar or identical to the Company's, or may have been identified by the Company as potential investor, merger or acquisition targets or potential candidates for some other business combination, cooperation or relationship.

(b)   The Company acknowledges that Source and/or its affiliates, in the future, may enter into agreements with one or more Investors participating in the Offering, to provide consulting and/or other advisory services or other industry-related matters and receive compensation for providing such consulting and/or other advisory services.

10.   **Placement Agency Agreement**. The Company understands and agrees that Source's obligations to commence the Offering may be subject to execution of a Placement Agency Agreement on customary terms and incorporating the principal terms hereof, subject to the approval of the agreements by the Company's board of directors. In the absence of such Placement Agency Agreement, you agree that we may rely upon, and are a third party beneficiary of, the representations and warranties, and applicable covenants, set forth in any offering documents and subscription agreements that you execute with investors in the Offering. In addition, at the closing of the Offering, the Company will provide Source with the same certificates, if any, of the officers of the Company as are furnished to the Investors and such other certification, opinions and documents as Source or its counsel may deem appropriate, in form and substance satisfactory to Source and its counsel.

11.   **Advice to the Board**. The Company acknowledges that any advice given by Source is solely for the benefit and use of the Company and its Managers and Board of Directors and may not be used, reproduced, disseminated, quoted or referred to, without our prior written consent, except as may be required by law or in connection with any action or proceeding.

12.   **Miscellaneous**.

(a)   **Governing Law; Arbitration**. This Agreement shall be deemed to have been made and delivered in New York City and shall be governed as to validity, interpretation, construction, affect and in all other respects by the internal laws of the State of New York. The parties agree that any dispute, claim or controversy directly or indirectly relating to or arising out of this Agreement, the termination or validity hereof, any alleged breach of this Agreement or the engagement contemplated hereby (any of the foregoing, a "Claim") shall be submitted to JAMS, or its successor, in New York, for final and binding arbitration in front of a panel of three arbitrators with JAMS in New

Source Capital Group, Inc.

York, New York under the JAMS Comprehensive Arbitration Rules and Procedures (with each of Source and the Company choosing one arbitrator, and the chosen arbitrators choosing the third arbitrator). The arbitrators shall, in their award, allocate all of the costs of the arbitration, including the fees of the arbitrators and the reasonable attorneys' fees of the prevailing party, against the party who did not prevail. The award in the arbitration shall be final, binding and non-appealable. The arbitration shall be governed by the Federal Arbitration Act, 9 U.S.C. Sec.1-16, and the judgment upon the award rendered by the arbitrators may be entered by any court having jurisdiction thereof. The Company and Source agree and consent to personal jurisdiction, service of process and venue in any federal or state court within the State and County of New York in connection with any action brought to enforce an award in arbitration.

      (b)    **Independent Contractor.**  In carrying out its responsibilities under this Agreement, the parties agree that Source shall be an independent contractor with complete supervision and control over its own activities, and shall have no right or authority to assume or create any obligation on behalf of the Company and Source's engagement by the Company shall not create any partnership, joint venture or similar business relationship between the Company and Source.  Source shall have no restrictions on its ability to provide services to companies other than the Company, except as stated herein.  In addition, the Company's engagement of Source is not intended to confer rights upon any person not a party hereto (including shareholders, directors, officers, agents, employees, or creditors of the Company) as against Source or its affiliates, or their respective directors, officers, employees or agents, successors or assigns. Nothing contained herein should be construed as creating any fiduciary duties between the parties.

      (c)    **No Conflict.** The Company represents, warrants and agrees, as of the date hereof, that: (i) neither the execution and delivery of this Agreement by the Company nor the consummation of the transactions contemplated hereby will, directly or indirectly, with or without the giving of notice or lapse of time, or both, (A) violate any provisions of the Certificate of Incorporation or the Articles of the Company or (B) violate, or be in conflict with, or constitute a default under, any agreement, lease, mortgage, debt or obligation of the Company or require the payment, any pre-payment or other penalty with respect thereto; (ii) it has all requisite power and authority to enter into and perform its obligations under this Agreement; and (iii) this Agreement has been duly executed and delivered and constitutes valid and binding obligations of the Company, enforceable against the Company in accordance with their respective terms.

      (d)    **Notices.**  All notices and other communications hereunder shall be deemed given upon (a) the sender's confirmation of receipt of a facsimile transmission to the recipient's facsimile number set forth below, (b) confirmed delivery by a standard overnight carrier to the recipient's address set forth below, or (c) delivery by hand to the recipient's address set forth below (or, in each case, to or at such other facsimile number or address for a party as such party may specify by notice given in accordance with this Section 12 (d)):

      (i)    If to the Company, to:

          Road West    Westport, CT 06880  •  203 341-3500  •  800 882-2889  •  Fax 203 341-3515

Source Capital Group, Inc.

      Mr. Paul Frischer
      Chief Executive Officer
      ETRE Financial, LLC
      44 Wall Street, 2nd Floor
      New York, New York 10005-2421

(ii)    If to Source Group, to:

      Mr. Russell W. Newton
      Source Capital Group Inc.
      276 Post Road West
      Westport, CT 06880

    (e)    **Construction of Certain Terms.** The parties acknowledge and agree that with respect to phrases contained herein such as "as a results of our efforts," "introduced to the Company by Source" or similar language, such phrases are intended to include any person or entity, *directly or indirectly* introduced to the Company by the undersigned. Thus, to the extent that the Company consummates any part of the Offering with any person or entity, whose introduction to the Company can be traced back, directly or indirectly, to a person or entity who was originally introduced to the Company by Source or are persons or entities with which Source had otherwise had discussions or negotiations during the Term on behalf of the Company, Source is entitled to the compensation described herein provided that it can be said that the indirect party would not have been introduced to the Company but for Source's direct introduction of another person.

    (f)    **Entire Agreement.** This Agreement constitutes the entire understanding of the parties with respect to the subject matter hereof and may not be altered or amended except in a writing signed by both parties.

    (h)    **Assignment; Binding; Waiver.** The rights and obligations of either party under this Agreement may not be assigned or delegated by such party without the prior written consent of the other party (except by operation of law), and any other purported assignment or delegation shall be null and void. This Agreement shall be binding upon and inure to the benefit of the parties and their respective permitted successors and assigns. No material provision of this Agreement shall be deemed waived and no breach excused, unless such waiver or consent excusing the breach shall be in writing and signed by the party to be charged with such waiver or consent.

    (i)    **Invalid Provisions.** If any provision of this Agreement is determined to be invalid or unenforceable in any respect, then such determination will not affect such