Source Capital Group, Inc.

provision in any other respect or any other provision of this Agreement, which will remain in full force and effect.

(j) **Counterparts.** This Agreement may be executed in one or more counterparts, all of which when taken together shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party, it being understood that both parties need not sign the same counterpart. In the event that any signature is delivered by facsimile transmission or by e-mail delivery of a ".pdf" format data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or ".pdf" signature page were an original thereof.

Sincerely,

W. Todd Coffin
Head of Investment Banking
Senior Managing Director

Approved and Accepted:

ETRE Financial, LLC

Paul Frischer
Chief Executive Officer
ETRE Financial, LLC

ETRE Financial Investors, LLC

Paul Frischer
Chief Executive Officer
ETRE Financial, LLC, Manager

Source Capital Group, Inc.

W. Todd Coffin
Senior Managing Director
Source Capital Group, Inc.

Russell W. Newton
Chief Financial Officer
Source Capital Group, Inc.

Source Capital Group, Inc.

## ANNEX A

### INDEMNIFICATION

The Company agrees to indemnify and hold harmless Source and its affiliates and their respective officers, directors, employees, agents and controlling persons (Source and each such person being an "Indemnified Party"), from and against any losses, claims, damages and liabilities, joint or several, to which such Indemnified Party may become subject under any applicable law, or otherwise, which relate to or arise in any manner out of any transaction, financing, or any other matter (collectively, the "Matters") contemplated by the Agreement of which this Annex A forms a part and the performance by Source of the services contemplated thereby, and will promptly reimburse each Indemnified Party for all reasonable expenses (including reasonable fees and expenses of legal counsel) as incurred in connection with the investigation of, preparation for or defense of any pending or threatened claim or any action or proceeding arising therefrom, whether or not such Indemnified Party is a party and whether or not such claim, action or proceeding is initiated or brought by or on behalf of the Company. Notwithstanding the foregoing, the Company shall not be liable under the foregoing to the extent that any loss, claim, damage, liability or expense is found in a final judgment by a court of competent jurisdiction to have resulted solely from Source's bad faith or gross negligence.

The Company also agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company or its security holders or creditors related to, arising out of, or in connection with, any Matters, the engagement of Source pursuant to, or the performance by Source of the services contemplated by, the Agreement, except to the extent any loss, claim, damage, liability if found in a final judgment by a court of competent jurisdiction to have resulted solely from Source's bad faith or gross negligence.

The Company agrees that it will not, without the prior written consent of Source, which shall not be unreasonably withheld, settle, compromise or consent to the entry of any judgment in any pending or threatened claim, action or proceeding in respect of which indemnification may be sought hereunder (whether or not Source or any other Indemnified Party is an actual or potential party to such claim, action or proceeding), unless such settlement, compromise or consent includes an unconditional release of Source and each other Indemnified Party hereunder from all liability arising out of such claim, action or proceeding.

If Source or any other Indemnified Party is requested or required to appear as a witness in any action brought by or on behalf of or against the Company in which such party is not named as a defendant, the Company will reimburse Source for all reasonable expenses incurred in connection with such party's appearing and preparing to appear as such a witness, including, without limitation, the fees and disbursements of its legal counsel.

EXHIBIT I

# LOAN AGREEMENT

FOR VALUE RECEIVED, the undersigned, **ETRE FINANCIAL, LLC,** a Delaware limited liability company (the "Maker", or the "Company"), promises as of February _17_, 2014 to pay to the order of Scott Panzer, (the "Payee"), the principal sum of Fifty Thousand Dollars DOLLARS ($50,000) in lawful money of the United States,. together with interest in like lawful money at the interest rate set forth in Section below.

1.    **Payment of Principal and Interest.** The full principal amount of this Note and interest thereon shall be due and payable at the time when the Maker has realized revenue of, or has received investment in the Company of at least $300,000 in total. In the event that the total amount of revenue and investment in the Company is less than $300,000, the full principal amount of this Note and interest together with the full principal amount of other notes where Scott Panzer is Payee and interest due on those notes shall be due and payable prior to Maker re-paying any of the Company's other outstanding notes to payees other than to Frischer Kranz Inc. and to Scott Panzer for Notes made after February 1, 2014, which notes shall be paid in full prior to the Company making any distributions, including but not limited to distributions as a result of operations, winding up, dissolution or liquidation, to its Members. All payments hereunder will be made in such coin or currency of the United States of America as at the time of payment shall be legal tender for the payment of public and private debts.

    **a) Use of Fund:** The funds will be used by the Company to make a good faith deposit towards a loan application for 1201 Connecticut Avenue.

2.    **Interest Rate.** The unpaid principal balance of this Note shall bear interest and accrue at ten percent (10%) per annum. Interest shall be calculated on the basis of a calendar year and the actual days elapsed.

3.    **Default.** This Note shall be considered in default (a) when any payment required to be made hereunder shall not be paid on the date it becomes due, and shall remain in default until such payment shall have been made, or (b) upon the insolvency, bankruptcy, dissolution, death or incompetence of any maker, endorser or guarantor hereof. Upon the occurrence of a default, (i) the Payee shall have the option to accelerate the payment of all amounts due hereunder.

4.    **Waiver and Consent.** To the fullest extent permitted by law, the Maker waives demand, presentment, protest, notice of dishonor, suit against or joinder of any other person, and all other requirements necessary to charge or hold the Maker liable with respect to this Note.

5.    **Costs, Indemnities and Expenses.** The Maker agrees to pay all filing fees and similar charges and all costs incurred by the Payee in collecting or securing or attempting to collect or secure this Note, including reasonable attorney's fees, whether or not involving litigation and/or appellate, administrative or bankruptcy proceedings. The Maker agrees to pay any documentary stamp taxes, intangible taxes or other taxes (except for federal or state income or franchise taxes based on the Payee's income) which may now or hereafter apply to this Note or any payment made in respect of this Note or any security for this Note, and the Maker agrees to indemnify and hold the Payee harmless from and against any liability, costs, attorney's fees, penalties, interest or expenses relating to any such taxes, as and when the same may be incurred.

6.    **Prepayment.** This Note may be prepaid in whole or in part at any time without penalty. Except as otherwise required by law or by the provisions of this Note, payments received by the Payee hereunder shall be applied first against expenses and indemnities, next against accrued but unpaid interest on this Note, and next in reduction of the outstanding principal balance of this Note.

7. **Maximum Interest Rate.** In no event shall any agreed to or actual exaction charged, reserved or taken as an advance or forbearance by the Payee as consideration for this Note exceed the limits (if any) imposed or provided by the law applicable from time to time to this Note for the use or detention of money or for forbearance in seeking its collection, the Payee hereby waives any right to demand such excess. In the event that the interest provisions of this Note shall result at any time or for any reason in an effective rate of interest that exceeds the maximum interest rate permitted by applicable law (if any), then without further agreement or notice the obligation to be fulfilled shall be automatically reduced to such limit and all sums received by the Payee in excess of those lawfully collectible as interest shall be applied against the principal of this Note immediately upon the Payee's receipt thereof, with the same force and effect as though the payor had specifically designated such extra sums to be so applied to principal and the Payee had agreed to accept such extra payment(s) as a premium-free prepayment or prepayments.

8. **Miscellaneous.** This Note shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws. This Note may not be amended or modified, nor shall any waiver or any provision hereof be effective, except by an instrument in writing executed by the Payee.

EXCEPT AS PROHIBITED BY LAW, NEITHER THE PAYEE NOR THE MAKER, NOR ANY GUARANTOR SHALL SEEK A JURY TRIAL OR ANY LAWSUIT, PROCEEDING OR COUNTERCLAIM BASED UPON OR ARISING OUT OF THIS NOTE, THE COLLATERAL OR THE RELATIONSHIP BETWEEN THE PAYEE AND THE MAKER. IF THE SUBJECT MATTER OF ANY SUCH LAWSUIT, PROCEEDING OR COUNTERCLAIM IS ONE IN WHICH THE WAIVER OF A JURY TRIAL IS PROHIBITED, NEITHER THE PAYEE NOR THE MAKER SHALL PRESENT AS A NON-COMPULSORY COUNTERCLAIM TO SUCH LAWSUIT, PROCEEDING OR COUNTERCLAIM ANY CLAIM ARISING OUT OF THIS NOTE. FURTHERMORE, NEITHER THE PAYEE NOR THE UNDERSIGNED SHALL SEEK TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY SUCH ACTION IN WHICH A JURY TRIAL CANNOT BE WAIVED.

MAKER

ETRE FINANCIAL, LLC

_(signature)_

PAYEE

_(signature)_

NAME

_(signature)_

AUTHORIZED REPRESENTATIVE
SIGNATURE

# LOAN AGREEMENT

FOR VALUE RECEIVED, the undersigned, **ETRE FINANCIAL, LLC**, a Delaware limited liability company (the "Maker", or the "Company"), promises as of April 16, 2014 to pay to the order of Scott Panzer, (the "Payee"), the principal sum of Fifty Thousand Dollars DOLLARS ($50,000) in lawful money of the United States, together with interest in like lawful money at the interest rate set forth in Section below.

1.      **Payment of Principal and Interest.** The full principal amount of this Note and interest thereon shall be due and payable at the time when the Maker has realized revenue of, or has received investment in the Company of at least $300,000 in total. In the event that the total amount of revenue and investment in the Company is less than $300,000, the full principal amount of this Note and interest together with the full principal amount of other notes where Scott Panzer is Payee and interest due on those notes shall be due and payable prior to Maker re-paying any of the Company's other outstanding notes to payees other than to Frischer Kranz Inc. and to Scott Panzer for Notes made after February 1, 2014, which notes shall be paid in full prior to the Company making any distributions, including but not limited to distributions as a result of operations, winding up, dissolution or liquidation, to its Members. All payments hereunder will be made in such coin or currency of the United States of America as at the time of payment shall be legal tender for the payment of public and private debts.

> a) **Use of Fund:** The funds will be used by the Company to make a good faith deposit towards a loan application for 1201 Connecticut Avenue..

2.      **Interest Rate.** The unpaid principal balance of this Note shall bear interest and accrue at ten percent (10%) per annum. Interest shall be calculated on the basis of a calendar year and the actual days elapsed.

3.      **Default.** This Note shall be considered in default (a) when any payment required to be made hereunder shall not be paid on the date it becomes due, and shall remain in default until such payment shall have been made, or (b) upon the insolvency, bankruptcy, dissolution, death or incompetence of any maker, endorser or guarantor hereof. Upon the occurrence of a default, (i) the Payee shall have the option to accelerate the payment of all amounts due hereunder.

4.      **Waiver and Consent.** To the fullest extent permitted by law, the Maker waives demand, presentment, protest, notice of dishonor, suit against or joinder of any other person, and all other requirements necessary to charge or hold the Maker liable with respect to this Note.

5.      **Costs, Indemnities and Expenses.** The Maker agrees to pay all filing fees and similar charges and all costs incurred by the Payee in collecting or securing or attempting to collect or secure this Note, including reasonable attorney's fees, whether or not involving litigation and/or appellate, administrative or bankruptcy proceedings. The Maker agrees to pay any documentary stamp taxes, intangible taxes or other taxes (except for federal or state income or franchise taxes based on the Payee's income) which may now or hereafter apply to this Note or any payment made in respect of this Note or any security for this Note, and the Maker agrees to indemnify and hold the Payee harmless from and against any liability, costs, attorney's fees, penalties, interest or expenses relating to any such taxes, as and when the same may be incurred.

6.      **Prepayment.** This Note may be prepaid in whole or in part at any time without penalty. Except as otherwise required by law or by the provisions of this Note, payments received by the Payee hereunder shall be applied first against expenses and indemnities, next against accrued but unpaid interest on this Note, and next in reduction of the outstanding principal balance of this Note.

7. **Maximum Interest Rate.** In no event shall any agreed to or actual exaction charged, reserved or taken as an advance or forbearance by the Payee as consideration for this Note exceed the limits (if any) imposed or provided by the law applicable from time to time to this Note for the use or detention of money or for forbearance in seeking its collection, the Payee hereby waives any right to demand such excess. In the event that the interest provisions of this Note shall result at any time or for any reason in an effective rate of interest that exceeds the maximum interest rate permitted by applicable law (if any), then without further agreement or notice the obligation to be fulfilled shall be automatically reduced to such limit and all sums received by the Payee in excess of those lawfully collectible as interest shall be applied against the principal of this Note immediately upon the Payee's receipt thereof, with the same force and effect as though the payor had specifically designated such extra sums to be so applied to principal and the Payee had agreed to accept such extra payment(s) as a premium-free prepayment or prepayments.

8. **Miscellaneous.** This Note shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws. This Note may not be amended or modified, nor shall any waiver or any provision hereof be effective, except by an instrument in writing executed by the Payee.

EXCEPT AS PROHIBITED BY LAW, NEITHER THE PAYEE NOR THE MAKER, NOR ANY GUARANTOR SHALL SEEK A JURY TRIAL OR ANY LAWSUIT, PROCEEDING OR COUNTERCLAIM BASED UPON OR ARISING OUT OF THIS NOTE, THE COLLATERAL OR THE RELATIONSHIP BETWEEN THE PAYEE AND THE MAKER. IF THE SUBJECT MATTER OF ANY SUCH LAWSUIT, PROCEEDING OR COUNTERCLAIM IS ONE IN WHICH THE WAIVER OF A JURY TRIAL IS PROHIBITED, NEITHER THE PAYEE NOR THE MAKER SHALL PRESENT AS A NON-COMPULSORY COUNTERCLAIM TO SUCH LAWSUIT, PROCEEDING OR COUNTERCLAIM ANY CLAIM ARISING OUT OF THIS NOTE. FURTHERMORE, NEITHER THE PAYEE NOR THE UNDERSIGNED SHALL SEEK TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY SUCH ACTION IN WHICH A JURY TRIAL CANNOT BE WAIVED.

MAKER

ETRE FINANCIAL, LLC

_____

PAYEE

_Scott M Panzer_
NAME

_____
AUTHORIZED REPRESENTATIVE
SIGNATURE

2

# LOAN AGREEMENT

FOR VALUE RECEIVED, the undersigned, **ETRE FINANCIAL, LLC**, a Delaware limited liability company (the "Maker", or the "Company"), promises as of May 15, 2014 to pay to the order of Scott Panzer, (the "Payee"), the principal sum of Fifty Thousand Dollars DOLLARS ($50,000) in lawful money of the United States, together with interest in like lawful money at the interest rate set forth in Section below.

1.    **Payment of Principal and Interest.** The full principal amount of this Note and interest thereon shall be due and payable at the time when the Maker has realized revenue of, or has received investment in the Company of at least $300,000 in total. In the event that the total amount of revenue and investment in the Company is less than $300,000, the full principal amount of this Note and interest together with the full principal amount of other notes where Scott Panzer is Payee and interest due on those notes shall be due and payable prior to Maker re-paying any of the Company's other outstanding notes to payees other than to Frischer Kranz Inc. and to Scott Panzer for Notes made after February 1, 2014, which notes shall be paid in full prior to the Company making any distributions, including but not limited to distributions as a result of operations, winding up, dissolution or liquidation, to its Members. All payments hereunder will be made in such coin or currency of the United States of America as at the time of payment shall be legal tender for the payment of public and private debts.

a) **Use of Fund:** The funds will be used by the Company to reimburse Mack-Cali for expenses incurred with respect to the 1201 Connecticut Avenue transaction.

2.    **Interest Rate.** The unpaid principal balance of this Note shall bear interest and accrue at ten percent (10%) per annum. Interest shall be calculated on the basis of a calendar year and the actual days elapsed.

3.    **Default.** This Note shall be considered in default (a) when any payment required to be made hereunder shall not be paid on the date it becomes due, and shall remain in default until such payment shall have been made, or (b) upon the insolvency, bankruptcy, dissolution, death or incompetence of any maker, endorser or guarantor hereof. Upon the occurrence of a default, (i) the Payee shall have the option to accelerate the payment of all amounts due hereunder.

4.    **Waiver and Consent.** To the fullest extent permitted by law, the Maker waives demand, presentment, protest, notice of dishonor, suit against or joinder of any other person, and all other requirements necessary to charge or hold the Maker liable with respect to this Note.

5.    **Costs, Indemnities and Expenses.** The Maker agrees to pay all filing fees and similar charges and all costs incurred by the Payee in collecting or securing or attempting to collect or secure this Note, including reasonable attorney's fees, whether or not involving litigation and/or appellate, administrative or bankruptcy proceedings. The Maker agrees to pay any documentary stamp taxes, intangible taxes or other taxes (except for federal or state income or franchise taxes based on the Payee's income) which may now or hereafter apply to this Note or any payment made in respect of this Note or any security for this Note, and the Maker agrees to indemnify and hold the Payee harmless from and against any liability, costs, attorney's fees, penalties, interest or expenses relating to any such taxes, as and when the same may be incurred.

6.    **Prepayment.** This Note may be prepaid in whole or in part at any time without penalty. Except as otherwise required by law or by the provisions of this Note, payments received by the Payee hereunder shall be applied first against expenses and indemnities, next against accrued but unpaid interest on this Note, and next in reduction of the outstanding principal balance of this Note.

7. **Maximum Interest Rate.** In no event shall any agreed to or actual exaction charged, reserved or taken as an advance or forbearance by the Payee as consideration for this Note exceed the limits (if any) imposed or provided by the law applicable from time to time to this Note for the use or detention of money or for forbearance in seeking its collection, the Payee hereby waives any right to demand such excess. In the event that the interest provisions of this Note shall result at any time or for any reason in an effective rate of interest that exceeds the maximum interest rate permitted by applicable law (if any), then without further agreement or notice the obligation to be fulfilled shall be automatically reduced to such limit and all sums received by the Payee in excess of those lawfully collectible as interest shall be applied against the principal of this Note immediately upon the Payee's receipt thereof, with the same force and effect as though the payor had specifically designated such extra sums to be so applied to principal and the Payee had agreed to accept such extra payment(s) as a premium-free prepayment or prepayments.

8. **Miscellaneous.** This Note shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws. This Note may not be amended or modified, nor shall any waiver or any provision hereof be effective, except by an instrument in writing executed by the Payee.

EXCEPT AS PROHIBITED BY LAW, NEITHER THE PAYEE NOR THE MAKER, NOR ANY GUARANTOR SHALL SEEK A JURY TRIAL OR ANY LAWSUIT, PROCEEDING OR COUNTERCLAIM BASED UPON OR ARISING OUT OF THIS NOTE, THE COLLATERAL OR THE RELATIONSHIP BETWEEN THE PAYEE AND THE MAKER. IF THE SUBJECT MATTER OF ANY SUCH LAWSUIT, PROCEEDING OR COUNTERCLAIM IS ONE IN WHICH THE WAIVER OF A JURY TRIAL IS PROHIBITED, NEITHER THE PAYEE NOR THE MAKER SHALL PRESENT AS A NON-COMPULSORY COUNTERCLAIM TO SUCH LAWSUIT, PROCEEDING OR COUNTERCLAIM ANY CLAIM ARISING OUT OF THIS NOTE. FURTHERMORE, NEITHER THE PAYEE NOR THE UNDERSIGNED SHALL SEEK TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY SUCH ACTION IN WHICH A JURY TRIAL CANNOT BE WAIVED.

MAKER

ETRE FINANCIAL, LLC

_____

PAYEE

Scott M. Panzer
_____
NAME

_____
AUTHORIZED REPRESENTATIVE
SIGNATURE

# LOAN AGREEMENT

FOR VALUE RECEIVED, the undersigned, **ETRE FINANCIAL, LLC**, a Delaware limited liability company (the "Maker", or the "Company"), promises as of May 7, 2014 to pay to the order of Scott Panzer, (the "Payee"), the principal sum of Fifty Thousand Dollars ($15,000) in lawful money of the United States, together with interest in like lawful money at the interest rate set forth in Section below.

1. **Payment of Principal and Interest.** The full principal amount of this Note and interest thereon shall be due and payable at the time when the Maker has realized revenue of, or has received investment in the Company of at least $300,000 in total. In the event that the total amount of revenue and investment in the Company is less than $300,000, the full principal amount of this Note and interest together with the full principal amount of other notes where Scott Panzer is Payee and interest due on those notes shall be due and payable prior to Maker re-paying any of the Company's other outstanding notes to payees other than to Frischer Kranz Inc. and to Scott Panzer for Notes made after February 1, 2014, which notes shall be paid in full prior to the Company making any distributions, including but not limited to distributions as a result of operations, winding up, dissolution or liquidation, to its Members. All payments hereunder will be made in such coin or currency of the United States of America as at the time of payment shall be legal tender for the payment of public and private debts.

a) **Use of Fund:** The funds will be used by the Company to pay rent for the Company's office and other operating expenses.

2. **Interest Rate.** The unpaid principal balance of this Note shall bear interest and accrue at ten percent (10%) per annum. Interest shall be calculated on the basis of a calendar year and the actual days elapsed.

3. **Default.** This Note shall be considered in default (a) when any payment required to be made hereunder shall not be paid on the date it becomes due, and shall remain in default until such payment shall have been made, or (b) upon the insolvency, bankruptcy, dissolution, death or incompetence of any maker, endorser or guarantor hereof. Upon the occurrence of a default, (i) the Payee shall have the option to accelerate the payment of all amounts due hereunder.

4. **Waiver and Consent.** To the fullest extent permitted by law, the Maker waives demand, presentment, protest, notice of dishonor, suit against or joinder of any other person, and all other requirements necessary to charge or hold the Maker liable with respect to this Note.

5. **Costs, Indemnities and Expenses.** The Maker agrees to pay all filing fees and similar charges and all costs incurred by the Payee in collecting or securing or attempting to collect or secure this Note, including reasonable attorney's fees, whether or not involving litigation and/or appellate, administrative or bankruptcy proceedings. The Maker agrees to pay any documentary stamp taxes, intangible taxes or other taxes (except for federal or state income or franchise taxes based on the Payee's income) which may now or hereafter apply to this Note or any payment made in respect of this Note or any security for this Note, and the Maker agrees to indemnify and hold the Payee harmless from and against any liability, costs, attorney's fees, penalties, interest or expenses relating to any such taxes, as and when the same may be incurred.

6. **Prepayment.** This Note may be prepaid in whole or in part at any time without penalty. Except as otherwise required by law or by the provisions of this Note, payments received by the Payee hereunder shall be applied first against expenses and indemnities, next against accrued but unpaid interest on this Note, and next in reduction of the outstanding principal balance of this Note.

7. **Maximum Interest Rate.** In no event shall any agreed to or actual exaction charged, reserved or taken as an advance or forbearance by the Payee as consideration for this Note exceed the limits (if any) imposed or provided by the law applicable from time to time to this Note for the use or detention of money or for forbearance in seeking its collection, the Payee hereby waives any right to demand such excess. In the event that the interest provisions of this Note shall result at any time or for any reason in an effective rate of interest that exceeds the maximum interest rate permitted by applicable law (if any), then without further agreement or notice the obligation to be fulfilled shall be automatically reduced to such limit and all sums received by the Payee in excess of those lawfully collectible as interest shall be applied against the principal of this Note immediately upon the Payee's receipt thereof, with the same force and effect as though the payor had specifically designated such extra sums to be so applied to principal and the Payee had agreed to accept such extra payment(s) as a premium-free prepayment or prepayments.

8. **Miscellaneous.** This Note shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws. This Note may not be amended or modified, nor shall any waiver or any provision hereof be effective, except by an instrument in writing executed by the Payee.

EXCEPT AS PROHIBITED BY LAW, NEITHER THE PAYEE NOR THE MAKER, NOR ANY GUARANTOR SHALL SEEK A JURY TRIAL OR ANY LAWSUIT, PROCEEDING OR COUNTERCLAIM BASED UPON OR ARISING OUT OF THIS NOTE, THE COLLATERAL OR THE RELATIONSHIP BETWEEN THE PAYEE AND THE MAKER. IF THE SUBJECT MATTER OF ANY SUCH LAWSUIT, PROCEEDING OR COUNTERCLAIM IS ONE IN WHICH THE WAIVER OF A JURY TRIAL IS PROHIBITED, NEITHER THE PAYEE NOR THE MAKER SHALL PRESENT AS A NON-COMPULSORY COUNTERCLAIM TO SUCH LAWSUIT, PROCEEDING OR COUNTERCLAIM ANY CLAIM ARISING OUT OF THIS NOTE. FURTHERMORE, NEITHER THE PAYEE NOR THE UNDERSIGNED SHALL SEEK TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY SUCH ACTION IN WHICH A JURY TRIAL CANNOT BE WAIVED.

MAKER

ETRE FINANCIAL, LLC

PAYEE

SCOTT PANZER
NAME

AUTHORIZED REPRESENTATIVE
SIGNATURE

2

## LOAN AGREEMENT

FOR VALUE RECEIVED, the undersigned, **ETRE FINANCIAL, LLC,** a Delaware limited liability company (the "Maker", or the "Company"), promises as of May 15, 2014 to pay to the order of Scott Panzer, (the "Payee"), the principal sum of Fifty Thousand Dollars DOLLARS ($50,000) in lawful money of the United States, together with interest in like lawful money at the interest rate set forth in Section below.

1.     **Payment of Principal and Interest.** The full principal amount of this Note and interest thereon shall be due and payable at the time when the Maker has realized revenue of, or has received investment in the Company of at least $300,000 in total. In the event that the total amount of revenue and investment in the Company is less than $300,000, the full principal amount of this Note and interest together with the full principal amount of other notes where Scott Panzer is Payee and interest due on those notes shall be due and payable prior to Maker re-paying any of the Company's other outstanding notes to payees other than to Frischer Kranz Inc. and to Scott Panzer for Notes made after February 1, 2014, which notes shall be paid in full prior to the Company making any distributions, including but not limited to distributions as a result of operations, winding up, dissolution or liquidation, to its Members. All payments hereunder will be made in such coin or currency of the United States of America as at the time of payment shall be legal tender for the payment of public and private debts.

a) **Use of Fund:** The funds will be used by the Company to reimburse Mack-Cali for expenses incurred with respect to the 1201 Connecticut Avenue transaction.

2.     **Interest Rate.** The unpaid principal balance of this Note shall bear interest and accrue at ten percent (10%) per annum. Interest shall be calculated on the basis of a calendar year and the actual days elapsed.

3.     **Default.** This Note shall be considered in default (a) when any payment required to be made hereunder shall not be paid on the date it becomes due, and shall remain in default until such payment shall have been made, or (b) upon the insolvency, bankruptcy, dissolution, death or incompetence of any maker, endorser or guarantor hereof. Upon the occurrence of a default, (i) the Payee shall have the option to accelerate the payment of all amounts due hereunder.

4.     **Waiver and Consent.** To the fullest extent permitted by law, the Maker waives demand, presentment, protest, notice of dishonor, suit against or joinder of any other person, and all other requirements necessary to charge or hold the Maker liable with respect to this Note.

5.     **Costs, Indemnities and Expenses.** The Maker agrees to pay all filing fees and similar charges and all costs incurred by the Payee in collecting or securing or attempting to collect or secure this Note, including reasonable attorney's fees, whether or not involving litigation and/or appellate, administrative or bankruptcy proceedings. The Maker agrees to pay any documentary stamp taxes, intangible taxes or other taxes (except for federal or state income or franchise taxes based on the Payee's income) which may now or hereafter apply to this Note or any payment made in respect of this Note or any security for this Note, and the Maker agrees to indemnify and hold the Payee harmless from and against any liability, costs, attorney's fees, penalties, interest or expenses relating to any such taxes, as and when the same may be incurred.

6.     **Prepayment.** This Note may be prepaid in whole or in part at any time without penalty. Except as otherwise required by law or by the provisions of this Note, payments received by the Payee hereunder shall be applied first against expenses and indemnities, next against accrued but unpaid interest on this Note, and next in reduction of the outstanding principal balance of this Note.

7. **Maximum Interest Rate.** In no event shall any agreed to or actual exaction charged, reserved or taken as an advance or forbearance by the Payee as consideration for this Note exceed the limits (if any) imposed or provided by the law applicable from time to time to this Note for the use or detention of money or for forbearance in seeking its collection, the Payee hereby waives any right to demand such excess. In the event that the interest provisions of this Note shall result at any time or for any reason in an effective rate of interest that exceeds the maximum interest rate permitted by applicable law (if any), then without further agreement or notice the obligation to be fulfilled shall be automatically reduced to such limit and all sums received by the Payee in excess of those lawfully collectible as interest shall be applied against the principal of this Note immediately upon the Payee's receipt thereof, with the same force and effect as though the payor had specifically designated such extra sums to be so applied to principal and the Payee had agreed to accept such extra payment(s) as a premium-free prepayment or prepayments.

8. **Miscellaneous.** This Note shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws. This Note may not be amended or modified, nor shall any waiver or any provision hereof be effective, except by an instrument in writing executed by the Payee.

EXCEPT AS PROHIBITED BY LAW, NEITHER THE PAYEE NOR THE MAKER, NOR ANY GUARANTOR SHALL SEEK A JURY TRIAL OR ANY LAWSUIT, PROCEEDING OR COUNTERCLAIM BASED UPON OR ARISING OUT OF THIS NOTE, THE COLLATERAL OR THE RELATIONSHIP BETWEEN THE PAYEE AND THE MAKER. IF THE SUBJECT MATTER OF ANY SUCH LAWSUIT, PROCEEDING OR COUNTERCLAIM IS ONE IN WHICH THE WAIVER OF A JURY TRIAL IS PROHIBITED, NEITHER THE PAYEE NOR THE MAKER SHALL PRESENT AS A NON-COMPULSORY COUNTERCLAIM TO SUCH LAWSUIT, PROCEEDING OR COUNTERCLAIM ANY CLAIM ARISING OUT OF THIS NOTE. FURTHERMORE, NEITHER THE PAYEE NOR THE UNDERSIGNED SHALL SEEK TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY SUCH ACTION IN WHICH A JURY TRIAL CANNOT BE WAIVED.

MAKER

ETRE FINANCIAL, LLC

PAYEE

Scott M. Panzer
NAME

AUTHORIZED REPRESENTATIVE
SIGNATURE

2

# LOAN AGREEMENT

FOR VALUE RECEIVED, the undersigned, **ETRE FINANCIAL, LLC**, a Delaware limited liability company (the "Maker", or the "Company"), promises as of June 5th, 2014 to pay to the order of Scott Panzer, (the "Payee"), the principal sum of Fifty Thousand Dollars DOLLARS ($50,000) in lawful money of the United States, together with interest in like lawful money at the interest rate set forth in Section 2 below.

1.  **Payment of Principal and Interest.** The full principal amount of this Note and interest thereon shall be due and payable at the time when the Maker has realized revenue of, or has received investment in the Company of at least $365,000 in total. In the event that the total amount of revenue and investment in the Company is less than $365,000, the full principal amount of this Note and interest together with the full principal amount of other notes where Scott Panzer is Payee and interest due on those notes shall be due and payable prior to Maker re-paying any of the Company's other outstanding notes to payees other than to Frischer Kranz Inc. and to Scott Panzer for Notes made as referenced on Exhibit A, which Notes shall be paid in full prior to the Company making any distributions, including but not limited to distributions as a result of operations, winding up, dissolution or liquidation, to its Members or creditors. All payments hereunder will be made in such coin or currency of the United States of America as at the time of payment and shall be legal tender for the payment of public and private debts.

    a) **Use of Fund:** The funds will be used for working capital.

2.  **Interest Rate.** The unpaid principal balance of this Note shall bear interest and accrue at ten percent (10%) per annum beginning on the date of this agreement. Interest shall be calculated on the basis of a calendar year and the actual days elapsed.

3.  **Equity Conversion Option.** Upon a new equity capital raise by the Company pursuant to the Action By Written Consent of the Board Members and Managers of ETRE Financial, LLC dated 21st of May, 2014 or through such other equity capital raises approved by the Board and Managers, Payee shall have the right to convert the principal sum of this Note and all other outstanding Notes made to the Payee from and after February 1st, 2014, together with any accrued interest, into additional membership units of the Company at the same time and the same price per unit being offered to the equity capital contributor.

4.  **Default.** This Note shall be considered in default (a) when any payment required to be made hereunder shall not be paid on the date it becomes due, and shall remain in default until such payment shall have been made, or (b) upon the insolvency, bankruptcy, dissolution, death or incompetence of any maker, endorser or guarantor hereof. Upon the occurrence of a default, (i) the Payee shall have the option to accelerate the payment of all amounts due hereunder.

5.  **Waiver and Consent.** To the fullest extent permitted by law, the Maker waives demand, presentment, protest, notice of dishonor, suit against or joinder of any other person, and all other requirements necessary to charge or hold the Maker liable with respect to this Note.

6.  **Costs, Indemnities and Expenses.** The Maker agrees to pay all filing fees and similar charges and all costs incurred by the Payee in collecting or securing or attempting to collect or secure this Note, including reasonable attorney's fees, whether or not involving litigation and/or appellate, administrative or bankruptcy proceedings. The Maker agrees to pay any documentary stamp taxes, intangible taxes or other taxes (except for federal or state income or franchise taxes based on the Payee's income) which may now or hereafter apply to this Note or any payment made in respect of this Note or any security for this Note, and the Maker agrees to indemnify and hold the Payee harmless from and against any liability, costs, attorney's fees, penalties, interest or expenses relating to any such taxes, as and when the same may be incurred.

7.  **Prepayment.** This Note may be prepaid in whole or in part at any time without penalty.

Except as otherwise required by law or by the provisions of this Note, payments received by the Payee hereunder shall be applied first against expenses and indemnities, next against accrued but unpaid interest on this Note, and next in reduction of the outstanding principal balance of this Note.

8. **Maximum Interest Rate.** In no event shall any agreed to or actual exaction charged, reserved or taken as an advance or forbearance by the Payee as consideration for this Note exceed the limits (if any) imposed or provided by the law applicable from time to time to this Note for the use or detention of money or for forbearance in seeking its collection, the Payee hereby waives any right to demand such excess. In the event that the interest provisions of this Note shall result at any time or for any reason in an effective rate of interest that exceeds the maximum interest rate permitted by applicable law (if any), then without further agreement or notice the obligation to be fulfilled shall be automatically reduced to such limit and all sums received by the Payee in excess of those lawfully collectible as interest shall be applied against the principal of this Note immediately upon the Payee's receipt thereof, with the same force and effect as though the payor had specifically designated such extra sums to be so applied to principal and the Payee had agreed to accept such extra payment(s) as a premium-free prepayment or prepayments.

9. **Miscellaneous.** This Note shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws. This Note may not be amended or modified, nor shall any waiver or any provision hereof be effective, except by an instrument in writing executed by the Payee.

EXCEPT AS PROHIBITED BY LAW, NEITHER THE PAYEE NOR THE MAKER, NOR ANY GUARANTOR SHALL SEEK A JURY TRIAL OR ANY LAWSUIT, PROCEEDING OR COUNTERCLAIM BASED UPON OR ARISING OUT OF THIS NOTE, THE COLLATERAL OR THE RELATIONSHIP BETWEEN THE PAYEE AND THE MAKER. IF THE SUBJECT MATTER OF ANY SUCH LAWSUIT, PROCEEDING OR COUNTERCLAIM IS ONE IN WHICH THE WAIVER OF A JURY TRIAL IS PROHIBITED, NEITHER THE PAYEE NOR THE MAKER SHALL PRESENT AS A NON-COMPULSORY COUNTERCLAIM TO SUCH LAWSUIT, PROCEEDING OR COUNTERCLAIM ANY CLAIM ARISING OUT OF THIS NOTE. FURTHERMORE, NEITHER THE PAYEE NOR THE UNDERSIGNED SHALL SEEK TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY SUCH ACTION IN WHICH A JURY TRIAL CANNOT BE WAIVED.

MAKER

ETRE FINANCIAL, LLC

PAYEE

Scott M. Panzer
NAME

AUTHORIZED REPRESENTATIVE
SIGNATURE

Exhibit A- Outstanding Notes made to Scott Panzer as of 6/5/2014:

| Date | Amount | Use of Proceeds |
|------|--------|-----------------|
| 2/17/2014 | $50,000 | Working Capital |
| 4/16/2014 | $50,000 | 1201 Connecticut Loan Deposit |
| 5/7/2014 | $15,000 | Working Capital |
| 5/15/2014 | $100,000 | 1201 Connecticut break-up fee |
| 6/5/2014 | $50,000 | Working Capital |
| 6/5/2014 | $50,000 | Working Capital |
| Total | $315,000 | |

EXHIBIT J

# LOAN AGREEMENT

FOR VALUE RECEIVED, the undersigned, **ETRE FINANCIAL, LLC,** a Delaware limited liability company (the "Maker", or the "Company"), promises as of February _17_, 2014 to pay to the order of Frischer kranz, Inc., (the "Payee"), the principal sum of Fifty Thousand Dollars DOLLARS ($50,000) in lawful money of the United States, together with interest in like lawful money at the interest rate set forth in Section below.

**1.** **Payment of Principal and Interest.** The full principal amount of this Note and interest thereon shall be due and payable at the time when the Maker has realized revenue of, or has received investment in the Company of at least $50,000 in total. In the event that the total amount of revenue and investment in the Company is less than $50,000, the full principal amount of this Note and interest shall be due and payable prior to Maker re-paying any of the Company's other outstanding notes, or making any distributions, including but not limited to distributions as a result of operations, winding up, dissolution or liquidation, to its Members. All payments hereunder will be made in such coin or currency of the United States of America as at the time of payment shall be legal tender for the payment of public and private debts.

       a) **Use of Fund:** The funds will be used by the Company for working capital.

**2.** **Interest Rate.** The unpaid principal balance of this Note shall bear interest and accrue at eight percent (8%) per annum. Interest shall be calculated on the basis of a calendar year and the actual days elapsed.

**3.** **Default.** This Note shall be considered in default (a) when any payment required to be made hereunder shall not be paid on the date it becomes due, and shall remain in default until such payment shall have been made, or (b) upon the insolvency, bankruptcy, dissolution, death or incompetence of any maker, endorser or guarantor hereof. Upon the occurrence of a default, (i) the Payee shall have the option to accelerate the payment of all amounts due hereunder.

**4.** **Waiver and Consent.** To the fullest extent permitted by law, the Maker waives demand, presentment, protest, notice of dishonor, suit against or joinder of any other person, and all other requirements necessary to charge or hold the Maker liable with respect to this Note.

**5.** **Costs, Indemnities and Expenses.** The Maker agrees to pay all filing fees and similar charges and all costs incurred by the Payee in collecting or securing or attempting to collect or secure this Note, including reasonable attorney's fees, whether or not involving litigation and/or appellate, administrative or bankruptcy proceedings. The Maker agrees to pay any documentary stamp taxes, intangible taxes or other taxes (except for federal or state income or franchise taxes based on the Payee's income) which may now or hereafter apply to this Note or any payment made in respect of this Note or any security for this Note, and the Maker agrees to indemnify and hold the Payee harmless from and against any liability, costs, attorney's fees, penalties, interest or expenses relating to any such taxes, as and when the same may be incurred.

**6.** **Prepayment.** This Note may be prepaid in whole or in part at any time without penalty. Except as otherwise required by law or by the provisions of this Note, payments received by the Payee hereunder shall be applied first against expenses and indemnities, next against accrued but unpaid interest on this Note, and next in reduction of the outstanding principal balance of this Note.

**7.** **Maximum Interest Rate.** In no event shall any agreed to or actual exaction charged, reserved or taken as an advance or forbearance by the Payee as consideration for this Note exceed the limits (if any) imposed or provided by the law applicable from time to time to this Note for the use or detention of money or for forbearance in seeking its collection, the Payee hereby waives any right to demand such excess. In the event that the interest provisions of this Note shall result at any time or for any reason in an effective rate of interest

that exceeds the maximum interest rate permitted by applicable law (if any), then without further agreement or notice the obligation to be fulfilled shall be automatically reduced to such limit and all sums received by the Payee in excess of those lawfully collectible as interest shall be applied against the principal of this Note immediately upon the Payee's receipt thereof, with the same force and effect as though the payor had specifically designated such extra sums to be so applied to principal and the Payee had agreed to accept such extra payment(s) as a premium-free prepayment or prepayments.

8.    **Miscellaneous.** This Note shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws. This Note may not be amended or modified, nor shall any waiver or any provision hereof be effective, except by an instrument in writing executed by the Payee.

EXCEPT AS PROHIBITED BY LAW, NEITHER THE PAYEE NOR THE MAKER, NOR ANY GUARANTOR SHALL SEEK A JURY TRIAL OR ANY LAWSUIT, PROCEEDING OR COUNTERCLAIM BASED UPON OR ARISING OUT OF THIS NOTE, THE COLLATERAL OR THE RELATIONSHIP BETWEEN THE PAYEE AND THE MAKER. IF THE SUBJECT MATTER OF ANY SUCH LAWSUIT, PROCEEDING OR COUNTERCLAIM IS ONE IN WHICH THE WAIVER OF A JURY TRIAL IS PROHIBITED, NEITHER THE PAYEE NOR THE MAKER SHALL PRESENT AS A NON-COMPULSORY COUNTERCLAIM TO SUCH LAWSUIT, PROCEEDING OR COUNTERCLAIM ANY CLAIM ARISING OUT OF THIS NOTE. FURTHERMORE, NEITHER THE PAYEE NOR THE UNDERSIGNED SHALL SEEK TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY SUCH ACTION IN WHICH A JURY TRIAL CANNOT BE WAIVED.


MAKER

ETRE FINANCIAL, LLC

_____

PAYEE

_____
NAME

_____
AUTHORIZED REPRESENTATIVE
SIGNATURE

EXHIBIT K

<h1 style="text-align:center">ACTION BY WRITTEN CONSENT<br>OF THE BOARD MEMBERS<br>AND MANAGERS OF ETRE FINANCIAL, LLC</h1>

The undersigned, being all of the Board members and Managers of ETRE Financial, LLC, a Delaware limited liability company (the "Company"), and acting pursuant to the provisions of the Delaware Limited Liability Company Act, do hereby declare the following as the action of the Company pursuant to Section 6.5(c) of the Company's Operating Agreement dated August 15, 2012, do hereby consent to the taking of such action without a meeting, do hereby vote in favor of such action, and do hereby waive all notice in connection with such action, as of the 21st day of May, 2014 (the "Effective Date"):

**WHEREAS**, the Company desires to conduct an offering to raise up to $2 million from the sale of up to 40% of its membership interests in a private offering (the "Offering") and to use the proceeds of the Offering for operating capital and payment of accounts payable pursuant the attached budget and accounts payable schedule; and for the repayment of certain loans made to the Company.

**WHEREAS** the Company is currently authorized pursuant to Section 3.1(a) of its Operating Agreement to issue 100,000 membership units all of which have been issued and are outstanding; and the Company desires to issue an additional 100,000 membership units.

**BE IT RESOLVED**, that all actions taken by the Company prior to the adoption of these resolutions in connection with the Offering and the furtherance of the respective transactions contemplated by the Company are hereby ratified and approved in all respects;

**BE IT FURTHER RESOLVED**, that Section 3.1(a) of the Company's Operating Agreement is hereby amended to provide that there are 200,000 Units authorized for issuance under the terms of the Company's Operating Agreement ("Units");

**BE IT FURTHER RESOLVED**, that the Company is hereby authorized to do and perform, or cause to be done and performed, all such acts, deeds and things, and to make, execute and deliver, or cause to be made, executed and delivered, all such agreements, undertakings, documents, instruments, and certificates and such further amendments, supplements, modifications and restatements in the name and on behalf of the Company, as be necessary, desirable or appropriate to effectuate or carry out more fully the purpose and intent of the foregoing resolutions, and to incur all such fees and expenses as in the Company's judgment shall be necessary or advisable in order to carry out fully the intent and purposes of the foregoing resolutions and in each such case, such execution or such action when made or taken will be conclusive evidence of such approval and of the authority therefor hereunder;

**BE IT FURTHER RESOLVED**, this Action by Written Consent may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument; and

**BE IT FURTHER RESOLVED**, that the execution and delivery of this Action by Written Consent by delivery of a facsimile or email copy bearing the facsimile or email signature of a party hereto shall constitute a valid and binding execution and delivery of this Written Consent by such party, and those facsimile and email copies shall constitute enforceable original documents.

**IN WITNESS WHEREOF,** the undersigned has duly executed this Action by Written Consent as of the Effective Date.

**BOARD MEMBERS AND MANAGERS:**

_____
**Jacob Frydman**


_____
**Jesse Stein**


_____
**Paul Frischer**


_____
**Scott Panzer**

EXHIBIT  L

VIA EMAIL:
pf@ETREfinancial.com
js@ETREFinancial.com

June 12, 2014

ETRE Financial LLC
44 Wall Street
New York, NY 10005
Attn: Mr. Paul Frischer
       Mr. Jesse Stein

Gentlemen:

I received a visit from Jesse Stein yesterday who informed me that ETRE Financial LLC (the "Company") has received an offer from LH Financial (and Sol Mayer) to invest $1.6 million into the Company upon certain conditions, and that SMP Realty NM, LLC and Frischer Kranz Inc. have also offered to make additional investments in the Company.

I have not seen any of the proposals referenced by Jesse, and hereby request copies of all offers, term sheets or other evidences of intention made by LH Financial, SMP Realty NM, LLC and Frischer Kranz Inc. to the Company so that I may understand these proposals and consider them.

I was also advised by Jesse that SMP Realty NM LLC's offer was to convert certain Company debt to equity securities. I was unaware that the Company had incurred any debt to SMP Realty NM, LLC, and, frankly, was surprised to hear that, as it is my understanding that the Company has no right or ability to incur any debt obligations without the prior unanimous approval of all the Managers then serving on the Board.

If in fact the Company has incurred any debt obligation to SMP Realty NM, LLC or any other person without the appropriate authorizations of the Board, please provide me with all the details of such obligations, all documents evidencing same and please advise which Members acted to purportedly bind the Company with respect to such debt obligations.

I have also not seen a proposed budget for 2014. It was my understanding that on or before November 1, 2013 the Company's officers were obligated to provide each Manager of the Board with the proposed budget for the Board's approval. Please accept this as my request that the Officers of the Company provide the requisite budgets for my review.

Please be further advised that the Company was required, within 120 days after the close of the 2013 fiscal year, to deliver to each Member audited consolidated balance sheets and statements of income and retained earnings and cash flows as of the close of such fiscal year, certified by the Company's auditors that such statements were prepared in accordance with GAAP (except as specifically disclosed therein). Please also accept this as our demand for same.

I also wish to remind you that the Company is required with thirty (30) days after the end of each calendar month to deliver to each Member consolidated unaudited balance sheets and statements of income and retained earnings and of cash flows for the Company and its Subsidiaries as of the end of each month, comparing such financial position and results of operations against the same periods for the prior year and against budget, and accompanied by a letter from the Company's management discussing revenues and operations of Company and its Subsidiaries with respect to each such month.

As you know, we have not received any such monthly statements and hereby make demand for each such statement for each period for which it has been due through and including the date of this letter. Please also ensure that all future monthly statements are timely provided.

In addition, I am hereby requesting that the officers of the Company provide a narrative regarding the business, affairs, prospects and financial condition of the Company. This narrative should discuss the impact of the failed attempt to list the Washington DC building, discussion of what went wrong and why, and what the officers intend to do to make sure this does not occur again, the proposed investments being offered by LH Financial, SMP Realty NM, LLC and Frischer Kranz Inc. and why those investments make sense, a review of any alternative investments which have been considered, discussed and/or reviewed, and what efforts the Company has made to source capital on better terms from other putative investors. In addition, the narrative should discuss the business plan for the Company for the balance of 2014, it's financial and market objectives, and how it plans to achieve those objectives, and whether, and if so when, Company plans to list its first building, the status of the Company's patent application, the Company's revenue model and pricing structure, description of all contracts entered into by briefly describing the nature of contract, companies obligations under such contracts, the names counterparties obligations counterparties under such contracts, and the Company's marketing plans for 2014.

As you know, I am the tax matters partner for the Company. I am obligated to furnish to each Member a schedule K-1, and review, approve, sign and file the Company's tax returns. With respect to my obligation, the Company is required to use commercially reasonable efforts to provide me with the requisite tax returns and K-1's within ninety (90) days of the end of each fiscal year, and in no event later than March 31 of the following Fiscal Year. The Company has failed to do so. Therefore, please accept this as my immediate demand for receipt of the foregoing, and assurance that the officers of the Company have timely filed or caused the company's accountants to timely file requests for extension for the filing of the Company's tax returns with the IRS. Please also provide all filings made with the IRS and any state taxing authority.

I will need all of the items requested in this letter in order to properly consider the proposed investments by LH Financial, SMP Realty NM, LLC and Frischer Kranz Inc.. To the extent that any of the foregoing request for demands constitutes an obligation under the terms of our Operating Agreement which has not been met, and which therefore would constitute a default thereunder, I request that cured the next 10 business days.

Very truly yours,

Jacob Frydman

EXHIBIT M

June 13, 2014

Sol Mayer
ETRE Investors Holdings LLC
510 Madison Avenue
Suite 1400
New York, NY 10022

**Re: Investment in ETRE Financial, LLC**

Mr. Mayer,

The following summarizes the principal terms between ETRE Financial, LLC ("ETRE") and LH Financial or its affiliates ("LH") pursuant to which LH will make an investment in ETRE (the "Transaction"). This letter is not intended to constitute a binding contract. ETRE is not obligated to proceed with the Transaction unless the parties agree on mutually acceptable definitive final closing agreements with respect to the Transaction.

| | |
|---|---|
| Investment Amount: | $1,725,000 (One Million and Seven Hundred and Twenty Five Thousand Dollars) of which (a) $500,000 will be funded upon the execution of the Amended and Restated Operating Agreement of ETRE Financial, LLC (the "Initial Investment") and (b) $1,225,000 to be held in escrow and funded at a later date ( the "Deferred Investment"). |
| Deferred Investment: | The Deferred Investment shall be funded as follows:<br><br>(a) $725,000 to be funded 90 days after closing.<br><br>(b) $500,000 to be funded 180 days after closing<br><br>(c) $250,000 for each signed term sheet the Company has to take a building(s) public (a "Building Investment")<br><br>(d) $250,000 upon the execution of a licensing agreement from an ETF provider for the Nasdaq ETRE Indexes (the "ETF Investment"). |
| Membership Interest: | LH will receive 20,000 membership units ("Units") in ETRE upon the funding of the Initial Investment and an additional 74,810 Units in ETRE upon the funding of the Deferred Investment. In total, the 94,810 Units will represent 34.5% of all outstanding and authorized Units. |
| Company: | ETRE Financial, LLC including its subsidiaries:<br><br>ETRE Asset Management, LLC<br>ETRE Trading, LLC |

ETRE Capital Markets, LLC
ETRE Tenant Profiles, LLC

| | |
|---|---|
| Board of Directors: | LH will be entitled to one seat on the board of directors of ETRE. The ETRE board will consist of 5 members in total. Board decisions will be based on 4/5 voting approval. |
| Operating Agreement: | LH confirms that it has reviewed the amended and restated Operating Agreement of ETRE Financial dated _____ that is attached to this letter as Exhibit A, and are prepared to execute such Agreement. |
| Contingencies: | LH shall have the right to withhold the Deferred Investment in the event that ETRE or any Member of ETRE is being indicted of, or the subject of, a governmental or regulatory securities or criminal complaint (exclusive of misdemeanor traffic violations); (b) ETRE or any Member of ETRE is convicted of or entering a plea of nolo contendere to a felony or misdemeanor involving a crime of moral turpitude or dishonesty; (c) the finding by a court or arbitrator that ETRE or any Member of ETRE has committed an act of dishonesty, misappropriation, embezzlement or fraud involving personal profit; (d) a Member of ETRE has become adverse to ETRE in a legal action or proceeding initiated by a Member of ETRE or by ETRE; (e) the finding by a court or arbitrator that the ETRE or any Member of ETRE has breached in any material respect the Operating Agreement, which breach is not cured (to the extent reasonably susceptible to cure) after written notice to the Company or Member of such breach and a thirty (30) Day opportunity to cure such breach. |
| | Notwithstanding the paragraph above, LH shall not have the right to withhold any Deferred Investment as part of a Building Investment or an ETF Investment. |
| Public Announcement: | Any public announcement by LH indicating the association of ETRE with LH in connection with the Transaction (including the execution of this Letter), and the timing of such announcements (the form of which shall include electronic communications), must be agreed to in writing by ETRE in advance. |
| Confidentiality: | The parties will keep the proposed transaction and the terms of this Term Sheet, as well as any materials provided by any party to the other party in connection with the proposed transaction or this Term Sheet, confidential except for disclosure on a confidential basis to attorneys, accountants, prospective lenders, |

**ETRE** Financial

financial partners and other professionals working with ETRE or
LH in connection with this transaction or others as required by
law.

Very truly yours,
ETRE Financial, LLC


By: Paul Frischer
President

# EXHIBIT  N

# ETRE Financial

## Summary of changes to amended and restated operating agreement for ETRE Financial, LLC

1. *Investment:* $2,000,000 for 40% membership interest. Issue additional 100,000 shares.

   (a) LH Financial-$1,600,000

   (b) SMP Realty NM- $315,000

   (c) Frischer Kranz- $85,000

### Post-Investment Ownership Structure

| Member | Capital Contribution | Units | % Total | Unit Value |
|--------|---------------------|-------|---------|-----------|
| JS3 Alternative Investments, LLC | $312,500 | 30,638 | 15.32% | $765,957 |
| Frischer Kranz Inc. | $397,500 | 28,932 | 14.47% | $723,298 |
| SMP Realty NM, LLC | $627,500 | 38,132 | 19.07% | $953,298 |
| EVE, LLC | $156,250 | 19,149 | 9.57% | $478,723 |
| Winter Investors, LLC | $156,250 | 19,149 | 9.57% | $478,723 |
| _____, LLC | $1,600,000 | 64,000 | 32.00% | $1,600,000 |
| Total | $3,250,000 | 200,000 | 100.00% | $5,000,000 |

2. *Board:* Increase size of board to 5 members

   (a) New board member- Sol Mayer (LH Financial)

3. *Board Voting:* Remove section related to unanimous board approval. Replace with all board decisions need to be approved by 4 out of 5 board members.

4. *Economic Interest:* Remove section related to principal compensation and member distributions.

   (a) *The Principals agree that from and after the date the Company Commenced Business each of them, so long as he is employed by the Company, shall be entitled to the same Economic Interest as each of the other Principals, in the Company, whether or not they devote all or any or none of their time to the Company as an employees of the Company. "Economic Interest" means the amount of salary and bonus compensation above $400,000, but not more than $1 million, then being paid to any Principal whether as an employee, officer or Manager of the Company and any subsidiaries, or as otherwise determined by the Board.*

# EXHIBIT O

# ETRE Financial

June 14, 2014

Winter Investors, LLC
c/o Jacob Frydman
46 Ledgerock Lane
Hyde Park, NY 12538

Re: Letter to the Company June 12, 2014

Dear Jacob,

Thank you for your Letter to the Company.

The Company has prepared the requested information in the attached Zip file: ETRE Documents for Jacob, and has provided additional narrative as requested for clarification of points outlined in the letter.

With respect to the request for the proposals and term sheet offer with LH Financial, please see attached Term Sheet-ETRE Investors and the ETRE Financial LLC First Amendment to Operating Agreement.

With respect to the request for documents with regard to SMP Realty NM, LLC, please see the attached Action and Consent January 6, 2014 and the SMP Realty NM, LLC and FKI, INC loan documents to cover fees and expenses in the Company's judgment that shall be necessary in connection and formation of ETRE REIT and the furtherance of the respective transactions contemplated by ETRE REIT, LLC. The loans were used to pay for immediate requests for payment of the ETRE REIT Series A-1 Loan Security Deposit, the payment of Exchange and other related filing fees, and post launch expenses as a result of the postponed offering.

With respect to the request for the proposed budget for 2014, ETRE Financial proposed 2014 budgets were provided by the Company for review at the ETRE Financial Board meeting September, 2013, ETRE Financial Board meeting December, 2013, as attachment to the Action and Consent PPM January, 2014, and as attachment to the Action and Consent May 21, 2014. Please see attached the most current Financials & Budget 2013 - 2014 for review.

With respect to the request for audited financial statements, the Board waived the requirement at the ETRE Financial Board Meeting January 2013, as per request of the Company on January 4, 2013, that tax preparation and tax filing documents would be sufficient until such

time the Board agreed otherwise, and that extensions would be filed timely for the 2012 tax period. It was further agreed that Lipsky Goodkin would prepare the extensions and tax filings for the Company. In September, 2013, K-1's were issued for 2012 returns at the instruction of the Tax Partner by the Company with Paul Frischer as signature, and 2012 tax return documents were delivered to the Tax Partner.

With respect to the request for the 2013 tax filings, the same procedure was followed in 2013 as for 2012, with extensions prepared by Lipsky Goodkin, filed timely on February 24, 2014, and notice of the filings to the Tax Partner. The 2013 tax extensions and payment of tax are attached for review Etre Financial LLC IT204LL, Etre Financial LLC NY IT204LL and Chase – Payment.

With respect to the request for consolidated monthly unaudited financial statements, the Company has relied on the ETRE Proposed budgets and actual expense schedules as provided in the running budgets of the Company. The Company has added, as to the request, the monthly Proposed budget schedules of Income Statement and Balance Sheet items and Accounts Payable, and will continue to provide updates each month as requested. Please see attached the most current Financials & Budget 2013 – 2014 file for review.

With respect to the request for narrative, the Company provided a narrative on the postponed offering of 1201C Connecticut Avenue on May 19, 2014 and the conditions that impacted the offering. As part of the narrative, the Company determined and further requested that capital funding be of the highest priority in order to continue the ongoing operations of the Company and to improve execution with regard to the next building offering.

Significant benefits have accrued from the offering process and provide confidence for the launch of the next offering. The SEC has cleared the ETRE REIT Series template, and awaits our request to become effective. The Company filed SEC documents in house through the Company licensed SEC software and prepared the printing of all Prospectus materials. NASDAQ has approved the ETRE REIT Series structure for listing. ETRE REIT Series A-1 certificates were submitted and approved for DTC and CUSIP registration. The NYSE reviewed the ETRE REIT structure and affirmed the governance and legal structure would be suitable for listing ETRE REIT Series. As a result of these activities, the time line to execution has been significantly abbreviated; retail and institutional banks are showing continued interest to participate in the next ETRE REIT Series offering.

With respect to the request for the LH Financial, SMP Realty NM, LLC and Frischer Kranz, Inc investment, the investment provides a higher valuation for the Company; the Company can rebuild the balance sheet from the current Company deficit position, and provide the incremental working capital to the Company required for on-going activities. The investment

will fund the additional head count required within the Company for the proposed Fall 2014 offering(s) that will require incremental marketing and promotional support, asset management personnel, document and filing IT, origination and due diligence. In addition, the investment will support the continued on-going costs associated with the distribution of the ETRE OMS trading and information platform, a directed sales and marketing team for the ETRE Tenant Profile Report, support the marketing and PR efforts of the NASDAQ ETRE real estate Indexes, and bring outstanding payments to vendors current.

With respect to an alternative investment or other sources of capital, the Company launched a 90 day campaign in January, 2014 attached Action and Consent PPM and retained Source Capital Group EL (replacement for Dalmore) and ETRE Tracker Jan 26 attached.

With respect to the request for the Company business plan, the Company business plan remains consistent in 2014 to list exchange traded properties on public exchanges through ETRE REIT Series LLC structure, support transparency and liquidity through ETRE Asset Management, distribute the ETRE OMS platform to IO and Trade users, extend the value add proposition of the ETRE Tenant Profile report, and support distribution of the NASDAQ ETRE real estate Indexes. In that respect, the Company has been moving consistently throughout 2014 from the building stage of product and services, to the distribution, marketing, promotion and revenue generation. Revenue and pricing models are outlined in the ETRE Financial Investor Presentation attached.

With respect to the request for timing to the list a first building, the Company intends (subject to capital funding) to list at least one building in Fall 2014. The Company is in discussion with several building owners and continues to prepare term sheets for consideration. The Company has expanded the conversation with additional underwriters and broker dealers to participate in the next potential offering.

With respect to the request for status of the patent application, the patent has been published for public review, and the Company has received the examiner first non-final rejection. First non-final rejection is the first expected response from the patent process, and as of June 6, 2014 the Company responded with the first amended claims (attached). The Company should expect the second non- final rejection in the next few months, at which time the Company will be able to review the examiners position. Patent Response June 6, 2014 attached.

With respect to the request for contracts to review, the Company has provided in 2012 and 2013 contracts currently in place or subject to renewal, and in 2014 has retired the Resolve and Advent contracts. The Company has added an Argus license for asset management and a license with FactSet for data consumption on the Nasdaq Indexes. These costs are reflected in the Financial & Budget 2013 - 2014 as ongoing IT and software and data feed costs.

With respect to the request for the Company marketing plan, the Company has reduced the Weber Shandwick relationship, as Nasdaq OMX intends to manage the bulk of the marketing and promotion of the Nasdaq ETRE indexes that will include thought leadership, television, print and social media throughout the financial services market in concert with minimal support from Great Ink and the Company in house marketing support. Great Ink will support direct PR real estate involvement for ETRE Financial and for ETP offerings. In consideration of the LH Financial proposal, the Company expects to hire in house marketing and PR support for print, social media, television, website, and event planning.

Jesse and I look forward to any comments to the above requests, and any further discussions you would like to have in review of the LH Financial proposal.

Thanks, Paul

President

Emailed: June 14, 2014
jacob.f@urpa.com

CC:
Jesse Stein
Scott Panzer
Paul Frischer

EXHIBIT P

ETRE FINANCIAL LLC

**AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**

August __15__, 2012JUNE ____, 2014

# ETRE FINANCIAL, LLC

## LIMITED LIABILITY COMPANY AGREEMENT

THIS Amended and Restated LIMITED LIABILITY COMPANY AGREEMENT (this "**Agreement**"), originally dated August 15, 2012~~dated August ___, 2012~~ 2012, is made and entered into on this ___ day of June, 2014 by and among ETRE Financial, LLC, a Delaware limited liability company (the "**Company**"); Jacob Frydman, Eli Verschleiser, Jesse Stein, Scott Panzer and Paul Frischer (the "**Principals**"); and Winter Investors, LLC ("JF Entity"), JS3 Alternative Investments LLC ("JS Entity"), SMP Realty NM LLC ("SP Entity"), Frischer Kranz Inc ("PF Entity"), ~~and~~ EVE, LLC ("EV Entity"), and ————ETRE TBD, LLC ("LH Entity") (the ~~initial~~ "**Members**") executing this Agreement as of the date hereof, and each other Person who after the date hereof becomes a Member of the Company and becomes a party to this Agreement.

## RECITALS

The Company was formed as a limited liability company under the Act (as defined below) by the filing of a Certificate of Formation with the Secretary of State of the State of Delaware on June 20, 2012.

The parties to this Agreement wish to set forth their respective rights and obligations as members of the Company and provide for the management of the Company and its affairs and the conduct of its business.

NOW, THEREFORE, in consideration of the foregoing and the covenants and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, each intending to be legally bound, hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

**Section 1.1**   <u>Definitions</u>. The following capitalized terms used in this Agreement have the following meanings:

"**Act**" means the Delaware Limited Liability Company Act, as it may be amended from time to time, and any successor to the Act.

"**Adjusted Capital Account Balance**" of a Member as of any date means the balance in such Member's Capital Account as of such date (a) increased by any amount such Member is deemed obligated to contribute to the Company pursuant to Treasury Regulation Section 1.704-1(b)(2)(ii)(c) or is deemed obligated to restore with respect to any deficit balance pursuant to the penultimate sentences of Treasury Regulation Section 1.704-2(g)(1) and Section 1.704-2(i)(5) and (b) reduced by any allocations or distributions to such Member described in Treasury Regulation Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6).

"**Affected Members**" has the meaning set forth in Article 10.

"**Affiliate**" means with respect to any Person, any other Person which is controlling, controlled by, or under common control with (directly or indirectly through any Person) the Person referred to, and, if the Person referred to is a natural person, a Family Member of such Person. The term "control" (including, with correlative meaning, the terms "controlled by" and "under common control with") as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" means this Agreement, as amended, supplemented or restated from time to time.

"**Applicable Law**" means all existing and future applicable laws, rules, regulations, statutes, treaties, codes, ordinances, permits, certificates and applicable judgments, decrees, injunctions, writs, orders or like action of any court, arbitrator or other administrative, judicial or quasi-judicial tribunal or agency of competent jurisdiction, as any of the foregoing are amended, modified, codified, replaced or reenacted, in whole or in part, and in effect from time to time.

"**Board**" has the meaning set forth in Section 6.1.

"**Breaching Party**" has the meaning set forth in Section 14.4.

"**Business Day**" means any day other than (a) Saturday or Sunday or (b) any other day on which banks in Delaware are permitted or required to be closed.

"**Capital Account**" of a Member means the account maintained by the Company for each Member pursuant to Section 3.5 of which the initial balance for each Member is set forth on Schedule A.

"**Capital Contributions**" of a Member means the amount of cash and/or the fair market value (as determined by the Board) of property (net of liabilities secured by such property that the Company is considered to assume or take subject to under Section 752 of the Code) contributed by such Member to the Company, as set forth on Schedule A, as such Schedule may be amended from time to time.

"**Capital Securities**" means as to any Person that is a corporation, the authorized shares of such Person's capital stock, including all classes of common, preferred, voting and nonvoting capital stock, and, as to any Person that is not a corporation or an individual, the ownership or membership interests in such Person, including, without limitation, the right to share in profits and losses, the right to receive distributions of cash and property, and the right to receive allocations of items of income, gain, loss, deduction and credit and similar items from such Person, whether or not such interests include voting or similar rights entitling the holder thereof to exercise control over such Person.

"**Cause**" means (a) the Member being indicted of, or the subject of, a governmental or regulatory securities or criminal complaint (exclusive of misdemeanor traffic violations); (b) the Member being convicted of or entering a plea of nolo contendere to a felony or misdemeanor

involving a crime of moral turpitude or dishonesty; (c) the finding by a court or arbitrator that the Member has committed an act of dishonesty, misappropriation, embezzlement or fraud involving personal profit or a breach of fiduciary duty in connection with the performance of such Member's company duties, or which affects the Company, or any member of the Group, or property of any member of the Group, (c) the finding by a court or arbitrator that the Member has breached in any material respect this Agreement or any other agreement with the Company or any member of the Group which breach is not cured (to the extent reasonably susceptible to cure) after written notice to the Member of such breach and a thirty (30) Day opportunity to cure such breach, or (d) the finding by a court or arbitrator that the Member has breached any of the representations, warranties or covenants contained in this Agreement.

"**Certificate**" means the Company's Certificate of Formation filed with the Secretary of State of the State of Delaware on June 20, 2012.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Commenced Business**" means the time when the Company has executed agreements with respect to the launch of an Exchange Traded Real Estate Platform with the following third parties: (i) a property management/leasing company; (ii) a trading exchange; (iii) a provider of electronic information; and (iv) an institutional investor.

"**Company**" has the meaning set forth in the preamble to this Agreement.

"**Competing Businesses**" has the meaning set forth in Section 12.1.

"**Confidential Information**" has the meaning set forth in Section 12.1.

"**Conversion**" has the meaning set forth in Section 9.4.

"**Covered Person**" means (a) each Member, (b) each officer, director, manager, stockholder, employee, member, partner, representative or agent of each Member in the foregoing capacity listed, (c) each Manager, (d) any Liquidator, and (e) any other Person designated by the Board as a Covered Person.

"**Depreciation**" means, for each Fiscal Year, an amount equal to the depreciation, amortization or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such Fiscal Year; provided, however, that if the Gross Asset Value of an asset differs from its adjusted tax basis at the beginning of such Fiscal Year, Depreciation shall be an amount that bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction with respect to such asset for such Fiscal Year bears to such beginning adjusted tax basis; and provided further, that if the federal income tax depreciation, amortization or other cost recovery deduction for such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Board.

"**Effective Date**" means the date of this Agreement.

"**Exchange Traded Real Estate Platform**" means an electronic investment platform where investors will be able to buy and sell shares in publicly traded securities in entities that own individual real estate assets, and the ancillary businesses related thereto.

"**Fair Value**" of Units means the fair market value of the applicable Units, as determined by the Board in good faith (excluding, for purposes of this determination, any Board member controlling or otherwise affiliated with the a Member whose Units are being valued).

"**Family Member**" means, as applied to any Person who is an individual, such individual's spouse, parent, sibling, child, stepchild, grandchild or other descendent thereof (whether natural or adopted) and each trust, limited partnership, limited liability company or other estate or tax planning vehicle or entity created for the exclusive benefit of the individual or one or more of such Persons.

"**Fiscal Year**" has the meaning set forth in Section 8.3.

"**Former Member**" has the meaning set forth in Section 7.4(d)Seetion 7.4(e).

"**Frischer Group**" means the PF Entity and the SP Entity.

"**Frischer Patents**" means (i) Method of trading in real estate derivatives, U.S. Patent No. #8,180,697; and (ii) Method of trading in real estate derivatives, U.S. No. Patent #7,974,904, which patents are expressly excluded from the meaning of the Stein-URP Patents (as hereinafter defined), or in any way a result of, or developed in reliance on, the Stein-URP Patents.

"**Frischer Patents Income**" means, for so long as Frischer and/or his Affiliates own the Frischer Patents, the sum of all income from any source whatsoever except only with respect to the proceeds of a Transfer of the Frischer Patents, if any, relating to the use, enjoyment, licensing, royalties, lease, sublease, license, concession or other grant of right to use all or any portion of the Frischer Patent and other benefits derived from the Frischer Patents received by Frischer and/or his Affiliates with respect to the Frischer Patents net of all actual cash expenses paid or incurred to third parties in order to generate such income, if any.

"**GAAP**" means United States generally accepted accounting principles consistently applied from period to period and throughout any period.

"**Gross Asset Value**" means, with respect to any asset, such asset's adjusted basis for federal income tax purposes, except as follows:

    (i)      the initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined in good faith and agreed to by the contributing Member and the Board;

    (ii)     for purposes of "booking up" the Capital Accounts of Members to reflect increases in the value of the Company upon certain occasions, the Gross Asset Value of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Board, as of the following times: (a) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more

than a de minimis Capital Contribution or as consideration for services performed on behalf of the Company; (b) the distribution by the Company to a Member of more than a de minimis amount of Company assets as consideration for an interest in the Company; and (c) the liquidation of the Company within the meaning of Treasury Regulation Section 1.704-l(b)(2)(ii)(g); provided, however, that adjustments pursuant to clause (a) and clause (b) of this sentence shall be made only if the Board reasonably determines such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company.

        (iii)    the Gross Asset Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution, as determined in good faith and agreed to by the Board.

If the Gross Asset Value of an asset has been determined or adjusted pursuant to paragraph (i) or paragraph (ii) above, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Net Income and Net Loss.

"Group" means the Company, its parents, subsidiaries, Affiliates and each of their respective owners, members, partners, shareholders, officers, managers and/or directors.

"**Indemnified Costs**" has the meaning set forth in Section 6.8(a).

"**IRS Notice**" has the meaning set forth in Section 3.10A.1(a).

"**Lien**" means (a) any encumbrance, mortgage, pledge, lien, charge or other security interest of any kind upon any property or assets of any character, or upon the income or profits therefrom; (b) any acquisition of or agreement to have an option to acquire any property or assets upon conditional sale or other title retention agreement, device or arrangement (including a capitalized lease); or (c) any sale, assignment, pledge or other transfer for security of any accounts, general intangibles or chattel paper, with or without recourse.

"**Liquidator**" has the meaning set forth in Section 9.2(a).

"**Manager**" has the meaning set forth in Section 6.1.

"**Member**" means each Person that executes a counterpart of this Agreement as a Member, and becomes a Member as provided herein or therein, as applicable, so long as such Person continues as a Member and is reflected as such in the records of the Company, in each case in such Person's capacity as a member of the Company, and "Members" means all such Persons. If a Member ceases to be a Member of the Company in accordance with the terms and conditions of this Agreement, all references in this Agreement to the actual name of that Member shall, if applicable, be deemed to refer to that Member's successors and permitted assigns pursuant to Section 7.3.as if the necessary changes have been made. References to a Member that is not a natural person shall also be deemed to include a Principal or any other person owning, controlling or otherwise affiliated with such Member who is also an employee of the Company.

"**Membership Rights**" means all legal and beneficial ownership interests in, and rights and duties as a Member of, the Company, including, without limitation, the right to share in Net Income and Net Loss, the right to receive distributions of cash and other property from the Company, and the right to receive allocations of items of income, gain, loss, deduction and credit and similar items from the Company.

"**Net Income**" and "**Net Loss**" for each Fiscal Year or part thereof means the income and loss of the Company for that period, as determined for federal income tax purposes, including all distributive items under Section 702 of the Code, adjusted to take into account any tax-exempt income of the Company and any expenses of the Company that are described in Section 705 or 709 of the Code as not deductible or amortizable for federal income tax purposes, and further adjusted as follows:

(a)    Upon adjustment of the Gross Asset Value of Company property pursuant to clauses (ii) and (iii) in the definition of Gross Asset Value, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such property;

(b)    Amount of depreciation, amortization and other cost recovery with respect to Company property having a Gross Asset Value that differs from its adjusted basis for tax purposes shall equal the Depreciation computed with respect to such property;

(c)    Items of income, gain, loss or deduction attributable to the disposition of Company property having a Gross Asset Value that differs from its adjusted basis for tax purposes shall be computed by reference to such property's book value in accordance with Treasury Regulation Section 1.704-l(b)(2)(iv)(g);

(d)    Any items that are specially allocated pursuant to Section 4.1(c) shall not be taken into account.

"**New Units**" shall mean any Units issued after the Effective Date other than (i) securities offered to the public pursuant to a registration statement filed under the Securities Act in connection with a Public Offering; (ii) securities issued to any sellers in consideration of the acquisition of another Person or business by the Company or any of its Subsidiaries by merger, consolidation, amalgamation, exchange of shares, the purchase of substantially all of the assets or otherwise; (iii) Units or options to purchase Units issued to any employees of, or providers of services to, the Company or its Subsidiaries pursuant to any form of incentive compensation plan or agreement approved by the Board; (iv) Units issued upon any Unit split, dividend, combination or other similar event with respect to the Units; (v) Units or warrants to purchase Units issued to one or more lenders as partial consideration for the Company's or any Subsidiary's debt financing; and (vi) Units subsequently issued on conversion, exercise or exchange of those Units, options, warrants or other rights which have been issued in compliance with, or on issuance were exempt from, the preemptive rights provided for in Section 7.6.

"**Notice of Proposed Issuance**" has the meaning set forth in Section 7.6(b).

"**Offer Period**" has the meaning set forth in Section 7.6(c).

"**Offered New Units**" has the meaning set forth in Section 7.6(b).

- 6 -

"**Original Cost**" means, with respect to a specified number of Units, an amount equal to the aggregate Capital Contributions, if any, attributable to such Units that have not been repaid by the Company as of the date of the exercise of the repurchase rights under this Agreement.

"**Partial Waiver**" has the meaning set forth in Section 7.6(a).

"**Permitted Transfer**" means: (i) any Transfer of Units by a Member to a a natural person who is a Family Member or Personal Representative of such Member solely for estate planning purposes so long as the Transferor retains sole and exclusive power to direct and exercise all Member rights pertaining to such Units, including but not limited to voting power over all of the Transferred Units, (ii) any Transfer of Units to a Family Member on such Member's death, (iii) a Transfer of Units pursuant to a Public Offering, (iv) any Transfer to the Company or another Member, (v) any Transfer to an Affiliate of a Principal, but only if the Principal retains sole and exclusive power to direct and exercise all Member voting, consent or approval rights pertaining to such Units. Any Transfer of Units pursuant to the preceding clauses (i), (ii), (iv) or (v) shall only be a Permitted Transfer if such Transferee agrees to execute a joinder to this Agreement providing that such Transferee is bound by all of the terms and conditions of this Agreement to the same extent that the Transferor was bound with respect to the Transferred Units.

"**Permitted Transferee**" means a Person to whom a Permitted Transfer of Units is made.

"**Person**" means any individual, sole proprietorship, partnership, joint venture, limited liability company, limited liability partnership, trust, estate, unincorporated organization, association, corporation, institution or other entity.

"**Personal Representative**" means the successor or legal representative (including without limitation, a guardian, executor, administrator or conservator) of a deceased or legally declared incompetent Member.

"**Platform Launch Date**" means the last day of the eighteenth (18th) month after the Effective Date.

"**Preemptive Rights Holder**" has the meaning set forth in Section 7.6(b).

"**Principal**" shall mean any of Jacob Frydman, Eli Verschleiser, Jesse Stein, Paul Frischer, and Scott Panzer, and ——————Sol Mayer.

"**Proportionate Share**" has the meaning set forth in Section 7.6(d).

"**Proposed Buyer**" has the meaning set forth in Section 7.6(b).

"**Public Offering**" means the sale or distribution of the common stock of a Public Vehicle pursuant to an underwritten public offering registered under the Securities Act following a Conversion of the Company.

"**Public Vehicle**" has the meaning set forth in Section 9.4.

"**Real Estate Exchange Platform**" means an Exchange Traded Real Estate Platform or any similar or competitive business.

"**Regulatory Authorizations**" has the meaning set forth in Section 4.1(c)(vi).

"**Restricted Period**" has the meaning set forth in Section 12.2.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Stein-URP Patents**" mean the provisional application for patent for Real Estate Exchange Platform filed on or about October 26, 2011 and which was assigned 25% each to Jacob Frydman and Eli Verschleiser on January 23, 2012, and all other Patents issued as a result thereof or reliance thereon and which are hereafter obtained by the Company or the Principals, except the Frischer Patents.

"**Subsidiary**" or **Subsidiaries**" means as of any time any Person of which the Company at such time owns directly or indirectly through another Person at least a majority of the outstanding Capital Securities entitled to vote generally.

"**Substituted Member**" means a Transferee of a Member that is admitted as a Member to the Company pursuant to Section 7.3.

"**Successor**" means any Person to whom a Member shall have Transferred Units in a Transfer.

"**Termination Event**" has the meaning set forth in Section 14.15.

"**Tax Matters Partner**" has the meaning set forth in Section 14.9.

"**Transfer**" means, with respect to any Unit, property, asset or other right or interest, when used as a verb, to sell, assign, transfer, exchange, distribute, devise, gift, grant a lien on, encumber or otherwise dispose of such Unit, property, asset or other right or interest, in whole or in part, or, when used as a noun, the sale, assignment, transfer, exchange, distribution, devise, gift, granting of a lien, encumbrance or other disposition of such Unit, property, asset or other right or interest, in whole or in part, in either case, whether pursuant to a sale, merger, combination, consolidation, reclassification or otherwise, and whether voluntarily or by operation of law.

"**Transferor**" and "**Transferee**" have meanings corresponding to the definition of "Transfer."

"**Treasury Regulations**" means the final and temporary income tax regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"**Units**" means collectively, the interests issued by the Company representing Membership Rights in the Company.

"**URPA Group**" means the JS Entity, the JF Entity and the EV Entity.

"**Withholding Payment**" has the meaning set forth in ~~Section 5.5(b)~~Section 5.4(b).

**Section 1.2    Other Definitions.**    Certain additional defined terms used in this Agreement have the meanings specified throughout the Agreement.

**Section 1.3    Rules of Interpretation.**

(a)    The singular includes the plural and the plural includes the singular.

(b)    A reference to the masculine gender shall be deemed to be a reference to the feminine gender and vice versa.

(c)    The word "or" is not exclusive.

(d)    A reference to a Person includes its permitted successors and permitted assigns.

(e)    The words "include," "includes" and "including" are not limiting.

(f)    A reference in a document to an Article, Section, Exhibit, Schedule, Annex or Appendix is to the Article, Section, Exhibit, Schedule, Annex or Appendix of such document unless otherwise indicated. Exhibits, Schedules, Annexes or Appendices to any document shall be deemed incorporated by reference in such document.

(g)    References to any document, instrument or agreement (i) shall include all exhibits, schedules and other attachments thereto, (ii) shall include all documents, instruments or agreements issued or executed in replacement thereof, and (iii) shall mean such document, instrument or agreement, or replacement or predecessor thereto, as amended, modified and supplemented from time to time and in effect at any given time.

(h)    The words "hereof," "herein" and "hereunder" and words of similar import when used in any document shall refer to such document as a whole and not to any particular provision of such document.

(i)    This Agreement is the result of negotiations among, and has been reviewed by, the Members with the advice of counsel to the extent deemed necessary by any Member. Accordingly, this Agreement shall be deemed to be the product of the Members, and no ambiguity shall be construed in favor of or against any Member on the basis of who drafted the Agreement.

(j)    All accounting terms not specifically defined in this Agreement shall be construed in accordance with GAAP.

(k)    The term "day" shall mean calendar day. Whenever an event or action is to be performed by a particular date or a period ends on a particular date, and the date in questions falls on a day which is not a Business Day, the event or action shall be performed, or the period shall end, on the next succeeding Business Day.

(l)     All references in this Agreement to any law shall be to such law as amended, supplemented, modified and replaced from time to time.

## ARTICLE 2
## GENERAL PROVISIONS

**Section 2.1     Formation.**  The parties agree to continue the Company under and pursuant to the Act. The Company was organized as a limited liability company by the filing of the Certificate pursuant to the Act with the Secretary of State of the State of Delaware on June 20, 2012.  The parties acknowledge that this Agreement may require amendment upon a Conversion.  The Members hereby confirm that Katina Hamm is an "authorized person" for purposes of the Act to execute and file the Certificate with the Secretary of State of Delaware, and hereby approve and ratify all actions taken by Katina Hamm in connection therewith.

**Section 2.2     Name.**  The name of the Company is "ETRE Financial, LLC" and shall operate under such name, or such other name as may from time to time be selected by the Board.

**Section 2.3     Purpose.**  The purpose of the Company is to establish an Exchange Traded Real Estate Platform and engage in any business activity permitted by the Act and approved by the Board.

**Section 2.4     Office.**  The principal place of business of the Company shall be located at 44 Wall Street, New York, NY, or such other location as the Board may determine from time to time; provided, however, that the Board shall provide notice of such change of the principal place of business to the Members as promptly as practicable after such change. The Board may establish other places of business of the Company when and where required by or advisable for the Company's business.

**Section 2.5     Term.**  The term of the Company commenced with the filing of the Certificate with the office of the Secretary of State of the State of Delaware and shall continue until the Company is dissolved in accordance with this Agreement and the Act.

**Section 2.6     Ownership of Company Property.**  All property acquired by the Company, real or personal, tangible or intangible, shall be owned by the Company as an entity, and no Member, individually, shall have any ownership interest therein solely due to its capacity as a Member.

**Section 2.7     Registered Office; Registered Agent; Principal Office in the United States; Other Offices.**  The registered agent and registered office of the Company required by the Act to be maintained in the State of Delaware shall be as provided in the Certificate or such other registered agent or office (which need not be a place of business of the Company) as the Board may designate from time to time in the manner provided by law.

**Section 2.8     No State Law Partnership.**  The Company (i) shall be taxed as a partnership for all applicable federal, state and local income tax purposes and (ii) shall not be a partnership or joint venture for any other purpose, and no Member or any Manager shall, by virtue of this Agreement, be a partner or joint venture of any other Member or Manager.

## ARTICLE 3
### UNITS, CAPITAL CONTRIBUTIONS, NATURE OF INTERESTS AND ESTABLISHMENT OF CAPITAL ACCOUNTS

**Section 3.1    Units.**

(a)    _Authorization_.    There are hereby established and authorized for issuance ~~100~~200,000 Units. As of the Effective Date, ~~100~~200,000 Units are issued and held as set forth on **Schedule A**. No Units or other interests purporting to confer Membership Rights shall be issued unless they have been authorized for issuance by the Company under the terms of this Agreement.

(i)    _Voting Rights_.    Except as otherwise provided by this Agreement or as otherwise required by the Act or applicable law each Member shall be entitled to one vote per Unit on all matters upon which the Members have the right to vote under this Agreement; and

**Section 3.2    Issuance of Additional Units; Admission of Additional Members**.    The Company may, subject to Section 4.1~~Section 6.12~~ and Section 7.6, issue additional Units or other Membership Rights, including any new class or series of Units, on terms, including relative rights and preferences, established by the Board, and amend this Agreement and **Schedule A** as the Board shall deem necessary or appropriate in connection with the authorization and issuance of such additional Units. No Person acquiring any such additional Units that is not currently a Member shall be admitted as a Member unless such Person shall execute and deliver a counterpart of or joinder to this Agreement.

**Section 3.3    Members' Capital Contributions.**

(a)    On the Effective Date, each Member is either (i) committing to make the Capital Contributions to the Company in an aggregate amount equal to such Member's Commitment as and when called pursuant to and in accordance with the requirements of this Section 3.3; ~~and~~or (ii) is making, or has heretofore made a Capital Contribution to the Company in immediately available funds and/or an in-kind Capital Contribution in the amount set forth opposite such Member's name below under the heading "~~Initial~~ Capital Contribution Amount" and, in consideration therefor, the Company is issuing to each such Member the number of Units set forth opposite such Member's name.

(b) All ~~Initial~~ Capital Contributions shall be made in cash except that the JS Entity and the PF Entity, in return for their Units, ~~shall~~have each executed a note (each a "Note"). Each Note shall have a term of 120 months, be non-recourse except as provide for herein, bear interest and be adjusted to the 10 year Treasury plus 200 basis points as of January 1st of each year and secured only by their Units. The JS Entity Note shall be in favor of the JF Entity and the EV Entity and shall be in the principal sum equal to (i) the JS Entity Initial Capital Contribution; and (ii) _increased_ by 33% of all Capital Calls (as defined in section 3.3(c) herein) contributed by the JF Entity and the EV Entity. A copy of the JS Entity Note is attached hereto as Exhibit "C". The PF Entity Note shall be in favor of the SP Entity and shall be in the principal sum equal to

(i) the PF Entity Initial Capital Contributions; and (ii) increased by 33% of all Capital Calls contributed by the SP Entity. A copy of the PF Entity Note is attached hereto as Exhibit "D". The JS Entity hereby directs the Company, and the Board hereby agrees, to pay all Distributions which would otherwise be paid to the JS Entity to be paid 50% to the JF Entity and 50% to the EV Entity until such time as the JS Note is paid in full. The PF Entity hereby directs the Company, and the Board hereby agrees, to pay all Distributions which would otherwise be paid to the PF Entity to be paid to the SP Entity until such time as the PF Note is paid in full.

### Capital Contribution & Membership Units

| Member | Capital Contribution | Units |
|---|---|---|
| JS3 Alternative Investments, LLC | $312,500 | 30,638 |
| Frischer Kranz Inc. | $397,500 | 28,932 |
| SMP Realty NM, LLC | $627,500 | 38,132 |
| EVE, LLC | $156,250 | 19,149 |
| Winter Investors, LLC | $156,250 | 19,149 |
| ~~ETRE TBD, LLC~~ | $1,600,000 | 64,000 |
| Total | $3,250,000 | 200,000 |

(b)

### ~~Initial Commitment and Capital Contribution Amount~~

| ~~Member~~ | ~~Total Commitment~~ | ~~Initial Capital Contribution~~ | ~~Units~~ |
|---|---|---|---|
| ~~[JF Entity]~~ | ~~$ 250,000~~ | ~~$ 62,500~~ | ~~15,000~~ |
| ~~[EV Entity]~~ | ~~$ 250,000~~ | ~~$ 62,500~~ | ~~15,000~~ |
| ~~[JS Entity]~~ | ~~$ 0~~ | ~~$ 125,000~~ | ~~30,000~~ |
| ~~[SP Entity]~~ | ~~$ 500,000~~ | ~~$ 125,000~~ | ~~20,000~~ |
| ~~[PF Entity]~~ | ~~$ 0~~ | ~~$ 125,000~~ | ~~20,000~~ |
| ~~Total~~ | ~~$1,000,000~~ | ~~$ 500,000~~ | ~~100,000~~ |

(c) In the event that the ~~75~~80% of the Board determines that additional Capital Contributions beyond the initial contributions are necessary to fund actual or anticipated costs or expenses of the Company, the Board shall determine the aggregate amount of additional capital to request up to but not exceeding the total Commitment, and shall call for Capital Contributions in proportion to the Commitments made from each of the Members (each a "Capital Call").

(d) With respect to each such Capital Call, the Members ~~who made Commitments~~ shall have the obligation to make Capital Contributions to the Partnership equal to the aggregate amount of such Capital Call. Each ~~such~~ Member shall make a pro rata Capital Contribution to the Partnership in an amount proportional to its respective ~~Commitment~~ Membership Interest. ~~These~~ Members shall make their Capital Contributions not later than the twentieth (20th) Business Day following their receipt of written notice thereof specified in such notice.