(e) If any Member ~~who has made a Commitment~~ fails to fund all or any part of such Member's pro rata share of any such required Capital Contributions, each other Member ~~who made a Commitment~~ shall have the right and option, pro rata based on such other Members' ownership of Units ~~who made Commitments~~, to fund the unpaid amount (including any other Member's pro rata share of the unpaid amount not funded by such other Member). ~~Should any of the Capital Call remain unfunded after this right is offered then any of the Other~~The Members who funded their portion of the Capital Call may fund a portion of the defaulting Member's required Capital Contribution, pro rata, and they shall be issued a number of additional Units equal to (i) the amount funded, divided by (ii) the total Commitment amount of the defaulting member, multiplied by (iii) Units held by the defaulting Member, and the number of Units held by such defaulting Member shall be deemed reduced by a like number. The issuance of additional Units pursuant to this Section 3.3(e) is authorized without further approval of the Company or Board and in accordance with the terms of Section 3.2.

~~(f) Should any of the Capital Call remain unfunded after this right is offered to the Other Members who funded their portion of the Capital Call, each of the Members other than the defaulting Member shall be issued a number of additional Units equal to (i) the unpaid amount divided by (ii) the total Commitment amount of the defaulting member, multiplied by (iii) the percentage of Units each of the Members owns of the total units excluding the Units being issued. The number of Units held by such defaulting Member shall be deemed reduced by (i) the unpaid amount, divided by (ii) the total Commitment of the defaulting member. In addition, the Frischer Patents and Frischer Patent Income shall no longer remain subject to the restrictions imposed by Section 5.4.1 and 5.4.2.~~

~~(g)~~(f) Except as set forth in this Section 3.3, no Member shall have any obligation to make any additional Capital Contribution to the Company at any time, and any future Capital Contributions made by any existing Member or new Member shall only be made in connection with a duly-authorized issuance of Units made in compliance with Section 3.2.

~~(h)(g) In the event any Member fails to make its Initial Capital Contribution as required by Section 3.3(a) within 10 days of the Effective Date, the Company shall be dissolved pursuant to Section 9 (a "Failure to Fund"). The parties agree that in the event of a Failure to Fund they shall each bear their own costs associated with their involvement in the transactions contemplated by this Agreement and waive and otherwise release each other of any and all claims that currently exist or that may arise in the future associated with their involvement in the transactions contemplated by this Agreement. The parties agree that the JF Entity shall assume the responsibility without compensation to effect a dissolution caused by a Failure to Fund including but not limited to the filing and signing of any required federal or state tax returns and documents with the the Secretary of State of Delaware.~~

Section 3.4 **Nature Of Interests.** The Units and all other Membership Rights shall for all purposes be personal property. No Member has any interest in specific Company property. Each Member hereby waives any and all rights such Person may have to initiate or maintain any suit or action for partition of the Company's assets.

Section 3.5 **Capital Accounts.** An individual Capital Account shall be established and maintained for each Member in accordance with the rules of Treasury Regulations Section

1.704-1(b)(2)(iv). Each Member's Capital Account shall be increased by (i) the amount of money contributed by such Member to the Company, (ii) the Gross Asset Value of property contributed by such Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to under Section 752 of the Code), and (iii) allocations to such Member of Net Income (or items thereof). Each Member's Capital Account shall be decreased by (i) the amount of money distributed to such Member by the Company, (ii) the Gross Asset Value of property distributed to such Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to under Section 752 of the Code), and (iii) allocations to such Member of Net Loss (or items thereof). The Capital Accounts also shall be maintained and adjusted as permitted by the provisions of Treasury Regulation Section 1.704-1(b)(2)(iv)(f) and as required by the other provisions of Treasury Regulation Section 1.704-1(b)(2)(iv) and Section 1.704-1(b)(4). Upon the Transfer of all or a portion of a Member's Units, the Capital Account of the Transferor that is attributable to the Transferred Units shall carry over to the Transferee Member in accordance with the provisions of Treasury Regulation Section 1.704-1(b)(2)(iv)(1).

Section 3.6    **Negative Capital Accounts**. No Member shall be required to pay to any other Member or the Company any deficit or negative balance that may exist from time to time in such Member's Capital Account (including, without limitation, any such deficit or negative balance as may exist upon and after dissolution of the Company).

Section 3.7    **No Withdrawal**. No Member shall be entitled to withdraw all or any portion of such Member's Capital Contributions or the balance of such Member's Capital Account, to borrow or withdraw any portion of such Member's Capital Contribution or Capital Account from the Company, or to receive any distribution from the Company, except as expressly provided herein.

Section 3.8    **Loans From Members**. Loans by Members to the Company shall not be considered Capital Contributions. If any Member shall advance funds to the Company in excess of the amounts required hereunder to be contributed by such Member to the capital of the Company, the making of such advances shall not result in any increase in the amount of the Capital Account of such Member unless otherwise agreed by the Company (with the approval of the Board) and such Member. The amount of any such advances that are not agreed to be additional Capital Contributions shall be a debt of the Company to such Member and shall be payable or collectible in accordance with the terms and conditions upon which such advances are made. The making of any loan must be approved by the Board in advance of it being made.

Section 3.9    **Units Governed by Article 8**. The Company hereby irrevocably elects that all Units in the Company shall be securities governed by Article 8 of the Uniform Commercial Code as in effect in the State of Delaware and each other applicable jurisdiction. Should the Company issue certificates to a Member evidencing the Units held by such Member in the Company, each such certificate shall bear the following legend:

> "This certificate evidences an interest in ETRE Financial, LLC and shall be a security governed by Article 8 of the Uniform Commercial Code as in effect in the State of Delaware and, to the extent permitted by applicable law, each other applicable jurisdiction."

Section 3.10    Code Section 83(b) Election.

(a)    Each Member that acquires Units subject to vesting hereunder agrees that within thirty (30) days after such Person becomes a Member, the Person who is performing the services to which the vesting requirement relates shall file an election with the Internal Revenue Service under Section 83(b) of the Code and the Treasury Regulations promulgated thereunder with respect to such Units.

(b)    By executing this Agreement or a joinder agreement, each Member authorizes and directs the Company to elect to have the "Safe Harbor" described in the proposed Revenue Procedure set forth in Internal Revenue Service Notice 2005-43 (the "IRS Notice") apply to any interest in the Company transferred to a service provider by the Company on or after the effective date of such Revenue Procedure in connection with services provided to the Company. For purposes of making such Safe Harbor election, ~~Jacob Frydman~~Paul Frischer is hereby designated as the "partner who has responsibility for U.S. federal income tax reporting" by the Company and, accordingly, execution of such Safe Harbor election by ~~Jacob Frydman~~Paul Frischer constitutes execution of a "Safe Harbor Election" in accordance with Section 3.03(1) of the IRS Notice. The Company and each Member hereby agree to comply with all requirements of the Safe Harbor described in the IRS Notice, including the requirement that each Member shall prepare and file all U.S. federal income tax returns reporting the income tax of each "Safe Harbor Partnership Interest" issued by the Company in a manner consistent with the requirements of the IRS Notice. A Member's obligations to comply with the requirements of this Section 3.10 shall survive such Member's ceasing to be a Member of the Company or the termination, dissolution, liquidation and winding up of the Company, and, for purposes of this Section 3.10, the Company shall be treated as continuing in existence.

(c)    Each Member authorizes the Board to amend this Section 3.10 to the extent necessary to achieve substantially the same tax treatment with respect to any Unit transferred to a service provider by the Company in connection with services provided to the Company as set forth in Section 4 of the IRS Notice (e.g. to reflect changes from the rules set forth in the IRS Notice in subsequent Internal Revenue Service guidance); provided, that such amendment is not adverse to such Member (as compared with the after tax consequences that would result if the provisions of the IRS Notice applied to all Units transferred to a service provider by the Company in connection with services provided to the Company).

### ARTICLE 4
### ALLOCATIONS

Section 4.1    Allocations of Net Income and Net Loss.

(a)    Subject to Section 4.1(c), for each Fiscal Year (or portion thereof), except as otherwise provided in this Agreement, Net Income and Net Loss (and, to the extent necessary, individual items of income, gain, loss or deduction) of the Company shall be allocated among the Members in a manner such that that would result in positive Capital Account balances equal to all amounts required to be distributed pursuant to the method described in Section 9.2(c)iii assuming a hypothetical liquidation of the Company. In determining the amounts distributable to

the Members using such method the distribution to each Member shall be equal to the amount that would be received by such Member if all Company assets were sold on the last day of the allocation period for cash equal to their basis for Capital Account purposes (provided, however, that the Company may increase or decrease Capital Accounts in accordance with applicable Treasury Regulations to reflect any revaluations of the Company's property, including any write-downs in the amount thereof), all Company liabilities were satisfied to the extent required by their terms (limited, with respect to each "partner nonrecourse liability" and "partner nonrecourse debt," as defined in Treasury Regulations Section 1.704-2(b)(4), to the fair market value of the assets securing such liability), and the net assets of the Company were distributed in full to the Members all as of the last day of such allocation period in accordance with Section 5.2 hereof.

(b)     The parties intend that the allocation provisions of this Section 4.1 shall produce Capital Account balances of the Members that will be consistent with the distribution provisions of Section 5.2 and the liquidation provisions of Section 9.2(c). Notwithstanding anything to the contrary in this Agreement, to the extent the Board determines that the allocation provisions of this Section 4.1 may fail to produce such Capital Account balances, (i) such provisions shall be amended by the Board to the extent necessary to produce such result and (ii) Net Income and Net Loss and other items of income, gain, loss, credit and deduction of the Company for the most recent open year (or items of income, gain, loss, deduction, and Code Section 705(a)(2)(B) expenditures of the Company for such years) shall be reallocated among the Members to the extent it is not possible to achieve such results with allocations of Net Income and Net Loss (or items of income, gain, loss, deduction, and Code Section 705(a)(2)(B) expenditures) for the current year and future years, as determined by the Board. This Section 4.1(a) shall control notwithstanding any reallocation or adjustment of taxable income, taxable loss, or items thereof by the Internal Revenue Service or any other taxing authority.

(c)     Special Allocations.

(i)     Minimum Gain Chargeback. Except as otherwise provided in Treasury Regulation Section 1.704-2(f), notwithstanding any other provision of this Agreement, if there is a net decrease in partnership minimum gain (as defined in the Code) during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in partnership minimum gain, determined in accordance with Treasury Regulation Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Treasury Regulation Sections 1.704-2(f)(6) and 1.704-2(j)(2). This Section 4.1(c)(i) is intended to comply with the minimum gain chargeback requirement in Treasury Regulation Section 1.704-2(f) and shall be interpreted consistently therewith.

(ii)     Partner Minimum Gain Chargeback. Except as otherwise provided in Treasury Regulation Section 1.704-2(i)(4), notwithstanding any other provision of this Section 4.1, if there is a net decrease in partner nonrecourse debt minimum gain (as defined in the Code) attributable to a partner nonrecourse debt during any Fiscal Year, each Member who has a share of the partner nonrecourse debt minimum gain attributable

- 16 -

to such partner nonrecourse debt, determined in accordance with Treasury Regulation Section 1.704-2(i)(5), shall be specially allocated items of income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in partner nonrecourse debt minimum gain attributable to such partner nonrecourse debt, determined in accordance with Treasury Regulation Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Treasury Regulation Section 1.704-2(i)(4) and 1.704-2(i)(2). This Section 4.1(c)(ii) is intended to comply with the minimum gain chargeback requirement in Treasury Regulation Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(iii)   Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulation Sections 1.704-1(b)(2)(ii)(d)(4), (d)(5) or (d)(6), items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the deficit Adjusted Capital Account Balance of such Member as quickly as possible, provided that an allocation pursuant to this Section 4.1(c)(iii) shall be made if and only to the extent that such Member would have a deficit Adjusted Capital Account Balance after all other allocations provided for in this Article 4 have been tentatively made as if this Section 4.1(c)(iii) were not a term of this Agreement. This Section 4.1(c)(iii) is intended to constitute a "qualified income offset" provision as described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(iv)   Gross Income Allocation. In the event any Member has a deficit Capital Account at the end of any Fiscal Year which is in excess of the amount such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulation Sections 1.704-2(g)(1) and 1.704-2(i)(5), each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 4.1(c)(iv) shall be made if and only to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Section 4.1(c) have been tentatively made as if this Section 4.1(c)(iv) and Section 4.1(c)(iii) hereof were not in the Agreement.

(v)   Partner Nonrecourse Deductions.   Any partner nonrecourse deductions for any Fiscal Year shall be specially allocated to the Member who bears the economic risk of loss with respect to the partner nonrecourse debt to which such partner nonrecourse deductions are attributable in accordance with Treasury Regulation Section 1.704-2(i)(1).

(vi)   Curative Allocations. The allocations set forth in Section 4.1(c)(i), (ii), (iii), (iv) and (v) hereof (collectively, the "Regulatory Allocations") are intended to comply with requirements of the Treasury Regulations. It is the intent of the parties hereto that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company

income, gain, loss, or deduction pursuant to this Section 4.1(c)(vi). Therefore, notwithstanding any other provision of Article 4 (other than the Regulatory Allocations), the Board shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Adjusted Capital Account Balance is, to the extent possible, equal to the Capital Account such Member would have had if the Regulatory Allocations were not terms of this Agreement and all Company items were allocated pursuant to Section 4.1. In exercising its discretion under this Section 4.1(c)(vi), the Board shall take into account future Regulatory Allocations under Section 4.1(c)(iii) and (v) that, although not yet made, are likely to offset other Regulatory Allocations previously made under Section 4.1(c)(ii) and (iv).

(vii)    Allocations of Withholding.  To the extent the Company receives (or is deemed to receive) an amount of income that is net of any withholding tax, (i) such income shall be allocated among the Members as if the Company received the gross amount of such income before giving effect to the payment of the withholding tax and (ii) any resulting tax credit shall be allocated among the Members such that each Member receives a portion thereof reflecting the amount of withholding tax to which such Member would be subject if such Member received the gross income allocated to such Member in accordance with clause (i) above directly.

(viii)    Member Loans.  Any interest deductions with respect to loans to the Company by any Member shall be specially allocated to the Member making such loan.

(ix)    Distributions of Nonrecourse Liability Proceeds.  If, during a Fiscal Year, the Company makes a distribution to any Member of the proceeds of any nonrecourse liability of the Company that would otherwise be allocable to an increase in partnership minimum gain pursuant to Treasury Regulation Section 1.704-2(h), then the Company may elect, to the extent permitted by Treasury Regulation Section 1.704-2(h)(3), to treat such distribution as a distribution that is not allocable to an increase in partnership minimum gain.

(d)    With respect to any Fiscal Year during which any Member's interest in the Company changes, allocations under Article 4 shall be adjusted appropriately to take into account the varying interests of the Members during such period.

Section 4.2    Tax Allocations.

(a)    Generally.  Except as otherwise provided in this Section 4.2, taxable income and loss and all items thereof shall be allocated to the Members to the greatest extent practicable in a manner consistent with the manner set forth in Section 4.1 and Sections 704(b) and (c) of the Code.  Allocations pursuant to this Section 4.2 are solely for federal income tax purposes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Income, Net Loss, other items or distributions pursuant to any provision of this Agreement.

- 18 -

(b)   Section 704(c) of the Code.   In accordance with Section 704(c) of the Code, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Gross Asset Value.

(c)   Adjustments Under Section 704(c) of the Code.   In the event the Gross Asset Value of any Company asset is adjusted pursuant to paragraph (ii) of the definition of "Gross Asset Value," subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted tax basis of such asset and its Gross Asset Value in the same manner as under Section 704(c) of the Code.

(d)   Decisions Relating to Section 704(c) of the Code.   Any elections or other decisions relating to allocations under this Section 4.2, including the selection of any allocation method permitted under Treasury Regulation Section 1.704-3, shall be made by the Board.

Section 4.3   Limitations on Allocations to Holders of Units.   Notwithstanding any other provision of this Article 4, to the extent that any Member has been granted any Units that, by the terms of such grant or by agreement, entitle the holder, once such Units vest, to receive less than the full amount of allocations of Net Income otherwise allocable with respect to such class or series of Units generally, then the provisions of such grant or agreement shall supersede such holder's rights under this Article 4 and the amount of reduction in allocations to such holder shall be made to all other Members in accordance with this Article 4.

## ARTICLE 5
## DISTRIBUTIONS

Section 5.1   General.   Subject to the provisions of Section 5.3, distributions pursuant to this Article 5 may be made from time to time in the sole discretion of the Board, acting unanimously.

Section 5.2   Distributions.

(a) Subject to the provisions of Section 5.3 and Section 5.6, all distributions made by the Company from any source and with respect to all income or capital items received by the Company, as determined from time to time by the Board, shall be made to the holders of Units pro rata in accordance with the number of Units held by them.

(b) The Board may in its discretion provide for annual draws by Members, pro rata according to the Units held by them, which shall be treated as advances against future distributions.

Section 5.3   Tax Distributions.

(a) Subject to the limitations set forth below, on or before March 31 of each Fiscal Year, the Company shall distribute to each Person who was a Member during the immediately preceding Fiscal Year of the Company an amount of cash equal to the product of (x) the highest federal and New York State and New York City individual or corporate marginal tax rate

pertaining to the type of income being taxed to any Member (i.e., the same rate shall be applied to each Member) multiplied by (y) the excess of (a) the cumulative amount of taxable income and gain allocated to such Person for federal income tax purposes in the Company's income tax return filed or to be filed with respect to such immediately preceding Fiscal Year and all prior Fiscal Years, over (b) the cumulative amount of losses, deductions and credits allocated to such Person for federal income tax purposes in the Company's income tax returns filed or to be filed with respect to such immediately preceding Fiscal Year and all prior Fiscal Years; with such product being reduced by any prior distributions to such Person pursuant to this Section 5.3. The amount of any distributions to a Member pursuant to this Section 5.3 shall be credited against and reduce any amounts otherwise distributable to such Member pursuant to Section 5.2 or Section 9.2(c).

(b) In the discretion of the Board, distributions under this Section 5.3 may be made on an estimated basis each quarter and if such estimated distributions exceed the actual amount required on March 31, such Member receiving excess distributions shall be given a credit balance and such excess shall be deducted from such Member's next distribution(s) under this Section 5.3 (until fully repaid).

(c) No distribution under this Section 5.3 shall be made if the making of such distribution would constitute a violation of the Act or any other applicable law or regulation or order of any court of competent jurisdiction or any contract or agreement by which the Company or any of its Subsidiaries is bound, including without limitation any credit agreement of the Company or any of its Subsidiaries.

(d) The Company shall provide, on a quarterly basis, information necessary to determine the estimated amount of federal and state income tax liability based on this Section 5.3. When otherwise required by this Section 5.3, distributions under this Section 5.3 shall be made no later than April 10th, June 10th, September 10th and December 10th of the applicable year.

**Section 5.4    Frischer Patents and Derivatives Business.**

The parties acknowledge that as of the Effective Date: (i) Frischer is the sole owner of the Frischer Patents, and Frischer represents and warrants that he is the owner of the Frischer Patents, has good title thereto, and has not transferred, sold or hypothecated any interest in the Frischer Patents to any other person; and (ii) that as of the Effective Date there exists no Frischer Patents Income. Notwithstanding the foregoing, Frischer has advised the Company and each of the Members that certain Persons may in the future assert claims against Frischer with respect to the Frischer Patents ("Third Party Claims"), in which case, Frischer, shall, directly or through one or more of his Affiliates, and at his or their costs, defend any such Third Party Claim.

**5.4.1    Assignment of Frischer Patents Income.**

Subject to (i) the Company having Commenced Business by launching an Exchange Traded Real Estate Platform on or before the Platform Launch Date; (ii) PF Entity is a Member of the Company; and (iii) the Frischer Patents have not been Transferred, Frischer hereby assigns to the Company 50% of all of his and his Affiliates' right and interest in and to the Frischer Patents Income generated from and after the Platform Launch Date from any and all

sources. If, at any time, all of the foregoing conditions (i), (ii), and (iii) are not met, Frischer shall no longer have the obligation to assign to the Company any of the Frischer Patents Income. Of the 50% assigned to the Company, 25% shall be assigned by the Company to the SP Entity, 7.5% to the JF Entity, 7.5% to the EV Entity and 10% to the JS Entity The Remaining fifty percent (50%)- of the Frischer Patents Income, and all proceeds of a Transfer of the Frischer Patents, shall remain the exclusive property of Frischer and/or his respective Affiliates, but subject to the Company's rights pursuant to section 5.4.2 below.

### 5.4.2 Company's right of First Refusal with respect to the Frischer Patents.

(a) From the Effective Date and so long as Frischer is an employee of the Company and/or a member of the Board and/or is an Affiliate of the PF Entity and/or has not Transferred the PF Entity's membership interest in the Company (in accordance with the terms of this Agreement) (the "ROFER Period"), except as provided in this Section 5.4, Frischer shall not directly or indirectly, sell, transfer, assign, or otherwise convey, or mortgage, pledge, hypothecate or otherwise dispose of (collectively, "Sale"), all or any interest in the Frischer Patents to any Person. A Sale shall not include a court ordered conveyance as a result of a Third Party Claim, or the determination by a court of competent jurisdiction in connection with a Third Party Claim, that Persons other than Frischer have an interest in all or part of the Frischer Patents.

(b) Subject to this subsection 5.4.2, during the ROFER Period in the event Frischer shall have received and conditionally accepted a bona fide offer from an independent third party for the purchase and sale of the Frischer Patents ("Offer"), Frischer shall give notice of such acceptance of Offer, stating in detail all the terms and conditions thereof ("Sale Notice"), to the Company. The Company shall have the right (but not the obligation) within thirty (30) Business Days after receipt of the Sale Notice ("Refusal Exercise Period") to elect to purchase the Frischer Patents by paying Frischer a sum equal to eighty percent (80%) of the price stated in the Offer, and otherwise upon the terms and conditions of the Offer.

(c) Subject to this subsection 5.4.2, if the Company elects to purchase the Frischer Patents pursuant to Section 5.4(c), it shall consummate such purchase, within ten (20) Business Days after the date such election is made. In the event the Company does not elect to purchase the Frischer Patents pursuant to Section 5.4(c), Frischer shall have the right during the ninety (90) day period immediately following the Refusal Exercise Period to sell the Frischer Patents, only upon the terms and conditions specified in the Offer to the Person named therein, and in the event such sale is not so consummated, the Frischer Patents shall remain subject to the restrictions imposed by Section 5.4.2.

(d) Notwithstanding anything contained in this subsection 5.4.2 to the contrary, in the event that a Third Party Claim is filed with respect to the Frischer Patents, then Frischer shall, within ten (10) days of being served with notice of same, deliver to the Company all documents and other information regarding such Third Party Claim and ask the Company and the Principals to indemnify Frischer with respect to said Third Party Claim and any and all costs, obligations, liabilities, legal fees and damages for which Frischer may be liable or obligated with respect to such Third Party Claim. The Company through unanimous approval of the Board and each Principal may elect to indemnify Frischer (but shall not be obligated to make said election)

within thirty (30) business Days after the date Frischer delivers to the Company, and the Company acknowledges receipt of, all documents and other information regarding said Third Party Claim. In the event that the Company and the Principals do not provide written notice of their election to indemnify Frischer as herein set forth on or before the close of business on the 30th Business Day after the Document Delivery Date, then the Company and the Principals shall be deemed to have elected *not* to provide said indemnification to Frischer, in which case the Right of First Refusal granted to the Company in this section 5.4.2 shall be extinguished, and the Frischer Patents and Frischer Patent Income shall no longer remain subject to the restrictions imposed by Section 5.4.1 and 5.4.2.

### Section 5.5    Receipt of Fair Value; Withholding.

(a)    Notwithstanding any provision of the Act, but subject to <u>Section 7.4</u>, no Person that ceases to be a Member of the Company shall be entitled to receive the fair value of such Person's interest in the Company prior to the dissolution and winding up of the Company.

(b)    The Company shall at all times be entitled to make payments with respect to any Member in amounts required to discharge any obligation of the Company to withhold from a distribution or make payments to any governmental authority with respect to any foreign, federal, state or local tax liability of such Member arising as a result of such Member's interest in the Company (a "**Withholding Payment**"). Any Withholding Payment made from funds withheld upon a distribution will be treated as distributed to such Member for all purposes of this Agreement. Any other Withholding Payment will be deemed to be a recourse loan by the Company to the relevant Member. The amount of any Withholding Payment treated as a loan plus interest thereon, from the date of each such Withholding Payment until such amount is repaid to the Company, at a rate per annum equal to the greater of (i) seven percent (7%), or (ii) the prime rate (as published in the Wall Street Journal) in effect on the date of the Withholding Payment plus three percent (3%), shall be repaid to the Company upon demand by the Company; <u>provided, however</u>, that in the Board's sole discretion, any such amount may be repaid by deduction from any distributions payable to such Member pursuant to this Agreement (with such deduction treated as an amount distributed to the Member) as determined by the Board in its sole discretion.

### ARTICLE 6
### MANAGEMENT OF THE COMPANY; INFORMATION

**Section 6.1    Management by Board of Managers.** Except for situations in which the vote, consent or approval of one or more Members is expressly required by this Agreement or by non-waivable provisions of applicable law, (i) the powers of the Company, including, without limitation, (A) converting the Company into a corporation in accordance with Section 216 of the Act and <u>Section 9.4</u> and (B) any merger or consolidation of the Company with any other Person pursuant to Section 18-209 of the Act, shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of, a Board of Managers (the "**Board**"); and each member thereof being referred to as a ("**Manager**") and (ii) the Board may make all decisions and take all actions for the Company not otherwise provided in this Agreement.

**Section 6.2** <u>Expenses</u>. The Company shall pay, or cause a Subsidiary to pay, all the reasonable out-of-pocket fees, costs and expenses incurred by the Managers in connection with travel to and attendance at Board meetings and other business functions on behalf of, or in connection with, the Company or any Subsidiaries or their respective businesses.

**Section 6.3** <u>Constitution of the Board; Rights and Powers of the Board and Officers; Removal and Termination</u>.

(a)     The size of the Board shall be fixed at ~~Four~~ <u>Five</u> (4<u>5</u>), two appointed by the URPA Group, ~~and~~ two appointed by the Frischer Group, <u>and one appointed by the LH Member</u> provided that such number may be increased or decreased by the Managers as provided in Section 6.12. The ~~initial~~ members of the Board shall be as follows, and the following designees are hereby duly elected as Managers of the Company:

> Jacob Frydman (the URPA Group Manager)
> Jesse Stein (the URPA Group Manager)
> Paul Frischer (the Frischer Group Manager)
> Scott Panzer (the Frischer Group Manager)
> <u>————————Sol Mayer (the LH Group Manager)</u>

(b)     In the event any vacancy in the Board shall occur as a result of death, disability or resignation of a Manager appointed by the URPA Group, a replacement Manager may be designated by the URPA Group. In the event any vacancy in the Board shall occur as a result of death, disability or resignation of a Manager appointed by the Frischer Group, a replacement Manager may be designated by the Frischer Group. In the event any vacancy in the Board shall occur as a result of removal for Cause of a Manager appointed by the URPA Group, a replacement Manager may be designated by the Frischer Group. In the event any vacancy in the Board shall occur as a result of removal for Cause of a Manager appointed by the Frischer Group, a replacement Manager may be designated by the URPA Group. In the event that any other vacancy in the Board shall occur as a result of death, disability or resignation of a Manager, or removal of a Manager for Cause, a replacement Manager may be designated by action of the remaining members of the Board, or the vacancy may remain open.

(c)     Except as specifically provided otherwise in this Agreement or by non-waivable provisions of the Act, any action taken by the Board may only be taken with the approval, either in writing or at a duly called meeting, of Managers holding (in accordance with this <u>Section 6.3(b)</u>) at least ~~majority four (4)~~ of the votes held by the Managers then serving on the Board. Each Manager shall be entitled to one (1) vote on matters coming before the Board.

(d)     The Board may establish one or more committees, which shall be comprised solely of Managers.

(e)     Any Manager may be removed from the Board for Cause by unanimous action of the other Managers. Any Manager's or Member's employment with the Company or a Subsidiary may be terminated by the Board for Cause by unanimous action of the Managers other than the Manager or Member whose employment is being terminated.

**Section 6.4** **Officers**. The Board may, from time to time appoint one or more individuals as officers and delegate to such officers such authority and duties as the Board deems advisable. In addition, the Board may assign titles (including, without limitation, chairman, chief executive officer, president, chief operating officer, chief financial officer, vice president, secretary, assistant secretary, treasurer or assistant treasurer) to such officers and, unless the Board decides otherwise, the assignment of such title shall constitute the delegation to such officer of the authority and duties that are normally associated with that office. Any number of titles may be held by the same individual. The salaries or other compensation, if any, of such officers shall be fixed from time to time by the Board. Any delegation pursuant to this Section 6.4 may be revoked at any time by the Board, in its sole and absolute discretion. The following are hereby appointed as officers of the Company:

| Name | Titles |
| --- | --- |
| Paul Frischer | Chief Executive Officer |
| Jesse Stein | ~~Executive Managing Director~~Chief Operating Officer |
| Scott Panzer | Board Member |
| Jacob Frydman | Board Member |
| Eli Verschleiser | |

**Section 6.5** **Meetings of Board**.

(a) The Board may hold its meetings in such place or places in the State of Delaware or outside the State of Delaware as it shall determine from time to time.

(b) Meetings of the Board or a Board committee shall be held whenever called by at least one (1) Manager. Notice of the day, hour and place of holding of each meeting of the Board or any meeting of a Board committee shall be given to each Manager or committee member by email or any other method under Article 11, at least seventy-two (72) hours before the meeting. Unless otherwise indicated in the notice thereof, any and all business may be transacted at any such meeting. At any meeting at which every Manager or committee member shall be present, even though without any notice, any business may be transacted.

(c) A quorum for the transaction of business by the Board shall consist of Managers holding a majority of the votes held by the Managers then serving on the Board, and a quorum for the transaction of business by a Board committee shall consist of committee members holding a majority of the votes held by the committee members then serving on such committee. If at any meeting of the Board or committee thereof, there is less than a quorum present, holders of a majority of the votes held by those present may adjourn the meeting from time to time until a quorum is present.

(d) Any Manager may participate in any meeting of the Board or a Board committee by means of telephone conference or similar communications equipment by means of which all persons participating in the meeting can hear each other, and such participation shall constitute presence in person at such meeting. Any Manager may participate in any meeting either in person or by proxy. A proxy may only be exercised by another Member and only for a single meeting after which it shall terminate. The Company must receive all proxies prior to the commencement of any meeting by any means.

(e) Any action required or permitted to be taken at any meeting of the Board or a committee thereof may be taken without a meeting if a consent in writing is sought from all Managers, and the consent sets forth the action proposed to be taken. The consent takes effect once it is signed by Managers holding the requisite number of the votes held by the Managers then serving on the Board or such committee as such action requires. Prompt notice of the taking of an action without a meeting by less than ~~unanimous~~ four of the Manager's written consent shall be given to those Managers who have not consented in writing. A Manager who does not sign the consent  may approve any matter by consent by email without actually signing the consent. If approval is requested in writing (including by e-mail) by a majority of the Managers with respect to any matter requiring approval of the Managers, and if a Manager has failed to respond to such request within 72 hours, such failure to respond shall be deemed an approval. All approvals and other written actions shall be filed with the minutes of proceedings of the Board or committee, as the case may be.

Section 6.6    Liability. Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company and its Subsidiaries, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company or a Subsidiary, and no Covered Person shall be obligated personally for any such debt, obligation or liability of the Company or a Subsidiary solely by reason of being a Covered Person.

Section 6.7    Exculpation.

(a) To the fullest extent permitted by applicable law, no Covered Person shall be liable to the Company or any other Covered Person, Member or other Person that is a party to or otherwise bound by this Agreement for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person from and after the Effective Date in good faith on behalf of the Company and its Subsidiaries and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Agreement, except that a Covered Person shall not be released from liability to the Company or any other Covered Person, Member or other Person that is a party to or otherwise bound by this Agreement for any such loss, damage or claim incurred by reason of such Covered Person's fraud, intentional misconduct or bad faith violation of the implied contractual covenant of good faith and fair dealing, or such Covered Person's breach of this Agreement or other agreement with the Company or a Subsidiary to which such Covered Person is a party.

(b) A Covered Person shall be fully protected in relying in good faith upon the records of the Company and its Subsidiaries and upon such information, opinions, reports or statements presented to the Company and its Subsidiaries by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert

competence and who has been selected with reasonable care by or on behalf of the Company and its Subsidiaries, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits, losses or income or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid. Without limiting the foregoing, neither the Company nor any Covered Person shall have any liability with respect to any valuations performed pursuant to this Agreement, and shall be fully protected in relying in good faith upon the records of the Company and its Subsidiaries and upon information, opinions, reports or statements presented to the Company and its Subsidiaries by any person as to matters which the Company or such Covered Person reasonably believes are within such other Person's professional or expert competence.

Section 6.8    Indemnification.

(a)    The Company shall cause its Subsidiaries to, indemnify and hold harmless each Covered Person to the fullest extent permitted by applicable law from and against any and all losses, claims, demands, costs, damages, liabilities (joint or several), obligations, expenses of any nature (including reasonable legal and accounting fees and expenses, costs of investigation and sums paid in settlement), judgments, fines, settlements, and other amounts ("**Indemnified Costs**") arising from any and all claims, demands, actions, suits, or proceedings, whether civil, criminal, administrative or investigative, in which the Covered Person may be involved, or threatened to be involved as a party or otherwise, incurred by reason of any act or omission performed or omitted by such Covered Person from and after the Effective Date in good faith on behalf of the Company and its Subsidiaries and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Agreement, regardless of whether the Covered Person is a Covered Person at the time any such Indemnified Cost is paid or incurred, except that no Covered Person shall be entitled to be indemnified in respect of (and this provision shall not reduce or limit the liability of a Covered Person with respect to) any Indemnified Cost incurred by such Covered Person by reason of such Covered Person's fraud, intentional misconduct or bad faith violation of the implied contractual covenant of good faith and fair dealing or such Covered Person's breach of a this Agreement or other agreement with the Company or a Subsidiary to which such Covered Person is a party; provided, however, that any indemnity under this Section 6.8 shall be provided out of and to the extent of the assets of the Company and its Subsidiaries (including insurance) only, and no Covered Person shall have any personal liability on account thereof. Further, the Company shall not indemnify any Covered Person in connection with a proceeding (or part thereof) initiated by such Person against the Company or any Subsidiary or any other Covered Person, whether by direct claim, counterclaim or otherwise, unless the initiation thereof was approved or ratified by the Board. The Company shall have the right to approve the selection of attorneys and to approve any settlement for any matter for which indemnification is claimed. The Company may cause each of its Subsidiaries to execute a joinder agreeing to assume responsibility for its obligations pursuant to this Section 6.8 and to act in accordance herewith.

(b)    Notwithstanding any other provision of this Section 6.8, the Company shall, and shall cause its Subsidiaries to, reimburse Indemnified Costs incurred by a Covered Person in connection with such Person's appearance as a witness on behalf of the Company or its

Subsidiaries or other participation at the request of the Company or a Subsidiary in a proceeding involving or affecting the Company or its Subsidiaries at a time when the Covered Person is not a named defendant or respondent in the proceeding.

(c) The indemnification provided by this Section 6.8 shall be in addition to any other rights to which a Covered Person may be entitled under any agreement or vote of the Board, both as to an action in the Covered Person's capacity as a Covered Person, and as to an action in another capacity, and shall continue as to a Covered Person who has ceased to serve in such capacity and shall inure to the benefit of the heirs, successors, assigns, and administrators of each Covered Person.

Section 6.9 Expenses; Advances. Subject to Section 6.8, to the fullest extent permitted by applicable law, the Company may, in the sole discretion of the Board, from time to time, advance the expenses (including reasonable legal fees and expenses and costs of investigation) incurred by a Covered Person in defense or settlement of any claim, demand, action, suit or proceeding (whether civil, criminal, administrative, investigative or otherwise) that may be subject to a right of indemnification hereunder as such expenses are incurred by such Covered Person and prior to the final disposition thereof upon receipt by the Company of a written undertaking by or on behalf of such Covered Person to repay such amount to the extent that it shall be determined that such Covered Person is not entitled to be indemnified as authorized in Section 6.8 hereof.

Section 6.10 Nature of Rights. The rights set forth in Section 6.6 through Section 6.9 are contractual in nature and may not be revised as applied to prior actions of a Covered Person by a subsequent amendment of this Agreement without such Covered Person's and the Company's prior written approval. The Company will cause the organizational documents of its Subsidiaries to contain rights for Covered Persons substantially similar to those set forth herein in Section 6.6 through Section 6.9.

Section 6.11 Information Rights. The Company shall comply with, and will cause its Subsidiaries to comply with, the following provisions:

(a) Annual Statements. Within one-hundred twenty (120) days after the close of each Fiscal Year of the Company, commencing with the Fiscal Year ending on December 31, 2012, the Company will deliver to each Member audited consolidated balance sheets and statements of income and retained earnings and cash flows of the Company and its Subsidiaries, which annual financial statements shall show the financial condition of the Company and its Subsidiaries as of the close of such Fiscal Year and the results of the Company's operations during such Fiscal Year. Each of the financial statements delivered in accordance with the immediately preceding sentence shall be certified by the Company's accounting firm auditing the same to have been prepared in accordance with GAAP, except as specifically disclosed therein.

(b) Monthly Statements. Within thirty (30) days after the end of each month, the Company will deliver to each Member (i) consolidated unaudited balance sheets and statements of income and retained earnings and of cash flows for the Company and its Subsidiaries as of the end of such month, comparing such financial position and results of operations against the same periods for the prior year and against the budget, and (ii) a letter from the Company's

management discussing the revenues and operations of the Company and its Subsidiaries with respect to such month.

(c) *Budget; Other Information.* Prior to the start of each Fiscal Year, the Company will deliver to the Members the Company's budget for such Fiscal Year, including monthly consolidated unaudited balance sheets and monthly statements of income and retained earnings and cash flows for the Company and its Subsidiaries. From time to time upon the request of a Member, the Company will furnish to the Members, within a reasonable time from the request, such information regarding the business, affairs, prospects and financial condition of the Company and the Subsidiaries as such Member may reasonably request.

(d) *Termination of Information Rights.* The information rights granted pursuant to this Section 6.11 will lapse and terminate immediately with respect to: (i) each Member whose employment with the Company or any Subsidiary terminates for any reason; (ii) each Member who breaches (whether before or after termination of his or her employment with the Company or any of its Subsidiaries or Affiliates) this Agreement or any confidentiality, non-competition or non-solicitation obligations to the Company or any of its Subsidiaries or Affiliates; and (iii) each Member who becomes adverse to the Company in a legal action or proceeding initiated by the Member or any threat of a legal action or proceeding.

~~Section 6.12 Managers' Unanimous Votes Required. Notwithstanding anything to the contrary contained in this Agreement, the Company shall not, and shall not permit any of the Subsidiaries to, engage in or cause any of the following transactions or take any of the following actions, and the Board shall not permit or cause the Company or any of the Subsidiaries to engage in, take or cause any such action, except with the unanimous prior approval of all of the Managers then serving on the Board:~~

~~(i) the issuance of any Units or other equity securities pursuant to Section 3.2, other than those issued and outstanding as of the Effective Date, (A) to any Person not already a Member, (C) except as provided in Section 5.4, or (C) except as provided in Section 3.3, to existing Members in any proportions different than their Proportionate Shares;~~

~~(ii) the repurchase of any Units by the Company, pursuant to Section 7.4 or otherwise;~~

~~(iii) the admission of an additional Member pursuant to Section 3.2;~~

~~(iv) the Company's consent to any transfer of Units pursuant to Section 7.3;~~

~~(v) a merger, consolidation, conversion or other similar transaction involving the Company or any of the Subsidiaries as a result of which the Principals and their Permitted Transferees (or in the case of a Subsidiary, the Company, directly or indirectly) hold in the aggregate less than a majority of the outstanding voting equity securities of the surviving entity immediately after such transaction;~~

(vi) any action that results in a liquidation or dissolution of the Company or any Subsidiary;

(vii) the commencement by the Company or a Subsidiary of any bankruptcy, reorganization, debt arrangement, or other case or proceeding under any bankruptcy or insolvency law;

(viii) the making of any capital call, except as provided for in Section 3.3(b);

(ix) the making of any distributions provided for in Article 5, or any distributions by a Subsidiary to its equity holders;

(x) the incurring of any debt obligations by the Company or by any Subsidiary of Company; any loan of funds by the Company or by any Subsidiary of Company; any finance or capital lease of the Company or any Subsidiary with a rental amount in excess of $50,000 per year which is not otherwise included in a Budget approved by the Board; any hedge or swap transaction; any prepayment, defeasance, refinancing or replacement of any of the foregoing; or any guarantee or other direct or indirect assumption of liability by the Company or any Subsidiary with respect to the obligations of any third party;

(xi) any expenditure by the Company during a Fiscal Year that is not provided for in the budget for such Fiscal Year approved by the Board;

(xii) an increase or decrease in the authorized size of the Board;

(xiii) the Company or any Subsidiary to enter into, amend, modify or terminate any agreement or transaction with a Member or with an Affiliate of a Member;

(xiv) the sale, lease, conveyance, pledge, mortgage, lease or other encumbrance of assets of the Company or any Subsidiary having a fair market value of more than $50,000 which is not otherwise included in a Budget approved by the Board;

(xv) the transfer or encumbrance of Units other than in a Permitted Transfer;

(xvi) any modification or amendment of this Agreement (subject to Article 10);

(xvii) the issuance of any equity securities by any Subsidiary or Affiliate;

(xviii) the prosecution, waiver, settlement or compromise of any claim or cause of action of or against the Company or a Subsidiary;

(xix) any amendment or modification of the organizational documents of and United Realty Fund;

(xx)   any action to change the tax status of the Company; or

(xxi)   any determination of the amount of any reserves of the Company or a Subsidiary; or

(xxii)   As to the Company or any Subsidiary: to (i) amend or modify its Certificate of Formation, (ii) change or designate its Tax Matters Partner, (iii) change its name, (iv) change its purpose, (v) hire or fire its accounting firm or law firm, (vi) approve a recapitalization, (vii) determine whether or not to extend indemnification to any agent or other Person, (viii) increase or decrease the number of managers, general partners, or the size of the board of any Subsidiary, or (ix) hire or fire any relative or in-law of a member, partner or manager, or an affiliate of any of the foregoing.

Section 6.13Section 6.12   **Mediation of Board Deadlocks.**  Should the Board be unable to reach a unanimous decision within thirty days of the initial vote then a final decision shall be made pursuant to mediation.  The Frischer Group shall select one mediator and the URPA Group shall select one mediator.  The two mediators shall then select a third mediator.  Should the two mediators not select a third mediator within ten days from the latest date a party selected their mediator any party to this Agreement may petition the Supreme Court of New York, NY to select the third mediator.  The mediators need not be attorneys and may be persons with industry knowledge of the subject matter of this Agreement.  There shall be no discovery during mediation.  The parties shall submit briefs to the mediators stating their positions and the mediators shall hear oral argument during one mediation session with the parties having an equal amount of time to argue their positions.  There shall be no testimony or witnesses at mediation.  The mediators shall consider their briefs and oral argument and render a written decision in no more than twenty days of oral argument.  The decision of the mediators shall be final non-appealable decision enforceable in any court of competent jurisdiction.  The parties shall use their best efforts in good faith to complete mediation within sixty days of the selection of the third mediator.

Section 6.14Section 6.13   **Budgets.** The Officers shall cause the Company's financial and accounting professionals or employees to prepare, and submit to the Board for its approval on or before November 1st of each calendar year, a proposed budget for the operation of the Company and for each Subsidiary for the succeeding calendar year (a "Budget").  The Budget for the Company and each Subsidiary shall consist of an operating budget (the "Operating Budget") and a capital improvements budget (the "Capital Budget").  The Operating Budget shall show, on a month-by-month basis, in reasonable detail, each line item of anticipated income and expense (on a cash basis).  The Capital Budget shall show, on a month-by-month basis, in reasonable detail, each line item of anticipated capital expenditures, including anticipated investments of capital in ETRE Financial. Attached here as Schedule B is the initial Operating Budget for the Company through December 31, 2012 2014 showing the budgeted amounts for each month through said date, which initial Operating Budget is hereby approved by the Board. If the Board shall fail to approve any Budget for any calendar year before the first day of such year, then the Board shall continue to manage, maintain, supervise, direct and operate the Company and its Subsidiaries in accordance with the Budget approved by the Board for the immediately preceding calendar year until the Board approves a new Budget.

## ARTICLE 7
## MEMBERS

**Section 7.1    Limited Liability.** Except as otherwise provided by the Act, the Members will not be personally liable for any obligations of the Company and will have no obligation to make contributions to the Company in excess of their respective Capital Contributions.

**Section 7.2    No Agency or Authority.** No Member is an agent of or has authority to act for or bind the Company solely by reason of such Member's status as a Member. Any Member who takes any action or purports or attempts to bind the Company in violation of this Section 7.2 shall be solely responsible for any loss and/or expense incurred by the Company, any Manager or any Member as a result of such unauthorized action, and such Member shall indemnify and hold harmless the Company, each Manager and each other Member with respect to such loss and/or expense.

**Section 7.3    Transfers of Units.**

(a)    Without the unanimous approval of the Board, (i) no Member may Transfer any Units, except pursuant to a Permitted Transfer, and (ii) a Transferee other than a Permitted Transferee will not become a Substituted Member. In addition, any Transferee (whether or not pursuant to a Permitted Transfer) will not become a Substituted Member unless and until the Transferee executes and delivers to the Company a counterpart of this Agreement. Except as otherwise provided in the instrument of Transfer and approved by the Board, any Substituted Member admitted to the Company in accordance with the terms of this Section 7.3 will succeed to all rights and be subject to all the obligations of the Transferor Member with respect to the Units to which the Transferee Member was substituted.

(b)    Except as expressly provided in this Agreement, the Transferor and Transferee will be jointly and severally obligated to reimburse the Company for all reasonable expenses (including legal fees) in connection with any Transfer or proposed Transfer of a Member's Units. As a condition to any Transfer of Units in the Company, the Transferor and the Transferee shall provide such legal opinions and documentation as the Board shall reasonably request.

**Section 7.4    Company's Rights to Repurchase Units on Termination of Employment for Cause or Withdrawal of a Member**

(a) In the event a  Member's employment with the Company or any Subsidiary is terminated for Cause, then in any such event such event the Company may, within ninety (90) days of such event, with the prior vote or written consent of all of the Managers (not including the Member serving as a Manager who is terminated), but shall not be obligated to, elect to repurchase from such Member, and/or his or her Personal Representative or Successor, and if the Company so elects, such Member and/or such Personal Representative or Successor shall be obligated to sell to the Company, all or any portion of such Member's Units at a price equal to the lower of (A) the Original Cost of such Units or (B) fifty percent (50%) of the Fair Value of such Units.

(b) In the event a Member's employment with the Company or any Subsidiary is terminated without Cause or a Member withdraws as a Member, then the Company may without the obligation, within ninety (90) days of such event, with the prior vote or written consent of all of the Managers (not including a withdrawing Member serving as a Manager), but shall not be obligated to, elect to repurchase from such Member, and/or his or her Personal Representative or Successor, and if the Company so elects, such Member and/or such Personal Representative or Successor shall be obligated to sell to the Company, all or any portion of such Member's Units at a price equal to the lower of (A) the positive Capital Account balance of such Member's Units or (B) the book value of such Units as determined in accordance with GAAP by the Company's certified public accountants.

(c) For purposes hereof "Employment" or "employment" of a Member shall mean the Member's relationship as a provider of services to the Company and its Subsidiaries in any legal capacity, not merely as an employee, in each case, whether in the capacity of Manager, employee, consultant, contractor or otherwise. References to a Member's employment shall mean, in the case of any Member that is not a natural person, the Company's employment of the Principal or any other person owning, controlling or otherwise affiliated with such Member.

(d) Procedure. Units that have been Transferred shall be subject to these repurchase provisions notwithstanding such Transfer. Upon a Member's termination of employment (a "Former Member"), and in the event the Board (not including a withdrawing terminated Member serving as a Manager) by unanimous vote or written consent elects to repurchase such Former Member's Units pursuant to Section 7.4(a), the Company shall notify the Former Member or other applicable holder in writing of such election and, within thirty (30) days after determination of the repurchase price therefor, pay the repurchase price in the manner set forth below to the Former Member and/or his or her Personal Representative or Successor. The purchase price shall be paid, at the Company's option by (i) check or wire transfer of funds to the account specified by such Persons, and/or (ii) issuance of a promissory note. Any promissory note issued hereunder will be unsecured, subordinated to all indebtedness of the Company then outstanding or thereafter issued on terms and conditions set forth by the Board, and payable in up to ten equal annual installments of principal, with interest accruing (without compounding) at the prime rate in effect as of the date of issuance of such note (as reported by Citibank, N.A. in New York, New York), provided that payments under such note shall be suspended if and for so long as the Company's capacity to make such payments is prohibited by any credit agreement of the Company or any of its Subsidiaries. As consideration for and as a condition to the Company's payment of the repurchase price, the Former Member and/or his or her Personal Representative or Successor shall execute and deliver to the Company a release of any and all claims against the Company and its Members, officers and Managers and their respective Affiliates. Upon payment of the repurchase price pursuant to the terms of this Section 7.4(d)Section 7.4(e) which includes upon the execution of a promissory note, the Units subject to repurchase shall be deemed repurchased by the Company without any further action being taken by the Former Member, his or her Personal Representative or Successor or the Company.

(e)    If any employment agreement with a Member contain terms that are contrary to or supplementary to the terms contained in this Section 7.4, then the provisions of such agreement shall supersede the terms contained in this Section 7.4.

(f)    A Member may withdraw at any time, and the Member shall have the right to sell all of its Member interests to the remaining Members for an arm's length transaction only after the Company has waived its right to purchase the Member's Units pursuant to Section 7.4 above. . A withdrawing Member may only sell its units to another Member subject to the terms herein, sales to a third party non-member are prohibited and the agreement to this term of ownership by all the parties hereto is a material inducement to the Principals to enter in to this Agreement. Only the Board in its sole discretion and with a ~~unanimous~~ vote may approve the sale of a withdrawing Member's Units to a third party non-member.

Section 7.5    **Mandatory Pledge**.  Each of the Members agrees to pledge and grant a Lien on and a security interest in and to their respective Units on a non-recourse basis to one or more lenders to the Company or Subsidiaries, and take all steps necessary to enable such senior lenders to perfect such Liens and security interests, on such terms and conditions as may from time to time be requested by the Board; provided that, none of the Members shall be obligated to so pledge their respective Units or grant a Lien on or security interest therein except on terms and conditions that are identical in all material respects as those that are to be applied to the other Members with respect to the Units held by the other Members.

Section 7.6    **Preemptive Rights**.  The Company shall only issue New Units in accordance with the following terms:

(a)    Notwithstanding clauses (b) through (i) of this Section 7.6, the Board may waive, either prospectively or retrospectively, any and all rights arising under this Section 7.6 with respect to the issuance of any New Units to any Person, or may elect to waive the rights under this Section 7.6 with respect to the issuance of a portion of such New Units (a "**Partial Waiver**"), provided none of the Members or their Affiliates are purchasing those New Units subject to a waiver or Partial Waiver, and any such waiver or Partial Waiver shall be effective as to all holders with such rights under this Section 7.6.

(b)    In the event the Company desires to issue any New Units or other Membership Rights, with the prior approval of the Board pursuant to Section 6.12, it shall first deliver to each Member that demonstrates to the Company's reasonable satisfaction that it is an "accredited investor" (within the meaning of Regulation D promulgated under the Securities Act) (collectively, the "**Preemptive Rights Holders**" and each a "**Preemptive Rights Holder**") a written notice (a "**Notice of Proposed Issuance**") specifying the name and address of the proposed purchaser of the New Units or other Membership Rights (each such purchaser, a "**Proposed Buyer**"), the type and total number of such New Units or other Membership Rights which the Company then desires to issue to such Proposed Buyer (such New Units or other Membership Rights, the "**Offered New Units**"), all of the material terms, including the price, upon which the Company proposes to issue such Offered New Units to such Proposed Buyer, and stating that the Preemptive Rights Holders shall have the right to purchase such Offered New Units in the manner specified in this Section 7.6 at the price and in accordance with the terms and conditions specified in such Notice of Proposed Issuance.

(c)     During the ten (10) Business Day period commencing on the date on which the Preemptive Rights Holders receive the Notice of Proposed Issuance (the "**Offer Period**"), each Preemptive Rights Holder shall have the option to purchase the Offered New Units subject to such Notice of Proposed Issuance at the price and terms specified in such Notice of Proposed Issuance and in the amount specified in Section 7.6(d).  A Preemptive Rights Holder shall give written notice of its election to purchase Offered New Units to the Company on or before the last day of the Offer Period and, if a Preemptive Rights Holder has not given such written notice within such period, such Preemptive Rights Holder shall be deemed to have rejected its right to purchase the Offered New Units.  If the Offered New Units are being offered as a part of an investment unit together with debt or other instruments, any election by a Preemptive Rights Holder to purchase Offered New Units shall also constitute an election to purchase a like portion of such debt or other instruments.  Each Preemptive Rights Holder shall have the right to condition his, her or its purchase of the Offered New Units upon the closing of the sale of the balance of such Offered New Units.

(d)     Each Preemptive Rights Holder shall have the right to purchase up to that number of the Offered New Units as shall be equal to the number of the Offered New Units multiplied by a fraction, the numerator of which is the number of Units then owned by such Preemptive Rights Holder and the denominator of which shall be the aggregate number of

(e)     Units then owned by all of the Preemptive Rights Holders thereof.  The amount of such Offered New Units that each Person is entitled to purchase under this Section 7.6(d) shall be referred to as its "**Proportionate Share**."

(f)     Each Preemptive Rights Holder shall have a right of oversubscription (pursuant to one process pursuant to this subsection only) such that if any Preemptive Rights Holder fails to elect to purchase its full Proportionate Share of the Offered New Units, the remaining Preemptive Rights Holders shall, among them, have the right to purchase up to the balance of the Proportionate Shares of such Offered New Units not so purchased.  Each Preemptive Rights Holder may exercise such right of oversubscription by electing to purchase more than its Proportionate Share of the Offered New Units by so indicating in its written notice given during the Offer Period.  If, as a result thereof, such oversubscriptions exceed the total number of the Offered New Units available in respect to such oversubscription privilege, the oversubscribing Preemptive Rights Holders shall be cut back with respect to oversubscriptions on a pro rata basis in accordance with their respective Proportionate Shares or as they may otherwise agree among themselves.

(g)     If some or all of the Offered New Units have not been purchased by the Preemptive Rights Holders pursuant to Section 7.6(b) through (f)(e) hereof, then the Company shall have the right, until the expiration of one-hundred eighty (180) days commencing on the first day immediately following the expiration of the Offer Period, to issue such remaining Offered New Units to the Proposed Buyer or one or more third parties at not less than, and on terms no more favorable to the purchasers thereof than, the price and terms specified in the Notice of Proposed Issuance.  If for any reason the Offered New Units are not issued within such period and at such price and on such terms, the right to issue in accordance with the Notice of Proposed Issuance shall expire and the provisions of this Agreement shall continue to be applicable to the Offered New Units.

(h)     The Preemptive Rights Holder purchasing the greatest percentage of any Offered New Units shall set the place, time and date for the closing of the purchase of the Offered New Units, which closing shall be no later than the date of the closing of the sale of any Offered New Units to the Proposed Buyer. The purchase price for the Offered New Units shall, unless otherwise agreed in writing by the parties to such transaction, be paid in immediately available funds on the date of the closing.

(i)     The Company may proceed with the issuance of New Units without first following procedures in Section 7.6(b) through (h)(g) above, provided that (i) the purchaser of such New Units agrees in writing to take such New Units subject to the provisions of this Section 7.6(i)Section 7.6(h), and (ii) within ten (10) days following the issuance of such New Units, the Company or the purchaser of the New Units undertakes steps substantially similar to those in Section 7.6(b) through (h)(g) above to offer to all Preemptive Rights Holders the right to purchase from the Company or such purchaser a pro rata portion of such New Units or equivalent at the same price and terms applicable to the purchaser's purchase thereof so as to achieve substantially the same effect from a dilution protection standpoint as if the procedures set forth in Section 7.6(b) through (h)(g) had been followed prior to the issuance of such New Units.

(j)     Notwithstanding the foregoing, no Preemptive Rights Holder shall have any rights under this Section 7.6 if (A) at any time such Preemptive Rights Holder has failed to purchase its Proportionate Share of New Units that (1) had not been the subject of a waiver or Partial Waiver pursuant to Section 7.6(a) and (2) such Preemptive Rights Holder had the right to purchase under this Section 7.6, or (B) in the case of a Preemptive Rights Holder that is a Member (w) such Member's employment with the Company or any Subsidiary is terminated for Cause (x) such Member voluntarily terminates his or her employment with the Company or any Subsidiary prior to the first (1st) anniversary of the Effective Date, or (y) such Member breaches this Agreement or any confidentiality, non-competition or non-solicitation obligations to the Company or any of its Subsidiaries or Affiliates.

## ARTICLE 8
## ACCOUNTS

**Section 8.1     Books.** The Board shall maintain or cause to be maintained complete and accurate books of account of the Company's affairs at the Company's principal office, including a list of the names and addresses of all Members and the aggregate Capital Contributions of each Member. Subject to the termination of information rights pursuant to Section 6.11(d), each Member whose rights have not been terminated shall have the right to inspect the Company's books and records at the Company's principal office at any reasonable time upon advance written request to the Company.

**Section 8.2     Tax Reports, Returns and Audits.** The Tax Matters Partner will furnish or will cause to be furnished to each Member (a) an Internal Revenue Service Schedule K-1 with respect to such Member, and (b) within 15 days after receipt thereof, any notice of audit from the Internal Revenue Service. The Company shall use its commercially reasonable efforts to cause the Tax Matters Partner to deliver such K-1 to each Member within ninety (90) days of the end of each Fiscal Year (and in no event later than March 31 of the following Fiscal Year). Without

limitation of the foregoing March 31 requirement, in the event that such K-1's cannot be provided within (90) days of the end of each Fiscal Year, the Tax Matters Partner will instead deliver to each Member, according to the same timeframe, an estimate of the annual tax information for the applicable Fiscal Year, including an estimated Internal Revenue Service Schedule K-1. The Company will also timely furnish to each Member an estimate of the quarterly tax information for each quarter during the Fiscal Year.

Section 8.3   **Fiscal Year.** The fiscal year of the Company for both financial reporting and tax purposes (the "**Fiscal Year**") shall be the twelve (12) months ended December 31 of each year or, if the context so requires, any portion thereof.

Section 8.4   **Method of Accounting**. The books and accounts of the Company shall be maintained using the accrual method of accounting for financial reporting purposes and tax purposes.

Section 8.5   **Tax Returns**. The Tax Matters Partner shall cause to be prepared and filed on a timely basis all federal, state and local tax returns required of the Company.

Section 8.6   **Bank Accounts**. All funds of the Company will be deposited in its name in an account or accounts maintained with such bank or banks selected by the Company. The funds of the Company will not be commingled with the funds of any other Person. Checks will be drawn upon the Company account or accounts only for the purposes of the Company and shall be signed by authorized officers of the Company.

Section 8.7   **Other Information**. The officers of the Company and the Managers may release such information concerning the operations of the Company to such sources as is customary in the industry or required by law or regulation or by order of any regulatory body. For the term of the Company and for a period of four years thereafter, the Managers shall cause to be maintained and preserved all books of account and other relevant documents.

## ARTICLE 9
## DISSOLUTION OF THE COMPANY

Section 9.1   **Dissolution**. The Company shall be dissolved and its affairs shall be wound up upon the earliest to occur of:

(a)     The approval of the Members holding all of the outstanding Units entitled to vote;

(b)     the sale or distribution by the Company of all or substantially all of its assets; or

(c)     a Failure to Fund.

Any other provision of this Agreement to the contrary notwithstanding, no withdrawal, assignment, removal, bankruptcy, insolvency, death, incompetency, termination, dissolution or distribution with respect to any Member or any Unit will effect a dissolution of the Company.

**Section 9.2**   **Liquidation of Company Interests.**

(a)   <u>Liquidation.</u>   Upon dissolution, the Company will be liquidated in an orderly manner. The Board will serve as the liquidator to wind up the affairs of the Company pursuant to this Agreement. The Person or Persons who act as the liquidator under this <u>Section 9.2</u> are referred to herein as the "<u>Liquidator</u>".

(b)   <u>Liquidation Procedure.</u>   Promptly following dissolution, the Liquidator shall within a reasonable period of time cause the Company's assets and properties to be liquidated for cash in an orderly and businesslike manner.

(c)   <u>Final Allocation and Distribution.</u>   Upon dissolution of the Company and liquidation of its assets and properties as set forth above, a final allocation of all items of income, gain, loss and deduction will be made in accordance with <u>Article 4</u> (<u>provided</u>, <u>however</u>, that the Company shall make remedial allocations to the Members so that the Capital Accounts of the Members at the time of final distribution comport with the distribution provisions of this <u>Section 9.2(c)</u>), and proceeds arising from such liquidation, shall be distributed or used as follows and in the following order of priority:

(i)   for the payment of the Company's liabilities and obligations to its creditors (including without limitation creditors that are also Members), and the expenses of liquidation;

(ii)   to the setting up of any reserves that the Liquidator may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company;

(iii)   to the holders of Units, pro rata in accordance with their Capital Contributions, if any, until such holders have received distributions pursuant to this Section 9.2(c) equal to the total amounts of such holders' Capital Contributions, to the extent not previously repaid to such holders; and

(iv)   to the Members in accordance with <u>Section 5.2.</u>

(d)   Notwithstanding <u>Section 9.2(b)</u>, the Liquidator may, upon dissolution of the Company, distribute the Company's assets to the Members in kind in lieu of liquidating the Company's assets as provided in <u>Section 9.2(b)</u>, <u>provided</u> that if any assets of the Company are to be distributed in kind, the Capital Accounts of the Members shall be adjusted in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(e) and such assets shall be distributed on the basis of the fair market value thereof (without taking Code Section 7701(g) into account) and any Member entitled to any interest in such assets shall receive such interest therein as a tenant-in-common with all other Members so entitled. The fair market value of such assets shall be that which is determined by the Liquidator.

**Section 9.3**   <u>Liability for Return of Capital Contributions.</u>   Each Member, by its execution of this Agreement, agrees that liability for the return of its Capital Contribution is limited to the Company's assets and, in the event of an insufficiency of such assets to return the amount of its Capital Contribution, hereby waives any and all claims whatsoever, including any

claim for additional contributions that it might otherwise have, against any of the Company's agents or representatives (in each case unless there has been fraud, gross negligence or intentional misconduct) by reason thereof. Each Member shall look solely to the Company and its assets for all distributions with respect to the Company and his, her or its Capital Contribution thereto, and shall have no recourse therefor (upon dissolution or otherwise) against any of the Company's agents or representatives (in each case unless there has been fraud, gross negligence or intentional misconduct).

Section 9.4    Conversion to Corporation or Other Entity. At any time, in connection with an initial Public Offering, the Board shall have the power and authority to, and shall, effect (a) the conversion of the Company's business form from a limited liability company to a corporation, a real estate investment trust or other entity (a "**Public Vehicle**"), (b) the merger of the Company with or into a new or previously-established but dormant Public Vehicle, or (c) the contribution of the assets and liabilities of the Company to a Public Vehicle, followed by a liquidation of the Company and a distribution of the Public Vehicle's equity securities to the Members (such a conversion, merger or liquidation is referred to as a "**Conversion**"). Upon the consummation of a Conversion, the Units held by each Member shall be converted into or exchanged for a number of shares or other units of the Public Vehicle's common stock or other equity interests determined by (i) calculating the fair market value of the Company based upon the actual offering price of the Public Vehicle's common stock or other equity interests and the number of Units of common stock or other equity interests to be outstanding after such offering, and (ii) by determining the amount each Member would receive if (A) all of the Company's assets were sold for such fair market value and (B) the proceeds were distributed in accordance with Section 5.2. The Board's determination of the number of Units of the Public Vehicle's common stock or other equity interests that each Member receives upon a Conversion shall be final and binding on the Members absent manifest arithmetic error. The Board shall use commercially reasonable efforts to undertake any Conversion in such manner as would provide for no gain or loss to the Members solely as a result of the Conversion.

## ARTICLE 10
## WAIVERS; AMENDMENTS

The provisions of this Agreement and the rights and obligations of the Company and all other parties hereto under this Agreement may be waived (either generally or in a particular instance, either retroactively or prospectively, and either for a specified period of time or indefinitely), or amended, or amended and restated, and, the Certificate may be amended (whether by merger or otherwise), or amended and restated, if and only if such waiver, amendment, or amendment and restatement is approved by the Members holding all of the outstanding Units entitled to vote; provided, however, that if any amendment, amendment and restatement, or waiver would materially and adversely change the specifically enumerated rights hereunder of one or more Members ("**Affected Members**") in a way that is materially different from the change such amendment, amendment and restatement, or waiver would have on such specifically enumerated rights of other Members, such amendment, amendment and restatement, or waiver shall not be effective as to any Affected Member unless consented to by all of the Affected Members. Any amendment to Sections 3.3, 6.12 or 7.1 shall not be binding on a

- 38 -

Member without such Member's written consent. Each Member shall be bound by any amendment, amendment and restatement or waiver effected in accordance with this Article 10, whether or not such Member has consented to such amendment, amendment and restatement or waiver. Upon effectuation of each such waiver, amendment, or amendment and restatement, the Company shall give prompt written notice thereof to the Members who have not previously consented thereto in writing.

## ARTICLE 11
## NOTICES

All demands, notices, requests, consents and other communications required or permitted under this Agreement shall be in writing and shall be personally delivered, or sent by facsimile machine or e-mail (with a confirmation copy sent by one of the other methods authorized in this Section), or by reputable commercial express delivery service (including Federal Express and U.S. Postal Service overnight delivery service), or deposited with the U.S. Postal Service mailed first class, registered or certified mail, postage prepaid, as set forth below:

(a)     If to the Company, to

> ETRE FINANCIAL, LLC
> 44 Wall Street
> Second Floor
> New York, New York 10005
> Attn: Paul Frischer, Manager
> Facsimile:
> Email:

> With a Copy to:

> ETRE FINANCIAL, LLC
> 44 Wall Street
> Second Floor
> New York, New York 10005
> Attn: Jacob Frydman, Manager
> Facsimile:
> Email:Jacob.F@urpa.com

(b)     If to a Member, to its address set forth on **Schedule A**.

Notices shall be deemed given and delivered upon the earlier to occur of (i) receipt by the party to whom such notice is directed; (ii) if sent by facsimile machine or e-mail, on the day (other than a Saturday, Sunday or legal holiday in the jurisdiction to which such notice is directed) after such notice is sent if sent (as evidenced by the facsimile confirmed receipt) prior to 5:00 p.m. Eastern Time and, if sent after 5:00 p.m. Eastern Time, on the second day (other than a Saturday, Sunday or legal holiday in the jurisdiction to which such notice is directed) after which such notice is sent; (iii) on the first day (other than a Saturday, Sunday or legal holiday in the jurisdiction to which such notice is directed) following the day the same is deposited with a

commercial courier if sent by commercial overnight delivery service; or (iv) the fifth day (other than a Saturday, Sunday or legal holiday in the jurisdiction to which such notice is directed) following deposit thereof with the U.S. Postal Service as aforesaid. Each party, by notice duly given in accordance herewith, may specify a different address for the giving of any notice hereunder.

## ARTICLE 12
## COVENANTS

### Section 12.1   Confidentiality.

(a)      Each Member acknowledges that during the term of this Agreement, such Member will have access to and become acquainted with trade secrets, proprietary information and confidential information belonging to the Company, the Subsidiaries and their Affiliates that are not generally known to the public, including, but not limited to, information concerning business plans, financial statements and other information provided pursuant to this Agreement, operating practices and methods, expansion plans, strategic plans, marketing plans, contracts, customer lists or other business documents which the Company treats as confidential, in any format whatsoever (including oral, written, electronic or any other form or medium) (collectively, "Confidential Information"). In addition, each Member acknowledges that: (i) the Company has invested, and continues to invest, substantial time, expense and specialized knowledge in developing its Confidential Information; (ii) the Confidential Information provides the Company with a competitive advantage over others in the marketplace; and (iii) the Company would be irreparably harmed if the Confidential Information were disclosed to competitors or made available to the public. Without limiting the applicability of any other agreement to which any Member is subject, no Member shall, directly or indirectly, disclose or use (other than solely for the purposes of such Member's monitoring and analyzing such Member's investment in the Company or performing such Member's duties as a Manager, officer, employee, consultant or other service provider of the Company) at any time, including, without limitation, use for personal, commercial or proprietary advantage or profit, either during such Member's association or employment with the Company or thereafter, any Confidential Information of which such Member is or becomes aware. Each Member in possession of Confidential Information shall take all appropriate steps to safeguard such information and to protect it against disclosure, misuse, espionage, loss and theft.

(b)      Nothing contained in Section 12.1(a) shall prevent any Member from disclosing Confidential Information: (i) upon the order of any court or administrative agency; (ii) upon the request or demand of any regulatory agency or authority having jurisdiction over such Member; (iii) to the extent compelled by legal process or required or requested pursuant to subpoena, interrogatories or other discovery requests; (iv) to the extent necessary in connection with the exercise of any remedy hereunder; (v) to other Members; (vi) to such Member's representatives who, in the reasonable judgment of such Member, need to know such Confidential Information and agree to be bound by the provisions of this Section 12.1 as if a Member; or (vii) to any potential Permitted Transferee in connection with a proposed Transfer of Units from such Member, as long as such Transferee agrees to be bound by the provisions of this Section 12.1 as if a Member; provided, that in the case of clause (i), (ii) or (iii), such Member shall notify the Company and other Members of the proposed disclosure as far in advance of such disclosure as

practicable (but in no event make any such disclosure before notifying the Company and other Members) and use reasonable efforts to ensure that any Confidential Information so disclosed is accorded confidential treatment satisfactory to the Company, when and if available.

(c)     The restrictions of Section 12.1(a) shall not apply to Confidential Information that: (i) is or becomes generally available to the public other than as a result of a disclosure by a Member in violation of this Agreement; (ii) is or becomes available to a Member or any of its Representatives on a non-confidential basis prior to its disclosure to the receiving Member and any of its Representatives in compliance with this Agreement; or (iii) is or has been independently developed or conceived by such Member prior to the Effective Date without use of Confidential Information.

Section 12.2   Non-Compete; Non-Solicit.

(a)     Non-Compete. In light of each Member's access to Confidential Information and position of trust and confidence with the Company, each Member hereby agrees that, during the period of his or her continued employment or other engagement with the Company, and for a period of twelve (12) months, running consecutively, beginning on the date of any termination of the Member's employment for any reason, unless prior thereto the Company has not Commenced Business by the Platform Launch Date, then until the Platform Launch Date (the "Restricted Period"), such Member shall not (x) render services or give advice to, or affiliate with (as employee, partner, consultant or otherwise), or (y) directly or indirectly through one or more of any of their respective Affiliates, own, manage, operate, control or participate in the ownership, management, operation or control of, any Competitor or any division or business segment of any Competitor; provided, that nothing in this Section 12.2(a) shall prohibit such Member or any of his Permitted Transferees or any of their respective Affiliates from acquiring or owning, directly or indirectly:

(i)     Up to 2% of the aggregate voting securities of any Competitor that is a publicly traded Person; or

(ii)     Up to 2% of the aggregate voting securities of any Competitor that is not a publicly traded Person, so long as neither such Member nor any of its Permitted Transferees, directly or indirectly through one or more of their respective Affiliates, designates a member of the board of directors (or similar body) of such Competitor or its Affiliates or is granted any other governance rights with respect to such Competitor or its Affiliates (other than customary governance rights granted in connection with the ownership of debt securities).

For purposes of this Section 12.2(a), "Competitor" means any Person engaged, directly or indirectly, in whole or in part, in any business that operates in the same or similar fashion to the Real Estate Exchange Platform and not to include any business which a Member is engaged, directly or indirectly, in whole or in part prior to the Effective Date.

(b)     Other Restrictions. Each Member further agrees that, for a period of one (1) year beginning on the date of any termination of the Member's employment for any reason he or she shall not, directly or indirectly through one or more of any of such Member's Affiliates:

- 41 -

(i)      hire or solicit, or encourage any other Person to hire or solicit, any individual who has been an employee, consultant or advisor of the Company or any Subsidiary or Affiliate of the Company within one (1) year prior to the date of such hiring or solicitation; provided that this Section 12.2(b) shall not prevent a Member from hiring or soliciting any employee or former employee of the Company or any Subsidiary or Affiliate of the Company who was previously employed by such Member prior to the date of execution of this Agreement;

(ii)     solicit or entice, or attempt to solicit or entice, any investors, contractors, suppliers of the Company or any Subsidiary or Affiliate of the Company for purposes of diverting their business or services from the Company or such Subsidiary or Affiliate or for any other purpose; or

(iii)    make any statement or publication that is intended to or could reasonably be understood to disparage or impugn the reputation of the Company or any Subsidiary or Affiliate of the Company, or any of their respective products, services, executives, partners, directors, officers or employees, regardless of any perceived truth of such statement or publication.

(c)      Blue Pencil. If any court of competent jurisdiction determines that any of the covenants set forth in this Section 12.2, or any part thereof, is unenforceable because of the duration or geographic scope of such provision, such court shall have the power to modify any such unenforceable provision in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Section 12.2 or by making such other modifications as it deems warranted to carry out the intent and agreement of the parties as embodied herein to the maximum extent permitted by Applicable Law. The parties hereto expressly agree that this Agreement as so modified by the court shall be binding upon and enforceable against each of them.

(d)      The restrictions in Section 12.2 (b) (i) and (ii) shall not apply from and after the Platform Launch Date in the event that the Company has not Commenced Business by the Platform Launch Date.

~~(e)      The Principals agree that from and after the date the Company Commenced Business each of them, so long as he is employed by the Company, shall be entitled to the same Economic Interest as each of the other Principals, in the Company, whether or not they devote all or any or none of their time to the Company as an employees of the Company. "Economic Interest" means the amount of salary and bonus compensation above $400,000, but not more than $1 million, then being paid to any Principal whether as an employee, officer or Manager of the Company and any subsidiaries, or as otherwise determined by the Board.~~

## ARTICLE 13

**13.1     Use of Name "ETRE Financial".**

The name "ETRE Financial" and all goodwill associated therewith are property of the Company, and no Member or Affiliate of the Company shall have the right to use the name "ETRE Financial" or "ETRE" as a component of the name of any business venture or otherwise.

## ARTICLE 14

## MISCELLANEOUS

**Section 14.1  Entire Agreement.** This Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof, and supersedes any prior or contemporaneous oral or written agreement or understanding among the parties hereto with respect to the subject matter hereof (other than any agreements with one or more Members effective on or after the Effective Date that expressly reference one or more sections of this Agreement and expressly modify the terms thereof for one or more of such Members).

**Section 14.2  Governing Law.** This Agreement shall be construed in accordance with and governed by the internal laws of the State of New York, without regard to the principles of conflicts or choice of laws thereof that would give rise to the application of the domestic substantive law of any other jurisdiction, except to the extent the laws of the State of Delaware are required to govern a limited liability company formed under the laws of such state.

**Section 14.3  Equitable Remedies.** The parties hereto agree that irreparable harm would occur in the event that any of the agreements or provisions of this Agreement were not performed fully by the parties hereto in accordance with their specific terms or conditions or were otherwise breached, and that money damages are an inadequate remedy for breach of the Agreement because of the difficulty of ascertaining and quantifying the amount of damage that will be suffered by the parties hereto in the event that this Agreement is not performed in accordance with its terms or conditions or is otherwise breached. It is accordingly hereby agreed that the parties hereto shall be entitled to an injunction or injunctions, without the necessity of proving actual damages, to restrain, enjoin and prevent breaches of this Agreement by the other parties and to enforce specifically the terms and provisions of this Agreement, such remedies being in addition to and not in lieu of, any other rights and remedies to which the other parties are entitled to at law or in equity.

**Section 14.4  Recovery of Expenses.** Each party hereto (the "**Breaching Party**") further covenants and agrees to indemnify and hold the other parties hereto harmless from and against all costs and expenses, including legal or other professional fees and expenses incurred by such parties, in connection with or arising out of any proceeding instituted by such parties against the Breaching Party; provided that the party or parties seeking indemnification pursuant to this Section 14.4 must have substantially prevailed in such proceeding.

**Section 14.5  Binding Effect.** Except as otherwise provided herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective legal representatives, heirs, successors and permitted assigns.

**Section 14.6  Severability.** Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such

prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 14.7 **Headings**. The sections and other headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

Section 14.8 **No Third-Party Beneficiaries**. Except for Section 6.6 through Section 6.10, as they relate to Covered Persons (each of whom shall be an express third party beneficiary of those Sections), nothing in this Agreement is intended to, or will, create any rights to any party other than a party that is a signatory hereto or who becomes a Member in accordance with the terms of this Agreement.

Section 14.9 **Tax Matters Partner**. The Board shall designate the "tax matters partner" of the Company (the "**Tax Matters Partner**") for purposes of, and in accordance with, Section 6231(a)(7) of the Code. The Tax Matters Partner may be removed, and a new Tax Matters Partner appointed, by the Board in accordance with the Code and the Treasury Regulations.

Section 14.10 **Counterpart Execution; Fax Signatures**. This Agreement may be executed in any number of counterparts, each of which, when so executed and delivered, shall be an original, but all of which together shall constitute one agreement binding on the parties hereto. Transmission of an executed counterpart by fax or PDF file of this Agreement shall be deemed to constitute due and sufficient delivery of such counterpart, and such signatures shall be deemed original signatures for purposes of the enforcement and construction of this Agreement.

Section 14.11 **Waiver of Claims Related to Fiduciary Duties of Members or Managers**. Each Member, on behalf of itself and its Affiliates, hereby waives, to the maximum extent permitted by law, any and all rights and claims which it, he or she may otherwise have against any other Member or Manager and such other Member's or Manager's officers, directors, shareholders, partners, members, managers, agents, employees, and Affiliates as a result of any claims of breach of fiduciary duties; provided that the foregoing shall not limit a Member's rights and claims with respect to a breach of this Agreement. No Member or Manager shall be liable to the Company or any other Member or its Affiliates for any act or omission taken or suffered by such Member or Manager in connection with the business or operations of the Company or arising out of this Agreement, unless such act or omission has been adjudicated by a court or arbitral panel of competent jurisdiction, in a final, non-appealable judgment or decision, to have constituted a breach of this Agreement on the part of such Member or Manager. The Company and each Member agree that the provisions of this Agreement, to the extent such provisions eliminate, restrict or limit the duties (including, without limitation, fiduciary duties) or liabilities of Members or Managers that may otherwise exist at law or in equity, shall replace such duties and liabilities of the Members and Managers.

Section 14.12 **Renunciation of Opportunities; No Expansion of Duties**.

(a) Each party to this Agreement agrees and acknowledges that no joint venture is created hereby.

(b) To the maximum extent permissible under applicable law, but subject to the restrictions provided in <u>Section 12.2</u> and <u>Section 12.3</u>, each of the Members, its respective Affiliates, the Company and each Subsidiary hereby renounce any interest or expectancy any of them has or may have in, or in being offered an opportunity to participate in, any and all business opportunities that are presented to the other Members and their respective Affiliates, including, without limitation, persons who serve on the Board who are affiliates of Members, and no Member shall be obligated to present any particular investment opportunity to the other Members, their respective Affiliates, the Company or any Subsidiary, even if such opportunity is of a character that, if presented to the Company or a Subsidiary, could be taken by the Company or such Subsidiary, and each Member shall continue to have the right to take for its own respective account or to recommend to others any such particular investment opportunity, except as otherwise provided in this Agreement.

**Section 14.13 <u>Disputes; Arbitration</u>**

(a) In the event of any controversy or claim arising out of or relating to this Agreement, or the breach thereof, the parties to such controversy or claim shall first use their reasonable best efforts in good faith to resolve such dispute among themselves. If they are unable to resolve the dispute within thirty (30) days after any party has first notified the others of the dispute, then the controversy or claim shall be settled by arbitration administered by JAMS and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

(b) The arbitration shall be decided by three (3) arbitrators assigned pursuant to JAMS procedures..

(c) The parties shall be afforded the discovery rights as established under the applicable JAMS rules or as provided for by the arbitrators.

(d) The award rendered in any arbitration commenced hereunder shall constitute an award under the Federal Arbitration Act, Title 9 US Code and the 1958 New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, shall be final and binding upon the parties and judgment thereon may be entered in any court of competent jurisdiction. The arbitral tribunal may order any remedy permitted by law and this Agreement, including damages and specific performance of this Agreement or any portion thereof.

(e) The language of the arbitration shall be English. The place of arbitration shall be New York, New York, United States.

(f) By agreeing to arbitration, the parties do not intend to deprive any court of its jurisdiction to issue a pre-arbitral injunction, pre-arbitral attachment, or other order in aid of arbitration proceedings and/or the enforcement of any award. Without prejudice to such provisional remedies as may be available under the jurisdiction of a national court, the arbitral tribunal shall have full authority to grant provisional remedies and to direct the parties to request that any court modify or vacate any temporary or preliminary relief issued by such court, and to award damages for the failure of any party to respect the arbitral tribunal's orders to that effect. Each of the parties irrevocably and unconditionally submits to the exclusive jurisdiction of the

federal and New York State courts located in Manhattan, New York City for the purpose of an order to compel arbitration, for provisional relief in aid of arbitration or to maintain the status quo or prevent irreparable harm prior to the appointment of the arbitral tribunal, and to the non-exclusive jurisdiction of such courts for the enforcement of any award issued hereunder. With respect to any action, suit or other proceeding for which it has submitted to jurisdiction pursuant to this Section 14.13, each party irrevocably consents to service of process in the manner provided for the giving of notices pursuant to Article 11 of this Agreement. Nothing in this Section 14.13 shall affect the right of any party to serve process in any other manner permitted by applicable law.

**Section 14.14 Further Assurances.** The Members shall from time to time execute or cause to be executed all other documents or cause to be done all filing, recording, publishing, or other acts as may be necessary or desirable to comply with the requirements for the operation of a limited liability company under the laws of the State of Delaware and all other jurisdictions in which the Company may from time to time conduct business.

**Section 14.15 Termination of Agreement.** Upon the consummation of (a) the dissolution of the Company in accordance with Section 9.1, (b) a merger or consolidation in which the Members of the Company immediately prior to such merger or consolidation do not own at least a majority of the Capital Securities of the surviving entity, or (c) a Conversion in accordance with Section 9.4 and consummation of an initial Public Offering in connection therewith (each a "Termination Event"), except as provided in the next sentence, all rights and obligations of the parties under this Agreement shall terminate immediately and be of no further effect. Notwithstanding the preceding sentence, the rights and obligations of the applicable parties under Sections 6.6 through 6.10, 7.1, 7.2, 9.3, Article 11 and this Article 13 shall survive any Termination Event.

**Section 14.16 Scope.** If any one or more of the provisions of this Agreement shall for any reason be held to be excessively broad as to time, duration, geographical scope, activity, or subject, each such provision shall be construed, by limiting and reducing it, so as to be enforceable to the extent compatible with applicable law then in force.

**Section 14.17 No Waiver.** No waiver by any party to this Agreement at any time of a breach by a party of any provision of this Agreement to be performed by such other party shall be deemed a waiver of any similar or dissimilar provisions of this Agreement at the same or any prior or subsequent time.

**Section 14.18 Acknowledgments and Representations.**

(a) Members' Acknowledgements, Representations and Waiver. Each of the Members hereby severally, and not jointly, represents and warrants to the Company that (i) such Member has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of an investment in the Company and making an informed investment decision with respect thereto, (ii) such Member is able to bear the economic and financial risk of the investment in the Company contemplated hereby for an indefinite period of time, (iii) such Member is acquiring an interest in the Company for investment only and not with a view to, or for resale in connection with, any distribution to the public or any public offering

- 46 -

thereof (other than such a distribution or offering which is registered and qualified under applicable federal or state securities laws), (iv) such Member is an "accredited investor" within the meaning of Regulation D promulgated under the Securities Act, (v) to the extent the Units have not been registered under the securities laws of any jurisdiction, the same cannot be disposed of unless they are subsequently registered and/or qualified under applicable securities laws or disposed of pursuant to an applicable exemption from such laws, (vi) such Member is a resident of the state or other jurisdiction listed as its address on Schedule A, and (vii) the execution, delivery and performance of this Agreement do not require such Member to obtain any consent or approval that has not been obtained and do not contravene or result in a default under any provision of any existing law or regulation applicable to it, any provision of its charter, by-laws or other governing documents or any agreement or instrument to which it is a party or by which it is bound. Each Member has had the opportunity to seek the advice of counsel and other personal advisors and acknowledges that neither the Company nor any of its Affiliates has provided such Member with any advice regarding the tax, economic or other impacts to such Member of the arrangements contemplated hereby.

(b) Company Representations. The Company hereby represents and warrants to the Members as of the date of this Agreement, the following: (i) the Company is a limited liability entity duly formed, validly existing and in good standing under the laws of the State of Delaware; (ii) the Units, when issued in accordance with the terms of this Agreement will be validly issued and, not subject to any adverse claim; (iii) the capitalization of the Company as of the date of this Agreement is set forth on Schedule A; (iv) except as set forth in the this Agreement, there are no outstanding options, warrants, preemptive rights, subscription rights, convertible securities or other agreements or plans under which the Company is or may become obligated to issue, sell or Transfer any Units or other securities of the Company; and (v) neither the Company nor anyone acting on its behalf has offered the Units for sale to or otherwise approached or negotiated in respect of such offer in a manner constituting a general solicitation and neither the Company nor anyone on its behalf has taken or will take any action that would subject the issuance or sale of any of the Company's securities to the registration requirements of Section 5 of the Securities Act of 1933, as amended.

**[The remainder of this page is left blank intentionally]**

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized representatives to execute this Limited Liability Company Agreement as their act and deed, to be effective as of the day and year first above written.

**The Company:**

ETRE FINANCIAL, LLC

By: _____
    Name:
    Title:

**The Members:**

Winter Investors, LLC

By: _____
    Name:  Jacob Frydman
    Title: Authorized Person

EVE, LLC

By: _____
    Name:  Eli Verschleiser
    Title: Authorized Person

JS3 Alternative Investments LLC

By: _____
    Name:  Jesse Stein
    Title: Authorized Person

SMP Realty NM LLC

By: _____
    Name:  Scott Panzer
    Title: Authorized Person

Frischer Kranz Inc.

By: _____
    Name:  Paul Frischer
    Title: Authorized Person

Solely for purposes of Sections 3.11, 12.2 and 12.3, the Principals:

_____
Jesse Stein

_____
Paul Frischer

_____
Scott Panzer

_____
Jacob Frydman

_____
Eli Verschleiser

<u>Schedule A</u>
<u>to Limited Liability Company Agreement of ETRE FINANCIAL, LLC</u>

<u>As of July [—], 2012June     , 2014</u>

| Name and Address of Member | Units | Initial Capital Contribution Amount | Initial Capital Account |
|---|---|---|---|
| Winter Investors LLC<br>46 Ledgerock Lane<br>Hyde Park, NY 12538 | | | |
| JS3 Alternative Investments LLC<br>100 Jay Street, Apt 14H<br>Brooklyn, NY 11201 | | | |
| SMP Realty NM LLC<br>200 Candlewood Lake Road North<br>New Milford, CT 06776 | | | |
| Frischer Kranz Inc.<br>80 Birch Lane<br>Greenwich, CT 06830 | | | |
| EVE, LLC<br>44 Wall Street 2nd Floor<br>New York, NY 10005 | | | |
| _____, LLC<br><u>XXXXXXX</u><br><u>XXXXXXX</u> | | | |
| | | | |
| **TOTAL:** | | | |

Execution Copy

**Schedule B**

**Operating Budget**

- 2 -

EXHIBIT Q

**WINTER INVESTORS, LLC**
**JACOB FRYDMAN**
**46 LEDGEROCK LANE**
**HYDE PARK, NY 12538**

VIA EMAIL:
pf@ETREfinancial.com
js@ETREFinancial.com

June 17, 2014

ETRE Financial LLC
44 Wall Street
New York, NY 10005
Attn: Mr. Paul Frischer
      Mr. Jesse Stein

Gentlemen:

So that there is no confusion – please be advised that I am not in agreement with the proposal on the recapitalization of the Company as outlined in the term sheet of May 29, 2014 addressed to Sol Mayer and LH Financial, and hereby vote against it or any variation of it.

Moreover, please be advised that the actions of the Company of (i) January 6, 2014; (ii) January 10, 2014; (iii) May 21, 2014; the loan agreements of (iv) February 17, 2014 and (v) February 19, 2014; and the (vi) Advisory Services Agreement of January 23, 2014, are all ultra vires, and undertaken without proper Company authorization as same were not approved in advance by the unanimous approval of the board.

Moreover, any liability with respect to the loan transactions of February 17 and February 19 are solely the liability of the Members who took those actions or who purported or attempted to bind the Company in violation of the operating agreement of the Company and those Members are solely responsible for any loss and/or expense incurred by the Company, any Manager or any Member as a result of such unauthorized actions, and such Members have indemnified the Company, each Manager and each other Member with respect to such loss and/or expense. Please accept this as my demand for indemnification.

Please also accept this as notice that all tax matters are required to be undertaken by me as tax matters partner. Please provide contact information to the Company's accountants and Auditors so that I may arrange a time to meet with them. Please also note that you are not authorized to act as the Tax Matters Partner, and are not authorized to execute tax returns. Your failure to provide the requisite tax returns and K-1's within ninety (90) days of the end of each fiscal year, and in no event later than March 31 of the following Fiscal Year constitutes a breach of the operating agreement. Please accept this as my demand that you immediately cure said breach.

With respect to your comment that the Board "waived the requirement" of an audit – that action is also ultra vires, because it constitutes a modification or amendment of the Operating Agreement which requires prior unanimous approval of the Board. As such, the failure to provide audited financial statements constitutes a breach of the operating agreement. Please accept this as my demand that you immediately cure said breach.

Your failure to Please to deliver within 120 days of the close of a fiscal year to each Member audited consolidated balance sheets and statements of income and retained earnings and cash flows as of the close of such fiscal year, certified by the Company's auditors that such statements were prepared in accordance

with GAAP (except as specifically disclosed therein) constitutes a breach of the operating agreement of the Company. Please accept this as my demand that you immediately cure said breach.

Your failure to provide monthly financial statements is not voluntary. It is a requirement of your obligation as an officer of the Company. "[R]elying on the ETRE proposed budget and actual expense schedules" does not comply with your obligation. Your failure to deliver to each Member within thirty (30) days after the end of each calendar month consolidated unaudited balance sheets and statements of income and retained earnings and of cash flows for the Company and its Subsidiaries as of the end of each month, comparing such financial position and results of operations against the same periods for the prior year and against budget, and accompanied by a letter from the Company's management discussing revenues and operations of Company and its Subsidiaries with respect to each such month constitutes a breach of the operating agreement. Please accept this as my demand that you immediately cure said breach.

Your failure to provide a proposed budget for 2014 constitutes a breach of the operating agreement. Please accept this as my demand that you immediately cure said breach.

Very truly yours

Jacob Frydman

# EXHIBIT R

# Jacob Frydman

**From:**       Jesse Stein <js@etrefinancial.com>
**Sent:**       Tuesday, June 17, 2014 1:41 PM
**To:**         Jacob Frydman
**Cc:**          'Paul Frischer'
**Subject:**   RE: Letter to the Company

Jacob,

As per our conversation this morning, I followed up on the topics we discussed with the following response:

1. Board Voting- LH is adamant on the non-unanimous board voting structure. The other investor that Scott was working with was equally adamant. We believe that any investor will require a change in our operating agreement to reflect a 4/5 vote so that no single board member has unlimited power to hold up the Company's agenda.

2. Scott's Loans- I understand that you are disputing the means by which these loans were made but I think we can all agree that they were necessary, and were made on behalf of the company for company expenses. Since any of the members have the opportunity to step into the same position as Scott at this time (without the risk he took), we don't see any reason why there is an issue with the repayment or conversion of the loans. However, in order to get this deal done, Paul and I will agree to eat half of the loans made by Scott ($137,500) which will not be included in your dilution.

3. Officer Compensation- We will agree to limit officer compensation to $400k up until the point that the other founding members have received 100% of their investment back in distributions or until the Company goes public.

Please Jacob. We cannot survive as a company without this investment and we are making as many concessions as possible to get this done.

Thanks.


*Jesse Stein*
212.596.7225 xt. 2
js@etrefinancial.com

**From:** Jacob Frydman [mailto:jacob.f@urpa.com]
**Sent:** Tuesday, June 17, 2014 10:10 AM
**To:** Jesse Stein
**Cc:** Paul Frischer
**Subject:** RE: Letter to the Company

Jesse

I received your email below. I am in a variety of meetings out of the office this morning, and tied up for the remainder of the day. I can arrange a phone conference with you for 10:35 AM (on way to my next meeting) if you like. If you wish to speak to me then, I can be reached on my cell phone at 917-578-3800.

Thank you,

*Jacob Frydman*
*Chairman, CEO*

**UNITED REALTY GROUP OF COMPANIES**
60 Broad Street, 34th Floor | New York, NY 10005
Direct: 212-388-6880 | Main: 212-388-6800
Mobile: 917-578-3800 | Fax: 212-388-6811
Jacob.F@URPA.com

**From:** Jesse Stein [mailto:js@etrefinancial.com]
**Sent:** Tuesday, June 17, 2014 9:57 AM
**To:** Jacob Frydman
**Subject:** RE: Letter to the Company

Jacob,

I've tried reaching you multiple times this morning but have been unable to connect. I really don't understand what your intentions are here. The company currently has no revenue, no customers, no real assets other than $750 in its bank account, and has a recently failed IPO, yet we have an investor willing to invest $1.6 million at a $5 million valuation. When I walked into your office last week to discuss, I thought you would be thrilled that despite our failed IPO, we were able to bring in capital at a value that provides you with a substantial increase in value for your Units.

I want to make clear that the alternative to bringing capital into the business would be shutting down the company on Monday and there would be no liquidation value. I personally don't see how this could be considered a preferred alternative.

I understand your views on the items below but you need to keep in mind that this is a company that should have at least a dozen employees but has been run for two years by only two people due to a lack of capital in the business. We do not have the capital for audits, we do not have the capital to hire an accountant to provide monthly financial statements, and we did not have capital to operate the business without the loans that were made earlier this year. I have been working for no compensation for 9 months and am acting as the company's lawyer, accountant, CFO, underwriter, research analyst, web designer, etc. If in the future, you want audited financials and monthly statements, we can incorporate that into the budget and provide moving forward. If you want to handle all tax matters that is great- less work for me.

With respect to your request for a 2014 budget, as per Pauls' email this weekend, this has been provided to you on 5 separate occasions. I do not know why it is still on your list of outstanding items.

Please call me when you have a chance to discuss or I can stop by the office anytime today.

Thanks.

Jesse Stein
212.596.7225 xt. 2
js@etrefinancial.com

**From:** Jacob Frydman [mailto:jacob.f@urpa.com]
**Sent:** Tuesday, June 17, 2014 7:11 AM
**To:** Paul Frischer; Jesse Stein (js@etrefinancial.com)

2

Gentlemen:

So that there is no confusion – please be advised that I am not in agreement with the proposal on the recapitalization of the Company as outlined in the term sheet of May 29, 2014 addressed to Sol Mayer and LH Financial, and hereby vote against it or any variation of it.

Moreover, please be advised that the actions of the Company of (i) January 6, 2014; (ii) January 10, 2014; (iii) May 21, 2014; the loan agreements of (iv) February 17, 2014 and (v) February 19, 2014; and the (vi) Advisory Services Agreement of January 23, 2014, are all ultra vires, and undertaken without proper Company authorization as same were not approved in advance by the unanimous approval of the board.

Moreover, any liability with respect to the loan transactions of February 17 and February 19 are solely the liability of the Members who took those actions or who purported or attempted to bind the Company in violation of the operating agreement of the Company and those Members are solely responsible for any loss and/or expense incurred by the Company, any Manager or any Member as a result of such unauthorized actions, and such Members have indemnified the Company, each Manager and each other Member with respect to such loss and/or expense. Please accept this as my demand for indemnification.

Please also accept this as notice that all tax matters are required to be undertaken by me as tax matters partner. Please provide contact information to the Company's accountants and Auditors so that I may arrange a time to meet with them. Please also note that you are not authorized to act as the Tax Matters Partner, and are not authorized to execute tax returns. Your failure to provide the requisite tax returns and K-1's within ninety (90) days of the end of each fiscal year, and in no event later than March 31 of the following Fiscal Year constitutes a breach of the operating agreement. Please accept this as my demand that you immediately cure said breach.

With respect to your comment that the Board "waived the requirement" of an audit – that action is also ultra vires, because it constitutes a modification or amendment of the Operating Agreement which requires prior unanimous approval of the Board. As such, the failure to provide audited financial statements constitutes a breach of the operating agreement. Please accept this as my demand that you immediately cure said breach.

Your failure to Please to deliver within 120 days of the close of a fiscal year to each Member audited consolidated balance sheets and statements of income and retained earnings and cash flows as of the close of such fiscal year, certified by the Company's auditors that such statements were prepared in accordance with GAAP (except as specifically disclosed therein) constitutes a breach of the operating agreement of the Company. Please accept this as my demand that you immediately cure said breach.

Your failure to provide monthly financial statements is not voluntary. It is a requirement of your obligation as an officer of the Company. "[R]elying on the ETRE proposed budget and actual expense schedules" does not comply with your obligation. Your failure to deliver to each Member within thirty (30) days after the end of each calendar month consolidated unaudited balance sheets and statements of income and retained earnings and of cash flows for the Company and its Subsidiaries as of the end of each month, comparing such financial position and results of operations against the same periods for the prior year and against budget, and accompanied by a letter from the Company's management discussing revenues and operations of Company

and its Subsidiaries with respect to each such month constitutes a breach of the operating agreement. Please accept this as my demand that you immediately cure said breach.

Your failure to provide a proposed budget for 2014 constitutes a breach of the operating agreement. Please accept this as my demand that you immediately cure said breach.

Thank you,

*Jacob Frydman*
*Chairman, CEO*

**UNITED REALTY GROUP OF COMPANIES**
60 Broad Street, 34th Floor | New York, NY 10005
Direct: 212-388-6880 | Main: 212-388-6800
Mobile: 917-578-3800 | Fax: 212-388-6811
Jacob.F@URPA.com

**From:** Paul Frischer [mailto:pf@etrefinancial.com]
**Sent:** Monday, June 16, 2014 7:16 PM
**To:** Jacob Frydman; Jesse Stein (js@etrefinancial.com)
**Cc:** Scott Panzer
**Subject:** Re: Letter to the Company

Jacob,

Thank you for the call this afternoon, and confirming receipt of the materials.

Hopefully, we can find solid ground to make this work.
As you know, everyone is excited about taking the next step.

Thanks,

Paul

**From:** Jacob Frydman <jacob.f@urpa.com>
**Date:** Thursday, June 12, 2014 at 6:15 AM
**To:** paul frischer <pf@etrefinancial.com>, "Jesse Stein (js@etrefinancial.com)" <js@etrefinancial.com>
**Subject:** Letter to the Company

Paul & Jesse:

Jesse visited with me yesterday to describe the current proposal made to provide additional capital to the Company.

Please see the attached letter with respect to same.

Thank you,

*Jacob Frydman*

*Chairman, CEO*

**UNITED REALTY GROUP OF COMPANIES**
60 Broad Street, 34th Floor | New York, NY 10005
Direct: 212-388-6880 | Main: 212-388-6800
Mobile: 917-578-3800 | Fax: 212-388-6811
Jacob.F@URPA.com

DISCLAIMER: This transmission is intended only for the use of the addressee and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please destroy it and notify us immediately via reply e-mail or by telephone. Thank you.

DISCLAIMER: This transmission is intended only for the use of the addressee and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please destroy it and notify us immediately via reply e-mail or by telephone. Thank you.

DISCLAIMER: This transmission is intended only for the use of the addressee and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please destroy it and notify us immediately via reply e-mail or by telephone. Thank you.

# EXHIBIT S

**From:** Jesse Stein [mailto:js@etrefinancial.com]
**Sent:** Tuesday, June 17, 2014 9:57 AM
**To:** Jacob Frydman
**Subject:** RE: Letter to the Company

Jacob,

I've tried reaching you multiple times this morning but have been unable to connect. I really don't understand what your intentions are here. The company currently has no revenue, no customers, no real assets other than $750 in its bank account, and has a recently failed IPO, yet we have an investor willing to invest $1.6 million at a $5 million valuation. When I walked into your office last week to discuss, I thought you would be thrilled that despite our failed IPO, we were able to bring in capital at a value that provides you with a substantial increase in value for your Units.

I want to make clear that the alternative to bringing capital into the business would be shutting down the company on Monday and there would be no liquidation value. I personally don't see how this could be considered a preferred alternative.

I understand your views on the items below but you need to keep in mind that this is a company that should have at least a dozen employees but has been run for two years by only two people due to a lack of capital in the business. We do not have the capital for audits, we do not have the capital to hire an accountant to provide monthly financial statements, and we did not have capital to operate the business without the loans that were made earlier this year. I have been working for no compensation for 9 months and am acting as the company's lawyer, accountant, CFO, underwriter, research analyst, web designer, etc. If in the future, you want audited financials and monthly statements, we can incorporate that into the budget and provide moving forward. If you want to handle all tax matters that is great- less work for me.

With respect to your request for a 2014 budget, as per Pauls' email this weekend, this has been provided to you on 5 separate occasions. I do not know why it is still on your list of outstanding items.

Please call me when you have a chance to discuss or I can stop by the office anytime today.

Thanks.

*Jesse Stein*
212.596.7225 xt. 2
js@etrefinancial.com