(a) the conversion of the Company's business form from a limited liability company to a corporation, a real estate investment trust or other entity (a "**Public Vehicle**"), (b) the merger of the Company with or into a new or previously-established but dormant Public Vehicle, or (c) the contribution of the assets and liabilities of the Company to a Public Vehicle, followed by a liquidation of the Company and a distribution of the Public Vehicle's equity securities to the Members (such a conversion, merger or liquidation is referred to as a "**Conversion**"). Upon the consummation of a Conversion, the Units held by each Member shall be converted into or exchanged for a number of shares or other units of the Public Vehicle's common stock or other equity interests determined by (i) calculating the fair market value of the Company based upon the actual offering price of the Public Vehicle's common stock or other equity interests and the number of Units of common stock or other equity interests to be outstanding after such offering, and (ii) by determining the amount each Member would receive if (A) all of the Company's assets were sold for such fair market value and (B) the proceeds were distributed in accordance with Section 5.2. The Board's determination of the number of Units of the Public Vehicle's common stock or other equity interests that each Member receives upon a Conversion shall be final and binding on the Members absent manifest arithmetic error. The Board shall use commercially reasonable efforts to undertake any Conversion in such manner as would provide for no gain or loss to the Members solely as a result of the Conversion. From and after the one year anniversary of the Effective Date, if ETR Investors Holdings LLC has reached a Capital Contribution of $1,725,000, ETR Investors Holdings LLC shall have the right to require the Company to conduct a Public Offering or merge with a Public Vehicle. Upon such request, the Company shall use its best efforts to conduct a Public Offering or merge with a Public Vehicle.

## ARTICLE 10
## WAIVERS; AMENDMENTS

The provisions of this Agreement and the rights and obligations of the Company and all other parties hereto under this Agreement may be waived (either generally or in a particular instance, either retroactively or prospectively, and either for a specified period of time or indefinitely), or amended, or amended and restated, and, the Certificate may be amended (whether by merger or otherwise), or amended and restated, if and only if such waiver, amendment, or amendment and restatement is approved by the Members holding at least a majority of the outstanding Units entitled to vote; provided, however, no provision of this Agreement may be amended or waived if such amendment or waiver of any provision would have the effect of treating preferentially (including the changing of any existing right or preference) in any way any Member over another Member, except by written agreement of such affected Member. Any amendment to Sections 3.3 or 7.1 shall not be binding on a Member without such Member's written consent. Each Member shall be bound by any amendment, amendment and restatement or waiver effected in accordance with this Article 10, whether or not such Member has consented to such amendment, amendment and restatement or waiver. Upon effectuation of each such waiver, amendment, or amendment and restatement, the Company shall give prompt written notice thereof to the Members who have not previously consented thereto in writing.

## ARTICLE 11
## NOTICES

All demands, notices, requests, consents and other communications required or permitted under this Agreement shall be in writing and shall be personally delivered, or sent by facsimile machine or e-mail, or by reputable commercial express delivery service (including Federal Express and U.S. Postal Service overnight delivery service), or deposited with the U.S. Postal Service mailed first class, registered or certified mail, postage prepaid, as set forth below:

(a) If to the Company, to

> ETRE FINANCIAL, LLC
> 44 Wall Street
> Second Floor
> New York, New York 10005
> Attn: Paul Frischer, Manager
> Facsimile:
> Email:

(b) If to a Member, to its address set forth on **Schedule A**.

Notices shall be deemed given and delivered upon the earlier to occur of (i) receipt by the party to whom such notice is directed; (ii) if sent by facsimile machine or e-mail, on the day (other than a Saturday, Sunday or legal holiday in the jurisdiction to which such notice is directed) after such notice is sent if sent (as evidenced by the facsimile confirmed receipt) prior to 5:00 p.m. Eastern Time and, if sent after 5:00 p.m. Eastern Time, on the second day (other than a Saturday, Sunday or legal holiday in the jurisdiction to which such notice is directed) after which such notice is sent; (iii) on the first day (other than a Saturday, Sunday or legal holiday in the jurisdiction to which such notice is directed) following the day the same is deposited with a commercial courier if sent by commercial overnight delivery service; or (iv) the fifth day (other than a Saturday, Sunday or legal holiday in the jurisdiction to which such notice is directed) following deposit thereof with the U.S. Postal Service as aforesaid. Each party, by notice duly given in accordance herewith, may specify a different address for the giving of any notice hereunder.

## ARTICLE 12
## COVENANTS

### Section 12.1  Confidentiality.

(a)     Each Member acknowledges that during the term of this Agreement, such Member will have access to and become acquainted with trade secrets, proprietary information and confidential information belonging to the Company, the Subsidiaries and their Affiliates that are not generally known to the public, including, but not limited to, information concerning business plans, financial statements and other information provided pursuant to this Agreement, operating practices and methods, expansion plans, strategic plans, marketing plans, contracts, customer lists or other business documents which the Company treats as confidential, in any format whatsoever (including oral, written, electronic or any other form or medium) (collectively, "Confidential Information"). In addition, each Member acknowledges that: (i) the

Company has invested, and continues to invest, substantial time, expense and specialized knowledge in developing its Confidential Information; (ii) the Confidential Information provides the Company with a competitive advantage over others in the marketplace; and (iii) the Company would be irreparably harmed if the Confidential Information were disclosed to competitors or made available to the public. Without limiting the applicability of any other agreement to which any Member is subject, no Member shall, directly or indirectly, disclose or use (other than solely for the purposes of such Member's monitoring and analyzing such Member's investment in the Company or performing such Member's duties as a Manager, officer, employee, consultant or other service provider of the Company) at any time, including, without limitation, use for personal, commercial or proprietary advantage or profit, either during such Member's association or employment with the Company or thereafter, any Confidential Information of which such Member is or becomes aware. Each Member in possession of Confidential Information shall take all appropriate steps to safeguard such information and to protect it against disclosure, misuse, espionage, loss and theft.

(b)     Nothing contained in <u>Section 12.1(a)</u> shall prevent any Member from disclosing Confidential Information: (i) upon the order of any court or administrative agency; (ii) upon the request or demand of any regulatory agency or authority having jurisdiction over such Member; (iii) to the extent compelled by legal process or required or requested pursuant to subpoena, interrogatories or other discovery requests; (iv) to the extent necessary in connection with the exercise of any remedy hereunder; (v) to other Members; (vi) to such Member's representatives who, in the reasonable judgment of such Member, need to know such Confidential Information and agree to be bound by the provisions of this <u>Section 12.1</u> as if a Member; or (vii) to any potential Permitted Transferee in connection with a proposed Transfer of Units from such Member, as long as such Transferee agrees to be bound by the provisions of this <u>Section 12.1</u> as if a Member; <u>provided</u>, that in the case of clause (i), (ii) or (iii), such Member shall notify the Company and other Members of the proposed disclosure as far in advance of such disclosure as practicable (but in no event make any such disclosure before notifying the Company and other Members) and use reasonable efforts to ensure that any Confidential Information so disclosed is accorded confidential treatment satisfactory to the Company, when and if available.

(c)     The restrictions of <u>Section 12.1(a)</u> shall not apply to Confidential Information that: (i) is or becomes generally available to the public other than as a result of a disclosure by a Member in violation of this Agreement; (ii) is or becomes available to a Member or any of its Representatives on a non-confidential basis prior to its disclosure to the receiving Member and any of its Representatives in compliance with this Agreement; or (iii) is or has been independently developed or conceived by such Member prior to the Effective Date without use of Confidential Information.

### Section 12.2  <u>Non-Compete; Non-Solicit</u>.

(a)     <u>Non-Compete</u>. In light of each Member's access to Confidential Information and position of trust and confidence with the Company, each Member hereby agrees that, during the period of his or her continued employment or other engagement with the Company, and for a period of twelve (12) months, running consecutively, beginning on the date of any termination of the Member's employment for any reason, unless prior thereto the Company has not Commenced Business by the Platform Launch Date, then until the Platform Launch Date (the

"Restricted Period"), such Member shall not (x) render services or give advice to, or affiliate with (as employee, partner, consultant or otherwise), or (y) directly or indirectly through one or more of any of their respective Affiliates, own, manage, operate, control or participate in the ownership, management, operation or control of, any Competitor or any division or business segment of any Competitor; provided, that nothing in this Section 12.2(a) shall prohibit such Member or any of his Permitted Transferees or any of their respective Affiliates from acquiring or owning, directly or indirectly:

(i)     Up to 50% of the aggregate voting securities of any Competitor that is a publicly traded Person; or

(ii)     Up to 50% of the aggregate voting securities of any Competitor that is not a publicly traded Person, so long as neither such Member nor any of its Permitted Transferees, directly or indirectly through one or more of their respective Affiliates, designates a member of the board of directors (or similar body) of such Competitor or its Affiliates or is granted any other governance rights with respect to such Competitor or its Affiliates (other than customary governance rights granted in connection with the ownership of debt securities).

For purposes of this Section 12.2(a), "Competitor" means any Person engaged, directly or indirectly, in whole or in part, in any business that operates in the same or similar fashion to the Real Estate Exchange Platform and not to include any business which a Member is engaged, directly or indirectly, in whole or in part prior to the Effective Date.

(b)     Other Restrictions. Each Member further agrees that, for a period of one (1) year beginning on the date of any termination of the Member's employment for any reason he or she shall not, directly or indirectly through one or more of any of such Member's Affiliates:

(i)     hire or solicit, or encourage any other Person to hire or solicit, any individual who has been an employee, consultant or advisor of the Company or any Subsidiary or Affiliate of the Company within one (1) year prior to the date of such hiring or solicitation; provided that this Section 12.2(b) shall not prevent a Member from hiring or soliciting any employee or former employee of the Company or any Subsidiary or Affiliate of the Company who was previously employed by such Member prior to the date of execution of this Agreement;

(ii)     solicit or entice, or attempt to solicit or entice, any investors, contractors, suppliers of the Company or any Subsidiary or Affiliate of the Company for purposes of diverting their business or services from the Company or such Subsidiary or Affiliate or for any other purpose; or

(iii)     make any statement or publication that is intended to or could reasonably be understood to disparage or impugn the reputation of the Company or any Subsidiary or Affiliate of the Company, or any of their respective products, services, executives, partners, directors, officers or employees, regardless of any perceived truth of such statement or publication.

(c)　　Blue Pencil. If any court of competent jurisdiction determines that any of the covenants set forth in this Section 12.2, or any part thereof, is unenforceable because of the duration or geographic scope of such provision, such court shall have the power to modify any such unenforceable provision in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Section 12.2 or by making such other modifications as it deems warranted to carry out the intent and agreement of the parties as embodied herein to the maximum extent permitted by Applicable Law. The parties hereto expressly agree that this Agreement as so modified by the court shall be binding upon and enforceable against each of them.

(d)　　The restrictions in Section 12.2 (b) (i) and (ii) shall not apply from and after the Platform Launch Date in the event that the Company has not Commenced Business by the Platform Launch Date.

## ARTICLE 13

### Section 13.1　Use of Name "ETRE Financial".

The name "ETRE Financial" and all goodwill associated therewith are property of the Company, and no Member or Affiliate of the Company shall have the right to use the name "ETRE Financial" or "ETRE" as a component of the name of any business venture or otherwise without the consent of the Board.

## ARTICLE 14

## MISCELLANEOUS

### Section 14.1　Entire Agreement. 
This Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof, and supersedes any prior or contemporaneous oral or written agreement or understanding among the parties hereto with respect to the subject matter hereof (other than any agreements with one or more Members effective on or after the Effective Date that expressly reference one or more sections of this Agreement and expressly modify the terms thereof for one or more of such Members).

### Section 14.2　Governing Law. 
This Agreement shall be construed in accordance with and governed by the internal laws of the State of New York, without regard to the principles of conflicts or choice of laws thereof that would give rise to the application of the domestic substantive law of any other jurisdiction, except to the extent the laws of the State of Delaware are required to govern a limited liability company formed under the laws of such state.

### Section 14.3　Equitable Remedies. 
The parties hereto agree that irreparable harm would occur in the event that any of the agreements or provisions of this Agreement were not performed fully by the parties hereto in accordance with their specific terms or conditions or were otherwise breached, and that money damages are an inadequate remedy for breach of the Agreement because of the difficulty of ascertaining and quantifying the amount of damage that will be suffered by the parties hereto in the event that this Agreement is not performed in

accordance with its terms or conditions or is otherwise breached. It is accordingly hereby agreed that the parties hereto shall be entitled to an injunction or injunctions, without the necessity of proving actual damages, to restrain, enjoin and prevent breaches of this Agreement by the other parties and to enforce specifically the terms and provisions of this Agreement, such remedies being in addition to and not in lieu of, any other rights and remedies to which the other parties are entitled to at law or in equity.

Section 14.4 **Recovery of Expenses**. Each party hereto (the "**Breaching Party**") further covenants and agrees to indemnify and hold the other parties hereto harmless from and against all costs and expenses, including legal or other professional fees and expenses incurred by such parties, in connection with or arising out of any proceeding instituted by such parties against the Breaching Party; provided that the party or parties seeking indemnification pursuant to this Section 14.4 must have substantially prevailed in such proceeding.

Section 14.5 **Binding Effect**. Except as otherwise provided herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective legal representatives, heirs, successors and permitted assigns.

Section 14.6 **Severability**. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 14.7 **Headings**. The sections and other headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

Section 14.8 **No Third-Party Beneficiaries**. Except for Section 6.6 through Section 6.10, as they relate to Covered Persons (each of whom shall be an express third party beneficiary of those Sections), nothing in this Agreement is intended to, or will, create any rights to any party other than a party that is a signatory hereto or who becomes a Member in accordance with the terms of this Agreement.

Section 14.9 **Tax Matters Partner**. Jesse Stein shall be the "tax matters partner" of the Company (the "**Tax Matters Partner**") for purposes of, and in accordance with, Section 6231(a)(7) of the Code. The Tax Matters Partner may be removed, and a new Tax Matters Partner appointed, by the Board in accordance with the Code and the Treasury Regulations.

Section 14.10 **Counterpart Execution; Fax Signatures**. This Agreement may be executed in any number of counterparts, each of which, when so executed and delivered, shall be an original, but all of which together shall constitute one agreement binding on the parties hereto. Transmission of an executed counterpart by fax or PDF file of this Agreement shall be deemed to constitute due and sufficient delivery of such counterpart, and such signatures shall be deemed original signatures for purposes of the enforcement and construction of this Agreement.

Section 14.11 **Waiver of Claims Related to Fiduciary Duties of Members or Managers**. Each Member, on behalf of itself and its Affiliates, hereby waives, to the maximum

13927581v.10

extent permitted by law, any and all rights and claims which it, he or she may otherwise have against any other Member or Manager and such other Member's or Manager's officers, directors, shareholders, partners, members, managers, agents, employees, and Affiliates as a result of any claims of breach of fiduciary duties; provided that the foregoing shall not limit a Member's rights and claims with respect to a breach of this Agreement. No Member or Manager shall be liable to the Company or any other Member or its Affiliates for any act or omission taken or suffered by such Member or Manager in connection with the business or operations of the Company or arising out of this Agreement, unless such act or omission has been adjudicated by a court or arbitral panel of competent jurisdiction, in a final, non-appealable judgment or decision, to have constituted a breach of this Agreement on the part of such Member or Manager. The Company and each Member agree that the provisions of this Agreement, to the extent such provisions eliminate, restrict or limit the duties (including, without limitation, fiduciary duties) or liabilities of Members or Managers that may otherwise exist at law or in equity, shall replace such duties and liabilities of the Members and Managers.

## Section 14.12 Renunciation of Opportunities; No Expansion of Duties.

(a) Each party to this Agreement agrees and acknowledges that no joint venture is created hereby.

(b) To the maximum extent permissible under applicable law, but subject to the restrictions provided in Section 12.2 and Section 12.3, each of the Members, its respective Affiliates, the Company and each Subsidiary hereby renounce any interest or expectancy any of them has or may have in, or in being offered an opportunity to participate in, any and all business opportunities that are presented to the other Members and their respective Affiliates, including, without limitation, persons who serve on the Board who are affiliates of Members, and no Member shall be obligated to present any particular investment opportunity to the other Members, their respective Affiliates, the Company or any Subsidiary, even if such opportunity is of a character that, if presented to the Company or a Subsidiary, could be taken by the Company or such Subsidiary, and each Member shall continue to have the right to take for its own respective account or to recommend to others any such particular investment opportunity, except as otherwise provided in this Agreement.

## Section 14.13 Disputes; Arbitration

(a) In the event of any controversy or claim arising out of or relating to this Agreement, or the breach thereof, the parties to such controversy or claim shall first use their reasonable best efforts in good faith to resolve such dispute among themselves. If they are unable to resolve the dispute within thirty (30) days after any party has first notified the others of the dispute, then the controversy or claim shall be settled by arbitration administered by JAMS and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

(b) The arbitration shall be decided by three (3) arbitrators assigned pursuant to JAMS procedures..

(c) The parties shall be afforded the discovery rights as established under the applicable JAMS rules or as provided for by the arbitrators.

(d) The award rendered in any arbitration commenced hereunder shall constitute an award under the Federal Arbitration Act, Title 9 US Code and the 1958 New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, shall be final and binding upon the parties and judgment thereon may be entered in any court of competent jurisdiction. The arbitral tribunal may order any remedy permitted by law and this Agreement, including damages and specific performance of this Agreement or any portion thereof.

(e) The language of the arbitration shall be English. The place of arbitration shall be New York, New York, United States.

(f) By agreeing to arbitration, the parties do not intend to deprive any court of its jurisdiction to issue a pre-arbitral injunction, pre-arbitral attachment, or other order in aid of arbitration proceedings and/or the enforcement of any award. Without prejudice to such provisional remedies as may be available under the jurisdiction of a national court, the arbitral tribunal shall have full authority to grant provisional remedies and to direct the parties to request that any court modify or vacate any temporary or preliminary relief issued by such court, and to award damages for the failure of any party to respect the arbitral tribunal's orders to that effect. Each of the parties irrevocably and unconditionally submits to the exclusive jurisdiction of the federal and New York State courts located in Manhattan, New York City for the purpose of an order to compel arbitration, for provisional relief in aid of arbitration or to maintain the status quo or prevent irreparable harm prior to the appointment of the arbitral tribunal, and to the non-exclusive jurisdiction of such courts for the enforcement of any award issued hereunder. With respect to any action, suit or other proceeding for which it has submitted to jurisdiction pursuant to this Section 14.13, each party irrevocably consents to service of process in the manner provided for the giving of notices pursuant to Article 11 of this Agreement. Nothing in this Section 14.13 shall affect the right of any party to serve process in any other manner permitted by applicable law.

**Section 14.14 Further Assurances.** The Members shall from time to time execute or cause to be executed all other documents or cause to be done all filing, recording, publishing, or other acts as may be necessary or desirable to comply with the requirements for the operation of a limited liability company under the laws of the State of Delaware and all other jurisdictions in which the Company may from time to time conduct business.

**Section 14.15 Termination of Agreement.** Upon the consummation of (a) the dissolution of the Company in accordance with Section 9.1, (b) a merger or consolidation in which the Members of the Company immediately prior to such merger or consolidation do not own at least a majority of the Capital Securities of the surviving entity, or (c) a Conversion in accordance with Section 9.4 and consummation of an initial Public Offering in connection therewith (each a "**Termination Event**"), except as provided in the next sentence, all rights and obligations of the parties under this Agreement shall terminate immediately and be of no further effect. Notwithstanding the preceding sentence, the rights and obligations of the applicable parties under Sections 6.6 through 6.10, 7.1, 7.2, 9.3, Article 11 and this Article 13 shall survive any Termination Event.

**Section 14.16 <u>Scope</u>**. If any one or more of the provisions of this Agreement shall for any reason be held to be excessively broad as to time, duration, geographical scope, activity, or subject, each such provision shall be construed, by limiting and reducing it, so as to be enforceable to the extent compatible with applicable law then in force.

**Section 14.17 <u>No Waiver</u>**. No waiver by any party to this Agreement at any time of a breach by a party of any provision of this Agreement to be performed by such other party shall be deemed a waiver of any similar or dissimilar provisions of this Agreement at the same or any prior or subsequent time.

**Section 14.18 <u>Acknowledgments and Representations</u>**.

(a) <u>Members' Acknowledgements, Representations and Waiver</u>. Each of the Members hereby severally, and not jointly, represents and warrants to the Company that (i) such Member has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of an investment in the Company and making an informed investment decision with respect thereto, (ii) such Member is able to bear the economic and financial risk of the investment in the Company contemplated hereby for an indefinite period of time, (iii) such Member is acquiring an interest in the Company for investment only and not with a view to, or for resale in connection with, any distribution to the public or any public offering thereof (other than such a distribution or offering which is registered and qualified under applicable federal or state securities laws), (iv) such Member is an "accredited investor" within the meaning of Regulation D promulgated under the Securities Act, (v) to the extent the Units have not been registered under the securities laws of any jurisdiction, the same cannot be disposed of unless they are subsequently registered and/or qualified under applicable securities laws or disposed of pursuant to an applicable exemption from such laws, (vi) such Member is a resident of the state or other jurisdiction listed as its address on **<u>Schedule A</u>**, and (vii) the execution, delivery and performance of this Agreement do not require such Member to obtain any consent or approval that has not been obtained and do not contravene or result in a default under any provision of any existing law or regulation applicable to it, any provision of its charter, by-laws or other governing documents or any agreement or instrument to which it is a party or by which it is bound. Each Member has had the opportunity to seek the advice of counsel and other personal advisors and acknowledges that neither the Company nor any of its Affiliates has provided such Member with any advice regarding the tax, economic or other impacts to such Member of the arrangements contemplated hereby.

(b) <u>Company Representations</u>. The Company hereby represents and warrants to the Members as of the date of this Agreement, the following: (i) the Company is a limited liability entity duly formed, validly existing and in good standing under the laws of the State of Delaware; (ii) the Units, when issued in accordance with the terms of this Agreement will be validly issued and, not subject to any adverse claim; (iii) the capitalization of the Company as of the date of this Agreement is set forth on **<u>Schedule A</u>**; (iv) except as set forth in the this Agreement, there are no outstanding options, warrants, preemptive rights, subscription rights, convertible securities or other agreements or plans under which the Company is or may become obligated to issue, sell or Transfer any Units or other securities of the Company; and (v) neither the Company nor anyone acting on its behalf has offered the Units for sale to or otherwise approached or negotiated in respect of such offer in a manner constituting a general solicitation

and neither the Company nor anyone on its behalf has taken or will take any action that would subject the issuance or sale of any of the Company's securities to the registration requirements of Section 5 of the Securities Act of 1933, as amended.

**[The remainder of this page is left blank intentionally]**

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized representatives to execute this Limited Liability Company Agreement as their act and deed, to be effective as of the day and year first above written.

**The Company:**

ETRE FINANCIAL, LLC

By: _____
      Name: Paul Frischer
      Title: Manager

**The Members:**

Winter Investors, LLC

By: _____
      Name:  Jacob Frydman
      Title: Authorized Person

EVE, LLC

By: _____
      Name:  Eli Verschleiser
      Title: Authorized Person

JS3 Alternative Investments LLC

By: _____
      Name:  Jesse Stein
      Title: Authorized Person

SMP Realty NM LLC

By: _____
      Name:  Scott Panzer
      Title: Authorized Person

*[signatures continued on following page]*

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized representatives to execute this Limited Liability Company Agreement as their act and deed, to be effective as of the day and year first above written.

**The Company:**

ETRE FINANCIAL, LLC

By:_____
     Name:
     Title:

**The Members:**

Winter Investors, LLC

By: _____
     Name:  Jacob Frydman
     Title: Authorized Person

EVE, LLC

By: _____
     Name:  Eli Verschleiser
     Title: Authorized Person

JS3 Alternative Investments LLC

By: _____
     Name:  Jesse Stein
     Title: Authorized Person

SMP Realty NM LLC

By: _____
     Name:  Scott Panzer
     Title: Authorized Person

*[signatures continued on following page]*

Frischer Kranz Inc.

By: _____
     Name: Paul Frischer
     Title: Authorized Person

ETR Investors Holdings LLC

By: _____
     Name: Sol Mayer
     Title: Authorized Person

**Solely for purposes of Sections 12.1, 12.2 and 13.1, the Principals:**

_____
Jesse Stein

_____
Paul Frischer

_____
Scott Panzer

_____
Jacob Frydman

_____
Eli Verschleiser

_____
Sol Mayer

Frischer Kranz Inc.

By: _____
     Name: Paul Frischer
     Title: Authorized Person

ETR Investors Holdings LLC
By: _____
     Name: Sol Mayer
     Title: Authorized Person Sole Member of its Manager

Solely for purposes of Sections 12.1, 12.2 and 13.1, the Principals:

_____
     Jesse Stein

_____
     Paul Frischer

_____
     Scott Panzer

_____
     Jacob Frydman

_____
     Eli Verschleiser

_____
     Sol Mayer

### As of July 24, 2014

| Name and Address of Member | Units | Capital Contribution Amount |
|---|---|---|
| Winter Investors LLC<br>46 Ledgerock Lane<br>Hyde Park, NY 12538 | 26,968 | $156,250 |
| JS3 Alternative Investments LLC<br>100 Jay Street, Apt 14H<br>Brooklyn, NY 11201 | 43,149 | $312,500 |
| SMP Realty NM LLC<br>200 Candlewood Lake Road North<br>New Milford, CT 06776 | 46,957 | $587,500 |
| Frischer Kranz Inc.<br>80 Birch Lane<br>Greenwich, CT 06830 | 35,957 | $312,500 |
| EVE, LLC<br>44 Wall Street 2nd Floor<br>New York, NY 10005 | 26,968 | $156,250 |
| ETR Investors Holdings LLC<br>510 Madison Avenue, Suite 1400<br>New York, NY 10022 | 20,000 | $500,000 |
| | | |
| **TOTAL:** | 200,000 | $2,025,000 |

**Schedule B**

**Operating Budget**

13927581v.10

## Operating Budget- ETRE Financial

| Month | Jul | Aug | Sep | Oct | Nov | Dec | Jul-Dec 2014 |
|---|---|---|---|---|---|---|---|
| **Corporate** | | | | | | | $10,000 |
| Legal- Partner Agmt. | $10,000 | | | | | | $60,500 |
| Legal-IP/General | $35,500 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $2,500 |
| Accounting | | | $2,500 | | | | $0 |
| Insurance | | | | | | | $0 |
| Travel | | | | | | | $73,000 |
| **Total Corporate** | $45,500 | $5,000 | $7,500 | $5,000 | $5,000 | $5,000 | |
| **Payroll** | | | | | | | $262,500 |
| Corporate | | | | | | | $0 |
| Originations | $43,750 | $43,750 | $43,750 | $43,750 | $43,750 | $43,750 | $0 |
| Underwriting | | | | | | | $60,000 |
| Trading | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $13,125 |
| Payroll Taxes | | | | $4,375 | $4,375 | $4,375 | $6,563 |
| Benefits | | | | $2,188 | $2,188 | $2,188 | $342,188 |
| **Total Payroll** | $53,750 | $53,750 | $53,750 | $60,313 | $60,313 | $60,313 | |
| **Administrative** | | | | | | | $41,000 |
| Office Rent | | | | | | | $0 |
| Phones/Internet | $3,500 | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 | $0 |
| Computers | | | | | | | $0 |
| Furniture | | | | | | | $12,000 |
| Miscellaneous | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 | $53,000 |
| **Total Administrative** | $5,500 | $9,500 | $9,500 | $9,500 | $9,500 | $9,500 | |
| **Technology** | | | | | | | $0 |
| Software Dvpt- Demo | | | | | | | $90,000 |
| Software Dvpt-Working | | | | | | | $18,000 |
| Software Licensing | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $0 |
| Servers & Hosting | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $0 |
| Web Development | | | | | | | $30,000 |
| Web Maintenance | | | | | | | $0 |
| Data Feed | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $138,000 |
| **Total Technology** | $23,000 | $23,000 | $23,000 | $23,000 | $23,000 | $23,000 | |
| **Property/REIT Related** | | | | | | | $0 |
| Legal- ETRE REIT Reg. | | | | | | | $563,800 |
| Asset Related Costs | $113,800 | | | $150,000 | $150,000 | $150,000 | $75,000 |
| SEC/FINRA Fees | | | | $25,000 | $25,000 | $25,000 | $0 |
| Exchange Fees | | | | | | | $0 |
| Reporting | | | | | | | $0 |
| D&O Insurance | | | | | | | $0 |
| Director Compensation | | | | | | | $60,000 |
| Due Diligence | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $688,800 |
| **Total Registration** | $113,800 | $10,000 | $10,000 | $185,000 | $185,000 | $185,000 | |
| **Sales & Marketing** | | | | | | | $0 |
| Graphic Design | | | | | | | $9,300 |
| Printing | $9,300 | | | | | | $90,000 |
| Public Relations | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $30,000 |
| General Marketing | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $0 |
| Travel & Entertainment | | | | | | | $129,300 |
| **Total Sales & Marketing** | $29,300 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | |
| Miscelleaneous & Contingency | | | | | | | 1,424,288 |
| **Total Operating Expenses** | 270,850 | 124,750 | 123,750 | 302,813 | 302,813 | 302,813 | 1,424,288 |
| Cumulative Expenses (June to) | 270,850 | 392,100 | $15,850 | 818,663 | 1,121,475 | 1,424,288 | |

# EXHIBIT X

# AGREEMENT OF MERGER

## MERGING

## ETRE FINANCIAL, LLC
### (a Delaware Limited Liability Company)

## WITH AND INTO

## ETRE FINANCIAL HOLDINGS, LLC
### (a Delaware Limited Liability Company)

This Agreement of Merger (this "Agreement") dated as of July 24, 2014, is entered into by and between ETRE Financial Holdings, LLC, a Delaware limited liability company ("Holdings"), and ETRE Financial, LLC, a Delaware limited liability company ( "Etre" and together with Holdings, the "Constituent Companies").

### Background

The boards of managers of Holdings and ETRE have determined that it is desirable and in the best interests of both companies that ETRE be merged with and into Holdings on the terms and conditions hereinafter set forth and in accordance with the Delaware Limited Liability Company Act, Title 16 of the Delaware Revised Statutes, 18-101, et. seq., as amended (the "LLC Act") and have each approved this Agreement and the Merger (as defined below) in accordance with the limited liability company agreements of Holdings and ETRE.

### Agreements

NOW, THEREFORE, in consideration of the premises and of the agreements, covenants and provisions hereinafter contained, Holdings and ETRE, intending to be legally bound hereby, agree as follows:

1. **Merger.** Upon the terms and subject to the conditions contained in this Agreement, at the Effective Time (as defined below) and in accordance with the LLC Act, ETRE shall be merged with and into Holdings (the "Merger"), the separate existence of Etre shall cease and Holdings shall continue as the sole surviving limited liability company under the corporate name "Etre Financial LLC" (the "Surviving Company").

2. **Certificate of Merger; Effective Time.** A certificate of merger giving effect to the Merger (the "Certificate of Merger"), shall be duly executed by the parties and thereafter delivered to the Secretary of State of the State of Delaware, for filing, as provided in the LLC Act, as soon as practicable on or after the execution of this Agreement. The Merger shall become effective upon the filing of the Certificate of Merger with the Secretary of State of the State of Delaware or at such time thereafter as is provided in the Certificate of Merger (the "Effective Time").

3.     <u>Effect of Merger</u>.  Immediately following the Merger, the Surviving Company shall (i) possess all rights, privileges, immunities and franchises, both public and private, of the Constituent Companies, (ii) be vested with all property, whether real, personal or mixed, and all debts due on whatever account, and all other causes of action, and all and every other interest belonging to or due to each of the Constituent Companies, and (iii) be responsible and liable for all the obligations and liabilities of each of the Constituent Companies, all with the effect set forth in the LLC Act.

4.     <u>Certificate of Formation; Limited Liability Company Agreement</u>.

(a)     In accordance with the applicable provisions of the LLC Act, the Certificate of Formation as in effect as of the Effective Time, as amended by the Certificate of Merger, shall be the Certificate of Formation of the Surviving Company from and after the Effective Time until thereafter altered, amended or repealed in accordance with applicable law and such document.

(b)     In accordance with Section 18-209(f) of the LLC Act, the Limited Liability Company Agreement of the Surviving Company, substantially in the form as set forth in Exhibit A hereto (the "Surviving Company LLC Agreement"), shall be the Limited Liability Company Agreement of the Surviving Company from and after the Effective Time until thereafter altered, amended or repealed in accordance with applicable law and such document.

5.     <u>Officers and Managers</u>.  The officers of ETRE shall be the officers of the Surviving Company following the Merger until their successors are duly elected and qualified under the Surviving Company LLC Agreement.  As set forth in the Surviving Company LLC Agreement, the managers of Etre shall be the managers of the Surviving Company following the Merger until their successors are duly elected and qualified in accordance with the Surviving Company LLC Agreement and applicable law.

6.     <u>Capitalization of the Constituent Companies; Conversion of Interests</u>.  Immediately prior to the Effective Time, there are 100,000 units of limited liability company interest of ETRE issued and outstanding (the "Etre Interests").  At the Effective Time, the Etre Interests shall without further action, be converted into the number of units of limited liability company interests of the Surviving Company as set forth in the table following this paragraph (the "Surviving Company Interests"); <u>provided</u>, <u>however</u>, that notwithstanding anything to the contrary herein or in the Surviving Company LLC Agreement, unless and until a holder of Etre Interests that have been converted to Surviving Company Interests executes and delivers to the Surviving Company a counterpart signature page to the Surviving Company LLC Agreement or such other joinder or similar instrument acceptable to the Surviving Company pursuant to which such holder agrees to be bound to all of the terms and conditions of the Surviving Company LLC Agreement, such holder shall not be a member of the Surviving Company, shall be and remain an unadmitted assignee of the Surviving Company, and shall not be entitled to any rights of any kind accorded to members of the Surviving Company under the Surviving Company LLC Agreement or otherwise, except for those limited rights expressly accorded to unadmitted assignees under the Surviving Company LLC Agreement and the LLC Act.  Each limited liability company interest of Holdings issued and outstanding immediately

prior to the Effective Time will, by virtue of the Merger and without any action on the part of the holder thereof, be cancelled and retired and cease to exist as of the Effective Time.

| Member | Units in ETRE (Etre Interests) | Units in Surviving Company as of the Effective Time (Surviving interests) |
|---|---|---|
| JS3 Alternative Investments, LLC | 30,000 | 43,149 |
| Frischer Kranz Inc. | 20,000 | 35,957 |
| SMP Realty NM, LLC | 20,000 | 35,957 |
| EVE, LLC | 15,000 | 26,968 |
| Winter Investors, LLC | 15,000 | 26,968 |

7. <u>Entire Agreement</u>. This Agreement together with the Certificate of Merger constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, representations and warranties and agreements, both written and oral, with respect to such subject matter.

8. <u>Successors and Assigns</u>. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns, provided that neither party may assign this Agreement or any of its rights or obligations hereunder without the prior written consent of the other party.

9. <u>No Third-Party Beneficiaries</u>. This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit or remedy of any nature whatsoever, under or by reason of this Agreement.

10. <u>Headings</u>. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

11. <u>Amendment and Modification</u>. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto.

12. <u>Severability</u>. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

13. <u>Governing Law; Equitable Relief</u>. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other

members, agents, and successors and assigns (collectively, the "Releasees") of and from any and all manner of actions, causes of action, suits, claims and demands whatsoever, whether now known or unknown, contingent or liquidated, at law or in equity, whether sounding in contract, tort (including negligence), fiduciary obligations or duties, fraud, misrepresentation, statute or any other theory of action whatsoever arising out of or related to this Agreement, the consummation of the Merger, or any actions taken or omissions made by or on behalf of Etre or Surviving Company in connection therewith.

[space intentionally left blank]

[signature page to Agreement of Merger]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

HOLDINGS:

ETRE FINANCIAL HOLDINGS, LLC,
a Delaware limited liability company

By:   ETR INVESTORS HOLDINGS LLC,
      a Delaware limited liability company and its
      Manager

      By: _____
          Name: Sol Mayer
          Title: Sole Member of its Manager

ETRE:

ETRE FINANCIAL, LLC
a Delaware limited liability company

By:   _____
      Name:
      Title:

[signature page to Agreement of Merger]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

HOLDINGS:

ETRE FINANCIAL HOLDINGS, LLC,
a Delaware limited liability company

By:    **ETR INVESTORS HOLDINGS LLC,**
       a Delaware limited liability company and its
       Manager

       By:_____
            Name:
            Title:

ETRE:

ETRE FINANCIAL, LLC
a Delaware limited liability company

By:  _____
    Name:
    Title:

# EXHIBIT Y

## WRITTEN CONSENT OF THE SOLE MEMBER OF
## ETRE FINANCIAL HOLDINGS, LLC

The undersigned, being the sole member (the "Member") of ETRE Financial Holdings, LLC, a Delaware limited liability company (the "Company") hereby unanimously consents to the adoption of the following resolutions (the "Consent") pursuant to Section 18-404(d) of the Delaware Limited Liability Company Act (the "Delaware Act"), to be effective as of July 24, 2014, and directs that this Consent to the actions taken be filed with the minutes of the proceedings of the Board:

### MERGER

WHEREAS, the Member desires to invest the sum of $1,725,000 in the Company pursuant to certain terms and conditions (the "Offer"), which Offer is attached hereto as Exhibit "A"; and

WHEREAS, one condition of the Offer is that the Company merge with ETRE Financial, LLC, a Delaware limited liability company ("ETRE Financial") on the terms and conditions set forth in the Agreement of Merger, attached hereto as Exhibit "B" ("Merger"), with the Company being the surviving company of such Merger; and

WHEREAS, in order to complete the investment contemplated by the Offer, the Member deems it advisable and in the best interests of the Company to approve the Merger;

NOW, BE IT THEREFORE:

RESOLVED, that the Merger is hereby approved.

FURTHER RESOLVED, that the Member or any officer of the Company (each, an "Authorized Person") be, and is hereby authorized and directed to (a) sign, execute, certify to, verify and acknowledge, deliver, accept, file and record any and all instruments and documents, and (b) take, or cause to be taken, any and all such action, in the name and on behalf of the Company, as, in any such Authorized Person's judgment, is necessary, desirable or appropriate in order to consummate the merger or otherwise to effect the purposes of the foregoing resolutions;

FURTHER RESOLVED, that all actions heretofore taken by the Authorized Person and all things done by his/her authority with respect to documents shall be, and the same are, hereby ratified and approved; and

FURTHER RESOLVED, that the transactions contemplated by the foregoing resolutions are reasonably expected to benefit the Company and its investors, both directly and indirectly.

## GENERAL AUTHORIZATION TO CARRY OUT RESOLUTIONS

RESOLVED, that any Authorized Person is authorized, empowered and directed on behalf of the Company, in the Company's name and on its behalf, to (i) make, enter into, execute, deliver, file and record any and all other or future contracts and related agreements, consents and other documents and instruments, (ii) pay or cause to be paid any and all expenses and fees and disburse such other funds of the Company and (iii) take any and all such other actions as such person(s) determines in his (or their) sole discretion to be necessary or advisable to carry out the terms, provisions, purposes or intent of the foregoing resolutions and the transactions contemplated thereby, the taking of any such action to constitute conclusive evidence of the exercise of such discretionary authority.

**[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

13927728v.2

This Consent may be transmitted electronically or by facsimile and such electronic or facsimile execution shall have the same force and effect of an original signature.

IN WITNESS WHEREOF, the undersigned has executed this Consent as of the day and year first written above.

SOLE MEMBER:

ETR INVESTORS HOLDINGS LLC,
a Delaware limited liability company and its
Manager

By: _____
Name: S. Mayer
Title: Sole Member of its Manger

# EXHIBIT Z

EXECUTION VERSION

**ETRE FINANCIAL, LLC**

**UNIT PURCHASE AGREEMENT**

This Unit Purchase Agreement (this "**Agreement**") is made as of the 24th day of July, 2014 ("**Effective Date**") by and among ETRE Financial, LLC (formerly known as ETRE Financial Holdings, LLC), a Delaware limited liability company (the "**Company**") and ETR Investors Holdings LLC, a Delaware limited liability company (the "**Purchaser**" and together with the Company, the "**Parties**").

WHEREAS, the Purchaser desires to invest in the Company, and the Company desires to accept such investment, pursuant to the terms hereof.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

1.    Purchase and Sale of Units.

    1.1.    Sale and Issuance of Units; Purchase Price.

        (a)    Subject to the terms and conditions of this Agreement, the Purchaser agrees to purchase from the Company, and the Company agrees to issue and sell to the Purchaser, up to 94,810 Units of the Company ("**Purchased Units**") for a purchase price of up to $1,725,000 ("**Purchase Price**") at the times, for the amounts, and on such other terms and conditions as set forth herein.

        (b)    The Purchased Units will purchased and sold as follows:   (i) 20,000 Units of the Company shall be acquired at the Initial Closing ("**Initial Units**") for a purchase price of $500,000; (ii) up to 38,400 Units of the Company shall be acquired at a Closing to occur on the First Additional Units Closing Date ("**First Additional Units**") for a purchase price of $725,000 ("**First Additional Units Price**") (with the exact number of First Additional Units being calculated by applying the applicable per Unit purchase price(s) set forth in 1.1(c), below), (iii) up to an additional 36,410 Units of the Company shall be acquired at a Closing to occur on the Second Additional Units Closing Date ("**Second Additional Units**") for a purchase price of $500,000 ("**Second Additional Units Price**") (with the exact number of Second Additional Units being calculated by applying the applicable per Unit purchase price(s) set forth in 1.1(c), below), (iv)  up to 36,410 Units of the Company shall be acquired on Closings to occur on up to two (2) IPO Closing Dates ("**IPO Units**") for a purchase price of either $250,000 upon an IPO Term Sheet Occurrence or $500,000 upon an IPO S-11 Occurrence (as applicable) per group of IPO Units to be so acquired ("**IPO Price**") (with the exact number of IPO Units being calculated by applying the applicable per Unit purchase price(s) set forth in 1.1(c), below) and (v) up to 18,205 Units of the Company shall be acquired on a Closing to occur on the License Closing Date ("**License Units**") for a purchase price of $250,000 ("**License Index Price**") (with the exact number of License Units being calculated by applying the applicable per Unit purchase price(s) set forth in 1.1(c), below), provided that (x) in no event shall the aggregate amount of Purchased Units to be purchased hereunder exceed 94,810 Units of the Company ("**Maximum**

1

**Units Obligation")** or an aggregate Purchase Price for such Units exceed $1,725,000 and (y) Purchaser's obligation to purchase First Additional Units shall not be reduced by any IPO Units or License Units purchased (or required to be purchased) by Purchaser hereunder prior to the First Additional Units Closing Date unless and only to the extent that the aggregate number of Purchased Units purchased hereunder prior to the First Additional Units Closing Date (including the First Additional Units) exceed the Maximum Units Obligation.

(c)    For the first $500,000 of Purchase Price for Purchased Units to be purchased by Purchaser hereunder, the per Unit purchase price shall be $25.00 per Unit. For the next $725,000 of Purchase Price for Purchased Units to be purchased by Purchaser hereunder, the purchase price per Unit shall be $18.88 per Unit. For the final $500,000 of Purchase Price for Purchased Units to be purchased by Purchaser hereunder, the per Unit purchase price shall be $13.73 per Unit.

(d)    In the event that the number of Units of the Company required to be purchased at a Closing hereunder are reduced in accordance with Section1.1(b) (proviso (x)), then for each Unit of the Company that Purchaser is not required to purchase at such Closing the applicable Purchase Price to be paid at such Closing shall be reduced by $13.73.

1.2.    Closings; Deliveries and Actions; Escrow.

(a)    *Closings.*  Each Closing shall take place at the offices of White and Williams LLP, counsel to the Company, 1650 Market Street, Suite 1800, Philadelphia, PA 19103, at 10:00 a.m. on the applicable Closing Date. At each Closing, (i) the Purchaser shall purchase from the Company, and the Company shall sell to the Purchaser, the applicable Purchased Units to be purchased at such Closing for the applicable Purchase Price to be paid at such Closing, and (ii) the Parties shall make or cause to be made the deliveries set forth in, as applicable, Sections 1.2(b) or 1.2(c) hereof.

(b)    *Deliveries and Actions at Initial Closing.*  At the Closing of the Initial Units (**"Initial Closing"**), (i) the Purchaser shall deliver (A) the Initial Units Price to the Company, (B) the balance of the Purchase Price (**"Escrow Amount"**) to Purchaser's counsel, Reed Smith LLP (**"Escrow Agent"**), who shall hold and release the same in accordance with the provisions of Section 1.2(d) hereof, and (C) an executed counterpart to the LLC Agreement and (ii) the LLC Agreement shall reflect and the Company shall cause its books and records to reflect that Purchaser has purchased the Initial Units.

(c)    *Deliveries and Actions at each Additional Closing.*  At each Closing other than the Initial Closing, (i) the Company and Purchaser shall instruct the Escrow Agent to release a portion of the Escrow Amount on account of the portion of the Purchase Price to be paid by Purchaser at such Closing and (ii) the Company shall (A) deliver to Purchaser an amended LLC Agreement reflecting that Purchaser has purchased the Units of the Company purchased at such Closing and (B) cause its books and records to so reflect such purchase.

(d)    *Escrow Agent Responsibilities.*  Escrow Agent shall hold the Escrow Amount in escrow and shall release the Escrow Amount as follows: (i) on the First Additional Closing Date, the First Additional Units Price to Purchaser, (ii) on the Second

Additional Closing Date, the Second Additional Units Price to Purchaser, (iii) on the IPO Closing Date, the IPO Price to Purchaser, and (iv) on the License Closing Date, the License Index Price to Purchaser, provided that if the Company or the Purchaser shall have notified the Escrow Agent and the other Party hereto in writing on the First Additional Closing Date or Second Additional Closing Date that a Return Occurrence has occurred and is continuing as of such Closing Date (a **"Return Occurrence Notice"**), then on such Closing Date, Escrow Agent shall release the then remaining portion of the Escrow Amount to the Purchaser, and thereafter Purchaser shall have no further obligation to purchase, and the Company shall have no obligation to sell, Purchased Units hereunder, provided, further, that, in the event a Return Occurrence Notice is provided as of an IPO Closing Date or License Closing Date, but prior to the First Additional Closing Date or Second Additional Closing Date, as applicable, the Escrow Agent shall release to the Company that portion of the Escrow Amount required to acquire the applicable IPO Units or License Units on such IPO Closing Date or License Closing Date and on the First Additional Closing Date or Second Additional Closing Date, as applicable, release any balance of the Escrow Amount to the Purchaser. The Escrow Amount shall bear no interest. Escrow Agent may rely upon and shall not be liable for acting or refraining from acting upon any written notice, document, instruction or request furnished to it hereunder and believed by it to be genuine and to have been signed or presented by the proper Party or Parties without inquiry and without requiring substantiating evidence of any kind.

(e) *Form of Payments.* All amounts to be delivered hereunder shall be delivered by wire transfer of immediately available funds to an account designated by the Party to receive such funds.

(f) *Indemnification of Escrow Agent.* Company and Purchaser shall jointly and severally indemnify and hold the Escrow Agent harmless from and against any liability, loss, damage or expense (including, without limitation, reasonable and documented attorneys' fees) that the Escrow Agent may incur in connection with this Agreement and its performance hereunder or in connection herewith, except to the extent such liability, loss, damage or expense arises from its willful misconduct or gross negligence.

1.3. Defined Terms Used in this Agreement. In addition to the terms defined above, the following terms used in this Agreement shall be construed to have the meanings set forth or referenced below. Capitalized terms used and not defined herein shall have the meanings ascribed to such terms in the LLC Agreement.

**"Closing"** means, as applicable, the closing of the purchase and sale of Initial Units, First Additional Units, Second Additional Units, IPO Units, or License Units.

**"Closing Date"** means the date on which the closing of the purchase and sale of the Initial Units, First Additional Units, Second Additional Units, IPO Units or License Units shall have occurred.

**"First Additional Units Closing Date"** means the date that is 90 days following the date hereof.

"**IPO Closing Date**" means, in each instance, the later to occur of either (i) the date on which the Company advises Purchaser and Escrow Agent in writing that it has signed a term sheet with a third party to acquire real estate with the intention of pursuing a public offering of securities of the entity acquiring such real estate and provides a copy of such term sheet to the Purchaser and Escrow Agent and Purchaser provides written confirmation of such term sheet to the Company and Escrow Agent, which confirmation should not be unreasonably withheld or delayed (the "**IPO Term Sheet Occurrence**") or (ii) the date on which the Company files a Form S-11 with the Securities Exchange Commission in connection with a bona fide underwritten public offering (the "**IPO S-11 Occurrence**"), provided that in no event shall there be more than two (2) IPO Closing Dates.

"**License Closing Date**" means the date on which the Company advises Purchaser and Escrow Agent in writing that a license agreement for NASDAQ ETRE indexes has been executed by an ETF provider and provides a copy of such license agreement to the Purchaser and Escrow Agent.

"**LLC Agreement**" means that certain Limited Liability Company Agreement by and among the Company and its Members, dated July 24, 2014, in the form attached hereto as <u>Exhibit A</u>.

"**Material Adverse Effect**" means a material adverse effect on the business, assets (including intangible assets), liabilities, condition (financial or otherwise), property, results of operations or prospects of the Company, taken together as a whole.

"**Merger**" means the merger of ETRE Financial, LLC ("**Predecessor ETRE**") with and into the Company on the terms and conditions set forth in that certain Agreement of Merger between the Company and Predecessor ETRE to be entered into by them on the Effective Date.

"**Return Occurrence**" means any of the following:

a) the Company, any Principal or any Member of the Company is indicted in respect of a securities or criminal matter (exclusive of misdemeanor traffic violations), or the subject of, a governmental or regulatory securities or criminal complaint (exclusive of misdemeanor traffic violations);

b) the Company, any Principal or any Member of the Company is convicted of or enters a plea of nolo contendere to a felony or misdemeanor involving a crime of moral turpitude or dishonesty;

c) the finding by a court or arbitrator that the Company, any Principal or any Member of the Company has committed an act of dishonesty, misappropriation, embezzlement or fraud involving personal profit;

d) any Principal or any Member of the Company has become adverse to the Company in a legal action or proceeding initiated by a Member of the Company or by the Company;

4

e)      the Company is subject to an injunction ordered by a court; or

f)      the finding by a court or arbitrator that Predecessor ETRE, any Principal of Predecessor ETRE or any person that was a Member of Predecessor ETRE has breached in any material respect the limited liability company agreement of Predecessor ETRE in effect prior to the Merger, which breach has not been cured (to the extent reasonably susceptible to cure) after written notice of such breach and a thirty (30) day opportunity to cure such breach.

"**Second Additional Closing Date**" means the date that is 180 days following the date hereof.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Transaction Agreements**" means this Agreement, the LLC Agreement and any other required agreements, consents documents or instruments.

2.      <u>Representations and Warranties of the Company</u>. The Company hereby represents and warrants to the Purchaser that the following representations are true and complete as of the date of each Closing, except as otherwise indicated:

2.1.      <u>Organization, Good Standing</u>. The Company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite limited liability company power and authority to carry on its business as presently conducted and as currently proposed to be conducted.

2.2.      <u>Authorization</u>. All limited liability company action on the part of the Company, its officers, Managers and Members necessary for the authorization, execution and delivery of this Agreement and the other Transaction Agreements, the performance of all obligations of the Company hereunder and thereunder and the authorization, issuance and delivery of the Purchased Units at the times provided herein has been taken, and the Transaction Agreements, when executed and delivered by the Company, shall constitute valid and legally binding obligations of the Company, enforceable against the Company in accordance with their respective terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally or (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

2.3.      <u>Valid Issuance of Purchased Units</u>. The Purchased Units, when issued, sold and delivered in accordance with the terms of this Agreement for the consideration expressed herein, will be duly and validly issued, fully paid and nonassessable and free of restrictions on transfer other than restrictions on transfer under the Transaction Agreements, applicable state and federal securities laws and liens or encumbrances created by or imposed by the Purchaser. Based in part upon the representations of the Purchaser in Section 3 of this Agreement and subject to the provisions of Section 2.4 below, the Purchased Units will be issued in compliance with the Securities Act and all applicable state securities laws.

2.4. <u>Governmental Consents and Filings</u>. Assuming the accuracy of the representations made by the Purchaser in Section 3 of this Agreement, no consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local governmental authority in the United States is required on the part of the Company in connection with the consummation of the transactions contemplated by this Agreement, except for any filings that the Company may choose to make pursuant to applicable state securities laws and Regulation D of the Securities Act.

2.5. <u>Compliance with Other Instruments</u>. The Company is not in violation or default of (a) any provisions of its Certificate of Formation or LLC Agreement or (b) of any instrument, judgment, order, writ, decree or under any note, indenture, mortgage, lease, agreement, contract or purchase order to which it is a party or by which it is bound, except as previously disclosed to the Purchaser in respect of Predecessor ETRE (following the effectiveness of the Merger) or the violation of which would have a Material Adverse Effect. The execution, delivery and performance of the Transaction Agreements and the consummation of the transactions contemplated hereby or thereby will not, except as previously disclosed to the Purchaser in respect of Predecessor ETRE (following the effectiveness of the Merger), result in any such violation or be in conflict with or constitute, with or without the passage of time and giving of notice, either a default under any such provision, instrument, judgment, order, writ, decree or contract or an event which results in the creation of any lien, charge or encumbrance upon any assets of the Company or the suspension, revocation, impairment, forfeiture or nonrenewal of any permit, license, authorization or approval applicable to the Company, except, in each such case, any such event that could not reasonably be expected to have a Material Adverse Effect.

2.6. <u>Legal Proceedings</u>. There is no claim, action, suit, proceeding or governmental investigation of any nature pending against the Company.

3. <u>Representations and Warranties of the Purchaser</u>. The Purchaser hereby represents and warrants to the Company that:

3.1. <u>Authorization</u>. The Purchaser has full requisite power and authority to enter into the Transaction Agreements. The Transaction Agreements, when executed and delivered by the Purchaser, will constitute valid and legally binding obligations of the Purchaser, enforceable in accordance with their terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of a specific performance, injunctive relief, or other equitable remedies.

3.2. <u>Purchase Entirely for Own Account</u>. This Agreement is made with the Purchaser in reliance upon the Purchaser's representation to the Company, which by the Purchaser's execution of this Agreement, the Purchaser hereby confirms, that the Purchased Units to be acquired by the Purchaser will be acquired for investment for the Purchaser's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that the Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same.

6

3.3. <u>Disclosure of Information</u>. The Purchaser acknowledges that it has received a copy of the business summary prepared by the Company's predecessor in interest in respect of the business of such predecessor (and now being conducted by the Company). Additionally, Purchaser believes it has received all information it considers necessary or appropriate for deciding whether to purchase the Purchased Units. The Purchaser further represents that it has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the Purchased Units and the business, properties, prospects and financial condition of the Company.

3.4. <u>Restricted Securities</u>. The Purchaser understands that the Purchased Units will be characterized as "restricted securities" under the federal securities laws, inasmuch as they are being acquired from the Company in a transaction not involving a public offering, and that under such laws and applicable regulations, such Purchased Units may not be resold without registration under the Securities Act, except in certain limited circumstances. In this connection, the Purchaser represents that it is familiar with Rule 144 promulgated under the Securities Act, as presently in effect, and understands the resale limitations imposed thereby and by the Securities Act. The Purchaser acknowledges that the Company has no obligation to register or qualify the Purchased Units for resale. The Purchaser further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Purchased Units, and on requirements relating to the Company that are outside the Purchaser's control, and which the Company is under no obligation and may not be able to satisfy.

3.5. <u>No Public Market</u>. The Purchaser understands that no public market now exists for the Units being issued by the Company, and that the Company has made no assurances that a public market will ever exist for the Units.

3.6. <u>Accredited Investor</u>. The Purchaser is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

3.7. <u>No General Solicitation</u>. Neither the Purchaser, nor any of its officers, employees, agents, directors, stockholders or partners has engaged the services of a broker, investment banker or finder to contact any potential investor nor has the Purchaser or any of the Purchaser's officers, employees, agents, directors, stockholders or partners, agreed to pay any commission, fee or other remuneration to any third party to solicit or contact any potential investor. Neither the Purchaser, nor any of its officers, directors, employees, agents, stockholders or partners has (a) engaged in any general solicitation, or (b) published any advertisement in connection with the offer and sale of the Purchased Units.

4. <u>Conditions of the Purchaser's Obligations at the Closing</u>. The obligations of the Purchaser to the Company under this Agreement are subject to the fulfillment, on or before the Initial Closing, of each of the following conditions, unless otherwise waived:

4.1. <u>Representations and Warranties</u>. The representations and warranties of the Company contained in Section 2 shall be true and correct in all material respects on and as of the Closing with the same effect as though such representations and warranties had been made on and as of the date of the Closing.

7

4.2.    Performance. The Company shall have performed and complied in all material respects with all covenants, agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by it on or before the Closing.

4.3.    Qualifications. All authorizations, approvals or permits, if any, of any governmental authority or regulatory body of the United States or of any state that are required in connection with the lawful issuance and sale of the Purchased Units pursuant to this Agreement shall be obtained and effective as of the Closing.

4.4.    Proceedings and Documents. All company and other proceedings in connection with the transactions contemplated at the Closing and all documents incident thereto shall be reasonably satisfactory in form and substance to the Purchaser, and the Purchaser (or its counsel) shall have received all such counterpart original and certified or other copies of such documents as reasonably requested.

5.    Conditions of the Company's Obligations at the Closing. The obligations of the Company to the Purchaser under this Agreement are subject to the fulfillment, on or before the Initial Closing, of each of the following conditions, unless otherwise waived:

5.1.    Representations and Warranties. The representations and warranties of the Purchaser contained in Section 3 shall be true and correct in all material respects on and as of the Closing with the same effect as though such representations and warranties had been made on and as of the Closing.

5.2.    Performance. All covenants, agreements and conditions contained in this Agreement to be performed by the Purchaser on or prior to the Closing shall have been performed or complied with in all material respects.

5.3.    Qualifications. All authorizations, approvals or permits, if any, of any governmental authority or regulatory body of the United States or of any state that are required in connection with the lawful issuance and sale of the Purchased Units pursuant to this Agreement shall be obtained and effective as of the Closing.

5.4.    LLC Agreement. The Purchaser shall have executed a counterpart signature page to the LLC Agreement.

5.5.    Proceedings and Documents. All corporate and other proceedings in connection with the transactions contemplated at the Closing and all documents incident thereto shall be reasonably satisfactory in form and substance to the Company, and the Company (or its counsel) shall have received all such counterpart original and certified or other copies of such documents as reasonably requested.

6.    Use of Proceeds. The proceeds from the sale of Purchased Units as contemplated by this Agreement shall be used by the Company for general working capital purposes.

7.    Conversion to Public Company. The Company shall use commercially reasonable efforts to effect a Conversion (as such term is defined in the LLC Agreement) of the Company in accordance with Section 9.4 of the LLC Agreement within 12 months after the Effective Date.

8.    Miscellaneous.

8.1.    Survival of Warranties. Unless otherwise set forth in this Agreement, the warranties, representations and covenants of the Company and the Purchaser contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement and the Closing.

8.2.    Transfer; Successors and Assigns. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the Parties, including transferees of any Purchased Units. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

8.3.    Governing Law; Choice of Forum. This Agreement and all acts and transactions pursuant hereto and the rights and obligations of the Parties shall be governed, construed and interpreted in accordance with the internal laws of the State of New York, without giving effect to principles of conflicts of law. Any dispute arising hereunder shall be subject to the exclusive jurisdiction of the federal and state courts located in New York, New York, and each Party hereby submits to the exclusive jurisdiction of, and waives any objection to the laying of venue in, such courts.

8.4.    Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

8.5.    Titles and Subtitles. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

8.6.    Notices. Any notice required or permitted by this Agreement shall be in writing and shall be delivered in accordance with the terms of the LLC Agreement.

8.7.    Finder's Fee. Each party represents that it neither is nor will be obligated for any finder's fee or commission in connection with the transactions contemplated by this Agreement and the other Transaction Agreements. Purchaser agrees to indemnify and to hold harmless the Company from any liability for any commission or compensation in the nature of a finder's fee arising out of this transaction (and the costs and expenses of defending against such liability or asserted liability) for which each Purchaser or any of its officers, employees, or representatives is responsible. The Company agrees to indemnify and hold harmless each Purchaser from any liability for any commission or compensation in the nature of a finder's or broker's fee arising out of this transaction (and the costs and expenses of defending against such liability or asserted liability) for which the Company or any of its officers, employees or representatives is responsible.

8.8.    <u>Fees and Expenses</u>. Each party shall pay all costs and expenses that it incurs with respect to the negotiation, execution, delivery and performance of the Transaction Agreements.

8.9.    <u>Amendments and Waivers</u>. Any term of this Agreement may be amended or waived only with the written consent of the Company, the Purchaser; provided, however, that any amendment to Section 1.2(d) shall also require the written consent of the Escrow Agent. Any amendment or waiver effected in accordance with this Section 8.9 shall be binding upon the Purchaser and each transferee of the Purchased Units, each future holder of all such securities, and the Company.

8.10.    <u>Severability</u>. If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provision shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as though such provision were so excluded and shall be enforceable in accordance with its terms.

8.11.    <u>Delays or Omissions</u>. No delay or omission to exercise any right, power or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power or remedy of such non-breaching or non-defaulting party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

8.12.    <u>Entire Agreement</u>. This Agreement, and the documents referred to herein constitute the entire agreement between the Parties pertaining to the subject matter hereof, and any and all other written or oral agreements relating to the subject matter hereof existing between the Parties are expressly canceled.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

Company:
ETRE Financial, LLC

By_____
Name:
Title:

Purchaser:
ETR Investors Holdings LLC

By_____
Name:
Title:

Acknowledged and agreed
solely for purposes of being bound
by Section 1.2(d) of this Agreement:

Reed Smith LLP

By:_____
Name:
Title:

*[Signature Page To Unit Purchase Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

Company:
ETRE Financial, LLC

By_____
Name:
Title:


Purchaser:
ETR Investors Holdings LLC

By_____
Name: Sol Mayer
Title: Sole Member of its Manager


Acknowledged and agreed
solely for purposes of being bound
by Section 1.2(d) of this Agreement:

Reed Smith LLP

By:_____
Name:
Title:

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

Company:
ETRE Financial, LLC

By_____
Name:
Title:

Purchaser:
ETR Investors Holdings LLC

By_____
Name:
Title:

Acknowledged and agreed
solely for purposes of being bound
by Section 1.2(d) of this Agreement:

Reed Smith LLP

By:_____
Name: Steven Cooper
Title: Partner

EXHIBIT AA

## FOUNDER DEBT FOR EQUITY EXCHANGE AGREEMENT

THIS FOUNDER DEBT FOR EQUITY EXCHANGE AGREEMENT (this "Agreement") is made and entered into this _24th_ day of July, 2014 (the "Effective Date") by and among ETRE Financial, LLC, a Delaware limited liability company (the "Issuer") and Scott Panzer, a _Connecticut_ resident ("Founder").

WHEREAS, the Founder made a series of loans dating from February 17, 2014 to June 5, 2014 to Issuer in the aggregate principal amount of Two Hundred Seventy-Five Thousand Dollars ($275,000) (collectively, the "Loan"), and immediately prior to the Effective Date the entire principal amount of such Loan remain outstanding; and

WHEREAS, Founder desires to exchange the Loan for units of limited liability company interests in the Issuer on the terms and subject to the conditions contained in this Agreement.

NOW THEREFORE, in consideration of the foregoing and the mutual covenants and agreements contained in this Agreement, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, intending to be legally bound hereby, the parties agree as follows:

## ARTICLE I
## EXCHANGE

1.1     Transfer and Exchange.  The Issuer and the Founder hereby acknowledge and agree that the Loan is hereby cancelled, and the Issuer shall cause its books and records to reflect the issuance 11,000 units of limited liability company interests in the Issuer (the "Units") to the Founder or his designee, SMP Realty NM LLC.  To the extent a promissory note or other instrument acknowledging the Loan was issued, Founder shall promptly return such note or instrument to the Company for cancellation.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES OF THE ISSUER

2.1     Organization and Authority.  The Issuer is a corporation duly organized, validly existing, and in good standing under the laws of the state of Delaware.  The Issuer has all requisite power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby.  All necessary action required to have been taken by or on behalf of the Issuer by applicable law, its Certificate of Formation or otherwise to authorize (a) the approval, execution, and delivery of this Agreement on behalf of the Issuer, and the agreements, certificates, and other documents contemplated by this Agreement and (b) the performance by the Issuer of its obligations under this Agreement and the consummation of the transactions contemplated by this Agreement has been taken.  This Agreement and the other Transaction Documents constitute valid and binding agreements of the Issuer, enforceable against it in accordance with their terms except (y) as the same may be limited by applicable bankruptcy, insolvency, moratorium or similar laws of general application relating to or affecting creditors' rights and (z) for the limitations imposed by general principles of equity.

2.2   Validity of Units.  The Units have been duly and validly authorized, and when issued and delivered in exchange for the Loans, will be duly and validly issued, fully paid and non-assessable.  Upon surrender of the Cancellation Documentation and delivery of the Units in accordance with this Agreement, the Founder will have good and marketable title to the Units, free and clear of any liens, encumbrances, security interest, equities and claims whatsoever.

2.3   Offering of the Units.  The offer, sale and issuance of each of the Units pursuant to this Agreement do not require registration of such securities under the United States Securities Act of 1933, as amended ("Securities Act") or registration or qualification under any applicable state "blue sky" or securities laws (or if so required, has been so registered or qualified).

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE FOUNDER

Founder hereby represents and warrants as follows:

3.1   Investment Representation.  The Units are being acquired for Founder's own account, for investment, and not with a present view to, or for resale in connection with, a distribution or public offering of the Units within the meaning of the Securities Act of 1933, as amended, (the "Securities Act") or applicable state securities laws.

3.2   Transfer Restrictions.  Founder understands and acknowledges that the Units have not been registered under the Securities Act, or qualified under any state securities law.  Founder understands that the resale of the Units may be restricted indefinitely unless a subsequent disposition is registered under the Securities Act and registered under any state securities law or is exempt from such registration.

3.3   Authority.  Founder has all requisite power and authority to execute and deliver this Agreement and to consummate the transaction contemplated by this Agreement.  This Agreement constitutes a valid and binding agreement of Founder, enforceable against him in accordance with its terms except (y) as the same may be limited by applicable bankruptcy, insolvency, moratorium or similar laws of general application relating to or affecting creditors' rights and (z) for the limitations imposed by general principles of equity.

3.4   Good Title to Exchanged Portion.  Founder is the lawful owner of his Loan and holds the Loan and has good title to the Loan, free and clear of all liens, claims, and encumbrances of any kind.

## ARTICLE IV
## MISCELLANEOUS

4.1   Governing Law.  This Agreement shall be governed by the laws of the State of New York, without regard to its conflicts of laws principles.

4.2   Survival.  All representations, warranties, covenants and agreements contained herein or made in writing by or on behalf of any party to hereto or thereto in connection herewith shall survive the execution and delivery of this Agreement and any transfer of the Units, and shall continue in full force and effect thereafter.

2

4.3     Modification, Waiver in Writing.   No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, or consent or waiver referred to herein or consent to any departure by Issuer therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.

4.4     Delay Not a Waiver.  Neither any failure nor any delay on the part of a Founder in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege.

4.5     Binding Effect.  This Agreement is binding upon and inures to the benefit of the parties to this Agreement and their respective permitted successors and assigns.

4.6     Entire Agreement.  This Agreement, and any documents delivered by the parties in connection with this Agreement constitute the entire agreement among the parties with respect to the subject matter contained herein and therein and supersede and cancel all prior discussions, agreements, and understandings between the parties, written, oral, or implied with respect to the subject matter hereof and thereof.

4.7     Severability.   Wherever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is prohibited by or invalid under applicable law, such provision will be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

4.8     Counterparts.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together will be deemed to constitute one and the same instrument.

*[Signature Page Follows]*

14010764v.2

IN WITNESS WHEREOF, the Issuer and the Founder have executed and delivered this Agreement as of the date first written above.

**ISSUER:**

ETRE FINANCIAL, LLC

By: _____

Name: _____

Its: _____

**FOUNDER:**

_____

Scott Panzer

4

14010764v.1

Thank you.

*Jesse Stein*
**ETRE** Financial
212.596.7225 xt. 2
js@etrefinancial.com

EXHIBIT AC

## NOTICE OF MEETING OF MANAGERS

## ETRE FINANCIAL LLC

August 2, 2014

Please take notice that pursuant to the provisions of Section 6.5 (b) of the Operating Agreement of ETRE FINANCIAL, LLC the undersigned, being one of the Managers of the Company, hereby calls a Meeting of the Board on Thursday, August 7th, 2014 at 11:30 AM at the offices of Jacob Frydman, 60 Broad Steet, 34th Floor, New York, NY 10004.

The Meeting shall address the documents sent to the undersigned by the Company and received on August 2, 2014, including:

A proposed operating agreement;
A proposed Agreement of Merger;
A proposed Unit Purchase Agreement;
A proposed term sheet; and
Several proposed actions of the board

and any and all other business as may come before the board.

These documents arrived without any cover letter or other information describing the purpose therefore or the intended transactions. Moreover, these proposed agreements require unanimous consent of the Managers pursuant to the terms of the Operating Agreement of the Company. The undersigned has not been kept informed of the proposed transactions, and has previously advised of his election **not** to support a prior version of these transactions. This meeting is being called so that all board members will be provided with sufficient information about the proposed transactions so that the board, and each board member, may make an informed decision as to whether to support or vote against the proposed transactions.

Section 6.5 (b) provides as follows:

Meetings of the Board or a Board committee shall be held whenever called by at least one (1) Manager. Notice of the day, hour and place of holding of each meeting of the Board or any meeting of a Board committee shall be given to each Manager or committee member by email or any other method under Article 11, at least seventy-two (72) hours before the meeting. Unless otherwise indicated in the notice thereof, any and all business may be transacted at any such meeting. At any meeting at which every Manager or committee member shall be present, even though without any notice, any business may be transacted.

Very truly yours,

Jacob Frydman, Manager