UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------X

WINTER INVESTORS, LLC, *et al.*,

                              Plaintiffs,

                v.

SCOTT PANZER, *et al.*,

                        Defendants.

---------------------------------------------------X

14 Civ. 6852 (KPF)

OPINION AND ORDER

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: <u>August 27, 2015</u> |

KATHERINE POLK FAILLA, District Judge:

      This action was precipitated by an intracompany squabble and eventual corporate reorganization of ETRE Financial, LLC ("Old ETRE") that occurred in July 2014. Specifically, Plaintiff Jacob Frydman, an Old ETRE board member, alleges that in July 2014, Defendants Scott Panzer, Paul Frischer, and Jesse Stein, the other Old ETRE board members, sought an investment from Defendant Sol Mayer in order to keep Old ETRE afloat. Old ETRE's 2012 Limited Liability Company Agreement (the "Operating Agreement"), however, required unanimous consent of the board to accept such an investment, and Frydman's opposition prevented, at least temporarily, Old ETRE from getting into business with Mayer. To circumvent Frydman's inherent veto power and obtain the funding they desired, Defendants engineered a merger of Old ETRE into a company bankrolled by Mayer — ETRE Financial Holdings, LLC — which Defendants promptly renamed ETRE Financial, LLC ("New ETRE").

Significant to the instant motions, the Operating Agreement contains an arbitration clause requiring that "any controversy or claim arising out of or relating to" the Operating Agreement "be settled by arbitration."  Defendants have moved pursuant to the Federal Arbitration Act (the "FAA"), 9 U.S.C. §§ 1-14, to compel Plaintiffs to arbitrate this dispute, which includes claims for breach of contract, common law fraud, conversion, breach of fiduciary duty, intentional interference with contractual rights, tortious interference with prospective business relations, and securities fraud under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), Pub. L. 73-291, 48 Stat. 881.  Plaintiffs counter that the arbitration clause is not binding because Old ETRE, and by extension its Operating Agreement, ceased to exist or have any legal force when the merger was completed; because Defendants have repudiated or waived their right to arbitrate under the Operating Agreement; and because performance under the Operating Agreement has been rendered impossible as a result of Defendants' conduct.  For the reasons set forth in the remainder of this Opinion, Defendants' motion to compel is granted in part and denied in part.

## BACKGROUND[1]

### A.   Factual Background

### 1.   The Formation of Old ETRE

In August 2012, Plaintiff Frydman and Defendants Panzer, Frischer, Stein, and Eli Verschleiser (collectively, the "Principals") formed Old ETRE, with the goal of creating a "Real Estate Liquidity Exchange." (Am. Compl. ¶¶ 44, 49). Specifically, the Principals hoped to create "an efficient liquid marketplace where large institutional investors as well as small retail investors [could] purchase partial ownership interests in a particular property (the 'shares'), which shares [would be] trade[d] on the exchange[.]" (*Id.* at ¶ 45). Plaintiffs allege that "[t]he platform would be the first to allow investors to invest in

---

[1]   The facts contained in this Opinion are drawn from the Complaint ("Am. Compl." (Dkt. #40)) and the Operating Agreement attached thereto (*id.*, Ex. C), and are taken as true for purposes of the pending motions.

Courts generally construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest. *See Cruz* v. *Gomez*, 202 F.3d 593, 597 (2d Cir. 2000). "Here, however, Plaintiff [Frydman] is an attorney, and is thus not entitled to liberal construction of his pleadings." *McNaughton* v. *de Blasio*, No. 14 Civ. 221 (KPF), 2015 WL 468890, at *4 (S.D.N.Y. Feb. 4, 2015) (citing *Erickson* v. *Pardus*, 551 U.S. 89, 94 (2007); *Tracy* v. *Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010); *Holtz* v. *Rockefeller & Co.*, 258 F.3d 62, 82 n.4 (2d Cir. 2001)). Moreover, Plaintiff Frydman's company, Winter Investors, LLC, is represented by counsel in this litigation, and the Court therefore has even less reason to construe liberally the pleadings and briefs submitted jointly by Plaintiffs.

Motions to compel arbitration have been filed by two groups of Defendants: Verschleiser, Mayer, and their respective companies (collectively, the "Verschleiser-Mayer Defendants") (Dkt. #48-49); and Old ETRE, New ETRE, Frischer, Stein, Panzer, and their respective companies (collectively, the "Frischer-Stein Defendants") (Dkt. #50-51). Separately, Defendant LH Financial ("LH") has filed a motion to dismiss for failure to state a claim. (Dkt. #66-67). For convenience, the memoranda of law in support of the respective motions to dismiss will be referred to as "Verschleiser-Mayer Br." (Dkt. #49); "Frischer-Stein Br." (Dkt. #51); and "LH Br." (Dkt. #67). Plaintiffs' opposition to the motions to compel arbitration will be referred to as "Pl. Opp." (Dkt. #59), and their opposition to the motion to dismiss will be referred to as "Pl. Opp. MTD" (Dkt. #70). Reply briefs will be referred to as "Verschleiser-Mayer Reply" (Dkt. #62); "Frischer-Stein Reply" (Dkt. #63); and "LH Reply" (Dkt. #71).

individual commercial real estate assets (e.g., a particular office building) by purchasing shares of those assets on a national stock exchange." (*Id.* at ¶ 49). On August 15, 2012, the Principals executed the Operating Agreement, which set forth the rights and responsibilities of Old ETRE's Members, Managers, and Officers. (*Id.* at ¶ 50). Pursuant to the Operating Agreement, each of these five Principals contributed capital through his respective company in return for membership units of Old ETRE; their five companies — Winter Investors, LLC ("Winter Investors"); EVE, LLC ("EVE"); Frischer Kranz, Inc. ("Frischer Kranz"); JS3 Alternative Investments, LLC ("JS3"); and SMP Realty NM, LLC ("SMP") — became the sole Members of Old ETRE. (*Id.* at ¶ 52).[2] Frydman, Panzer, Frischer, and Stein were established as the four Managers and board members of Old ETRE, and Frischer was also named the Chief Executive Officer of Old ETRE. (*Id.* at ¶¶ 19, 47, 51, 63).

### 2.    The Operating Agreement

The Operating Agreement requires the unanimous consent of the four board members before Old ETRE could "incur[] … any debt obligations," "issu[e] … any Units or other equity securities," "admi[t] [any] additional Members," or make any "modification or amendment" to the Operating Agreement. (Am. Compl. ¶ 64 (citing Section 6.12 of the Operating Agreement)). In contrast, with respect to a merger transaction, the Operating Agreement requires unanimous consent only where, as a result of the merger,

---

[2]    The individuals contributed through their corporate entities as follows:  Frydman through Winter Investors; Verschleiser through EVE; Frischer through Frischer Kranz; Panzer through SMP; and Stein through JS3.  (*See* Am. Compl. ¶¶ 17-24, 52).

the Principals "hold in the aggregate less than a majority of the outstanding voting equity securities of the surviving entity immediately after" the merger takes place.  (*Id.*).

Section 14.15 of the Operating Agreement, entitled "Termination of Agreement," provides in relevant part: "Upon the consummation of ... a merger or consolidation in which the Members of the Company immediately prior to such merger or consolidation do not own at least a majority of the Capital Securities of the surviving entity . . . (each a 'Termination Event'), ... all rights and Obligation of the parties under this Agreement shall terminate immediately and be of no further effect."  (Am. Compl. ¶ 211).

The Operating Agreement also includes a broadly-worded agreement to arbitrate any disputes that might arise:

> In the event of *any controversy or claim arising out of or relating to this Agreement, or the breach thereof*, the parties to such controversy or claim shall first use their reasonable best efforts in good faith to resolve such dispute among themselves.  If they are unable to resolve the dispute within thirty (30) days after any party has first notified the others of the dispute, then the controversy or claim shall be settled by arbitration administered by JAMS [Judicial Arbitration and Mediation Services, Inc.] and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

(Operating Agreement § 14.13 (emphasis added)).

### 3.    Frischer's Employment Agreement

In addition to alleging various breaches of the Operating Agreement, Plaintiffs also allege that Frischer breached his employment agreement with

Old ETRE. (Am. Compl. ¶¶ 396-98).[3] As with the Operating Agreement, Frischer's employment agreement contains a broadly-worded arbitration clause:

> In the event of *any dispute or claim relating to or arising out of this Agreement or any other agreement between the parties, or your employment* or termination of employment with the Company, all parties to this Agreement agree that all such disputes shall be fully and finally resolved by binding arbitration conducted by the American Arbitration Association in New York, New York under its Commercial Arbitration Rules.

(Am. Compl., Ex. B at 5 (emphasis added)).

### 4.   The Merger and Formation of New ETRE

By early 2014, Old ETRE was facing financial difficulties, which Plaintiffs ascribe to "Frischer and Stein's negligence and/or ineptitude." (Am. Compl. ¶ 161; *see generally id.* at ¶¶ 162-74). On June 11, 2014, Stein visited Frydman's office and informed him for the first time that Old ETRE had received an offer from Sol Mayer and his company, LH Financial ("LH"), to invest $1.6 million into Old ETRE. (*Id.* at ¶ 175). Stein also informed Frydman that Old ETRE had incurred a series of debts in favor of Defendants Panzer and Frischer — debts the company planned to convert into equity securities. (*Id.*).

During this same time, Frischer proposed various amendments to the Operating Agreement. (Am. Compl. ¶¶ 184-88). Specifically, Frischer proposed amendments that would have removed board member unanimity requirements

---

[3]     Frischer's June 1, 2012 employment agreement was actually with United Realty Partners, LLC, a joint venture between Frydman and Verschleiser; a copy of the agreement is included as an exhibit to the Amended Complaint. (Am. Compl., Ex. B).

for particular transactions, added Mayer as a Manager and board member of Old ETRE, and added Mayer's corporate entity, ETR Investor Holdings, LLC ("ETR") as a Member of Old ETRE. (*Id.*). These proposed changes, Plaintiffs allege, would have diluted their interest in Old ETRE by $3,238,269.00. (*Id.* at ¶ 185). Plaintiffs also allege that Verschleiser was the driving force behind the proposed Mayer investment and the other changes made or proposed by Stein and Frischer. (*See id.* at ¶¶ 1-6, 183-84). According to Plaintiffs, Verschleiser was motivated by both a specific desire to dilute Plaintiffs' ownership interest in Old ETRE, and a more general desire to cause harm to Frydman's business ventures wherever possible. (*See id.*).

Plaintiffs allege that all of the proposed changes would have required Frydman's consent under the Operating Agreement. (Am. Compl. ¶ 190). On June 17, 2015, Frydman voted against the proposals, and expressed his dissent from those actions (such as the assumption of debt) that had already taken place without his consent. (*Id.*). That same day, Stein "ma[d]e clear" to Frydman that "the alternative to bringing capital into the business would be shutting down the company on Monday[, with] no liquidation value." (*Id.* at ¶ 191). Frydman was unmoved.

To circumvent Frydman's veto power, on July 24, 2015, Defendants relied on a different provision of the Operating Agreement to merge Old ETRE with ETRE Financial Holdings, LLC — a company funded by Mayer. (*See* Am. Compl. ¶ 198). The goal of this merger was clear: to effect essentially all of the actions (including the receipt of Mayer's cash infusion, and the addition of

Mayer as board member) that Defendants originally sought to effect through the amendment of the Operating Agreement and through approval by Old ETRE's board.  (*See id.* at ¶¶ 197, 204).  Defendants would later reclaim Old ETRE's moniker, ETRE Financial LLC, as the formal name of the post-merger company referred to here as New ETRE.  (*Id.* at ¶ 233).

On August 4, 2014, Frydman attempted to call a meeting of the board of Old ETRE, but was informed by Frischer that Old ETRE no longer existed and that no one would be attending Frydman's meeting.  (Am. Compl. ¶ 210). Similarly, when Frydman attempted to exercise other powers that he believed to be available under the auspices of Old ETRE, he was informed by counsel for Defendants that, "[a]s part of the merger, ETRE Financial Holdings, LLC changed its name to ETRE Financial, LLC …, adopted a new Operating Agreement, and [O]ld ETRE ceased to exist."  (*Id.* at ¶ 232).

Plaintiffs assert that the merger that transformed Old ETRE into New ETRE was *ultra vires* because it occurred without Frydman's approval.  (Am. Compl. ¶ 203).  Plaintiffs also allege that the merger constitutes a "Termination Event" under the terms of the Operating Agreement, such that its provisions, including the arbitration clause, cease to have any effect.  (*See id.* at ¶ 214 ("As a result of the purported merger, and pursuant to Section 14.[1]5 of the … Operating Agreement, all rights and Obligation of the parties to the … Operating Agreement terminated immediately upon the filing of the certificate of merger with the Delaware Secretary of State."))  Somewhat in tension with this allegation, Frydman maintains that "[Old] ETRE continues to exist, and

8

the … Operating Agreement continues to govern the [parties'] rights, … but Defendants … specifically waived their right to seek enforcement of the arbitration agreement (or any other agreement) made in the … Operating Agreement." (*Id.* at ¶ 114).

## B.    Procedural Background

Plaintiffs initiated this action on August 22, 2014.  (Dkt. #1).  On September 29, 2014, the Verschleiser-Mayer Defendants and the Frischer-Stein Defendants each submitted a letter requesting a pre-motion conference in anticipation of moving the Court to compel arbitration.  (Dkt. #15, 16).  After receiving responsive letters from Plaintiffs (Dkt. #18, 19), the Court held a pre-motion conference on October 15, 2014.  On the same day, the Court issued a scheduling order requiring Defendants to file their motions on November 17, 2014.  (Dkt. #28).

Counsel for the Verschleiser-Mayer Defendants originally filed a notice of appearance on behalf of LH (Dkt. #25), and appeared on its behalf at the pre-motion conference.  Several weeks later, however, counsel moved to withdraw from representing LH, explaining that his firm did not, in fact, represent LH in this action.  (Dkt. #46).  Service of LH thereafter proved impracticable, and the Court granted Plaintiffs' request to effect service by alternate means.  (Dkt. #53).

On November 3, 2014, Plaintiffs filed an Amended Complaint, which added an additional 131 paragraphs and four new counts against Defendant Verschleiser.  (Am. Compl. ¶¶ 460-71).  The new allegations relate to

Verschleiser's involvement with a wholly separate business venture of Frydman's called 500 Lincoln LLC.  Plaintiffs allege that, as part of an overarching campaign of harassment, Verschleiser conspired with Scott and Warren Diamond (non-parties to the instant action) to extort and then eventually to file a baseless lawsuit against Frydman.  (*Id.* at ¶¶ 236-345). Plaintiffs also allege that the "500 Lincoln Operating Agreement … includes an arbitration agreement, [which] was *not* signed by any of the parties to [the instant] action."  (*Id.* at ¶ 340 (emphasis in original)).  Notably, on the same day Plaintiffs filed their Amended Complaint in this action, they filed a separate action in this Court against the Diamonds focusing entirely on alleged misconduct relating to the 500 Lincoln venture.  *See Frydman* v. *Diamond*, No. 14 Civ. 8741 (GHW).

After receiving an extension to file their papers (based on Plaintiffs' unexpected amendment), Defendants filed their motions to compel arbitration on December 17, 2014.  (Dkt. #48-51).  Plaintiffs filed their opposition on January 23, 2015 (Dkt. #59), and Defendants submitted their replies on February 6, 2015 (Dkt. #62-63).

As the briefing of the motions to compel was drawing to a close, Defendant LH appeared through counsel and indicated its intent to file a motion to dismiss for failure to state a claim.  (Dkt. #61, 64).  Pursuant to a scheduling order issued by the Court, LH filed its motion to dismiss on March 13, 2015 (Dkt. #66-67); Plaintiffs filed their opposition on April 10, 2015

(Dkt. #70); and LH filed its reply on April 21, 2015 (Dkt. #71).  All motions are now fully briefed.

## DISCUSSION

### A.    Applicable Law

The FAA "'creates a body of federal substantive law of arbitrability applicable to arbitration agreements … affecting interstate commerce.'" *Ragone* v. *Atl. Video of Manhattan Ctr.*, 595 F.3d 115, 121 (2d Cir. 2010) (quoting *All. Bernstein Inc. Research & Mgmt., Inc.* v. *Schaffran*, 445 F.3d 121, 125 (2d Cir. 2006)).  "[E]nacted in 1925[,] in response to widespread judicial hostility to arbitration agreements," *AT&T Mobility LLC* v. *Concepcion*, 131 S. Ct. 1740, 1745 (2011), the FAA provides, in relevant part:

> A written provision in any … contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction … shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.

The Supreme Court and the Second Circuit have consistently recognized that the FAA embodies a "liberal federal policy favoring arbitration agreements." *CompuCredit Corp.* v. *Greenwood*, 132 S. Ct. 665, 669 (2012); *see also AT&T Mobility LLC*, 131 S. Ct. at 1750 ("[O]ur cases place it beyond dispute that the FAA was designed to promote arbitration"; noting that the Act "embod[ies] a national policy favoring arbitration, and a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary" (internal citations and quotation marks

omitted)); *Sutherland* v. *Ernst & Young LLP*, 726 F.3d 290, 295 (2d Cir. 2013) ("In analyzing this provision of the FAA, the Supreme Court has remarked on several occasions that it establishes a liberal federal policy favoring arbitration agreements." (internal quotation marks omitted)).  Central to this policy is the tenet that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  *Citigroup, Inc.* v. *Abu Dhabi Inv. Auth.*, 776 F.3d 126, 130 (2d Cir. 2015) (citation omitted).  This tenet remains true "even when the claims at issue are federal statutory claims, unless the FAA's mandate has been 'overridden by a contrary congressional command.'" *CompuCredit Corp.*, 132 S. Ct. at 669 (quoting *Shearson/Am. Express Inc.* v. *McMahon*, 482 U.S. 220, 226 (1987)).

It is settled law that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  *Howsam* v. *Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (citation omitted).  "The question whether the parties have submitted a particular dispute to arbitration, *i.e.*, the '*question of arbitrability*,' is 'an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise.'"  *Schneider* v. *Kingdom of Thailand*, 688 F.3d 68, 71 (2d Cir. 2012) (quoting *Howsam*, 537 U.S. at 83) (emphasis in original).  To that end, Section 4 of the FAA allows "a party to an arbitration agreement [to] petition a United States district court for an order directing that 'arbitration proceed in the manner provided for in such agreement.'"  *Stolt-Nielsen S.A.* v. *AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010) (quoting 9 U.S.C. § 4).

In order to determine whether all or part of an action should be sent to arbitration, a court must conduct the following inquiries:

> [F]irst, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then decide whether to stay the balance of the proceedings pending arbitration.

*JLM Indus., Inc.* v. *Stolt-Nielsen SA*, 387 F.3d 163, 169 (2d Cir. 2004) (citation omitted).  With respect to the first inquiry, the Second Circuit has recognized a number of theories under which non-signatories may be bound to the arbitration agreements of other parties: "[i] incorporation by reference; [ii] assumption; [iii] agency; [iv] veil-piercing/alter ego; and [v] estoppel." *Thomson-CSF, S.A.* v. *Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995); *accord Magi XXI, Inc.* v. *Stato della Citta del Vaticano*, 714 F.3d 714, 723 n.9 (2d Cir. 2013).

Under principles of estoppel, a non-signatory to an arbitration agreement may compel a signatory to that agreement to arbitrate a dispute where a careful review of "the relationship among the parties, the contracts they signed ..., and the issues that had arisen" among them discloses that "the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." *Choctaw Generation Ltd. P'ship* v. *Am. Home Assurance Co.*, 271 F.3d 403, 406 (2d Cir. 2001) (internal quotation marks and citation omitted).  Additionally, "there must be a

relationship among the parties of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute with the adversary which is not a party to the arbitration agreement." *Sokol Holdings, Inc.* v. *BMB Munai, Inc.*, 542 F.3d 354, 359 (2d Cir. 2008).

"In the context of motions to compel arbitration … the court applies a standard similar to that applicable for a motion for summary judgment." *Bensadoun* v. *Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003); *accord Hines* v. *Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010) (summary order). "The party seeking to stay the case in favor of arbitration bears an initial burden of demonstrating that an agreement to arbitrate was made." *Hines*, 380 F. App'x at 24. Conversely, "[a] party to an arbitration agreement seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid." *Harrington* v. *Atl. Sounding, Co., Inc.*, 602 F.3d 113, 124 (2d Cir. 2010).

## B.   Analysis

To resolve the instant motions in an orderly manner, it is necessary to uncouple and regroup Plaintiffs' claims as follows: (i) Counts 1 through 7 and 9 through 22, which relate to the Operating Agreement and/or the merger with Old ETRE, brought against the Defendant Principals and Members of Old ETRE, will be referred to as the "Signatory Claims";[4] (ii) Counts 11 through 17,

---

[4]     Defendants Verschleiser, Frischer, Stein, and Panzer are Principals of Old ETRE; Defendants EVE, Frischer Kranz, SMP, and JS3 are Members.

a subset of the counts that relate to the Operating Agreement and/or the merger with Old ETRE, brought against Defendants Mayer and ETR, will be referred to as the "Non-Signatory Claims"; (iii) Count 8 against Frischer, alleging a violation of his employment agreement, will be referred to as the "Employment Agreement Claim"; (iv) Counts 23 through 26, which are brought against Verschleiser alone and relate to 500 Lincoln, will be referred to as the "500 Lincoln Claims"; and, finally, (v) Counts 11 through 17, brought against Defendant LH, will be referred to as the "LH Claims." (*See* Am. Compl. ¶¶ 365-471).

### 1.      The Motions to Compel Arbitration

The Verschleiser-Mayer Defendants and the Frischer-Stein Defendants argue that the Signatory Claims should be dismissed in favor of arbitration because: (i) the parties' agreement to arbitrate disputes relating to the Operating Agreement was broad and unequivocal; (ii) the Signatory Claims all "arise out of" or "relate to" the Operating Agreement; and (iii) each of the Signatory Claims, including the single federal cause of action, is arbitrable. (Verschleiser-Mayer Br. 9-12; Frischer-Stein Br. 12-13).

With respect to the Employment Agreement Claim, the Frischer-Stein Defendants argue that this claim must be arbitrated based on a similarly unequivocal arbitration clause contained within Frischer's employment agreement, or alternatively, if the Operating Agreement supersedes his employment agreement, based on the Operating Agreement's arbitration clause. (Frischer-Stein Br. 11-12; Frischer-Stein Reply 2).

As to the Non-Signatory Claims, the Verschleiser-Mayer Defendants argue that these claims too should be dismissed in favor of arbitration because they are "intertwined" with claims that are subject to mandatory arbitration. (Verschleiser-Mayer Br. 13-17).  Additionally, in the event the Court were to determine that some claims were arbitrable and some were not, the Verschleiser-Mayer Defendants contend that this Court should stay the litigation pending disposition of the arbitrable claims.  (*Id.* at 17-18).  Finally, the Verschleiser-Mayer Defendants argue that the 500 Lincoln Claims are "unrelated," and thus do not impact the arbitrability of the Signatory and Non-Signatory Claims; that they are impermissibly duplicative of claims brought in another lawsuit; and that they are subject to a separate arbitration clause.  (*Id.* at 6-8, 12-13).

Plaintiffs do not directly contest these arguments.  (*See generally* Pl. Opp.; *see also* Verschleiser-Mayer Reply 1).  Instead, Plaintiffs argue that the Court cannot compel arbitration because the arbitration clauses in the Operating Agreement and in Frischer's employment agreement are unenforceable.  Specifically, Plaintiffs argue that (i) there is no enforceable arbitration agreement with respect to Frischer's employment agreement because this agreement was superseded upon execution of the Operating Agreement (Pl. Opp. 11-12); (ii) there is no enforceable arbitration agreement with respect to any of the other claims because all obligations under the Operating Agreement extinguished upon the occurrence of a "Termination Event," i.e., the merger (*id.* at 7-11); (iii) Defendants cannot rely upon the

16

arbitration clause in the Operating Agreement because they have repudiated it (*id.* at 12-14); and (iv) somewhat relatedly, performance under the Operating Agreement, including arbitration of any disputes that arise, has been rendered "impossible" based on Defendants' repudiation of the agreement (*id.* at 14-16).

The Verschleiser-Mayer Defendants and the Frischer-Stein Defendants challenge Plaintiffs' arguments on their merits. They also contend that an arbitrator, and not this Court, must determine whether the agreement to arbitrate has been terminated, repudiated, or otherwise rendered unenforceable. (Verschleiser-Mayer Reply 2-6; Frischer-Stein Reply 4).[5]

### a. The Motion to Compel Arbitration Is Granted as to the Signatory Claims

Beginning with the Signatory Claims, the Court agrees with the Verschleiser-Mayer Defendants and the Frischer-Stein Defendants that the Signatory Claims are subject to the mandatory arbitration clause contained in the Operating Agreement.

First, there is no dispute that the parties involved in the Signatory Claims — the Principals who signed the Operating Agreement and the related corporate Members — agreed to arbitrate. Second, the Signatory Claims, which boil down to assorted allegations of contractual breaches and tortious

---

[5]     Defendants do not argue — and the Court therefore does not consider — whether, by incorporating the JAMS arbitration rules into the Operating Agreement, "the parties ... committed gateway questions of arbitrability to the arbitrator." *Emilio* v. *Sprint Spectrum L.P.*, 508 F. App'x 3, 5 (2d Cir. 2013) (summary order) (finding that "the parties clearly and unmistakably delegated questions of arbitrability to the arbitrator" by referencing the JAMS rules); *see Contec Corp.* v. *Remote Solution Co.*, 398 F.3d 205, 208 (2d Cir. 2005) ("[W]hen, as here, parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator.").

conduct involving Old ETRE's management and corporate restructuring, are, unquestionably, "controvers[ies] … arising out of or relating to" the Operating Agreement.  There is simply no way to adjudicate any of the Signatory Claims without interpreting the Operating Agreement.  The interpretation of Section 6.12 of the Operating Agreement, which requires unanimous consent of the board for certain transactions, is integral to each of the Signatory Claims, and very much in dispute; the interpretation of Section 14.15, which determines the effect of a merger on the terms of the Operating Agreement, is equally significant and similarly controverted.  Third, turning to the sole federal claim asserted, the Court agrees with Defendants that Plaintiffs' claim under Section 10(b) of the Exchange Act, is arbitrable.  *Shearson/American Express*, 482 U.S. at 225-26; *Coenen* v. *R. W. Pressprich & Co.*, 453 F.2d 1209, 1214 (2d Cir. 1972); *First Eagle Sogen Funds, Inc.* v. *Bank for Int'l Settlements*, No. 01 Civ. 0087 (RO), 2001 WL 1150323, at *2 (S.D.N.Y. Sept. 28, 2001) ("[I]t is well-settled that Exchange Act claims are arbitrable[.]").  Accordingly, the Court finds that each of the Signatory Claims must be arbitrated.

The Court takes no position on the merits of Plaintiffs' arguments that the Operating Agreement has been terminated, repudiated, or rendered impossible to perform, nor on Defendants' arguments in opposition: These are issues for the arbitrator to resolve.  *See, e.g.*, *ACEquip Ltd.* v. *Am. Eng'g Corp.*, 315 F.3d 151, 155 (2d Cir. 2003) ("[T]he arbitrator decides issues like expiration or termination, which involve the interpretation of other contractual provisions[.]"); *Mulvaney Mech., Inc.* v. *Sheet Metal Workers Int'l Ass'n, Local 38*,

351 F.3d 43, 46 (2d Cir. 2003) ("[T]he issue of repudiation most closely resembles the defenses to arbitrability ... that the Supreme Court listed as questions properly decided by arbitrators."); *Island Territory of Curacao* v. *Solitron Devices, Inc.*, 489 F.2d 1313, 1320 (2d Cir. 1973) ("[The] argument ... that the contract terminated as a matter of law by reason of impossibility of performance .... was, under the broad arbitration clause, initially a question for the arbitrators."); *Philippe* v. *Red Lobster Restaurants LLC*, No. 15 Civ. 2080 (VEC), 2015 WL 4617247, at *3 (S.D.N.Y. Aug. 3, 2015) (refusing to address argument that the defendants' "non-compliance ... rendered [the parties'] agreement [to arbitrate] void," because "[t]he question of whether Defendants have complied ... is a question for the arbitrator in the first instance"); *Carpet et Cetera, Inc.* v. *Forde*, No. 06 Civ. 6993 (BSJ), 2006 WL 2959063, at *4 (S.D.N.Y. Oct. 16, 2006) ("[T]he means by which an agreement was repudiated does not transform the issue from one which is properly decided by the arbitrators to one reserved for the courts.").

Additionally, if the Court were to delve into any of these issues, it would be passing judgment on the central issues of this case:  the propriety of Defendants' actions as measured by their obligations under Section 6.12 of the Operating Agreement, the validity of the merger under the same provision, and the effect of the merger under Section 14.15 of the Operating Agreement. These "questions which grow out of the dispute and bear on its final disposition are presumptively *not* for the judge, but for an arbitrator, to decide." *Howsam*, 537 U.S. at 84 (internal quotation marks and citation omitted, emphasis in

original).  Moreover, Plaintiffs' arguments do not call into question whether this particular dispute is arbitrable; rather, they probe whether Defendants, by virtue of their obligations under Operating Agreement and their alleged conduct in contravention of that Agreement, have waived their right to arbitrate. Plaintiffs are, in other words, asserting a defense against what otherwise is a facially arbitrable dispute.  By compelling arbitration here, the Court heeds the Supreme Court's instruction that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability."  *Moses H. Cone Mem'l Hosp.* v. *Mercury Const. Corp.*, 460 U.S. 1, 24-25 (1983); *see also Benihana of Tokyo, LLC* v. *Benihana Inc.*, 73 F. Supp. 3d 238, 248 (S.D.N.Y. 2014) ("[W]aiver is presumptively an issue for the arbitrator to decide[.]").[6]

### b.   The Motion to Compel Arbitration Is Granted as to the Employment Agreement Claim

The Court next turns to Plaintiffs' Employment Agreement Claim, in which they allege that Frischer's conduct constituted a breach of his

---

[6]     There is an exception to the rule that waiver is to be decided by the arbitrator:  "[A] district court may reach the question of waiver whenever a party seeking arbitration has engaged in any prior litigation" regarding the dispute.  *Doctor's Assocs., Inc.* v. *Distajo*, 66 F.3d 438, 456 n.12 (2d Cir. 1995); *accord Bell* v. *Cendant Corp.*, 293 F.3d 563, 569 (2d Cir. 2002); *see also LG Electronics, Inc.* v. *Wi-LAN USA, Inc.*, No. 13 Civ. 2237 (RA), 2014 WL 3610796, at *3 (S.D.N.Y. July 21, 2014) ("Traditionally, courts, not arbitrators, have decided claims of waiver of the right to arbitrate based on participation in protracted litigation.").  This exception does not come into play here because this action "was in its nascent phase when [Defendants] moved to compel arbitration." *Krantz & Berman, LLP* v. *Dalal*, No. 09 Civ. 9339 (DLC), 2010 WL 2674590, at *4 (S.D.N.Y. July 2, 2010), *aff'd*, 472 F. App'x 76 (2d Cir. 2012) (summary order).

employment agreement.  The employment agreement provides, in sweeping fashion, that "any dispute or claim relating to or arising out of this Agreement or any other agreement between the parties, or your employment … shall be fully and finally resolved by binding arbitration conducted by the American Arbitration Association[.]"  (Am. Compl., Ex. B at 5).  The alleged breach of the employment agreement by Frischer, without doubt, fits comfortably within this broad framework.  Plaintiffs do not contest this.  The potential difficulty then is not whether the claim is arbitrable, but rather whether this particular arbitration clause controls in lieu of the clause found in the Operating Agreement.  This is perhaps significant, although no party to this action voices this specific concern, because the employment agreement calls for arbitration before the AAA, while the Operating Agreement calls for arbitration before JAMS.

Plaintiffs argue that the arbitration clause in Frischer's employment agreement cannot be invoked because the Operating Agreement supersedes all other agreements between the parties.  (Pl. Opp. 12).  Of course, this line of argument creates somewhat of a paradox:  On the one hand, Plaintiffs have attached to their Amended Complaint the employment agreement and allege that it has been breached; on the other hand, they argue that the employment agreement itself has been rendered a nullity by virtue of the execution of the Operating Agreement.

This tension need not detain the Court.  For the same reasons as those discussed *supra*, the Court declines to reach the issue of whether the

Operating Agreement functions to supersede or terminate Frischer's employment agreement. This is an issue that should be decided (if necessary) by an arbitrator. Nor will this Court decide whether the Employment Agreement Claim should be brought before the AAA or JAMS. "[T]he question to be resolved is not '*whether* to proceed by arbitration, but *which arbitration panel* should decide certain issues.'" *UBS Fin. Servs., Inc.* v. *W. Va. Univ. Hospitals, Inc.*, 660 F.3d 643, 655 (2d Cir. 2011) (quoting *Cent. W. Va. Energy, Inc.* v. *Bayer Cropscience LP*, 645 F.3d 267, 274 (4th Cir. 2011) (emphases in *Cent. W. Va. Energy*)). Any dispute on this issue that might arise "is far more akin to a venue dispute than a question of arbitrability, and, as such, it is appropriate for arbitral resolution." *Cent. W. Va. Energy*, 645 F.3d at 274. Accordingly, the Employment Agreement Claim must be arbitrated.

### c. The Motion to Compel Arbitration Is Denied as to the Non-Signatory Claims

The Court next turns to the Non-Signatory Claims against Mayer and ETR. The Verschleiser-Mayer Defendants argue that, while Mayer and ETR were not parties to the Operating Agreement, Plaintiffs must nonetheless arbitrate the Non-Signatory Claims because the issues raised therein are "intertwined" with the arbitrable Signatory Claims. (Verschleiser-Mayer Br. 13-15). More accurately, the Verschleiser-Mayer Defendants contend that Plaintiffs should be estopped from refusing to arbitrate. (*Id.*). The Court disagrees.

Although the Verschleiser-Mayer Defendants are correct that the issues raised in the Non-Signatory Claims are intertwined with those raised in the

Signatory Claims, this fact is not dispositive of the issue.  As the Second

Circuit explained in *Sokol Holdings*, estoppel is not warranted simply because

"a relationship … may be found among the parties to a dispute and their

dispute deals with the subject matter of an arbitration contract made by one of

them."  542 F.3d at 359.[7]  Significantly, under *Sokol Holdings*, in order to find

the Non-Signatory Claims arbitrable, the Court would need to conclude that

> the promise to arbitrate by [Plaintiffs], the [parties]
> opposing arbitration, was reasonably seen on the basis
> of the relationships among the parties as extending not
> only to [the Principals and Members], [the] contractual
> counterpart[ies], but also to [Mayer and ETR], [parties]
> that [were], or would predictably become, with
> [Plaintiffs'] knowledge and consent, affiliated or
> associated with [the Principals and Members] in such a
> manner as to make it unfair to allow [Plaintiffs] to avoid
> [their] commitment to arbitrate on the ground that
> [Mayer and ETR were] not the very [parties] with which
> [Plaintiffs] had a contract.

*Id.* at 361.

---

[7]     The Court is aware that whether Defendants can invoke a "theory of estoppel … is a
question governed by … state law[.]"  *Laumann* v. *Nat'l Hockey League*, 989 F. Supp. 2d
329, 339 (S.D.N.Y. 2013) (citing, *inter alia*, *Arthur Andersen LLP* v. *Carlisle*, 556 U.S.
624, 630-32 (2009)); *accord The Republic of Iraq* v. *BNP Paribas USA*, 472 F. App'x 11,
13-14 (2d Cir. 2012) (summary order).  The Operating Agreement is governed by New
York law (Am. Compl. ¶ 105), which recognizes estoppel as a theory that can be invoked
to compel arbitration with parties who are non-signatories.  *See Belzberg* v. *Verus Invs.
Holdings Inc.*, 21 N.Y.3d 626, 630 (2013); *Gabriel Capital, L.P.* v. *Caib Investmentbank
Aktiengesellschaft*, 814 N.Y.S.2d 66, 68 (1st Dep't 2006) ("The agreement is enforceable
by [defendant] against plaintiffs, despite the fact that [defendant] itself was not a
signatory." (citing, *inter alia*, *JLM Indus., Inc.* v. *Stolt-Nielsen SA*, 387 F.3d 163, 177-78
(2d Cir. 2004))).  Significantly, the Second Circuit's case law on this issue, as expressed
most fully in *Sokol Holdings*, is consistent with the contours of the estoppel theory
under New York law.  *See TNS Holdings, Inc.* v. *MKI Sec. Corp.*, 92 N.Y.2d 335, 340
(1998) (holding that "interrelatedness, standing alone, is not enough to subject a
nonsignatory to arbitration").

Here, nothing in the Amended Complaint (or in the Verschleiser-Mayer Defendants' briefing) suggests the inevitable or predictable intervention of Mayer and ETR into Old ETRE's operations.  As in *Sokol Holdings*, therefore, "there would be no unfairness in allowing [Plaintiffs], the victim[s] of tortious interference, to insist that, while [they] agreed to arbitrate with [the] contractual counterpart[ies] …, [they] in no way consented to extend that agreement to [Mayer and ETR,] which tortiously subverted [their] rights under the [Operating] [A]greement."  542 F.3d at 362; *see also The Republic of Iraq* v. *BNP Paribas USA*, 472 F. App'x 11, 14 (2d Cir. 2012) (summary order) (finding that "even if the contract between the [signatories] [could] give rise to third-party claims, there [was] no evidentiary basis for concluding that the [signatories] bound themselves to resolve such claims through arbitration").  Although there may be practical expediencies to having the Signatory and Non-Signatory Claims arbitrated together, this is a strategic concern for Plaintiffs; the Court will not estop Plaintiffs from refusing to arbitrate the Non-Signatory Claims if they elect to do so.

### 2. The Court Will Enter a Partial Stay

#### a. The Signatory Claims and Employment Agreement Claims Are Stayed

Where the Court diverges most from Defendants is in their assertion that this case should be dismissed in favor of arbitration.  To begin with, even if the Court concluded that *all* of Plaintiffs' claims were subject to mandatory arbitration (and they are not, as explained *supra*), the Second Circuit has recently held that the proper course would be to enter a stay.  *Katz* v. *Cellco*

24

*P'ship*, — F.3d —, No. 14-138-cv, 2015 WL 4528658, at *3 (2d Cir. July 28, 2015); *see also Arnold* v. *D'Amato*, No. 14 Civ. 6457 (PAE), 2015 WL 4503533, at *10 (S.D.N.Y. July 23, 2015) ("[C]ourts in this District that have compelled arbitration … have commonly chosen to stay district court proceedings, even where urged to dismiss them." (collecting cases)).  The Court therefore has no difficulty concluding that the arbitrable Signatory and Employment Agreement claims must be stayed.

### b.      The Non-Signatory Claims and LH Claims Are Stayed

Here, of course, the Court is also faced with the decision of whether to stay the balance of claims that Plaintiffs are not compelled to arbitrate.  The remaining claims are the Non-Signatory Claims, the 500 Lincoln Claims, and the LH Claims.  "The decision to stay the balance of the proceedings pending arbitration is a matter largely within the district court's discretion to control its docket." *Genesco, Inc.* v. *T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 856 (2d Cir. 1987) (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 20 n.23); *see also White* v. *Fitzgerald*, 393 F. App'x 804, 808 (2d Cir. 2010) (summary order) ("[T]he district court is not required to stay the litigation of the nonarbitrable claims before it on remand pending the outcome of any arbitrated claims." (collecting cases)).

A discretionary stay is particularly appropriate where there is significant factual overlap between the remaining claims and the arbitrated claims.  *See, e.g.*, *Maritima de Ecologia, S.A. de C.V.* v. *Sealion Shipping Ltd.*, No. 10 Civ. 8134 (DLC), 2011 WL 1465744, at *5 (S.D.N.Y. Apr. 15, 2011) (finding that,

even though arbitration would not prove "controlling of the action before the court," a stay was appropriate because the arbitration "will have a significant bearing on this case" (internal citations omitted)); *Moore* v. *Interacciones Global, Inc.*, No. 94 Civ. 4789 (RWS), 1995 WL 33650, at *7 (S.D.N.Y. Jan. 27, 1995) ("It is well-settled that claims are appropriately stayed when they involve common issues of fact and law with those subject to arbitration or when the arbitration is likely to dispose of issues common to claims against both arbitrating and non-arbitrating defendants."); *Midland Walwyn Capital Inc.* v. *Spear, Leeds & Kellogg*, No. 92 Civ. 2236 (LLM), 1992 WL 249914, at *2 (S.D.N.Y. Sept. 22, 1992) ("The courts in this district have consistently granted stays pending arbitration where the nonarbitrable issues overlap the arbitrable issues, thus minimizing inconsistent results and conserving judicial resources."); *Hikers Indus., Inc.* v. *William Stuart Indus. (Far East) Ltd.*, 640 F. Supp. 175, 178-79 (S.D.N.Y. 1986) ("[T]he arbitration will provide the court with insight into the issues of law and fact" and prevent "any decisions by this court on the merits of the claims ... [from] thwart[ing] the federal policy in favor of arbitration of disputes by rendering the arbitrator's interpretation ... meaningless."). In such cases, a stay is warranted in part because the prior litigation or arbitration is likely to have preclusive effect over some or all of the claims not subject to arbitration. *See Bear, Stearns & Co.* v. *1109580 Ont., Inc.*, 409 F.3d 87, 91 (2d Cir. 2005) (finding it established that, under certain conditions, "[a]n arbitration decision may effect collateral estoppel in a later

litigation or arbitration if the proponent can show with clarity and certainty that the same issues were resolved" (internal quotation marks omitted)).

With this framework in mind, the decision to stay the Non-Signatory Claims is straightforward.  Each of these claims against Mayer and ETR is brought as part and parcel of one of the Signatory Claims against the Principals and Members; in consequence, the issues that the arbitration panel will decide in resolving the Signatory Claims overlap significantly (if not entirely) with the issues that this Court would need to reach to adjudicate the Non-Signatory Claims.  The Non-Signatory Claims will accordingly be stayed.

The Court reaches the same conclusion with respect to the LH Claims, despite the fact that LH has not sought to compel arbitration of these claims. To begin with, taking the allegations in the Amended Complain as true, it would be illogical to stay claims against Mayer, and not against what is alleged to be Mayer's company, LH.  After all, to the extent that LH is alleged to have committed fraud, conversion, and other assorted economic torts, it is alleged to have done so because of Mayer's actions.  Insofar as the Amended Complaint alleges, LH has no role separate and apart from being Mayer's investment vehicle.  The LH Claims, therefore, overlap with the Signatory Claims in the precise manner that the Non-Signatory Claims against Mayer and ETR do; there is no reason to stay one set of claims and not the other.

The Court appreciates that LH believes it has strong arguments to dismiss the LH Claims.  (*See generally* LH Br.).  These arguments may be renewed promptly for the Court's consideration, either verbatim or in modified

fashion, following the arbitration proceedings.  In the meantime, LH's Claims are stayed, and its motion to dismiss the Amended Complaint is denied without prejudice.  *See Syncora Guarantee Inc.* v. *HSBC Mex., S.A.*, 861 F. Supp. 2d 252, 261 (S.D.N.Y. 2012) (denying without prejudice dispositive motions where stay of claims pending arbitration had been entered).

### 3.    The 500 Lincoln Claims Are Not Stayed

The Court cannot extend the reasoning behind stays of the other claims to the 500 Lincoln Claims.  As the Verschleiser-Mayer Defendants note, the 500 Lincoln claims against Verschleiser relate to an entirely separate business venture.  (Verschleiser-Mayer Br. 13).  Indeed, these claims appear to have been tacked on to the original Complaint in order to stymie anticipated motions to compel, or to convince the Court to accept as related Frydman's action against Scott and Warren Diamond.  Regardless of the genesis of the 500 Lincoln Claims, the fact is that they were brought before this Court, and — absent some reason to the contrary — they need to be resolved.

Almost certainly because of the eleventh-hour introduction of the 500 Lincoln Claims, the Verschleiser-Mayer Defendants do not fully address the claims in their moving papers.  For instance, while the Verschleiser-Mayer Defendants assert that the separate dispute constituting the 500 Lincoln Claims is also subject to an operating agreement with an arbitration provision, they have not provided the Court with any of the requisite information to evaluate this assertion.  (Verschleiser-Mayer Br. 13 n.8 ("these allegations … are subject to an arbitration clause")).  The Verschleiser-Mayer Defendants

28

have not established that the relevant parties to the 500 Lincoln Claims (i.e., Frydman and Verschleiser) actually agreed to arbitrate a dispute arising out of that business venture, and they have not provided enough information to permit this Court to make a threshold arbitrability determination.  (*Cf.* Am. Compl. ¶ 340 (alleging that the 500 Lincoln Operating Agreement "includes an arbitration agreement, [which] was *not* signed by any of the parties to [the instant] action" (emphasis in original)).  In the interests of judicial economy — and, again, recognizing the disruption to the original briefing schedule occasioned by the inclusion of the 500 Lincoln Claims — the Court will consider a properly supported motion to compel arbitration of the 500 Lincoln Claims, should the Verschleiser-Mayer Defendants wish to file it.

In this same vein, Defendants allude to the impropriety of Plaintiffs' amendment to include the 500 Lincoln Claims, and, more specifically, suggest that these claims are improperly before the Court while a parallel action proceeds against non-parties Scott and Warren Diamond.  (*See* Verschleiser-Mayer Br. 13 n.8; *see also* Frischer-Stein Br. 6 n.3).  But, to date, the Verschleiser-Mayer Defendants have not moved the Court to dismiss or stay these claims as duplicative.  In sum, because the 500 Lincoln Claims do not overlap with the issues raised in the arbitrable claims, and because the Verschleiser-Mayer Defendants have not provided the Court with a basis at this juncture to stay or dismiss the 500 Lincoln Claims, these claims will not be stayed.

**CONCLUSION**

For the foregoing reasons, Defendants' motion to compel arbitration is GRANTED IN PART and DENIED IN PART.

The motions to compel arbitration of the Signatory Claims and the Employment Agreement Claim are GRANTED; the motion to compel arbitration of the Non-Signatory Claims is DENIED.

The Signatory Claims, the Employment Agreement Claims, the Non-Signatory Claims, and the LH Claims are hereby STAYED pending resolution of arbitration proceedings.  In light of the stay, LH's motion to dismiss the Amended Complaint is DENIED WITHOUT PREJUDICE.  The parties shall submit a joint letter to the Court by **January 8, 2016**, and every six months thereafter, updating the Court on the status of the arbitration proceedings.

By **September 9, 2015**, the Verschleiser-Mayer Defendants shall inform the Court if they wish to file a pre-answer motion with respect to the 500 Lincoln Claims.  The Court will either set a briefing schedule (which, the Court cautions, will be expedited), or a schedule for Defendant Verschleiser's responsive pleading and discovery limited to the 500 Lincoln Claims, upon receipt of the Verschleiser-Mayer Defendants' letter.

The Clerk of Court is directed to terminate Docket Entries 48, 50, and 56.

SO ORDERED.

Dated:	August 27, 2015
	New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

30

*A copy of this Order was mailed by Chambers to:*

Jacob Frydman
60 Broad Street
34th Floor
New York, NY 10004